UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| LAMOTTA MCMAHAN, | ) |
| MAURICIO LEDESMA, | ) |
| MARILYN B. ADAMS, | ) |
| MILES N. ADKINS, | ) |
| JOSEPH K. AKINS, | ) |
| JAMES W. ALBURY SR., | ) |
| REBECCA E. ALLISON, | ) |
| THOMAS L. ALLISON, | ) |
| JEFFREY A. ANDERSON, | ) |
| MITCHELL W. ANDERSON, | ) |
| RANDY A. ATKINS, | ) |
| TIFFANY S. BALLEW, | ) |
| DAVID G. BERENS, | ) |
| TATUM M. BILLINGS, | ) |
| JOHNNY B. BINGHAM JR., | ) |
| MICHAEL R. BISHOP, | ) |
| BILLY R. BIVENS, | ) |
| JUSTIN K. BLACK, | ) |
| TONYA R. HYLTON, | ) |
| a/k/a TONYA R. BLACK-HYLTON, | ) |
| GREGG D. BLOOM, | ) |
| MARGARET B. BORING, | ) |
| KEHYN N. BRADFORD, | ) |
| JAMEY L. BRADFORD, | ) |
| ERIC A. BROKISH, | ) |
| JOSEPH A. BROWN, | ) |
| JULIE M. BROWN, | ) |
| KENNETH L. BURRIS, | ) |
| LEWIS O. CAPEHART, | ) |
| JOHNNY L. CARSON, | ) |
| LISA A. CARSON, | ) |
| TONYA L. CASSADY-PENDERGRASS, | ) |
| JEFFERY D. CASTEEL, | ) |
| JEFFERY L. CASTEEL, | ) |
| LAURA F. CASTEEL, | ) |
| CHARLES R. CAVETT, | ) |
| TIMOTHY L. CHOATE, | ) |
| RODNEY S. CHRISTIAN, | ) |
| GERALD J. CLINE, | ) |
| a/k/a GERALD J. CLINE JR., | ) |
| ROBERT M. CONINE, | ) |

JURY DEMAND

Case No. 1:24-cv-00096-TRM-CHS

*McDonough/Steger*

ODIN MARADIAGA-CONTRERAS, )
RONALD C. CRISP, )
GEORGE J. CRYE, )
MALCOLM Y. DALTON, )
WARREN A. DANIEL, )
RICHARD K. DAVIS, )
TERRENCE M. DAVIS, )
WARD C. DONALDSON, )
CHRISTOPHER D. ELLIS, )
WILLIAM G. EMENDORFER III, )
SALLY L. OWENS, )
MICHAEL W. FIFE JR., )
VITALIY V. FOMIN, )
JONATHAN L. FREEMAN, )
CHARLES A. FRYE, )
JOHN F. GANT JR., )
KRYSTAL M. GATLIN, )
DIAMOND P. GENTRY, )
EDWARD L. GENTRY, )
TOMMY G. GIBBY, )
ADAM J. GOFORTH, )
CHANDLER G. GOINS, )
SAMUEL L. GOINS, )
TRAVIS S. GOINS, )
ZACHARY C. GOINS, )
DUSTIN J. GRAINGER, )
FLOYD M. GREEN, )
REBECCA S. GREGORY, )
SHIRLEY A. GREGORY, )
BARBARA A. CAPEHART, )
LAURA B. HALE, )
ROBERT D. HALE, )
SHANNON L. HARDEN, )
ERIC S. HARRIS, )
EDWARD G. HARVEY, )
MICHAEL K. HEISKELL, )
TRAVIS L. HEMBREE, )
BILLIE R. HEMBREE, )
NATASHA A. HENEGAR, )
WILLIAM A. HOBBS, )
JAMES C. INMAN, )
JIMMY A. JACK, )
SEAN T. JACOBS, )
DOUGLAS B. JENKINS, )
JOSEPH H. JERFIE III, )
JEROME A. JOHNKINS, )

SARA J. JOHNSON, )
SCOTT M. JOHNSON )
RANDALL K. JONES, )
ROBBE L. KELLAKIS, )
TIMOTHY K. KELLEY, )
CHARLES D. KINCAID, )
DAVID D. KINCAID, )
ROBERT D. LANKFORD, )
RANDY L. LEE, )
ROSCOE F. LEFFEW II, )
JONATHAN LEDESMA LEMER, )
LEZLI LEDESMA-LEMER, )
ALMA O. LEMER ZAMORA, )
MELISSA M. MALONEY, )
MARK A. MCALISTER, )
ROBERT A. MCALISTER, )
TONY R. MCALISTER, )
JOSHUA C. MCCARTNEY, )
VICKIE A. MCCONKEY, )
RANDALL W. MCDOWELL, )
JANET M. LEE, )
a/k/a JANET L. MCFERRIN, )
CARLOS R. VASQUEZ MEJIA, )
JOHN W. MILLER, )
DIANNE M. MILLER, )
STEVEN R. MILLER, )
DARRYL A. MIMS, )
QUINTIN A. MURPHY, )
JEFFREY G. OLDFIELD, )
GLORIA S. OLINGER, )
KIMBERLY K. OVERSTREET, )
ROBERT PARRIS, )
DAVID K. PARROTT, )
JOSHUA D. PEELS, )
JERRY L. PENDERGRASS, )
TRENA G. PENDERGRASS, )
GABRIEL L. PEREZ, )
ANTHONY M. PHILLIPS, )
LESLIE J. BUSTOS, )
RALEIGH W. POTTER, )
ROBIN S. POWERS, )
TIM E. POWERS, )
STEPHEN PRICE, )
CARL E. PRUETT II, )
CHRISTOPHER K. PRUITT, )
JONATHAN E. RABURN, )

DAVID W. RATCLIFF,                          )
LLOYD R. REAGAN JR.,                        )
AMY R. MAYNOR,                              )
MICHAEL E. ROGERS JR.,                      )
WILLIAM R. RUNYAN,                          )
RAE A. RUTLEDGE,                            )
LETITISHA M. SAUNDERS,                      )
ZACHARY L. SHARP,                           )
ALEX S. SHAW,                               )
JENNIFER L. SHELTON,                        )
NICHOLAS R. SHEPHERD,                       )
MICHAEL E. SHERMAN,                         )
RICKY L. SIGLER,                            )
JOHN J. SIMMONS,                            )
BRANDI D. SMITH,                            )
DILLON A. SMITH,                            )
MANUEL L. SMITH,                            )
JACQUELIN S. CORDELL,                       )
MILISA D. SNIDER,                           )
GARY D. ST. CLAIR,                          )
DAVID A. STAFFORD,                          )
ARTHUR E. STANDRIDGE,                       )
TONY E. STANLEY,                            )
SCOTT V. STEARMAN,                          )
IMOGENE C. STEVENSON,                       )
GARY L. SWAFFORD,                           )
JAMES B. THOMPSON,                          )
ROBERT E. TUCKER II,                        )
CESAR AUGUSTO VASQUEZ,                      )
BOBBY D. WALDROP,                           )
JASON M. WALKER,                            )
JAMES V. WARD JR.,                          )
DONNIE R. WEBB,                             )
MICHAEL E. WEBB,                            )
FRED J. WILCOXON,                           )
GREGORY S. WILLIAMS,                        )
JASON S. WILSON,                            )
DANIEL A. WINGARD,                          )
WILLIAM E. YORK II,                         )
LARRY S. YOUNG,                             )
KENNETH M. WYATT,                           )
JOHN F. MARSHALL JR.,                       )
GREGORY K. BLACK,                           )
BENJAMIN L. SHELTON,                        )
WILSON W. WEAVER,                           )
CHRISTOPHER T. GILLMAN,                     )

TED A. KROUSE,                                    )
DANIEL G. WITHROW,                                )
MARK A. BARBER,                                   )
TONY L. THOMPSON,                                 )
DONALD E. HILL,                                   )
LARRY L. LANKFORD,                                )
MATTHEW L. FARMER,                                )
SONYA G. HACKO,                                   )
RICHARD D. MCLEOD,                                )
CHARLES W. HALL,                                  )
TEENA S. CATO,                                    )
CALLENE P. SCRUGGS,                               )
JESSE S. COOK,                                    )
JESSE SKYLAR COOK,                                )
HUBERT R. VOYLES JR.,                             )
SHANE F. LAWSON,                                  )
JODY M. BROWN,                                    )
BRIAN S. BUMGARDNER,                              )
RICKEY D. RAPIER SR.,                             )
KENNETH R. HOWELL,                                )
CASIE D. WILCOX,                                  )
PAUL F. LAFORTUNE II,                             )
RICHARD O. HICKMAN,                               )
TIMOTHY C. WHITE,                                 )
PAULA A. WORLEY,                                  )
BENNY R. HARRIS SR.,                              )
NICHOLAS E. HOBSON,                               )
PAMELA M. HENDERSON,                              )
DEBRA K. WILLIAMS,                                )
CESAR ALEXANDER VASQUES,                          )
JENNIFER M. OZMORE SHAW,                          )
VIVIAN D. MCLEOD,                                 )
a/k/a VIVIAN D. GODFREY,                          )
KENDRA E. BYLER,                                  )
NICOLE A. POWERS,                                 )
a/k/a NICOLE A. GUZZETTI,                         )
MARY A. ARMSTRONG,                                )
ANGELA D. FERGUSON,                               )
GEORGE B. DAVIS,                                  )
MACK E. PLEMONS,                                  )
ANGELA H. VASQUEZ MOYA,                           )
RICKY L. JACOBS,                                  )
LORI A. HAMM,                                     )
DEBRA F. KAEHLER,                                 )
CHRYSTEPHOR G. MASHBURN II,                       )
JERRY T. SLEDGE,                                  )

JAMES L. DOWER,                                )
ROGER L. WALDEN,                               )
JASON E. MALONE,                               )
KEVIN D. CAMPBELL,                             )
ROBERT E. HAILE III,                           )
JON N. WILKINS,                                )
WESLEY A. HAMM,                                )
DONALD R. REIBELING III,                       )
ANDY L. HOLDER,                                )
MITCHELL C. KAEHLER,                           )
DANIEL L. WALLER,                              )
DAVID M. SMITH,                                )
CHARLES H. HILL,                               )
VAN G. GIBSON,                                 )
JEFFREY T. HICKS,                              )
ROBERT P. HUFF,                                )
JASON E. HAMES,                                )
JODY F. ROBERTS,                               )
WILLIAM C. THURMAN,                            )
BRIAN K. MCNABB,                               )
PHILLIP L. WILLIAMS,                           )
SHELIA A. MILLAWAY,                            )
KASEY B. SMITHERS,                             )
FRANKLIN E. BRANNON,                           )
BASIL H. NUNLEY III,                           )
NITA E. SWALLOWS,                              )
MARTIN A. LATTIMORE,                           )
FREDRICK D. PITNER,                            )
DONALD R. CRABTREE,                            )
KIMBERLY D. OSBORNE-INGRAM,                    )
JONATHAN K. MOSES,                             )
CAREY O. BURGER,                               )
REBECCA E. LYNCH,                              )
LAUREN R. SHAR,                                )
EVA C. VANHOOK,                                )
LARRY D. STEVENSON,                            )
TIMOTHY P. MCKAY,                              )
PATRICIA L. CAVITT,                            )
REBECCA K. ENGLAND,                            )
PATTI S. DALTON,                               )
RILEY C. VANHOOK,                              )
JUDITH C. ROBINSON,                            )
RONALD D. GORCZYNSKI,                          )
HOYT F. SWAFFORD,                              )
MICHAEL W. KELLEY,                             )
CLYDE V. CROSS,                                )

HAROLD R. BUCKNER,                    )
PEGGY S. PERSON,                      )
DEBORAH H. LAMBERT,                   )
ANGIE R. MOSES,                       )
MARY A. WILCOX,                       )
MARTHA JANE U. SMITH,                 )
JERI D. GREENE,                       )
ELIZABETH A. BOTTOMS,                 )
SELINA E. DAVIS,                      )
CHRISTOPHER L. CUMMINGS,              )
TODD V. OLINGER,                      )
ANTHONY L. CUMMINGS,                  )
SHELBY J. PRESSWOOD,                  )
CHRISTOPHER S. SUMNER,                )
SHERRY J. PRICE,                      )
BILLY L. GREEN JR.,                   )
STEPHANIE J. SHANAHAN,                )
JAMIE L. STAFFORD,                    )
PATRICIA R. DECKER,                   )
PENNY T. ORDERS,                      )
DONNA K. BLACK,                       )
AMY S. DAVENPORT,                     )
MARTHA P. HARBISON,                   )
RICHARD P. CHIUSANO,                  )
RHONDA J. COLLINS,                    )
BERNEIDA G. CASH,                     )
LATORIA C. MCMAHAN,                   )
TODD J. CORVIN,                       )
WENDY B. CANIDA,                      )
NANCY D. BAKER,                       )
KRISTI C. BENTON,                     )
PAMELA D. BAKER,                      )
COREY A. MANTOOTH,                    )
DENITA L. MCMAHAN,                    )
NATASHA M. SMITH,                     )
ZELYIA M. CALDWELL,                   )
JENNIFER J. ABBES,                    )
JULIAN F. WATSON JR.,                 )
XAVIERY E. CALDWELL,                  )
CANESHA M. NORRIS,                    )
BEVERLY C. ABERNATHY,                 )
a/k/a BEVERLY C. MILLER,              )
WILLIAM L. KURTZ,                     )
RONALD D. HALE,                       )
CHRISTOPHER S. COFFEY,                )
YOULANDA G. GOLDSTON,                 )

BILLY A. HARRIS,                                )
TERRY K. ARMSTRONG,                             )
CHARLES R. JENNINGS JR.                         )
CHRISTOPHER H. BROOKS,                          )
JASON BOTTOMS,                                  )
CHARLES T. EPPERSON,                            )
DONALD T. HOLMAN JR.,                           )
MATTHEW T. OWNBY,                               )
ROCKY M. SHELTON,                               )
EVELYN L. ISOM,                                 )
GIFFORD J. SENTERS,                             )
GILBERT M. SHELDON,                             )
JENNIFER L. LAWSON,                             )
MARTHA A. BOYD,                                 )
JULIAN F. WATSON SR.,                           )
DEBRA M. LATTIMORE,                             )
DENNIS C. ROY,                                  )
CEACILA B. GUZZETTI,                            )
XIOMARA Y. MOYA,                                )
ROBERTO C. MENDEZ-RODRIGUEZ,                    )
BRENDA S. CULBERSON,                            )
LYNN J. GORCZYNSKI,                             )
BRADLEY S. FROEMKE,                             )
JAMES F. PRITCHARD,                             )
LAVINIA A. JOHNSON,                             )
MISTINA M. BROWN,                               )
JAMES W. ARMSTRONG,                             )
JAN C. ARMSTRONG,                               )
SIED S. ABBASSIAN,                              )
TIMOTHY L. THOMPSON,                            )
KENNETH E. HANEY,                               )
JOSEPH H. DAVIS,                                )
OLIVIA A. MIMS,                                 )
DEION A. MIMS,                                  )
DAVID A. MIMS,                                  )
ROBERT J. CHEEK,                                )
DONALD E. BEAL,                                 )
CARRIE G. MARTIN,                               )
ELIZABETH S. HAYES,                             )
RANDALL E. MASON,                               )
WILLIAM A. ROACH,                               )
KENNITH A. JOHNSON,                             )
AMANDA C. HANEY,                                )
JIMMIE V. MASSINGALE II,                        )
BRANDI R. CALDWELL,                             )
DAVID C. WINKLER,                               )

LEONARD WILLIAMS,                           )
DONALD L. WARDEN JR.,                       )
KENNETH S. BRIDGES,                         )
JOYCE A. CASKINS,                           )
DONALD R. STEPHENS,                         )
WILLIAM G. SPUHLER,                         )
CHRISTOPHER L. CLARK,                       )
WILLIAM B. ROBERTS,                         )
MICHAEL D. DAILEY,                          )
MARY A. MOORE,                              )
RICKIE C. DALE,                             )
LARRY J. NEWPORT II,                        )
JAMES H. BLASSINGAME,                       )
ELIZABETH A. HOWELL,                        )
TONY W. WILSON,                             )
TABITHA A. HUNT,                            )
BRANDY A. STIEGLER,                         )
MARISSA A. HUNT,                            )
LAUREEN C. GUNDERSON,                       )
LAWRENCE C. WALTON,                         )
STACEY L. HESTER,                           )
ANDREW D. MOORE,                            )
PHILLIP D. GASTON,                          )
JACK A. HUNT III,                           )
ELIJAH A. BARBER,                           )
BERNICE S. BLASSINGAME,                     )
BRADLEY D. WALDROP,                         )
CARRIE A. HARVEY,                           )
CODY T. SHAW,                               )
MICHAEL D. DALTON,                          )
BRYAN A. MENDEZ,                            )
LORA L. MELTON,                             )
SHEILA S. GOINS,                            )
ALEXANDRA K. GRULKE,                        )
CHRISTOPHER H. WEIR,                        )
KATHLEEN M. WEIR,                           )
GLORIA M. VERSA,                            )
MARCIA Y. MCMAHAN,                          )
KRISTIE W. MEADOWS,                         )
EUGENE MELTON,                              )
TONY E. NEELY,                              )
BELINDA F. HOWARD,                          )
JOHNNIE J. HENRY,                           )
KURT D. RODGERS,                            )
JERRY D. HARVEY JR.,                        )
KEITH D. VANDERGRIFF,                       )

BRADY F. MARTIN,                               )
MARSHALL M. MOSER,                             )
TIMOTHY A. BOUSQUET,                           )
JOHN M. KEELING,                               )
JOSEPH D. MARTIN,                              )
DERECK V. BURNS,                               )
JOHN C. JAEGER,                                )
STEVEN D. GREGORY,                             )
HARLEYANN P. GOINS,                            )
KEITH A. WILKINS,                              )
CLYDE E. DILL,                                 )
JOHN A. MORRISON,                              )
MITCHELL H. CULBERSON,                         )
JIMMY F. ROBINSON JR.,                         )
GROVER E. HEDGECOTH,                           )
CODEY A. TAYLOR,                               )
MARTY A. TURNER,                               )
HENRY C. URQUHART,                             )
JUSTIN E. BIVENS,                              )
CYNTHIA L. LANKFORD,                           )
JOHNNIE F. GRIFFIN,                            )
SHELIA S. GREEN,                               )
VALARIE M. DOSS,                               )
REX A. BLASSINGAME,                            )
BRANDY M. LAFORTUNE,                           )
DAVID CHIUSANO,                                )
JARRELL L. DISSPAIN,                           )
FABIO A. MENDEZ,                               )
BETTY A. CARTER,                               )
BARBARA J. HUNT,                               )
JANIS M. NEWMAN,                               )
BARRY L. PHILLIPS,                             )
BILL M. SLUDER,                                )
CHARLES M. SLUDER,                             )
PATRICIA M. SLUDER,                            )
ZAYNE E. LEAMON,                               )
CHASE M. CLINE,                                )
RODNEY S. CHRISTIAN,                           )
         on behalf of D.C., a minor,           )
JENNIFER L. LAWSON,                            )
         on behalf of C.K., a minor,           )
MAURICIO LEDESMA,                              )
         on behalf of L.L., a minor,           )
CHARLA R. BARKER,                              )
         on behalf of S.B., a minor,           )
CORTNEY S. FISHER,                             )

```
              on behalf of Z.C., a minor,            )
MATTHEW L. FARMER,                                    )
              on behalf of E.F., a minor,            )
VITALIY V. FOMIN,                                     )
              on behalf of E.F., a minor,            )
NICHOLAS E. HOBSON,                                   )
              on behalf of B.H., a minor,            )
WILLIAM M. PARKS,                                     )
              on behalf of Z.P., a minor,            )
MICHAEL E. ROGERS JR.,                                )
              on behalf of M.R., a minor,            )
MICHAEL E. ROGERS JR.,                                )
              on behalf of M.R., a minor,            )
JENNIFER P. PANTER,                                   )
              on behalf of K.P., a minor,            )
JENNIFER P. PANTER,                                   )
              on behalf of K.S., a minor,            )
JENNIFER P. PANTER,                                   )
              on behalf of K.S., a minor,            )
JENNIFER P. PANTER,                                   )
              on behalf of J.S., a minor,            )
CASIE D. WILCOX,                                      )
              on behalf of D.W., a minor,            )
TEENA S. CATO,                                        )
              on behalf of E.Y., a minor,            )
ODIN MARADIAGA,                                       )
              on behalf of A.M., a minor,            )
CHRISTOPHER WYLLIE,                                   )
              on behalf of B.W., a minor,            )
KASEY B. SMITHERS,                                    )
              on behalf of L.S., a minor,            )
ELIZABETH WORLEY,                                     )
              on behalf of H.W., a minor,            )
MEGAN R. POWELL,                                      )
              on behalf of B.M., a minor,            )
JOSEPH D. MARTIN,                                     )
              on behalf of T.M., a minor,            )
CEACILA B. GUZZETTI, as surviving daughter of )
         MICHAEL B. GUZZETTI II (DECEASED),)
MILISA D. SNIDER, as surviving daughter of           )
         DALLAS A. PRICE (DECEASED),                 )
MARGARET B. BORING, as surviving spouse of  )
         DENNIS G. BORING (DECEASED),                )
ERIC S. HARRIS, as surviving son of                  )
         DENNIS W. HARRIS (DECEASED),                )
BERNEIDA G. CASH, as surviving daughter of  )
```

ROY L. BURRIS (DECEASED),                                )
RHONDA J. COLLINS, as surviving spouse of                )
       JERRY W. COLLINS (DECEASED),                     )
JACQUELIN S. CORDELL, as surviving                       )
       spouse of LARRY R. CORDELL,                       )
       (DECEASED),                                       )
SHELBY J. PRESSWOOD, as surviving spouse of              )
       THOMAS L. CUMMINGS (DECEASED),                    )
MICHAEL K. HEISKELL, as surviving son of                 )
       BENNY B. HEISKELL III                             )
       (DECEASED),                                       )
GLORIA S. OLINGER, as surviving spouse of                )
       WILLIAM M. OLINGER (DECEASED),                    )
GLORIA S. OLINGER, as surviving mother of                )
       KRISTOPHER M. OLINGER                             )
       (DECEASED),                                       )
KIMBERLY K. OVERSTREET, as surviving                     )
       spouse of ROBERT L. OVERSTREET JR.                )
       (DECEASED),                                       )
IMOGENE C. STEVENSON, as surviving spouse                )
       of RAY D. COOK (DECEASED),                        )
MARY A. WILCOX, as surviving spouse of                   )
       WILFORD W. WILCOX (DECEASED),                     )
BRENDA S. CULBERSON, as surviving spouse of              )
       GARY L. CULBERSON (DECEASED),                     )
PATRICIA R. DECKER, as surviving spouse of               )
       HOBERT L. DECKER (DECEASED),                      )
BILLY L. GREEN, JR., as surviving son of                 )
       BILLY L. GREEN, SR. (DECEASED),                   )
SHELIA S. GREEN, as surviving spouse of                  )
       RICHARD L. GREEN (DECEASED),                      )
SHIRLEY A. GREGORY, as surviving spouse of               )
       HARRY C. GREGORY (DECEASED),                      )
JOHNNIE F. GRIFFIN, as surviving spouse of               )
       CHARLES GRIFFIN (DECEASED),                       )
PAMELA M. HENDERSON, as surviving spouse of              )
       ALAN C. HENDERSON (DECEASED),                     )
SARA J. JOHNSON, as surviving spouse of                  )
       OSCAR D. JOHNSON (DECEASED),                      )
BETTY A. CARTER, as surviving sister of                  )
       RICKY A. LANKFORD (DECEASED),                     )
BETTY A. CARTER, as surviving aunt of                    )
       TIMOTHY A. LANKFORD (DECEASED),                   )
CARRIE G. MARTIN, as surviving spouse of                 )
       JOHNNIE A. MARTIN (DECEASED),                     )
RANDALL E. MASON, as surviving son of                    )

JULIAN B. MASON (DECEASED),     )
AMY R. MAYNOR, as surviving spouse of     )
     DAVID L. MAYNOR (DECEASED),     )
ANGIE R. MOSES, as surviving spouse of     )
     DANNY E. MOSES (DECEASED),     )
AMANDA C. HANEY, as surviving daughter of     )
     ALMYRA E. MOSIER,     )
     a/k/a ELIZABETH A. MOSIER     )
     (DECEASED),     )
SALLY L. OWENS, as surviving spouse of     )
     JOHN H. OWENS (DECEASED),     )
VALARIE M. DOSS, as surviving spouse of     )
     STEPHEN E. PHILLIPS (DECEASED),     )
AMY S. DAVENPORT, as surviving     )
    daughter of ROBERT T. SAMPLES     )
     (DECEASED),     )
KRISTIE W. MEADOWS, as estate     )
    executor of DAVID L. SCOGGINS, JR.     )
     (DECEASED),     )
MARTHA JANE U. SMITH, as surviving spouse     )
     of GLENN A. SMITH (DECEASED),     )
TATUM M. BILLINGS, as surviving daughter of     )
     MICHAEL D. TURNER (DECEASED),     )
NANCY D. BAKER, as surviving spouse of     )
     JIMMY C. BAKER (DECEASED),     )
DAVID CHIUSANO, as surviving son     )
     of PASQUALE P. CHIUSANO     )
     (DECEASED),     )
TABITHA A. HUNT, as surviving daughter of     )
     EDWARD M. WADE (DECEASED),     )
LAUREEN C. GUNDERSON, as surviving     )
     granddaughter of JAMES L. NEWMAN     )
     (DECEASED),     )
CYNTHIA A. RAMSEY, as surviving sister of     )
     JAMES D. PHILLIPS (DECEASED),     )
JEFFREY A. ANDERSON, as surviving spouse     )
     of CYNTHIA A. ANDERSON     )
     (DECEASED),     )
MARTHA P. HARBISON, as surviving spouse of     )
     GEORGE E. HARBISON (DECEASED),     )
BARBARA J. HUNT, as surviving spouse of     )
     LOUIS V. HUNT JR. (DECEASED),     )
ELIZABETH A. BOTTOMS, as surviving spouse     )
     of RONALD E. BOTTOMS (DECEASED), )
JOHNATHON S. JACK, as surviving son of     )
     GREGORY S. JACK, f/k/a

GEORGE S. JACK (DECEASED),   )
JULIAN F. WATSON SR., as surviving spouse of   )
     FREIDA S. WATSON (DECEASED),   )

*plaintiffs*,   )
   )
v.   )
   )
OLIN CORPORATION,   )
a/k/a OLIN CHLOR ALKALI   )
PRODUCTS,   )
a/k/a OLIN CHLOR ALKALI   )
PRODUCTS AND VINYLS,   )
ARCH CHEMICALS, INC.,   )
BILFINGER INDUSTRIAL SERVICES, INC.,   )
     successor in interest to BIS INDUSTRIAL   )
         SERVICES, INC.,   )
     successor in interest to BIS FRUCON   )
         INDUSTRIAL SERVICES, INC.,   )
     successor in interest to BIS FRUCON   )
         ENGINEERING, INC.,   )
     successor in interest to FRU-CON   )
         CONSTRUCTION   )
         CORPORATION,   )
     successor in interest to FRU-CON   )
         TECHNICAL SERVICES, INC.,   )
     successor in interest to FRUIN-COLNON   )
         CONTRACTING COMPANY,   )
ROBINS & MORTON CORPORATION,   )
a/k/a ROBINS & MORTON, LLC,   )
     a/k/a ALABAMA ROBINS & MORTON,   )
     LLC,   )
PEN GULF, INC.,   )
TURNER SPECIALTY SERVICES, LLC,   )
WHITE ELECTRICAL CONSTRUCTION CO.,   )
f/k/a DUNCAN ELECTRIC COMPANY,   )
CUSTOM MECHANICAL CONTRACTORS,   )
     INC.,   )
     f/k/a LENNON COMPANY, INC.,   )
*defendants*.   )

# FOURTH AMENDED COMPLAINT

## TABLE *of* CONTENTS

**CHAPTER I: INTRODUCTION** ........................................................................................................19

*Statement of the Case* ..............................................................................................................19

*Who Are Our Party Plaintiffs?* ..............................................................................................22

*Overview of the FACILITY's History* ......................................................................................35

*Who are the OPERATING DEFENDANTS?* .............................................................................40

*Identification of CONTRACTOR DEFENDANTS* .....................................................................41

*Jurisdiction and Venue are Proper in this Court* ...................................................................43

**CHAPTER II: THE CHLOR-ALKALI INDUSTRY** .......................................................................44

*Use of Toxic Mercury in the Chlor-Alkali process*..................................................................44

*The Mercury Cell Chlor-Alkali Process Generates Dangerous Waste That is Contaminated with Toxic Mercury.* 48

*Operation and Maintenance of a Chlor-Alkali Facility Creates Mercury Exposure Risks.* ...................51

*Decommissioning and Demolition Creates Known Elevated Mercury Exposures.* .........................54

**CHAPTER III: ONSITE AND OFFSITE CONTAMINATION** .......................................................56

*A. Cell House Contamination*..................................................................................................57

*B. Hazard Dome* .....................................................................................................................61

*C. General Maintenance Contamination – Entire FACILITY* .................................................67

*D. Contamination of the Liquefaction Area and its Grounds* ................................................70

*E. Mercury Recovery Team* .....................................................................................................71

*F. SISTER FACILITY* ..............................................................................................................75

*G. OWNER & CONTRACTOR – CROSS-CONTAMINATION* .................................................83

*As we have discussed in detail above, the Operating Defendants and Contractor Defendants worked in proximity to one another at the FACILITY and SISTER FACILITY.* .......................................................83

*CROSS CONTAMINATION – BILFINGER, formerly known as FRUCON, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, CUSTOM MECHANICAL, ROBINS & MORTON, and PEN* .................85

*BILFINGER, formerly known as FRUCON* ..............................................................................85

*CROSS CONTAMINATION- TURNER* .....................................................................................96

*COSS CONTAMINATION- WHITE ELECTRICAL, formerly known as DUNCAN* .....................101

*CROSS CONTAMINATION - CUSTOM MECHANICAL* ...........................................................109

*CROSS CONTAMINATION - PEN*............................................................................................112

*CONTRACTOR CROSS CONTAMINATION – SUPPORTED BY OLIN EMPLOYEES* .................119

**CHAPTER IV – ENVIRONMENTAL REGULATORY HISTORY OF THE FACILITY** ..............122

**CHAPTER V - CROSS-CONTAMINATION OF PLAINTIFF FAMILY MEMBERS** .....................136

**CHAPTER VI: HOW MERCURY HARMS AND INJURES PEOPLE** ................................................**142**

*What is Mercury?* .................................................................................................*142*

*Utilization of Mercury by the Chlor-Alkali Industry.* ...........................................*142*

*Mercury Exposure Can Result in Life-Threatening and Debilitating Injuries to Humans.* ................*154*

*The Dangerous Nature of Mercury in Vapor Form.* ...............................................*156*

*Mobilization of Mercury – Creating Secondary Exposures* ...................................*157*

*Harmful Effects of Mercury Exposure* ...................................................................*159*

*Toxic Mercury Exposure Causes More Severe Injury to Women* ...........................*167*

*Toxic Mercury Exposure Causes More Severe Injury to Children* .........................*175*

*Detection, Testing, and Treatment of Individuals Exposed to Toxic Mercury* ........*182*

*Biomarkers for Mercury Exposure* ........................................................................*183*

**CHAPTER VII: DIAGNOSTIC & MEDICAL CHALLENGES OF MERCURY TOXICITY** ......................**186**

*An Overview of Diagnostic & Medical Challenges Related to Mercury Toxicity* ..................*186*

**CHAPTER VIII: ENVIRONMENTAL, HEALTH, AND SAFETY** ................................................**189**

*Duty of Care - Process Safety Engineering* ...........................................................*190*

*Mercury Exposure – Standards and Limits* ...........................................................*195*

*Elemental Mercury Vapor Exposure Limits and Health Effects* ............................*198*

*Duty of Care-Mandatory Medical Evaluations required by OSHA Standards* ...................*199*

**CHAPTER IX: DEFENDANTS' CONDUCT DEMANDS LEGAL LIABILITY** ..............................**201**

*Process Hazard Analysis* .......................................................................................*201*

*Exposure Assessment and Air Monitoring* .............................................................*202*

*Worker Protection Should Have Been Insured Through a Properly Implemented Medical Surveillance Program* ...............................................................................................*206*

*Base Line Medical Examination* ............................................................................*209*

*Routine Medical Examination* ...............................................................................*210*

*Biological Monitoring Program* ............................................................................*211*

*Medical Surveillance and Biological Monitoring – Early Detection* ....................*213*

*Written Respiratory Protection Program* ..............................................................*215*

*Appropriate PPE Protection* .................................................................................*217*

*Job Safety Analysis Program* ................................................................................*225*

*Chemical Safety Training – Mercury* .....................................................................*229*

*Decontamination of Workers' Bodies to avoid Cross Contamination* ...................*236*

*Plaintiff Workers Were Highly Exposed During Decommissioning and Demolition* ................*243*

*Contamination Transported Offsite* .......................................................................*248*

*OLIN Failed to Protect Plaintiff Contractor Workers* .................................................................*253*

*Failure to Recognize and Follow Current Scientific Epidemiology* ............................................*257*

*Defendants Recklessly Ignored Established Data & Information* .................................................*259*

*Fraud by OLIN* ..................................................................................................................................*263*

*Fraudulent Misrepresentations* .....................................................................................................*264*

*Misrepresentation by Concealment by Olin* .................................................................................*267*

*Misrepresentation by Concealment by Contractor Defendants* ...................................................*271*

**CHAPTER X: TOLLING** .............................................................................................................**276**

**CHAPTER XI: COUNTS** .............................................................................................................**277**

*Count I – Negligence* .......................................................................................................................*277*

*Count II – Negligence* ......................................................................................................................*282*

*Count III – Negligence* .....................................................................................................................*287*

*Count IV – Negligence* .....................................................................................................................*289*

*Count V - Negligence* .......................................................................................................................*294*

*Count IX – Negligence* .....................................................................................................................*312*

*Count X –Misrepresentation by Concealment* ..............................................................................*317*

*Count XI –Misrepresentation by Concealment* .............................................................................*322*

*Count XII- Intentional (Fraudulent) Misrepresentation/Reckless Misrepresentation* ..............*328*

*Count XIII - Premises Liability* .......................................................................................................*334*

*Count XIV - Premises Liability* .......................................................................................................*337*

*Count XV- Negligence Per Se* ..........................................................................................................*340*

*RELIEF SOUGHT* .............................................................................................................................*342*

# CHAPTER I: INTRODUCTION

**Statement of the Case**

*For Corporate Profit, Defendants Knowingly Exposed Their Workers, Contractors, and Select Family Members to Toxic Levels of Mercury for Over Six (6) Decades, Resulting in Hundreds, if Not Thousands, of Individuals Incurring Incurable, Life-Threatening, and Debilitating Injuries and Diseases.*

1. This case is about large corporations willfully using a toxic substance in their manufacturing processes, despite knowing that workers were being harmed. The toxic substance is mercury. Plaintiffs will prove that Defendants' actions were driven by profit, with full knowledge of the harm their actions would cause.

2. Defendants knowingly exposed Plaintiffs, their own workers, contractors, and select family members, to dangerous and harmful levels of mercury at the Charleston, Tennessee manufacturing facility from 1962 forward. From 1962 to approximately 2012, the Charleston facility used a "Chlor-Alkali" manufacturing process that required the use of mercury. This long-term mercury usage left behind a work site that remains highly contaminated.

3. Defendants' misfeasance extends to any person where harm may reasonably be anticipated, resulting from the Defendants' conduct.

4. As a direct and proximate cause of Defendants' nonfeasance, misfeasance, and/or malfeasance, Workers suffered illness and disease from Defendants' mercury.

5. As a result of the mercury used at the Charleston facility, Plaintiffs have experienced bodily injuries including, but not limited to, auto-immune disorders, gastrointestinal injury, organ damage and/or failure, brain damage, cognitional loss, neuropsychological injuries, neurological disorders, and specifically neuropathies, all related to their exposure to mercury at the Charleston facility.

6. In addition, other Plaintiffs have experienced injuries from mercury that their family members inadvertently carried home from the Charleston facility on their clothing, physical body, personal belongings, and in their cars. This resulted from the Defendants' failure to adhere to basic safety protocols. The Plaintiffs who were exposed to mercury while working at the facility must now deal with the horrible reality that they unknowingly poisoned their loved ones through this cross-contamination.

7. The mercury cell production technology used at the Charleston facility was adapted for industrial use in the late 1800s. By the 1970s, this technology was antiquated, and new technologies were available that eliminated the use of mercury. Even though new, safer production technology was available, the companies who owned and operated the Charleston facility chose to continue utilizing this toxic and injurious process of manufacturing.

8. For centuries, mercury has been known to be highly toxic. Accordingly, government regulations and industry standards establish how to safely operate facilities that use mercury, how to monitor workers' exposures, and how to avoid cross-contamination beyond the facility. For example, there are specific guidelines for personal protective equipment, environmental monitoring, medical monitoring, and employee training. Defendants failed to comply with these regulations and standards, allowing Plaintiffs to be unknowingly exposed to dangerous levels of toxic mercury. Further, Defendants falsely and fraudulently assured Plaintiffs their work conditions were safe, and the protective measures were adequate, while knowing this was untrue.

9. The harm did not stop with the workers at the Charleston facility. Discovery in this action will prove that other workers, contractors, and family members were injured by mercury

exposure as a result of Defendants' flagrant operation of the Charleston facility. Beyond the facility and its equipment, Defendants exposed members of the general public when Defendants improperly stored and disposed of mercury-contaminated materials and sold mercury-contaminated scrap metal to at least one Tennessee scrap dealer. Furthermore, contractors were not required to decontaminate their equipment and were not told to keep it at the facility, allowing the equipment to be used offsite. This offsite use by contractors further contaminated areas throughout the Charleston community.

10. Injury to Plaintiffs did not cease right away once the Charleston facility finally stopped using the mercury-based manufacturing process in 2012, decades after most Chlor-Alkali facilities worldwide had already eliminated the use of mercury. In fact, because the Defendants failed to follow well-established safety guidelines developed over many instances of chlor-alkali facility closures and conversions in both the United States and Europe, Plaintiffs and their families continued being exposed to mercury, both directly in the workplace and indirectly by cross-contamination, for many years after the mercury-cell process was shut down.

11. These Chlor-Alkali companies, including Defendants, continued using the mercury-cell process because they did not want the expense of switching to a safer process until they were forced to do so. Also, these companies knew that the health effects of chronic mercury exposure could go unnoticed for years. Therefore, the chlor-alkali companies hoped this late onset of symptoms would give them enough time to distance themselves from the injuries they caused and get away without compensating the victims or paying for their medical needs. The time has come for these companies to take responsibility for the harm they have caused.

12. This action seeks justice in the form of financial compensation for those individuals and families who have been adversely impacted by this outrageous conduct in Charleston, Tennessee. Further, this group is seeking to establish a medical clinic with specialized treatment designed to treat specific neuropsychological and physical injuries known to be caused by mercury toxicity. In addition to medical treatment, it is hoped that national attention can bring detailed awareness regarding these neurological injuries. Thus, compelling governmental intervention against those companies who have, and continue to, injure the environment and the individuals working for them.

13. The facility has an address of 1186 Lower River Road, Charleston, Tennessee and covers approximately 679.66 acres along the Hiwassee River, in Bradley County, Tennessee (the "FACILITY").

14. Formerly, the facility occupied 708.86 acres, when Olin Corporation ("OLIN") owned both the Facility proper, and a facility located immediately next door (the "SISTER FACILITY"). While the allegations of this case focus on the Chlor-Alkali process, testimony shows that the FACILITY has affected the SISTER FACILITY and those working in and around it. Importantly, the FACILITY and SISTER FACILITY continued to share a number of operations after OLIN sold the SISTER FACILITY. This will be discussed further beginning in paragraph 120.

**Who Are Our Party Plaintiffs?**

*Plaintiffs in This Action Are Individuals who worked at the Facility and Sister Facility, as well as Family Members of These Workers, Who Contracted Mercury-Related Mental and Physical Injuries When Their Loved Ones and Relatives (Former Workers) Unknowingly Introduced Mercury Into Their Homes Through Their Clothing, Possessions, Hair, Boots, and Bodies After Working at the Facility.*

15. The "Plaintiff Workers" are resident citizens of Charleston, Bradley County, Tennessee, or the surrounding area, or were at all times material hereto, and are over the age of eighteen (18) years. At all times material hereto, the said Plaintiff Workers were employed by OPERATING DEFENDANTS or CONTRACTOR DEFENDANTS, as defined below, and/or a subsidiary, sister company, parent company, or successor company thereof (collectively the "Defendants"), or were employed by other companies that employed them to perform services or supplied goods at the FACILITY and/or the SISTER FACILITY.

16. The Plaintiff Workers are as follows: Lamotta McMahan, Jerome A. Johnkins, Johnny L. Carson, Stephen Price, Eric A. Brokish, William A. Hobbs, Jerry L. Pendergrass, Thomas L. Allison, Gerald J. Cline, a/k/a Gerald J. Cline Jr., Jeffery D. Casteel, Tonya R. Hylton, a/k/a Tonya R. Black-Hylton, David G. Berens, Lewis O. Capehart, Jamey L. Bradford, Richard K. Davis, Charles A. Frye, Robin S. Powers, Daniel A. Wingard, James B. Thompson, Marilyn B. Adams, Randy A. Atkins, Gregg D. Bloom, Julie M. Brown, Kenneth L. Burris, Lisa A. Carson, Warren A. Daniel, Terrence M. Davis, Shannon L. Harden, Natasha A. Henegar, Douglas B. Jenkins, Scott M. Johnson, Melissa M. Maloney, Mark A. McAlister, Jeffrey G. Oldfield, Joshua D. Peels, Raleigh W. Potter, David W. Ratcliff, Lloyd R. Reagan Jr., William R. Runyan, Zachary L. Sharp, John J. Simmons, Jason S. Wilson, Charles R. Cavett, Krystal M. Gatlin, Vickie A. McConkey, Letitisha M. Saunders, Michael E. Sherman, Tiffany S. Ballew, Tim E. Powers, Timothy K. Kelley, Michael W. Fife Jr., Samuel L. Goins, Donnie R. Webb, Ward C. Donaldson, Zachary C. Goins, Gary D. Waters, Johnny B. Bingham Jr., Anthony M. Phillips, Mauricio Ledesma, Odin Maradiaga-Contreras, Tommy G. Gibby, Adam J. Goforth, Rebecca S. Gregory,

Edward G. Harvey, Travis L. Hembree, James C. Inman, Carlos R. Vasquez Mejia, Nicholas R. Shepherd, Gary D. St. Clair, David A. Stafford, Arthur E. Standridge, Robert E. Tucker II, Gregory S. Williams, Cesar Augusto Vasquez, Tony E. Stanley, Jason M. Walker., Dillon A. Smith, Joshua C. McCartney, Billie R. Hembree, Alex S. Shaw, Gabriel L. Perez, Christopher D. Ellis, Jonathan E. Raburn, Billy R. Bivens, Michael K. Heiskell, Jimmy A. Jack, Robert D. Lankford, Randy L. Lee, James V. Ward, Jr., Fred J. Wilcoxon, Christopher K. Pruitt, John F. Gant, Jr., Joseph K. Akins, Joseph H. Jerfie III, Steven R. Miller, Larry S. Young, Malcolm Y. Dalton, David K. Parrott, Michael R. Bishop, Ronald C. Crisp, Kehyn N. Bradford, Rodney S. Christian, Sean T. Jacobs, Michael E. Rogers, Jr., William E. York II, Johnathon S. Jack, Scott V. Stearman, Dustin J. Grainger, Ricky L. Sigler, Bobby D. Waldrop, Roscoe F. Leffew II, Charles D. Kincaid, David D. Kincaid, Mitchell W. Anderson, Jeffrey A. Anderson, James W. Albury Sr., Timothy L. Choate, Floyd M. Green, Gary L. Swafford, Robert M. Conine, George J. Crye, Robbe L. Kellakis, Jonathan L. Freeman, Miles N. Adkins, Chandler G. Goins, John W. Miller, Robert Parris, Quintin A. Murphy, Edward L. Gentry, Vitaliy V. Fomin, Travis S. Goins, Randall W. McDowell, Randall K. Jones, Joseph A. Brown, Manuel L. Smith, Michael E. Webb, Darryl A. Mims, Kenneth M. Wyatt, John F. Marshall, Jr., Gregory K. Black, Benjamin L. Shelton, Wilson W. Weaver, Christopher T. Gillman, Ted A. Krouse, Daniel G. Withrow, Mark A. Barber, Tony L. Thompson, Donald E. Hill, Larry L. Lankford, Matthew L. Farmer, Sonya G. Hacko, Richard D. McLeod, Charles W. Hall, Teena S. Cato, Callene P. Scruggs, Jesse S. Cook, Hubert R. Voyles, Jr., Shane F. Lawson, Jody M. Brown, Brian S. Bumgardner, Rickey D. Rapier Sr., Kenneth R. Howell, Casie D. Wilcox, Paul F. Lafortune II, Richard O. Hickman, Timothy C. White, Paula A. Worley, Benny R. Harris,

Sr., Nicholas E. Hobson, Angela D. Ferguson, George B. Davis, Chrystephor G. Mashburn II, Jerry T. Sledge, James L. Dower, Roger L. Walden, Jason E. Malone, Kevin D. Campbell, Robert E. Haile III, Jon N. Wilkins, Wesley A. Hamm, Donald R. Reibeling III, Andy L. Holder, Mitchell C. Kaehler, Daniel L. Waller, David M. Smith, Charles H. Hill, Van G. Gibson, Jeffrey T. Hicks, Robert P. Huff, Jason E. Hames, Jody F. Roberts, William C. Thurman, Brian K. McNabb, Phillip L. Williams, Shelia A. Millaway, Kasey B. Smithers, Franklin E. Brannon, Basil H. Nunley III, Nita E. Swallows, Martin A. Lattimore, Fredrick D. Pitner, Donald R. Crabtree, Kimberly D. Osborne-Ingram, Jonathan K. Moses, Carey O. Burger, Rebecca E. Lynch, Lauren R. Shar, Eva C. VanHook, Larry D. Stevenson, Timothy P. McKay, Patricia L. Cavitt, Rebecca K. England, Patti S. Dalton, Judith C. Robinson, Ronald D. Gorczynski, Hoyt F. Swafford, Michael W. Kelley, Clyde V. Cross, Harold R. Buckner, Peggy S. Person, William L. Kurtz, Robert D. Hale, Ronald D. Hale, Christopher S. Coffey, Youlanda G. Goldston, Billy A. Harris, Terry K. Armstrong, Charles R. Jennings Jr., Christopher H. Brooks, Jason Bottoms, Charles T. Epperson, Donald T. Holman Jr., Matthew T. Ownby, Rocky M. Shelton, Evelyn L. Isom, Gifford J. Senters, Gilbert M. Sheldon, Jennifer L. Lawson, Martha A. Boyd, Julian F. Watson Sr., Dennis C. Roy, Roberto C. Mendez-Rodriguez, Bradley S. Froemke, James F. Pritchard, Justin K. Black, Tony R. McAlister, James W. Armstrong, Jan C. Armstrong, Sied S. Abbassian, Timothy L. Thompson, Kenneth E. Haney, Joseph H. Davis, Eugene Melton, Robert J. Cheek, Donald E. Beal, Elizabeth S. Hayes, William A. Roach, Kennith A. Johnson, Jimmie V. Massingale II, Brandi R. Caldwell, David C. Winkler, Phillip D. Gaston, Joyce A. Caskins, Mary A. Moore, Leonard Williams, Kenneth S. Bridges, William G. Spuhler, Michael D. Dailey, Tony W. Wilson, Jack A. Hunt III, Lawrence C.

Walton, Andrew D. Moore, Donald L. Warden, Jr., Donald R. William B. Roberts, Christopher L. Clark, Larry J. Newport II, James H. Blassingame, Rickie C. Dale, Elizabeth A. Howell, Stacey L. Hester, Tony E. Neely, Belinda F. Howard, Johnnie J. Henry, Kurt D. Rodgers, Jeremy Sandlin, Jerry D. Harvey, Jr., Keith D. Vandergriff, Brady F. Martin, Marshall M. Moser, Timothy A. Bousquet, John M. Keeling, Joseph D. Martin, Dereck V. Burns, John C. Jaeger, Steven D. Gregory, Keith A. Wilkins, Clyde E. Dill, John A. Morrison, Mitchell H. Culberson, Jimmy F. Robinson, Jr., Grover E. Hedgecoth, Codey A. Taylor, Marty A. Turner, Henry C. Urquhart, Rex A. Blassingame, Justin E. Bivens, Cynthia L. Lankford, Brandy M. Lafortune, Jarrell L. Disspain, Lavinia A. Johnson, Barry L. Phillips, Bill M. Sluder, Patricia M. Sluder, Charles M. Sluder, Christopher S. Sumner, Ceacila B. Guzzetti, Tonya L. Cassady-Pendergrass, Eric S. Harris, Ceacila B. Guzzetti, as surviving daughter of Michael B. Guzzetti II (deceased), Milisa D. Snider, as surviving daughter of Dallas A. Price (deceased), Margaret B. Boring, as surviving spouse of Dennis G. Boring (deceased), Eric S. Harris, as surviving son of Dennis W. Harris (deceased), Berneida G. Cash, as surviving daughter of Roy L. Burris (deceased), Rhonda J. Collins, as surviving spouse of Jerry W. Collins (deceased), Jacquelin S. Cordell, as surviving spouse of Larry R. Cordell (deceased), Johnathon S. Jack, as surviving son of Gregory S. Jack, f/k/a George S. Jack (deceased), Shelby J. Presswood, as surviving spouse of Thomas L. Cummings (deceased), Michael K. Heiskell, as surviving son of Benny B. Heiskell III (deceased), Gloria S. Olinger, as surviving spouse of William M. Olinger (deceased), Gloria S. Olinger, as surviving mother of Kristopher M. Olinger (deceased), Kimberly K. Overstreet, as surviving spouse of Robert L. Overstreet Jr. (deceased), Imogene C. Stevenson, as surviving spouse of Ray D. Cook (deceased), Mary A. Wilcox,

as surviving spouse of Wilford W. Wilcox (deceased), Tabitha A. Hunt, as surviving daughter of Edward M. Wade (deceased), Laureen C. Gunderson, as surviving granddaughter of James L. Newman (deceased), Julian F Watson, Sr., as surviving spouse of Freida S. Watson (deceased), Cynthia Ramsey, as surviving sister of James D. Phillips (deceased), and Kristie W. Meadows, as surviving estate executor of David L. Scoggins Jr. (deceased).

**17.** The Plaintiff Workers fall into three categories.

   A.   Plaintiff Workers who were employed directly by one or more of the OPERATING DEFENDANTS that owned and operated the FACILITY (each a "Plaintiff Direct Worker") or;

   B.   Plaintiff Workers who were employed directly by one or more of the OPERATING DEFENDANTS that owned and operated the SISTER FACILITY (each a "Plaintiff Sister Facility Worker") or;

   C.   Plaintiff Workers who were employed by one or more of the CONTRACTOR DEFENDANTS to perform work at the FACILITY and/or the SISTER FACILITY or were employed by other companies that employed them to perform services or supplied goods at the FACILITY and/or the SISTER FACILITY (each a "Plaintiff Contractor Worker").

**18.** Another set of Plaintiffs are the "Plaintiff Family Members" who cohabitated with a Plaintiff Worker while said employee worked at the FACILITY and/or the SISTER FACILITY. Plaintiff Family Members are resident citizens of Charleston, Bradley County, Tennessee, or the surrounding area, or were at all times material hereto. At all times material hereto, the Plaintiff Family Members were members of the same household as

one or more Plaintiff Workers who were working at the FACILITY and/or the SISTER

FACILITY. The Plaintiff Family Members are as follows: Rebecca E. Allison, Tonya L.

Cassady-Pendergrass, Laura F. Casteel, Jeffery L. Casteel, Barbara A. Capehart, Sara J.

Johnson, Tatum M. Billings, Margaret B. Boring, Jacquelin S. Cordell, William G.

Emendorfer III, Diamond P. Gentry, Laura B. Hale, Robert D. Hale, Eric S. Harris, Robert

A. McAlister, Dianne M. Miller, Gloria S. Olinger, Sally L. Owens, Kimberly K.

Overstreet, Brandi D. Smith, Milisa D. Snider, Imogene C. Stevenson, Leslie J. Bustos,

Carl E. Pruett II, Shirley A. Gregory, Janet M. Lee, a/k/a Janet L. McFerrin, Trena G.

Pendergrass, Sheila S. Goins, Alexandra K. Grulke, Valarie M. Doss, Shelia S. Green,

Johnnie F. Griffin, Lezli Ledesma-Lemer, Kathleen M. Weir, Gloria M. Versa, Marcia Y.

McMahan, Jennifer L. Shelton, Alma O. Lemer Zamora, Jonathan Ledesma Lemer,, Amy

R. Maynor, Rae A. Rutledge, Pamela M. Henderson, Debra K. Williams, Cesar Alexander

Vasques, Jennifer M. Ozmore Shaw, Vivian D. McLeod, a/k/a Vivian D. Godfrey, Kendra

E. Byler, Nicole A. Powers, a/k/a Nicole A. Guzzetti, Mary A. Armstrong, Angela H.

Vasquez Moya, Ricky L. Jacobs, Lori A. Hamm, Debra F. Kaehler, Riley C. VanHook,

Deborah H. Lambert, Angie R. Moses, Mary A. Wilcox, Martha Jane U. Smith, Jeri D.

Greene, Elizabeth A. Bottoms, Selina E. Davis, Christopher L. Cummings, Todd V.

Olinger, Anthony L. Cummings, Shelby J. Presswood, Christopher S. Sumner, Sherry J.

Price, Billy L. Green Jr., Stephanie J. Shanahan, Jamie L. Stafford, Patricia R. Decker,

Penny T. Orders, Donna K. Black, Amy S. Davenport, Martha P. Harbison, David

Chiusano, Rhonda J. Collins, Berneida G. Cash, Latoria C. McMahan, Todd J. Corvin,

Wendy B. Canida, Nancy D. Baker, Kristi C. Benton, Pamela D. Baker, Corey A.

Mantooth, Denita L. McMahan, Natasha M. Smith, Zelyia M. Caldwell, Jennifer J. Abbes,

Laureen C. Gunderson, Christopher H. Weir, Julian F. Watson Jr., Xaviery E. Caldwell, Canesha M. Norris, Beverly C. Abernathy, a/k/a Beverly C. Miller, Ceacila B. Guzzetti, Xiomara Y. Moya, Brenda S. Culberson, Lynn J. Gorczynski, Lavinia A. Johnson, Mistina M. Brown, Michael K. Heiskell, Olivia A. Mims, Deion A. Mims, David A. Mims, Carrie G. Martin, Randall E. Mason, Kristie W. Meadows, Steven D. Gregory, Harleyann P. Goins, Amanda C. Haney, Brandy A. Stiegler, Marissa A. Hunt, Stacey L. Hester, Elijah A. Barber, Bernice S. Blassingame, Bradley D. Waldrop, Carrie A. Harvey, Cody T. Shaw, Michael D. Dalton, Bryan A. Mendez, Lora L. Melton, Evelyn L. Isom, Fabio A. Mendez, Rex A. Blassingame, Betty A. Carter, Elizabeth A. Howell, Janis M. Newman, Barbara J. Hunt, Tabitha A. Hunt, Debra M. Lattimore, Charles M. Sluder, Patricia M. Sluder, Richard P. Chiusano, Charla R. Barker, on behalf of S.B., a minor, Cortney S. Fisher, on behalf of Z.C., a minor, Matthew L. Farmer, on behalf of E.F., a minor, Vitaliy V. Fomin, on behalf of E.F., a minor, Nicholas E. Hobson, on behalf of B.H., a minor, William M. Parks, on behalf of Z.P., a minor, Michael E. Rogers Jr., on behalf of M.R., a minor, Michael E. Rogers Jr., on behalf of M.R. a minor, Jennifer P. Panter, on behalf of K.P., a minor, Jennifer P. Panter, on behalf of K.S., a minor, Jennifer P. Panter, on behalf of K.S., a minor, Jennifer P. Panter, on behalf of J.S., a minor, Casie D. Wilcox, on behalf of D.W., a minor, Teena S. Cato, on behalf of E.Y., a minor, Odin Maradiaga, on behalf of A.M., a minor, Christopher Wyllie, on behalf of B.W., a minor, Kasey B. Smithers, on behalf of L.M., a minor, Elizabeth Worley, on behalf of H.G., a minor, Megan R. Powell, on behalf of B.M., Joseph D. Martin, on behalf of T.M., Rodney S. Christian, on behalf of D.C., a minor, Jennifer L. Lawson, on behalf of C.K., a minor, Mauricio Ledesma, on behalf of L.L., a minor, Gloria S. Olinger, as surviving mother of Kristopher M. Olinger (deceased),

Jeffrey A. Anderson, as surviving spouse of Cynthia A. Anderson (deceased), Martha P. Harbison, as surviving spouse of George E. Harbison (deceased), and Barbara J. Hunt as surviving spouse of Louis V. Hunt Jr. (deceased).

19. Some Plaintiff Family Members are pursuing causes of action as the surviving spouse, child, next-of-kin, or personal representative of their deceased family member under the Tennessee wrongful death statutes at *Tenn. Code Ann.* §20-5-101, et seq. Moreover, a substantial number of Family Members were members of the same household as one or more of the deceased Plaintiff Workers who were working at the FACILITY and/or the SISTER FACILITY. These Plaintiff Family Members and their deceased Plaintiff Workers are as follows: Ceacila B. Guzzetti, as surviving daughter of Michael B. Guzzetti II (deceased), Milisa D. Snider, as surviving daughter of Dallas A. Price (deceased), Margaret B. Boring, as surviving spouse of Dennis G. Boring (deceased), Eric S. Harris, as surviving son of Dennis W. Harris (deceased), Berneida G. Cash, as surviving daughter of Roy L. Burris (deceased), Rhonda J. Collins, as surviving spouse of Jerry W. Collins (deceased), Jacquelin S. Cordell, as surviving spouse of Larry R. Cordell (deceased), Shelby J. Presswood, as surviving spouse of Thomas L. Cummings (deceased), Michael K. Heiskell, as surviving son of Benny B. Heiskell III (deceased), Gloria S. Olinger, as surviving spouse of William M. Olinger (deceased), Gloria S. Olinger, as surviving mother of Kristopher M. Olinger (deceased), Kimberly K. Overstreet, as surviving spouse of Robert L. Overstreet (deceased), Imogene C. Stevenson, as surviving spouse of Ray D. Cook (deceased), Mary A. Wilcox, as surviving spouse of Wilford W. Wilcox (deceased), Brenda S. Culberson, as surviving spouse of Gary L. Culberson (deceased), Patricia R. Decker, as surviving spouse of Hobert L. Decker (deceased), Billy L. Green, Jr., as

surviving son of Billy L. Green, Sr. (deceased), Shelia S. Green, as surviving spouse of Richard L. Green (deceased), Tabitha A. Hunt, as surviving daughter of Edward M. Wade, Shirley A. Gregory, as surviving spouse of Harry C. Gregory (deceased), Johnnie F. Griffin, as surviving spouse of Charles Griffin (deceased), Pamela M. Henderson, as surviving spouse of Alan C. Henderson (deceased), Sara J. Johnson, as surviving spouse of Oscar D. Johnson (deceased), Betty A. Carter, as surviving sister of Ricky A. Lankford (deceased), Betty A. Carter, as surviving aunt of Timothy A. Lankford (deceased), Carrie G. Martin, as surviving spouse of Johnnie A. Martin (deceased), Randall E. Mason, as surviving son of Julian B. Mason (deceased), Amy R. Maynor, as surviving spouse of David L. Maynor (deceased), Angie R. Moses, as surviving spouse of Danny E. Moses (deceased), Amanda C. Haney, as surviving daughter of Almyra E. Mosier, a/k/a Elizabeth A. Mosier (deceased), Sally L. Owens, as surviving spouse of John H. Owens (deceased), Valarie M. Doss, as surviving spouse of Stephen E. Phillips (deceased), Amy S. Davenport, as surviving daughter of Robert T. Samples (deceased), Kristie W. Meadows, as stepdaughter and estate executor of David L. Scoggins, Jr. (deceased), Martha Jane U. Smith, as surviving spouse of Glenn A. Smith (deceased), Tatum M. Billings, as surviving daughter of Michael D. Turner (deceased), Nancy D. Baker, as surviving spouse of Jimmy C. Baker (deceased), David Chiusano, as surviving son of Pasquale P. Chiusano (deceased), Laureen C. Gunderson, as surviving granddaughter of James L. Newman (deceased), Cynthia Ramsey, as surviving sister of James D. Phillips (deceased), Elizabeth A. Bottoms, as surviving spouse of Ronald E. Bottoms (deceased), Jeffrey A. Anderson, as surviving spouse of Cynthia A. Anderson (deceased), Martha P. Harbison, as surviving

spouse of George E. Harbison (deceased), Barabara J. Hunt, as surviving spouse of Louis V. Hunt Jr. (deceased), and Julian F. Watson Sr., as surviving spouse of Freida S. Watson.

20. There are additional family members ("Additional Family Members"), living in the same household with one or more Plaintiff Workers, while said employee(s) were working at the FACILITY and/or the SISTER FACILITY, but who are not yet listed as Plaintiff Family Members. Additional Family Members were exposed in the same manner as the Plaintiff Family Members.

21. Counsel for the Plaintiffs reserves the right to add Additional Workers and Family Members as named Plaintiffs in the future.

22. As explained below, the Defendants that owned and operated the FACILITY, the SISTER FACILITY, and the Defendants supplying contract labor owed a duty to all the Plaintiff Workers, not just the Plaintiff Direct Workers.

23. Exhibit 1 is a Matrix of Plaintiff Claims which includes a chart detailing the names, employers, relevant timelines, and counts for each identified Plaintiff Direct Worker, Plaintiff Contractor Worker, and Plaintiff Family Member. The rows for Plaintiff Family Members specify the family member who exposed them to contaminants, along with their timeline of exposure. Additionally, the chart enables quick identification of Plaintiffs who have submitted affidavits, as previously mentioned. A legend is provided at the beginning of Exhibit 1 to facilitate the interpretation of the data presented.[1]

24. Exhibit 2 contains maps of the FACILITY and SISTER FACILITY and identifies the areas discussed herein.

25. Exhibits 3 through 57 contain Affidavits of certain Plaintiffs and other Exhibits as follows:

_____

[1] An electronic, native version of Exhibit 1 is being provided to the Court and to all Defendants to allow them to search, filter and sort all data contained therein.

Exhibit 3 – Affidavit of Tim E. Powers

Exhibit 4 – Affidavit of Jerome A. Johnkins

Exhibit 5 – Affidavit of Johnny L. Carson

Exhibit 6 – Affidavit of Stephen Price

Exhibit 7 – Affidavit of Timothy K. Kelley

Exhibit 8 – Affidavit of James W. Albury, Sr.

Exhibit 9 – Affidavit of Eric A. Brokish

Exhibit 10 – Affidavit of Michael W. Fife, Jr.

Exhibit 11 – Affidavit of Samuel L. Goins

Exhibit 12 – Affidavit of Mitchell W. Anderson

Exhibit 13 – Affidavit of William A. Hobbs

Exhibit 14 – Affidavit of Jerry L. Pendergrass

Exhibit 15 – Affidavit of Donnie R. Webb

Exhibit 16 – Affidavit of Lamotta McMahan

Exhibit 17 – Affidavit of Rebecca E. Allison

Exhibit 18 – Affidavit of Michael K. Heiskell

Exhibit 19 – Affidavit of Tonya L. Cassady-Pendergrass

Exhibit 20 – Affidavit of Laura F. Casteel

Exhibit 21 – Affidavit of Jeffery L. Casteel (a/k/a "J.L. Casteel")

Exhibit 22 – Affidavit of Ward C. Donaldson

Exhibit 23 – Affidavit of Thomas L. Allison

Exhibit 24 – Affidavit of Gerald J. Cline, Jr.

Exhibit 25 – Affidavit of Jeffery D. Casteel

Exhibit 26 – Affidavit of Tonya R. Hylton (a/k/a "Tonya R. Black-Hylton")

Exhibit 27 – Affidavit of Christopher H. Brooks

Exhibit 28 – Affidavit of Matthew T. Ownby

Exhibit 29 – Affidavit of Natasha A. Henegar

Exhibit 30 – Affidavit of Eva C. VanHook

Exhibit 31 – Affidavit of Shelia A. Millaway

Exhibit 32 – Affidavit of Rhonda J. Collins

Exhibit 33 – Affidavit of Rebecca E. Lynch

Exhibit 34 – Affidavit of Gloria S. Olinger

Exhibit 35 – Affidavit of Lisa A. Carson

Exhibit 36 – Affidavit of Jennifer L. Lawson

Exhibit 37 – Affidavit of Alex S. Shaw

Exhibit 38 – Affidavit of Nicholas E. Hobson

Exhibit 39 – Supplemental Affidavit of Jeffery D. Casteel

Exhibit 40 – Supplemental Affidavit of Lamotta McMahan

Exhibit 41 – Supplemental Affidavit of Michael K. Heiskell

Exhibit 42 – OLIN Waiver for Females

Exhibit 43 – OLIN Orientation Checklist

Exhibit 44 - Summary of Symptoms

Exhibit 45– Link to Native Files and Exhibits for Download

Exhibit 46 – Supplemental Affidavit of Gloria S. Olinger

Exhibit 47 – Supplemental Affidavit of Alex S. Shaw

Exhibit 48 – Supplemental Affidavit of Ward C. Donaldson

Exhibit 49 – Affidavit of Jimmy A. Jack

Exhibit 50 – Affidavit of Charles M. Sluder

Exhibit 51 – Affidavit of Roger L. Walden

Exhibit 52 – Second Supplemental Affidavit of Alex S. Shaw

Exhibit 53 – Supplemental Affidavit of Timothy K. Kelley

Exhibit 54 – Supplemental Affidavit of Michael W. Fife, Jr.

Exhibit 55 – Supplemental Affidavit of Samuel L. Goins

Exhibit 56 – Supplemental Affidavit of James W. Albury, Sr.

Exhibit 57 – Affidavit of Charles D. Kincaid

*These Affidavits and other Exhibits will be cited throughout the Complaint in support of the allegations against the Defendants.*

## Overview of the FACILITY's History

26. The FACILITY has been in operation since 1962 and is currently operational. Upon information and belief, the FACILITY has been owned and operated by OLIN the entire time and remains so as of the filing of this Complaint.

27. OLIN has operated under a number of names since its founding in 1892. These names, in chronological order are: Equitable Powder Company founded in 1892, Western Cartridge Company in 1898, Winchester-Western in 1931, Olin Industries, Inc., in 1944, Olin Mathieson Chemical Corporation after merging with Mathieson Chemical Corporation (founded also in 1892) in August of 1954, and Olin Corporation as of 1969. Additionally, on February 8, 1999, Olin Corporation spun off its specialty chemicals business under the name Arch Chemicals, Inc. In Tennessee and at the FACILITY specifically, OLIN has

operated at one time or another under the assumed names Olin Chlor-Alkali Products and Olin Chlor-Alkali Products and Vinyls.

28. As of 2014, the FACILITY manufactured chlorine ($Cl_2$), sodium hydroxide (NaOH), also known as caustic soda, potassium hydroxide (KOH), also known as caustic potash, and hydrogen ($H_2$) using the membrane electrolytic process. The FACILITY also manufactured sodium hypochlorite (NaClO), sulfur dioxide ($SO_2$), and hydrochloric acid (HCl), using chemical reaction processes.[2] Upon information and belief, the FACILITY continues to do the same or similar manufacturing processes today.

29. The FACILITY is located in Bradley County. Here was the status of this FACILITY as of a 2015 Report from the Tennessee Department of Environment and Conservation:

> It is using a membrane cell process, SIC codes 2812 and 2819. OLIN and Lonza (a separate company located within OLIN's property) employ approximately 500 people and operate 24 hours a day, 7 days a week [LONZA]. A separate company, located within and not on OLIN's property, [LONZA] manufactures calcium hypochlorite for use in water treatment products [SISTER FACILITY]. The reason for the close proximity is that OLIN provides the raw materials for [LONZA's] products. In addition to [LONZA], several companies which provide support services to OLIN are located onsite. All of them share process water and stormwater infrastructure with OLIN.[3]

30. As of 2015, additional chemicals were manufactured onsite to supply internal processes. By-products of these processes such as 20-40% hydrochloric acid, sodium hypochlorite and sulfur dioxide provided additional revenue streams. Chemtrade Logistics, Inc., owned and operated an air stripper unit (ASU) within OLIN's property. The ASU strips oxygen and nitrogen from ambient air and condenses them into liquid so that they can be used to manufacture OLIN's products. Liquid Nitrogen is used to purge process vessels and liquid

---

[2] Tenn. Dept. of Env't Conservation, div. Water Resources, Draft of NPDES Permit No. TN0002461 (2014).
[3] Tenn. Dept. of Env't Conservation, Chattanooga Env't Field Office, Compliance Evaluation Inspection (2015).

oxygen is used to manufacture sulfur dioxide. The facility's collection system is referred to as the "chemical sewer" by OLIN personnel ("Chem Sewer"). The Chem Sewer directs wastewater to the facility's wastewater treatment plant which is known as "secondary treatment" by OLIN personnel.[4]

31. In December 2010, OLIN announced that the FACILITY would convert its Chlor-Alkali operation from mercury cell to a membrane cell process.[5] Then, from 2011 to 2014, the FACILITY converted from mercury to membrane cell technology. At that time, the plant consisted of chlorine and caustic soda production facilities, a hydrochloric acid production unit, sulfur dioxide production, and a 'utilities area' consisting of water treatment facilities and steam production. In addition, there was Administration, Rubber Services, Process Wastewater Treatment, Sanitary Wastewater Treatment, and additional maintenance and warehousing facilities located onsite.

32. The FACILITY was originally owned and operated by OLIN with the adjacent SISTER FACILITY, until approximately 1998. The SISTER FACILITY is located right next door at 1200 Old Lower River Road. The property of the FACILITY actually surrounds the SISTER FACILITY.

33. The SISTER FACILITY has been owned and operated and doing business under a number of different names. Upon information and belief, these include: OLIN, Arch Chemicals, Inc., Lonza, and Innovative Water Care, LLC.

34. As of 2013, co-located at the FACILITY were several customers and a service provider, all of which contributed to the wastewater stream of OLIN. Lonza Microbial Control (formerly Arch Chemical) utilized several OLIN products as raw materials for the

---

[4] *Ibid.*
[5] Olin Corp. Ann. Report., (2011).

manufacture of water treatment products. United Hydrogen used hydrogen produced as a by-product from OLIN's production process as their feedstock for producing gaseous and liquid hydrogen. TransWood, Inc., was OLIN's primary trucking carrier, and it operated a terminal at the FACILITY. [6]

35. Before converting from mercury to membrane cell technology, the FACILITY was rather unique in that it had three cell rooms whereas, generally, mercury cell facilities have only a single cell room. The three cell rooms were adjacent to one another and will be identified as follows:

   a. A building identified by OLIN on its reports as the "E510 Cell Room" and known by the workers at the FACILITY as the "510 Building" because each cell top section was five feet wide by ten feet long (the "510 Building"). Affidavit of Tim E. Powers, Exhibit 3, page 3.

   b. A building identified by OLIN on its reports as the "E812 Cell Room" and known by the workers at the FACILITY as the "812 Building" because each cell top section was eight feet wide by twelve feet long the ("812 Building"). Powers Aff, Ex. 3, page 3.

   c. A building identified by OLIN on its reports as the "E812 Expansion" and known by the workers at the FACILITY as the ("812 Expansion Building").

36. The 510 Building started up in 1962 and had 58 cells arranged in two rows. The 812 Building, which started up in 1968 had 38 cells also in two rows. In 1974, the FACILITY added 10 cells to the south of the existing E812 cell room. All three cell rooms were of a

---

[6] Tenn. Dept. of Env't Conservation, div. Water Pollution Control, Application for NPDES Permit, Olin Corp., 1 (2013).

simple rectangular design and a central Control Room was located between the 510 Building and the 812 Building.[7]

37. From approximately 1962 to 2012, electrolytic cells containing mercury were used to manufacture chlorine, sodium hydroxide, and potassium hydroxide, which took place in the Cell House located in the southern part of the FACILITY. As a result of many decades of mercury use in the Cell House, building materials and process equipment from the Cell House contained residual concentrations of mercury.

38. In June of 2011, the 812 Expansion Building was demolished.[8]

39. The sodium mercury cell process was shut down on September 4, 2012, and demolition began. The new, mercury-free, sodium membrane process was started on September 20, 2012.

40. The potassium-mercury cell process was shut down on October 29, 2012. The new, mercury-free, potassium membrane process was started on November 12, 2012.[9]

41. Chlorine and hydrogen are by-products of the electrolysis process for both sodium and potassium hydroxide. A notable difference between the two processes is the brine. Sodium chloride brine is used for sodium hydroxide production, and potassium chloride brine is used for potassium hydroxide production.

42. By December 2012, the last of the mercury used in the mercury cells had officially been sold to a raw material distributor and removed from the site.[10]

---

[7] EPA, Office of Air Quality Planning and Standards, Summ. of Cell Room Mercury Emissions Data for Olin Mercury Cell Chlor-Alkali Plant: Charleston, Tenn. (2007).
[8] Tenn. Dept. of Env't & Conservation, Chattanooga Env't Field Office, Compliance Evaluation Inspection (2013).
[9] Tenn. Dept. of Env't & Conservation, div. Water Pollution Control, Permits Sec, Mercury Minimization Plan (2012).
[10] Tenn. Dept. of Env't & Conservation, Chattanooga Env't Field Office, Compliance Evaluation Inspection (2013).

**43.** The FACILITY is located in northern Bradley County on property immediately next to the Hiwassee River. McMinn County, Tennessee is across the river.

## Who are the OPERATING DEFENDANTS?

**44.** OPERATING DEFENDANTS, as previously defined, are those corporations that over the relevant time owned and operated this FACILITY and/or the SISTER FACILITY. For the FACILITY, OLIN has been the only OPERATING DEFENDANT. For the SISTER FACILITY, there have been several, which will be discussed later.

**45.** Upon information and belief, OLIN built the FACILITY in 1962 for the production of chlorine and caustic soda at the Charleston, Tennessee location. Later, this FACILITY added the capacity to make sodium hydrosulfite. The FACILITY utilized the mercury-cell production method until its decommissioning in 2012.

**46.** Defendant Olin Corporation is a Virginia corporation that is authorized to do business in the State of Tennessee. OLIN is subject to the jurisdiction of this Court.

**47.** Upon information and belief, in approximately 1998, OLIN sold, leased, or otherwise conveyed the SISTER FACILITY to Defendant Arch Chemicals, Inc. ("ARCH").

**48.** ARCH is a Virginia company that is authorized to do business in Tennessee. ARCH is subject to the jurisdiction of this Court.

**49.** ARCH was originally "organized under the laws of the Commonwealth of Virginia on August 25, 1998, as a wholly owned subsidiary of [OLIN] for the purpose of effecting a tax-free distribution of [OLIN's] specialty chemical businesses to the shareholders of OLIN." Arch Chem. Inc., Annual Report, (Form 10-K), 1 (2011). The Distribution Agreement, dated February 8, 1999, made ARCH a "separate, independent, publicly-held

corporation."[11] Under this agreement, on February 8, 1999, OLIN distributed the outstanding common stock of ARCH to its shareholders – one share of ARCH for every two shares held in OLIN's common stock.[12]

50. Upon information and belief, in approximately 2011 an entity purchased ARCH's interest in the SISTER FACILITY.

51. OLIN has maintained a long-term business relationship with the SISTER FACILITY after OLIN stopped operating the SISTER FACILITY directly.

**Identification of CONTRACTOR DEFENDANTS**

52. The OPERATING DEFENDANTS employed several contractors to provide work in and around the FACILITY and/or the SISTER FACILITY. The Defendants who served as contractors for the OPERATING DEFENDANTS are referred to as CONTRACTOR DEFENDANTS.

53. Defendant Bilfinger Industrial Services, Inc., ("BILFINGER, formerly known as FRUCON") is a Delaware corporation that is registered to do business in Tennessee. Upon information and belief, BILFINGER, formerly known as FRUCON was formerly known as and is the successor in interest to the following entities: BIS Industrial Services, Inc., BIS FruCon Industrial Services, Inc., BIS FruCon Engineering, Inc., Fru-Con Construction Corporation, Fru-Con Technical Services, Inc. and Fruin-Colnon Contracting Company. These entities will be collectively referred to as BILFINGER, formerly known as FRUCON. BILFINGER, formerly known as FRUCON, is headquartered in The Woodlands, Texas. Upon information and belief, BILFINGER, formerly known as FRUCON, is a contractor that provided work in and around the

---

[11] Arch Chem. Inc., Ann. Report, 1 (2011).
[12] Olin Corp., Distribution Agreement, 17 (1999).

FACILITY and/or the SISTER FACILITY. BILFINGER, formerly known as FRUCON, is subject to the jurisdiction of this Court.

54. Defendant Robins & Morton Corporation is a Delaware corporation that is registered to do business in Tennessee. Its principal place of business is located at 400 Shades Creek Parkway in Birmingham, Alabama. Robins & Morton Corporation does business through its affiliated entity Robins & Morton, LLC.

55. Robins & Morton, LLC, is an Alabama limited liability company that is registered to do business in Tennessee. The principal place of business of Robins & Morton, LLC, is located at 400 Shades Creek Parkway in Birmingham, Alabama. Robins & Morton, LLC, operates in Tennessee under the assumed name Alabama Robins & Morton, LLC. The sole member manager of Robins & Morton, LLC, is the Robins & Morton Corporation.

56. Since they operate as alter-egos or essentially one entity, Robins & Morton Corporation and Robins & Morton, LLC, are collectively referred to as ("ROBINS & MORTON") All allegations against one is an allegation against the other. Upon information and belief, ROBINS & MORTON is a contractor that provided work in and around the FACILITY and/or the SISTER FACILITY. ROBINS & MORTON is subject to the jurisdiction of this Court. In particular, ROBINS & MORTON was involved in the decontamination, demolition, and construction of new facilities for OLIN when OLIN converted its Chlor-Alkali processes at the FACILITY (as discussed in detail below).

57. Defendant Pen Gulf, Inc. ("PEN") is a Florida corporation that is registered to do business in Tennessee. Upon information and belief, PEN is a contractor that provided work in and around the FACILITY and/or the SISTER FACILITY. PEN is subject to the jurisdiction of this Court.

58. Defendant Turner Specialty Services, LLC, ("TURNER") is a Louisiana corporation that is registered to do business in Tennessee. Upon information and belief, TURNER is a contractor that provided work in and around the FACILITY and/or the SISTER FACILITY. TURNER is subject to the jurisdiction of this Court.

59. Defendant White Electrical Construction Co. (f/k/a "Duncan Electric Company") ("WHITE ELECTRICAL, formerly known as DUNCAN") is a Georgia corporation that is registered to do business in Tennessee. Its principal place of business is in Chattanooga, Hamilton County, Tennessee. Upon information and belief, WHITE ELECTRICAL, formerly known as DUNCAN, is a contractor that provided work in and around the FACILITY and/or the SISTER FACILITY. WHITE ELECTRICAL, formerly known as DUNCAN, is subject to the jurisdiction of this Court.

60. Defendant Custom Mechanical Contractors, Inc. (f/k/a Lennon Company, Inc.) ("CUSTOM MECHANICAL") is a Tennessee corporation, with its principal place of business in Cleveland, Bradley County, Tennessee. Upon information and belief, CUSTOM MECHANICAL is a contractor that provided work in and around the FACILITY and/or the SISTER FACILITY. CUSTOM MECHANICAL is subject to the jurisdiction of this Court.

61. Defendants BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL are collectively referred to as "CONTRACTOR DEFENDANTS".

**Jurisdiction and Venue are Proper in this Court**

62. This case is filed pursuant to the procedural and substantive law of the State of Tennessee (including but not limited to, where applicable, the wrongful death statutes at *Tenn. Code Ann.* §20-5-101, et seq.).

43

**63.** This Court has jurisdiction pursuant to 28 *U.S.C.* §1332 in that the parties are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

**64.** Venue is appropriate in this judicial district pursuant to 28 *U.S.C.* §1391(a)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district in or near Charleston, Bradley County, Tennessee.

## CHAPTER II: THE CHLOR-ALKALI INDUSTRY

**Use of Toxic Mercury in the Chlor-Alkali process**

**65.** There are three electrolytic cell-type processes used for Chlor-Alkali production on an industrial scale: the mercury cell (beginning in the 1890s), the diaphragm cell (also beginning in the 1890s), and the membrane cell which, beginning in the 1960s, progressed relatively quickly as a practical alternative to mercury and diaphragm cell technology. Of the three options, the mercury cell process is the only one wherein the use of mercury is required.[13 & 14]

**66.** The mercury-cell process for producing chlorine and caustic utilized by the FACILITY from 1962 to 2012 evolved from the Castner-Kellner mercury-cell process first implemented in the 1890s.[15]

**67.** The mercury cell chlor-alkali process utilizes electrolysis of a saltwater solution (also known as "brine") to produce both chlorine gas ($Cl_2$) and an alkaline solution (either sodium hydroxide or potassium hydroxide). Sodium hydroxide (NaOH), also known as "caustic soda," is produced by the electrolysis of sodium chloride brine. Potassium

---

[13] EPA, Final Test Report: Measurement and Evaluation of Fugitive Mercury Emissions at a Mercury Cell Chlor-Alkali Plant, (2007).
[14] THOMAS O'BRIEN, ET AL., HANDBOOK OF CHLOR-ALKALI TECHNOLOGY (2005).
[15] *Ibid.*

hydroxide (KOH), also known as "caustic potash," is produced by the electrolysis of potassium chloride brine. This process also yields hydrogen gas ($H_2$) as a by-product.[16]

68. The mercury cell has a steel bottom with rubber-coated steel sides, as well as the boxes for brine and mercury feed and exit streams, with a flexible rubber or rubber-lined steel cover. Horizontal, adjustable metal anodes hang from the top, and mercury flows on the inclined bottom. The current flows from the steel bottom to the flowing mercury. Saturated brine fed from the end box is electrolyzed at the anode to produce chlorine, and the depleted brine flows from the top portion of the trough. The cation, be it sodium or potassium, reacts with mercury to form an amalgam, which flows out of the end box to a vertical cylindrical tank. The amalgam reacts with water in the decomposer, packed with graphite particles, and produces caustic soda or potash and hydrogen. Hydrogen saturated with water vapor exits from the top, along with the mercury vapor. The concentration out of the decomposer is either 48-50 percent by weight of caustic soda or 45-50 percent by weight of caustic potash. The depleted brine flows out of the exit end box. Some cells are designed with chlorine and anolyte outlets from the end box, which are separated in the depleted brine tank. The mercury from the decomposer is pumped back to the cell.

69. A mercury cell plant typically has circuits of 30 or more individual cells electrically connected in a series.[17] Each mercury cell has two primary units, the electrolyzer (electrolytic cell) and the denuder (decomposer). The electrolytic cell has a steel bottom with rubber-coated steel sides, as well as the boxes for brine and mercury feed and exit

---

[16] EPA, Final Test Report: Measurement and Evaluation of Fugitive Mercury Emissions at a Mercury Cell Chlor-Alkali Plant, (2007).
[17] EPA, Final Test Report: Measurement and Evaluation of Fugitive Mercury Emissions at a Mercury Cell Chlor-Alkali Plant, (2007).

streams, with a flexible rubber or rubber-lined steel cover.[18] Chlorine gas is produced in the electrolytic cell and, in a separate compartment, the decomposer produces hydrogen gas and caustic soda or potash solution.[19]

70. The FACILITY had 106 mercury cells housed in three Cell Buildings where both caustic soda and caustic potash were produced along with chlorine and hydrogen.[20] The cells were controlled from a centralized control room by an integrated computer system called the Distributed Control System (DCS). See Affidavit of Jeffery D. Casteel, Exhibit 25.

> "Any changes I could make that saved OLIN money on the power
> bill made them happy." Casteel, J.D. Aff, Ex. 25. Page 5.

71. Purified, saturated brine is fed into the electrolytic cell at the inlet end-box and then flows through an elongated, slightly inclined trough in between a shallow, co-current stream of mercury (cathode) and an electrode assembly (anode). The adjustable metal anodes, the lower surfaces of which are close to the mercury surface and parallel to it, are dimensionally stable, metal electrodes made of a titanium substrate with a metal catalyst. The cell trough has a gas-tight cover, which also serves to support the anodes. During electrolysis, which is electrical current applied between the anode and the mercury cathode, chlorine is liberated by the anode and collects at the top of the cell in gaseous form.

72. The elemental mercury in liquid form flows in a continuous loop between the electrolytic cell and the decomposer. The mercury attracts sodium/potassium ions to form a mercury-sodium (Hg:Na) or mercury-potassium (Hg:K) amalgam as it flows through the cell from the inlet end-box down a slight grade to the outlet end-box. From the outlet end-box, the

---

[18] THOMAS O'BRIEN, ET AL., HANDBOOK OF CHLOR-ALKALI TECHNOLOGY 17–36 (First ed. 2005).
[19] EPA, Final Test Report: Measurement and Evaluation of Fugitive Mercury Emissions at a Mercury Cell Chlor-Alkali Plant, (2007).
[20] EPA, Office of Air Quality Planning and Standards, Regulatory Impact Analysis (2010).

amalgamated mercury flows to the decomposer where it reacts with deionized water in the presence of a catalyst to remove the sodium/potassium, thus restoring the mercury to its non-amalgamated form and yielding caustic soda/potash (NaOH or KOH) and hydrogen gas. After the caustic soda/potash and mercury are separated in the decomposer, the mercury is pumped back to the electrolytic cell to repeat the process while the caustic soda/potash and hydrogen are transferred to auxiliary processes for purification.

**73.** Depleted brine also exits the electrolytic cell at the outlet end-box where it is piped to a tank and/or through an auxiliary system designed to reconcentrate (re-saturate) the brine for reuse. Chlorine is collected from the tops of the mercury cells by a common header system. Hydrogen is also collected from the amalgam decomposers in a common header system. The hydrogen stream contains a small amount of mercury vapor from the liquid mercury processed in the decomposer. To remove the mercury vapor, the hydrogen stream is cooled, passed through a mist eliminator, and sent to a finishing device such as a carbon adsorber. The hydrogen may then be discharged to the atmosphere, used on-site, or sold for use off-site. In a mercury cell process, a 50 percent caustic solution is obtained directly from the amalgam decomposers. Thus, the mercury cell caustic requires minimal further processing to yield a commercial product. [21 & 22]

**74.** The brine system contains a series of tanks and pumps for the circulation of potassium chloride and water. First, solid potassium chloride is transported to the brine system and mixed with water. From this point, the solution of potassium chloride and water goes through a purification stage. Impurities in the potassium chloride brine are removed

---

[21] EPA, Final Test Report: Measurement and Evaluation of Fugitive Mercury Emissions at a Mercury Cell Chlor-Alkali Plant, (2007).
[22] THOMAS O'BRIEN, ET AL., HANDBOOK OF CHLOR-ALKALI TECHNOLOGY 17–36 (2005).

through pH adjustments (adjustments to levels of acidity of the mixture), settling, and filtration. Hazardous waste sludges are generated as part of the purification process.[23]

75. In a 2010 report published by the EPA titled "Regulatory Impact Analysis in conjunction with Proposed National Emission Standards for Hazardous Air Pollutants (NESHAP) for Mercury Emissions from Mercury Cell Chlor-Alkali Plants," the FACILITY was estimated to have been operating its mercury cell Chlor-Alkali process with over 550 tons of elemental mercury.[24]

**The Mercury Cell Chlor-Alkali Process Generates Dangerous Waste That is Contaminated with Toxic Mercury.**

76. Solid wastes from mercury cell plants include spent graphite from decomposer cells and spent caustic filtration cartridges from the filtration of sodium and potassium hydroxide. It is expected that some amount of mercury will be present in the solid waste. The primary waste produced at the FACILITY as part of the mercury cell Chlor-Alkali process is brine purification mud, which typically contains mercury in elemental form and mercuric chloride. This brine purification mud, where separately purified brine is not used, is a listed hazardous waste (K071) under RCRA Appendix VII.[25]

77. The Chlor-Alkali process generates 10kg to 45kg of brine mud per metric ton of chlorine. Mercury concentration in brine muds from mercury cell plants varies from 13ppm to 1000ppm, with an average concentration of 200ppm. These muds are considered hazardous and must be disposed of in a RCRA Subtitle C landfill after being treated with sodium sulfide ($Na_2S$), which creates an insoluble sulfide compound.[26]

---

[23] *Ibid.*
[24] EPA, Office of Air Quality Planning and Standards, Regulatory Impact Analysis (2010).
[25] Hamidi Aziz et al., *Waste Treatment and Management in Chlor-Alkali Industries*, *in* Waste Treatment in the Service and Utility Industries 99 (Yung-Tse Hung et al. eds., First ed. 2017).
[26] *Ibid.*

**78.** Mercury should be recovered from these wastes where possible, and the remainder should be disposed of in secured landfills to prevent migration of mercury, which can cause damage to the environment. Routinely, mercury-contaminated waste was transported to the FACILITY retort units where the mercury was volatilized, condensed, and recovered to be recycled back into the production process.[27] For decades, the FACILITY used old retorts to attempt to recover mercury from waste. Based on sworn Affiant testimony, this system was old, inefficient, and there was mercury-contaminated waste all over the place. This system failed to adequately recover mercury from the FACILITY's waste, creating hazards for everyone working onsite and anyone receiving the waste offsite. *See Affidavit of Jerome A. Johnkins, Exhibit 4, Affidavit of Johnny L. Carson, Exhibit 5, and Affidavit of Stephen Price, Exhibit 6.*

**79.** Plaintiff Direct Worker Jerome Johnkins describes the irremediable retort unit at the FACILITY:

> Everything brought to the retort was too full of mercury to be salvaged. It was brought there to be burned and have as much of the expensive mercury reclaimed as possible. I don't know how long that first retort furnace had been there when I started working in Environmental, but it was awful. It was cylindrical and shaped like a big back yard propane tank. It ran on propane. It had shelves in it, like dresser drawers that contaminated material would be placed on, pushed back inside the cylinder, and have doors closed behind it. It was old and inefficient. That thing killed people. The smoke that came out of that thing killed people. It didn't drop anybody right there on the spot, but it killed them just as surely. Johnkins, J. Aff, Ex. 4, page 4.

**80.** In May of 1993, the FACILITY began using a newly constructed Thermal Recovery Unit ("TRU") in place of the old retorts. The new TRU allowed for more types of wastes to be treated for recovery of mercury such as K106 and K071 listed wastes, and some materials

---

[27] *Ibid.*

classified as D009 waste. Many of these wastes were previously buried in the hazardous waste landfill (also known as the "Hazard Dome") or shipped out to toxic waste disposal facilities (TSDFs) before the new TRU was placed into normal operations.[28]

81. Jerome A. Johnkins is a Plaintiff Direct Worker who worked as a supervisor at the FACILITY. Johnkins started working at the FACILITY in 1972 and continued until 2005, when he retired. Johnkins describes the retort systems this way:

> There were two vastly different retort systems used during my time at the FACILITY. The purpose of both was the same. Materials were brought from all over the FACILITY, usually in a covered hopper, that was contaminated with mercury. The retort used extreme heat to evaporate as much of the mercury as possible and therefore separate it from whatever material it was in. The evaporated mercury could then be reclaimed and reused for further production. Everything brought to the retort was too full of mercury to be salvaged. It was brought there to be burned and have as much of the expensive mercury reclaimed as possible. I don't know how long that first retort furnace had been there when I started working in Environmental, but it was awful. . . It ran on propane. . . It was old and inefficient. That thing killed people. The smoke that came out of that thing killed people. It didn't drop anyone right there on the spot, but it killed them just as surely. I had a buddy, a guy that I graduated from high school name Billy Gains. He and another guy, Louis Hunt … they would sit up against a wall when they took breaks or when they had everything under control was right behind the retort. That thing smoked like crazy. It smoked like no locomotive ever dared to smoke. They both died of lung cancer. I knew that smoking retort was a major problem and so did my superiors. Johnkins Aff, Ex. 4, page 4.

82. Wastewater treatment in mercury cell plants typically generates about 1.4 kg of sludge (K106 waste) per metric ton of chlorine produced.[29] Mercury is the main pollutant of concern in wastewater that is released by mercury cell plants. In addition to wastewater

---

[28] Olin Corp., Certified letter to Tenn Dept Env't & Conservation re: Thermal Recovery Unit Operation, (1993).
[29] The Chlorine Inst., Inc., Pamphlet 125 Guidelines - Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (4th ed. 2004).

treatment sludge, spilled mercury from sumps and mercury cell "butters" may also be classified as K106 listed waste.[30]

83. Elemental mercury is capable of permeating and amalgamating with metal components and metallic structures in a Chlor-Alkali facility. This permeation can turn metal items, which may not be identified as waste products, into potential sources of exposure to mercury. Effectively, the mercury vapor turns the building and production process systems into a prolific source of mercury vapor emissions. Thus, the industrial process itself turns the FACILITY into a source of toxic mercury emissions endangering both workers and the surrounding communities.

**Operation and Maintenance of a Chlor-Alkali Facility Creates Mercury Exposure Risks.**

84. Caustic soda and potash (sodium and potassium hydroxides, respectively) are corrosive chemicals that may cause burns upon contact with the skin. Leaks and spills of caustic chemicals and mercury are known production hazards with the potential to cause serious health effects.[31] As mercury cells age and, in turn, become less efficient, they require more frequent maintenance and must be rebuilt more often. Mercury is supposed to remain enclosed during production operations. However, many tons of mercury are present in the production equipment, and, inevitably, mercury vapor enters the ambient air during periods of operation, equipment overhaul, maintenance outages, and during cleaning and decontamination of plant equipment and structures.

85. The National Institute for Occupational Safety and Health ("NIOSH") has established an Immediately Dangerous to Life or Health ("IDLH") value for mercury vapor of 10 mg/m$^3$. IDLH is a condition that poses an immediate threat to life, would cause irreversible

---

[30] *Ibid.*
[31] *Ibid.*

adverse health effects, or would impair an individual's ability to escape from a dangerous atmosphere. At temperatures around 17°C (62°F) and above, the concentration of mercury vapor in the air exceeds the IDLH level at the point of saturation. The saturation point of mercury in this context can be thought of as the maximum number of mercury molecules the air can hold at a given temperature and pressure.[32] The higher the ambient temperature, the more mercury will be vaporized, which in turn increases the inhalation hazard.[33 & 34] Many workers, Plaintiff Workers among them, have mentioned temperatures of 80°F or higher being commonly experienced while performing duties in the Cell Room and that temperatures routinely exceeded 90°F or were "unbearable" during the summer months. *See Affidavit of Timothy K. Kelley, Exhibit 7, page 3.; and Carson Aff, Ex. 5, page 3.*

86. In the mercury-cell Chlor-Alkali process, there exists the possibility that chlorine will react with mercury vapor to produce inorganic mercury compounds.[35] There are two mechanisms by which this occurs within a mercury cell Chlor-Alkali facility: 1) Residual chlorine gas (one of the main products of the process) may interact with mercury vapor in the air to form mercuric chloride, which will deposit onto the floor and other surfaces of the FACILITY, and 2) Hypochlorite solutions (e.g., bleach) are used for cleaning and decontaminating surfaces and equipment or sprayed into the ambient air of a Cell Room to decrease levels of mercury vapor in the air. The chlorine in the bleach-containing solutions may interact with mercury to form mercuric chloride. Exposure to mercuric

---

[32] *Ibid.*
[33] *Ibid.*
[34] OSHA, Guidance for the Identification and Control of Safety and Health Hazards in Metal Scrap Recycling, (2008).
[35] ATSDR, Public Health Statement Mercury (1999).

chloride is also a recognized hazard to workers primarily by way of the ingestion exposure route.[36]

87. During the operation of the Chlor-Alkali process at the FACILITY, there was ongoing maintenance work performed on the equipment, buildings, and utilities during production and scheduled outages.

88. Maintenance work is any work that is performed to repair, sustain, upkeep, or refurbish existing materials, property, or equipment in their current state without changing their size, type, or quality. The work scope for maintenance activities performed at the FACILITY during normal production operations, as described by Plaintiff Workers, is wide-ranging in nature. Such activities (collectively the "Maintenance Work") include, but are not limited to:

    A. Housekeeping and mercury vapor control in the Cell House,

    B. Maintaining an inventory, recovering, and adding mercury to cells,

    C. Loading, unloading, and operating mercury retorts or thermal recovery units,

    D. Processing (treatment, storage, and disposal) D009, K071, and K106 wastes,

    E. Monitoring and cleaning or replacing filtration media,

    F. Rebuilding, repairing, and cleaning out cells and other process equipment,

    G. Draining mercury from cells and other process equipment,

    H. Anode construction, installation, adjustment, repair, and removal, and

    I. Removing or replacing pipes and other parts by cutting or sawing.

---

[36] NIOSH, Criteria for a Recommended Standard: Occupational Exposure to Inorganic Mercury (1973).

*See Affidavit of James W. Albury, Sr., Exhibit 8; Affidavit of Eric A. Brokish, Exhibit 9; Carson, Aff, Ex. 5; Affidavit of Michael W. Fife, Jr., Exhibit 10; and Affidavit of Samuel L. Goins Exhibit 11.*

89. During the performance of maintenance work, Plaintiff Workers were exposed to harmful levels of mercury causing significant personal injury to themselves and Plaintiffs' Family Members. The fact is a worker's exposure to dangerous mercury vapor levels significantly increases when opening parts of the mercury-cell system, handling contaminated parts, or adding heat to mercury-contaminated materials.

**Decommissioning and Demolition Creates Known Elevated Mercury Exposures.**

90. In addition to those exposures present during operations and maintenance, even more dangerous exposure occurred during the Decommissioning and Demolition process ("D&D").

91. In this context, the terms "Decommissioning" and "Demolition" refer to distinct phases following the shut-down of an industrial mercury cell Chlor-Alkali process. Decommissioning typically entails flushing mercury out of the system for recovery, removing any other hazardous chemicals used during production, and ensuring all products and by-products have been removed from the system. Demolition typically entails the dismantlement of plant equipment and structures upon completion of the Decommissioning phase.

92. D&D is often used singularly to describe any combination of post-production phases and activities necessary to remove hazardous chemicals, remove and/or decontaminate hazardous waste, and to remove contaminated equipment or waste from the FACILITY.

54

This occurs after a mercury cell Chlor-Alkali operation is either shut down permanently or converted from mercury cell to membrane cell.

93. The FACILITY conducted D&D operations while also converting Chlor-Alkali operations to membrane cell technology from approximately 2011 until the foundations of the Mercury Cell Buildings were paved over in 2014. This D&D process exposed the Plaintiff Workers to significantly high levels of mercury.

94. The Plaintiff Workers were employed at the FACILITY and/or the SISTER FACILITY by one or more of the OPERATING DEFENDANTS or CONTRACTOR DEFENDANTS. Plaintiff Workers were performing plant operations, maintenance, contracting work, and/or D&D at the FACILITY and/or the SISTER FACILITY. They thereby contacted elemental mercury and its vapors, mercury compounds, and other toxicants at the FACILITY and/or the SISTER FACILITY. They were further exposed in and around a variety of fixtures, equipment, and structures at the FACILITY and/or the SISTER FACILITY, which were contaminated with mercury and other toxicants.

95. ROBINS & MORTON was contracted to perform work at the FACILITY and SISTER FACILITY during production and operations, for a range of services, but also during D&D.

96. ROBINS & MORTON pride themselves on safety, and state "At its core, safety is caring about team members…" and state "...their responsibility to report any at-risk behaviors or conditions.[37]" Furthermore, ROBINS & MORTON holds contracts with major federal agencies, such as the U.S. Army Corps of Engineers, the General Services Administration (GSA), and the Department of Veterans Affairs. These contracts include Indefinite

---

[37] Expertise | Robins & Morton, Robins & Morton (Feb. 5, 2026).

Delivery/Indefinite Quantity (IDIQ) and Multiple Award Construction Contracts (MACCs) for new construction, renovation, repair, and design-build work on government facilities. ROBINS & MORTON was contracted to work at the FACILITY and SISTER FACILITY, providing construction management and general construction, pipe work, fabrication, pipe removal, and pipe installation.

97. The Plaintiff Workers were exposed to mercury and other toxicants at the FACILITY and/or the SISTER FACILITY, and, in direct and proximate relationship thereto, suffered personal injuries and damages including, but not limited to: death, physical damage to organs and organ systems, brain injuries, severe emotional distress, pain and suffering, impairment of earning capacity, medical expenses, temporary, permanent, partial, or complete disability, and will suffer these personal injuries and damages for the remainder of their lives. *See Affidavit of Mitchell W. Anderson, Exhibit 12; Carson Aff, Ex. 5; Affidavit of William A. Hobbs, Exhibit 13; Affidavit of Jerry L. Pendergrass, Exhibit 14; Powers Aff, Ex. 3; and Affidavit of Donnie R. Webb, Exhibit 15.*

## CHAPTER III: ONSITE AND OFFSITE CONTAMINATION

*This Antiquated and Dangerous Production Process Highly Contaminated the FACILITY Itself, the SISTER FACILITY and Off-site Locations Throughout the Charleston Community.*

98. From the preceding it has been demonstrated that high mercury exposure is possible during the operation, maintenance, and D&D of a Chlor-Alkali mercury cell production FACILITY. In addition to this operational exposure, the maintenance and D&D of parts and systems also present a danger for mercury exposures. Now understanding the general exposure dangers presented by such facilities, the following testimony of Plaintiff Workers will pertain to relevant areas of operations, i.e., (A) Cell House, (B) Hazard Dome, (C) General Maintenance, (D) Liquefaction, (E) Mercury Recovery Team, and (F)

Sister Facility, and (G) Owner & Contractor Cross-Contamination.  . In addition to these distinct areas this testimony will reflect the levels of mercury exposures while working in said areas. Lastly, this testimony will show facts surrounding how this toxic mercury was spread throughout the Charleston community.

## A. Cell House Contamination

99. Demonstrative of the levels of mercury within the Cell House is the testimony of Plaintiff Contractor Worker Samuel L. Goins, who worked for PEN doing maintenance in the Cell House at the FACILITY:

> I worked in Cell House Maintenance. I repaired cells, which means I performed a complete overhaul of everything, except the cell floor. All the rubber coated parts were sent to the Rubber Room to be assessed. If it could be reworked and reused, it was. If it couldn't be reworked, it was thrown into a dumpster that would be taken to a landfill, or to the hazardous waste dump onsite called the Hazard Dome. All the irreparable metal parts were put into a different dumpster that would also be dumped at the Hazard Dome. I cleaned cells. I built cell tops and changed them out. I changed decomposers. This was a maintenance job for the whole of the buildings in the Cell House. By this time, there were thirty-five cells in the 510 Building, twenty-five more in the 812 Building, and another twenty-nine in the expansion building.

> We broke down entire cells daily. We started by using a mercury pump to remove as much as possible before changing the side rails. Then, we'd have to clean the floor of the cell of residual mercury or brine, whatever had leaked onto it. It was usually mercury. Next, we'd change out the inlet and outlet boxes, which always had significant amounts of mercury residue. We'd pull the old anodes (that had been completely encased in the cell with the mercury and brine solution) and take them downstairs to the basement and wash them off with a water hose. We didn't have a pressure washer or any cleaning solution to wash them with, just a hose. Once they were as clean as we could get them, we took the anodes to the anode room where they would be rebuilt or scrapped. The guys in the anode room made that call. At this point in the process, we removed the cell top. Again, there was always excess mercury on the top that we let spill onto the floor, where it would stay until the end of our shift. Nobody vacuumed it up during the shift. It was not taken care of immediately. Mercury just lay where

it fell until we were done for the day. We'd make another trip downstairs to wash the cell top with the same water hose before taking it to the Rubber Room to be sandblasted. I did this every day and did most of it without wearing a respirator or even gloves. Leather gloves would disintegrate quickly from the mercury, so they were useless. Goins Aff, Ex. 11, pages 2 and 3.

We had a general safety meeting once monthly in a large meeting/conference room above the cafeteria. The meetings never lasted very long. They were conducted by Dave Doorman, Matt Gayheart, Tim Yearwood or one of the OLIN Safety People. Sometimes they showed a short video and there might be a quiz. Chlorine was mentioned. Preventing injuries was talked about. I don't remember mercury ever being the subject. I don't remember mercury ever being mentioned, honestly. We also had a morning meeting every day that they called a "safety meeting". It was really just to dole out everyone's assignments for the shift. Safety was talked about, but only common-sense kind of stuff and following procedure. They talked about making sure your ladder was tied off or properly using safety harnesses when called for. It was all about avoiding broken bones or a bump on your head. Mercury was not discussed at these meetings either. Goins Aff, Ex. 11, page 5.

100. Samuel L. Goins suffers from a number of health problems, as described below:

I've dealt with excessive fatigue. I get chills and have night sweats. I've had changes in vision. I deal with shortness of breath and circulation issues. I lost teeth after working in the Cell House. I went to Dr. Martin Wilhelm in Athens, TN. I have problems reading and learning new things because my attention span is now much more limited. I've had blackouts. I've dealt with debilitating headaches. I've lost strength due to muscle weakness or loss and my hand/eye coordination is diminished. Sleep is harder to get because I have muscle cramps, spasms, and a lot of joint pain. My arms, legs, hands, and feet sometimes tingle or go temporarily numb. That is just the physical stuff. I also deal with anxiety and depression. My short-term memory is not good. I'm irritable and have marked mood swings that I've never had before. Goins Aff, Ex. 11, page 6.

101. Plaintiff Direct Worker Lamotta McMahan describes his experience in the Cell

House this way:

The cells were so huge and heavy that each one had to be lifted with cranes for maintenance. The 812 Building had more cells than the 510 Building. The 510 Building was the "small" building and was built first. The FACILITY built the 812 Building later to

carry most of the production load. The 510 Building was easier to work in because of the position of the cells. The cells were higher off the floor, so we could stand and work with them. In the 812 Building, the cells were closer to the floor. We had to bend over to reach the cells at that low height, and we felt back pain all the time. This also meant that we were closer to the C-clamps, which was dangerous if a cell exploded. My Supervisor from 1977 to the early 1980s was Lamar Smith. We called him Smitty. He was a company man, through and through. He didn't care how a job got done, as long as it got done quickly. He would rather we had no safety precautions at all to save time and finish jobs as soon as possible. Smitty was always saying, "Get the job done, no matter what it takes." He was always "horsing around." He would make jokes at my expense, and he would douse me with a water hose when I was doing my job. I was the only black guy in the department back then, and I felt like Smitty singled me out. He mistreated me, but I felt I had no one to complain to. He was above me. Lloyd Thomason took over as my supervisor after Smitty. Lloyd told me all the time, "Mercury won't hurt you. There's no possible way you could get poisoned by mercury at work. The mercury levels here are safe. Affidavit of Lamotta McMahan, Exhibit 16, pages 1 and 2.

102.    Plaintiff Direct Worker Lamotta McMahan further discusses in a supplemental

affidavit:

> As discussed in my Prior Affidavit, Lloyd Thomason took over as my supervisor after Lamar Smith. I recall now the frequency at which they told me that I was safe at work. Both of them told me once or twice a year during safety meetings with the OLIN safety men, "Mercury won't hurt you. There's no possible way you could get poisoned by mercury at work. The mercury levels here are safe.

> I discussed in my Prior Affidavit that I had to switch between a chlorine escape respirator and a dual cartridge half-mask ("COMFO II") respirator to wear during my job tasks. Since my Prior Affidavit, I have recalled more details regarding my respirator use. When I first started at the FACILITY, we were only given paper 3M masks for respiratory protection. I think that about a year later, in approximately 1978, the government made OLIN provide us with a COMFO II respirator. However, we were not able to wear this COMFO II respirator every single week. This was because we would give the respirator we wore during the workweek to John Adams (the laundry man) to clean it and change out the cartridges. The following week, we would have to use a

chlorine escape respirator (nose clips and a pacifier-like mouthpiece that you had to bite down on that was only meant for escaping quickly from sudden chlorine gas releases) during our daily tasks while we waited to get the COMFO II respirator back from John Adams. My coworkers and I asked Lamar Smith four or five times in safety meetings about how effective the chlorine escape respirator was in our daily Cell Maintenance duties. He told me, "It's safe. It's certified for use in this job. Everything is OSHA-regulated." Lloyd Thomason also told us three or four times in safety meetings that our respiratory protection was sufficient enough to keep us safe. The FACILITY kept this practice of making us switch between using the COMFO II respirator and the chlorine escape respirator weekly until OLIN started providing us with two COMFO II respirators in approximately 1979 or 1980. That way, one could be used during our jobs while the other one was being washed. The only times when I was required to wear respiratory protection while performing Cell Maintenance were pulling the cell top, cleaning the cell sides, cleaning cell bottoms, and draining decomposers. McMahan Supp. Aff, Ex. 40, page 1.

**103.**   McMahan suffers from a number of health problems, as described below:

All sorts of symptoms started coming up at once in the late 1980s and early 1990s. I've been having dry skin patches and rashes come up on my arms and legs since then. I started experiencing excessive sweating, chills, and drooling, especially during the night. I would wake up, and my wife would say, "What's wrong with you? You're sweaty, wet, and acting crazy." I was diagnosed with restless leg syndrome in the early 1990s, too. My legs get weak and get stiff a lot. I have to stand up and loosen up before I take a step. I have to get motivated just to get up and move. My right leg swells all the time. I got put on gabapentin to help with the nerve damage in my leg. Around that time too, my stomach issues started. I got in a cycle of gaining a lot of weight, then losing a lot of weight, gaining it back, and losing it again. I couldn't figure out what was making my stomach hurt, either. I thought I had ulcers, and my doctor really didn't know what was going on, either. I have used Pepcid to soothe the stomach upset.

My hands have curled down. If I put my hands together, they feel like they're magnetized towards each other. I have to struggle to pull them apart. They're clamped down like fists, and I cannot even open my fingers. It makes daily functions almost impossible. It's gotten worse over the years, too. I went to different hand specialists, including Dr. Hayes of Hayes Hand Clinic, starting in

1998 to try to figure out what was wrong. They told me they had never seen anything like it.

My feet have also given me problems. I was diagnosed with peripheral neuropathy, and I also had to have plantar fibromas on the bottoms of my feet cut off. I tried every kind of therapy and shoe insoles to make the pain go away, but I had to quit working because my legs and feet were hurting so badly.

I have joint pain and blood circulation problems. I lose my balance and get dizzy all the time. I can't remember when it started, but it has gotten much worse recently. I get up normally from sitting down, and I almost fall down on the floor. I've been falling a lot lately. I don't remember when this started, either, but I have shortness of breath. My vision is pretty good, but sometimes I see a bunch of spots in my vision. My sense of smell has gotten bad: I can hardly smell anything, even perfume. I get headaches about four or five times a week, especially when I get upset and anxious. Sometimes they are so intense that I have to lie down and close my eyes to ease the pain. I have ringing in my ears all the time. I've had a couple of teeth pulled out, but I try to keep up with taking care of my teeth as much as possible.

I have kidney dysfunction and diabetes. I was on dialysis, and I had to have a kidney transplant on July 8, 2011. I was so blessed to get that kidney transplant because I got to see the day my granddaughters were born that September. I didn't think I would be alive to see that day. I also have mitral valve prolapse. In October of 2023, I had to have my main heart valve replaced.

I have anger problems and issues with keeping my nerves in check. I have to make myself walk away from situations that make me upset, or else I will blow up really quickly. I was diagnosed with depression, anxiety, and paranoia. McMahan Aff, Ex. 16, pages 7 and 8.

## B. Hazard Dome

104.     The FACILITY's hazardous waste landfill, commonly referred to as the OLIN Hazard Dome ("Hazard Dome"), is where mercury process wastes, and other mercury-contaminated materials have been disposed of since the unit's construction in 1980. The Hazard Dome was originally designed as a surface impoundment and a landfill to meet the intent of EPA's Hazardous Waste Draft Guidelines and Regulations, Section 3004,

published in December 1978. The unit was retrofitted with an air-supported roof structure in mid-1986.[38]

105.     Rising above the ground and situated on a man-made hilltop, the Hazard Dome is removed from the FACILITY proper by nearly half a mile (approx. 2,348 feet). The white dome is over approximately one and a half (1.6792) times larger than a football field and, like a hot air balloon, is held up solely by air pressure.[39] The Hazard Dome covers a pit of at least one hundred fifty (150) feet deep, cut into the earth and back filled with all manner of mercury laden parts and other deadly wastes discarded from the FACILITY. These toxic wastes cannot otherwise be disposed of and, therefore, are left to leach their toxins within the Hazard Dome where one tear could create enough toxic vapor to poison the area for miles around.

106.     Despite the deadly and noxious contents of the Hazard Dome, the actual structure is merely plastic and thin enough to be punctured. OLIN knew that its Hazard Dome was not sufficient to protect people from the hazards within. OLIN had experience with the limitations of the Hazard Dome. This was demonstrated by employee Samuel L. Goins when something he was hauling shifted in the dumpster he was driving and pierced the Hazard Dome wall releasing a sea of mercury that spread half a mile up the main FACILITY road. It took all day before it was contained by shoveling the dirt where the mercury lay and simply turning it over. Inside is just as terrifying. The air pressure is provided by three primary pumps and supported by two propane auxiliary pumps. The constant pumping of air into the Hazard Dome to maintain its necessary internal pressure

---

[38] Olin Corp, RCRA Hazardous Waste Management Facility Part B Application, vol. 1 (1992).
[39] Tenn. Comptroller of the Treasury, Bradley County Property Maps (2023).

kicks up the dust and particulate matter that has been interred within, creating a very disturbing solution for toxic waste at the FACILITY of OLIN.

Anything from the Cell House deemed unfit to use or repair was deposited in the Hazard Dome. Sometimes the dumpsters were so heavy with excess mercury that it lifted the front wheels of the dumpster truck off the ground as I hoisted it on. To my knowledge, none of it was ever sprayed down with any cleaning agent. To my knowledge, none of it had ever even had a water hose taken to it. That equipment went into the dumpster in exactly the condition it was in when pulled off the FACILITY floor. It was about a mile and a half to the Hazard Dome from the FACILITY, which was situated just a few hundred yards from the Hiwassee River. There are double doors on the Hazard Dome. I'd have to back the truck up, open the first set of doors and back through, then close the doors behind me. Then, I did all of that again through another set of doors. Finally, I'd find myself alone inside a dome, behind two sets of doors, and work to be done while I sweated bullets. I did all of this in my personal work clothes. A hard hat wasn't really required because I was driving a truck. I had a Comfo II mask respirator on my hip (where most employees kept theirs), but it was not mandated that I wear it in the Hazard Dome. Glen Allman was my Supervisor on that job. I liked Glen a lot. However, he never told me I needed to wear a respirator in the Hazard Dome. He's deceased now. No one else from the FACILITY told me I needed to wear one in there either. Goins Aff, Ex. 11, page 4.

On one trip, something in the dumpster I was hauling shifted and punched a hole in the side of it. Mercury leaked onto one of the main thoroughfares for about half a mile. It took a full day to clean up. They sent heavy equipment out to pick up as much of the spill as possible. Then they scooped up the residual stuff and turned it over, so it was underground. After that, they made me take a different route to the Hazard Dome and kept all the dumpster trucks off the main FACILITY roads. Goins Aff, Ex. 11 pages 4 and 5.

"Mercury leaks were everywhere I looked in the Cell House. There were puddles of liquid mercury on the walkways, on the I-beams, in the basement, and on the cell tops. Altogether, there were consistently about fifteen to twenty gallons of mercury out in the open in the cell room." Powers Aff, Ex. 3, page 8.

107.    Jerome A. Johnkins is a Plaintiff Direct Worker who worked as a Supervisor in the

Hazard Dome. Johnkins started working at the FACILITY in 1972 and continued until

2005, when he retired. Johnkins describes the following in his affidavit:

> "The Hazard Dome was a big part of my work life for many years. I was working twelve-hour shifts at night in the Environmental Department when my supervisor, Phil Newman, came to me about taking over as the Hazard Dome supervisor. It was a great deal of responsibility."

> "Simply put, it's a big inflatable lid that was placed over the top of a very wide and deep hole in the ground. The FACILITY had it dug to be used as a hazardous waste landfill. . . . None of that PPE could be reused. I'd leave the bag in the dome until there were several of mine and some from other people. Then, I'd collect them all one day and either send them off to another FACILITY or just send them down to the TRU to be burned. That's how toxic all the dusty air in that place was." Johnkins Aff, Ex. 4, page 6.

> The FACILITY had Environmental Technicians and Maintenance Men and Instrument Technicians. None of them knew what they were doing out there at the dome. I'd get phone calls at all hours, two, three, four o'clock in the morning saying there's a problem with the dome. We need you to come look. Some of those guys I just talked about would go out there to maintain the blowers or something and somehow forget to turn it back on when they left. The dome is quite a distance from the main body of the plant. It's just out there all by itself. It wasn't staffed every hour of the day and night, but it was equipped with sensors that would ring the security office if it lost too much pressure. Next thing you know, the dome is calling security. Then security immediately phoned the environmental lab saying there was an emergency at the hazardous waste landfill. That's what the recorded message would say when I picked up the phone at home. "There is an emergency at the Hazardous Waste Landfill." By the time I got there, the thing would be halfway down, and the propane backups weren't strong enough to push it back up. I'd just have to let it fall and start over from scratch. Remember, there is a hazardous waste landfill under this thing. The things in that landfill are so mercury contaminated that they can't be cleaned and a great deal of it is thick metal so it can't be burned in the TRU. Nobody wants the vapor from this stuff in the wind. Johnkins Aff, Ex. 4, page 7.

108. Donnie R. Webb is a Plaintiff Contractor Worker who worked for PEN and TURNER at the FACILITY, while in the Hazard Dome. Webb started working at the FACILITY in approximately 1998 and continued until 2020. He was part of the Buildings and Ground Groups, Liquefaction Area, Brine Area, Old Cell Buildings, TRU Building, Water Treatment Area, RCRA pad, and New Membrane Building. Webb said this about being a Buildings and Grounds worker in the Hazard Dome:

> The Hazard Dome at the FACILITY is a disposal area for contaminated materials. The inflated dome is held up by air pressure. The airlocked doors had to be opened one at a time to avoid the dome collapsing. There is a liner that goes underground to hold all the contaminated material in the Dome. The liner has several holes in it. This was a huge problem during the rainy season. There was a gauge in the Dome that showed the water level. Eddie Morris and I would have to get that gauge down to keep the Dome from filling with water. We would take a dozen 400- to 500-gallon totes to the Dome, run a pump over to a pipe that was installed in the middle of the Dome, run the hose, and pump all of those totes full of leach water. Sometimes we would have to take two trips, depending on how rainy it was. The leach water was taken to shipping, where they sent it to California. The shipping workers took care of labeling it. I do not know if they labeled it as hazardous, but it definitely was. When I left the FACILITY in 2020, the Dome was almost full. The FACILITY was in the process of figuring out how to proceed when it was completely filled.
>
> I went to the Hazard Dome about twice a week during the decommissioning and demolition of the old Cell House, and a couple of times a month (more during the rainy season) as part of Buildings and Grounds. During the decommissioning and demolition of the old Cell House, I was always in mercury hygiene PPE (the provided socks, underwear, assigned cotton/polyester mix coveralls, safety glasses (mine were approved prescription), rubber gloves, rubber dielectric boots, hard hat, and a COMFO II respirator). When I went with Buildings and Grounds, I was seldom in that hygiene PPE because I was usually just rearranging the materials in the Dome with a backhoe. I wore my personal work clothes without equipping a COMFO II respirator then. Webb Aff, Ex. 15, page 6.

109. Webb suffers from a number of health problems, including:

The magnetism in the old Cell House was incredibly strong. If you had any fillings or crowns in your teeth and walked in there, they came out. They weren't pulled out as soon as you walked in, but if you put a piece of bubblegum in your mouth and started chewing, they came out. My dentist didn't know what was going on. I gave up on getting them filled and having root canals because I was tired of having to go back to get work done on my teeth so often. I said, "Oh Lord, I'm over it." I had about seventeen teeth pulled at once to get dentures.

I have a lot of vision problems now. For the past four or five years, I haven't been able to drive at night. Last year, my eyes started getting itchy and dry around the outside. For about six or seven years, I have been experiencing this weird sensation where my vision starts fading out in one eye, and then it goes completely blind, like I covered it up. It lasts for about three minutes at a time. I just keep my eyes closed and hold my head down, and eventually it starts coming back. When it was coming back recently, it only came back halfway- it was like I had a shutter over my eye and could only see out of the bottom. That lasted about four minutes more before it completely came back. I've had every test in the world run on me at Cleveland Imaging in Cleveland, Tennessee, to make sure nothing was wrong with my heart or carotid arteries that could be causing it. Dr. Joel Craig Riley determined it was a "mini/micro-migraine," which I thought was weird because I only get a light headache and numbness with these episodes. I had to stop riding motorcycles because the last thing in the world I need is to be on a bike on the road with one of those spells.

I have been diagnosed with high blood pressure and hearing loss. Once a year, at the FACILITY, there was a contracted physician who set up a trailer for us to take hearing tests. They sent a printout to the safety men of each contracting company stating what percentage of hearing loss each person had. I have 80% hearing loss in my right ear, and about 45% hearing loss in my left ear. Webb Aff, Ex. 15, pages 19 and 20.

"I was diagnosed with and underwent treatment for bladder cancer in 2017. I also had a tumor on my kidney" Webb Aff, Ex. 15, page20.

"OLIN supervisors and management always emphasized that mercury levels were safe at the FACILITY." Webb Aff, Ex. 15, page 20.

**110.**    Plaintiff Contractor Worker Roger L. Walden, who worked for BILFINGER,

formerly known as FRUCON, from 1995 to 1997, explains his experience this way:

The Hazard Dome was where equipment and materials that came into contact with mercury were disposed. I estimate that the Dome was about 150 feet wide. A dump truck could easily fit through the door. There was a major snowstorm in about 1993.

The Hazard Dome collapsed under the weight of the snow. Since there was steel underneath the dome, it ripped right through the cover. I was with BROWN at the time, and I was on the crew shoveling snow around the dome. I recall the snow being very dirty from mud, dirt, and other debris in the area surrounding the dome. We melted the snow as well as shoveled it. We had to use heaters to help us melt the snow. We put the melted snow into tanker trucks since the snow contained mercury. A specialized crew that I'd not seen until this incident was brought in to fix the collapsed dome. I only recall that it was a group of Hispanic contractor workers, but I am unsure of the contracting company name. I witnessed them blow the tarp-like dome back up. They were running around in circles making sure the cables lined up. This was treated like an all-hands-on deck situation because we had about 20 inches of snow. Several BROWN contractor workers loaded up in a van and went to work on cleaning up the site. We stayed at the Hazard Dome all day, every day, for over a week. It might have even been a two-week job. We even took our lunch breaks there. There were also OLIN direct workers that were in and out checking on the progress of the cleanup process throughout the week. We were not instructed to wear respirators during this cleanup process. We only wore rubber boots because it was a wet, muddy mess. Affidavit of Roger L. Walden, 51, page 5.

## C. General Maintenance Contamination – Entire FACILITY

111.    As previously stated, performing maintenance on the systems throughout the FACILITY posed increased exposure to toxic mercury. Affirming this increase in mercury exposure, Plaintiff Contractor Worker Eric A. Brokish worked for PEN at the FACILITY, describes it in his affidavit this way:

I worked in cell maintenance doing the tasks described below from 1994 until 1999 with PEN. I continued to work in cell maintenance with OLIN from 1999 until 2003. When I switched from PEN to OLIN, all my tasks remained the same. I encountered a lot of liquid mercury and mercury mud in this area. I do not remember specific dates because it happened all the time. The amount of mercury on me would differ depending on the task I was

performing. A lot of times if guys were washing down mercury from the cell floor, it would fall on me if I was in the basement, which was the first floor of the 812 Building. I often had mercury in my gloves, on my boots, and on my face. If I was doing a full rubber line, I would get half a cup to a cup of mercury splattered on me during one shift. Whenever I lifted a handrail, mercury would fall on my boots. Mercury would get on my boots when I got inside a decomposer to swap the graphite out. I had to stand on what I was digging, and those rough graphite rocks were full of mercury. There have been times when there would be a hole in the bottom of a cell, and there would be approximately thirty gallons of mercury on the floor. I was urine tested weekly when I worked in cell maintenance, both for PEN and OLIN. At this time, I always showered and changed into my personal work clothes before I went home. Brokish Aff, Ex. 9, page 2.

"On a daily basis, we would come in and have a short morning safety meeting. Perry King was the foreman over both the 812 Building and the 510 Building. He was employed by OLIN. We would all be assigned an area." Brokish Aff, Ex. 9, page 2.

I would clean up mercury spills pretty much every day. Equipment gets holes and liners get worn out, so mercury leaks happened at the FACILITY often. There could be puddles about the size of a baseball or basketball, and I have seen puddles, multiple times over the years, as big as 30 gallons. You would not want to spray water on really big puddles because it would splatter everywhere. We would use squeegees to push as much of the puddle as we could toward a ditch. Whatever was left of it, we would wash it down with water. You just had to chase it around until it was all cleaned up. At first glance the floor seemed clean. But if you started washing one side, you would see that gray mercury sand start building up. We would just keep pushing water in a certain direction, and eventually get mercury. It would bubble out of cracks in the floor. Brokish Aff, Ex. 9, page 7.

112.     Eric A. Brokish suffers from a number of health problems, including:

The FACILITY medical staff informed me that I had elevated mercury levels. When I was working at the FACILITY, I experienced night sweats. It was general knowledge among workers that people would deal with night sweats when working around mercury because the sweating was mercury leaving the body's system. It would happen every night for me when I was working there. I would wake up drenched and not be able to go back to sleep because I was so uncomfortable. The sheets would be stained gray and smell metallic, like the way your finger smells

after you rub a nickel. My wife would have to buy new sheets every six months.

The constant heat was extremely uncomfortable. Working at the FACILITY led to constant fatigue, anger issues, and mood changes in my daily life. I would become irritable over insignificant situations. I also became overwhelmed and had feelings of depression and despair for short periods of time. I would have to push through these feelings to go to work every day.

The other physical symptoms I experienced while working at the FACILITY began around the same time. I developed an occasional tingling sensation in my fingertips. I had to have several of my teeth capped during that time, and I have had little abnormal dental issues since I left the FACILITY. Every time I have had a urinalysis, the results would say that I had trace amounts of blood in my urine. This happened when I was given urine tests during my time working at the FACILITY, and it still happens when I get a physical now. No doctor has gone further into detail about this with me. Brokish Aff, Ex. 9, page 11



*Significant corrosion & rust resulting in the deterioration of metallic structures.*

113.     During scheduled Outages at the facility, instances of inexperienced foot traffic occurred, which put workers at a higher risk of mercury exposure.

## D. Contamination of the Liquefaction Area and its Grounds

114.     Plaintiff Workers who worked on the grounds of the FACILITY saw mercury on a regular basis when cutting grass and doing other grounds maintenance.

115.     Donnie R. Webb worked for PEN, TURNER and other non-party contractors in the Liquefaction Area of the FACILITY and observed mercury in these situations:

> When I worked for PEN and TURNER, the FACILITY had a system in place whenever mercury was spotted. In the Liquefaction Area, that usually meant that mercury was leaking out of the lines that were pumped from other areas to this building. I was on the Mercury Recovery Team with Eddie Morris. We would dress out in our mercury hygiene PPE: the provided socks, underwear, assigned coveralls (they felt like a really thin cotton/polyester mix), safety glasses (mine were approved prescription), rubber gloves, rubber dielectric boots, a hard hat, and our dual mercury and chlorine cartridge half-mask ("COMFO II") respirator. We would have to vacuum the mercury with our mercury-specific Shop-Vac. It was stored in a little building near the railroad tracks and we had it wrapped in black plastic bags on a pallet. We had to get a hot work permit because anything that made a spark was considered "hot work". We vacuumed up the mercury. We emptied that mercury into cell pots, sealed them up, and took those to that little building that stored the Shop-Vac.

> No matter if we dressed out in mercury hygiene PPE or wore our personal clothes, we were always required to wear an extra COMFO II respirator in a bag on our side throughout the whole FACILITY. We had a "dirty respirator," the COMFO II respirator that we wore during jobs where we were required to wear one. The "clean side" COMFO II respirator was meant to be used as an emergency respirator in case of a random chemical leak somewhere at the FACILITY.  Webb Aff, Ex. 15, pages 2 and 3.

> "When the cartridges changed color to brown on either COMFO II respirator, we had to wash the respirator in the sink and put in new, clean cartridges. If there was hand soap in the dispenser at the sink, we washed the respirator with soap and water. If the dispenser was out of soap, we just washed off the respirator with water." Webb Aff, Ex. 15, page 3.

Ground – During my entire time at the FACILITY, I had to dig holes. Whenever we dug holes, we had to take water samples to test for mercury. About sixty to seventy percent of the time when we dug, we ran across mercury. This was either visible mercury or discoloration in the ground that indicated mercury. Whenever we had to dig a pit for a storm sewer or catch basin, there would always be mercury showing up in that dirt. Sometimes it would be instant, and other times we would just run into it as we dug deeper. Other times, it would take longer for it to appear. We would dig the pit, get the rebar set, and have our form ready to pour concrete the next day. We would come in the next morning to pour the concrete, and there would be mercury in the bottom of the pit we dug, seeping up out of the ground. Around 1983 or 1984, I had to pour concrete for a new part of the old Cell Building. The FACILITY was building it to try a new process of cooling water (to filter and return the water that was coming out of the Cell Building). This new part was between the South Cell Building and the Environmental Department. There was a street that ran down right beside it. I remember the unbelievable amount of mercury that showed up in this area. We dug footers to get ready to pour concrete the next morning. When we came in to pour the concrete, there were a couple of gallons of mercury that had seeped in these footers overnight. We went ahead and poured the footers and poured the floors over that mercury. We had to put huge pipes called bollards up and fill them with concrete. We dug the holes for the bollards, and mercury seeped in those holes, too. Those holes were approximately eighteen inches wide and four feet deep. We set the metal pipe, filled them up with concrete, and poured concrete around them. The FACILITY had two options when it came to mercury removal most of the time. That was to either wash it down the drain or cover it up. Whenever we were excavating and tearing up concrete, we would see mercury in the concrete. The little silver beads would show up on the old rebar. Webb Aff, Ex. 15, page 12.

## E. Mercury Recovery Team

*In addition to onsite contamination events, these Defendants participated in activities that allowed this toxic mercury to spread throughout the community.*

116.    Johnny L. Carson was another type of Plaintiff Worker. Carson worked at OLIN as

an Environmental Inspector on the Mercury Recovery Team. He describes it this way:

Mercury is expensive and was in use or in storage at numerous places around the FACILITY. The Mercury Recovery Team, of which there were several in different areas, was responsible for

capturing fugitive mercury wherever it could be found. This was also a time-sensitive task, though it was rarely treated as such. Liquid mercury starts to vaporize at a relatively low temperature, around sixty degrees. Conditions in most buildings on the property were warmer than that even in winter. In the spring, summer and early fall it was brutally hot. In places like the Cell Building, temperatures routinely hit the top side of one hundred and twenty degrees and stayed that way until the sun went down. It might cool down to ninety or ninety-five at night. In those conditions, mercury was evaporating into the air rapidly and in heavy doses. That's why so many areas or even entire buildings were "posted" more frequently in the warmer months. It was my job as part of the Environmental team to help them determine what to do with the mercury they recovered. Some of it was taken back to the cell house and other places for reuse. Some of it was no longer usable for the FACILITY'S purposes and had to be disposed of. Mercury was recovered in ways you might never imagine. The FACILITY had a very large vacuum truck (affectionately known as the "suck truck") capable of cleaning out manhole size drainpipes. It was not staffed by FACILITY employees, but rather by a contracting company called Pen-Gulf and their employees. This was the biggest of all the recovery equipment. It ranged from that all the way down to a ladle used to scoop mercury out of smaller drains. The Mercury Recovery Teams in the Cell Buildings were equipped with Shop-Vacs that they would use to recover liquid mercury from the floor, off or out from under cells, even off the walls. I don't have any idea how many tons of mercury were on the premises at any given time, but it was a lot. It was a lot, and they spent a great deal of time and money chasing down every drop so it could be reused. I never worked on the Mercury Recovery Team as a production worker, only in my capacity as an Environmental Inspector, so I was allowed to wear my personal work clothes. I had a hard hat, safety glasses, Comfo II respirator, leather (steel toe) boots, and leather gloves. I had access to and would use a Tyvek suit over my personal work clothes from time to time as I deemed appropriate. I was not required to shower at the end of my shift. I had a small locker in the lab to leave my PPE in at the end of my shift, but I wore my personal work clothes and boots home every day. I kissed my wife, played with my sons, and went to the grocery store wearing those personal work clothes that had been in mercury-contaminated air for twelve hours. I walked through puddles of liquid mercury at work and then I walked into my house in the same boots. My personal work clothes got washed and dried in the same machines as the rest of my family's clothing. Carson Aff, Ex. 5, page 3.

**117.** William A. Hobbs was another Plaintiff Worker who worked at the FACILITY on

the Mercury Recovery Team. Hobbs observed mercury in these situations:

> I worked on the Mercury Recovery Team on a rotating basis. When one of the full-time members of that team took a vacation, the people on my team rotated to fill that one-week slot. You would think there would be more to it with a title like Mercury Recovery, but we only used one tool on that team. That tool was a water hose. That is all we did. Turn a water hose on, find the mercury on the floor and use the water to run the liquid mercury down a drain. That is how much mercury was being spilled and was leaking from in and around the cells and out of the pipes and such. They had full time people hired to do essentially nothing, but spray escaped liquid mercury down a drain in the floor. Thinking about it now, all that mercury had to be going somewhere or we wouldn't have to replenish it So, evidently it wasn't very self-contained. Hobbs Aff, Ex. 13, page 2.

> My supervisors, Lloyd Thomason and the Cell House engineer, Dennis Odom talked a lot about injuries, reportable injuries, preventable injuries and the like during safety meetings. If any of the discussion centered on mercury, I don't recall it. Mercury may have been mentioned, but I don't remember it ever being the focal point of any safety meetings. We never sat down and watched a video or took a quiz. We just got together for a few minutes, had a quick talk, and got back to work. I thought I was doing everything necessary to keep myself safe from both immediate and future harm. Hobbs Aff, Ex. 13, page 5.

> My most recent diagnosis, from April of last year, is that I now have Raynaud's Disease. What follows is a short sampling of medical tests and diagnostic/treatment I have needed: Diagnosed with Depression/Anxiety in January of 2013 and prescribed Xanax and Zoloft. Diagnosed with a heart disorder and severe coronary calcification in October of 2021. Nerve conduction study done on my elbows and wrists in October of 2012. MRI (Magnetic Resonance Imaging) on my left hip in December of 2011 to help deal with Osteoarthritis. US/Cartoid Blood Sonogram in December of 2014 to help deal with dizziness. Bone density test in February of 2010 to help deal with Osteoporosis. US/ Doppler Arterial Segmental Pressure Legs Bilateral test in April of 2022 to help deal with diagnosis of Raynaud's Disease. Hobbs Aff, Ex. 13, page 4.

Case 1:24-cv-00096-TRM-CHS    Document 191    Filed 02/05/26    Page 73 of 345
PageID #: 7152



*Decomposing metal supports at the FACILITY*

118.    Donnie R. Webb also testifies about his work on the Mercury Recovery Team at the

FACILITY:

> The TRU Building had trenches and troughs that went to sumps
> (pits that serve as drains) full of mercury that was under some
> water. The troughs were lined with fiberglass. Through the years,
> the trough had developed holes. There was at least a quart of
> mercury that leaked from the troughs into the ground. Usually,
> when we saw mercury in the ground, in any area, those of us on
> the mercury recovery team would vacuum up the mercury into cell
> pots until we no longer saw any. Then, we would patch the area
> with concrete. In the ground by the TRU Building, though, we
> kept vacuuming the mercury we saw, and it still kept coming. No
> amount of vacuuming was getting it out of the ground. Steve
> Barnett, the OLIN Overseer, ordered us to go ahead and patch it
> with concrete even though we could not get all the mercury out.
> Webb Aff, Ex. 15, page 3.

119.     Lisa A. Carson also testifies about her work in the TRU building at the FACILITY:

> I consistently saw mercury on the floor in the TRU Building. There was a ditch in the TRU Building that was full of mercury, and I'm not sure how it got there. It always got on my boots in there. One of the last lockouts I worked on, I drained mercury out of a hydrogen blower line. This was long after the conversion from mercury cells to membrane cells. It had happened while a contractor was doing work on it, and I assisted him by getting a bucket, filling it with water, and then using a mercury vacuum to suck up the mercury. We dumped it in the bucket of water, and I do not know what happened to the bucket after that. Affidavit of Lisa A. Carson, Exhibit 35, pages 8 and 9.

120.     As demonstrated herein, Plaintiff Workers were exposed to mercury contamination in both indoor and outdoor environments.

## F. SISTER FACILITY

*In addition to onsite contamination events at the FACILITY, these Defendants participated in activities that allowed toxic mercury to spread throughout the SISTER FACILITY.*

121.     The operation of the FACILITY has affected the SISTER FACILITY and those working in and around it.  As explained by the testimony below, the two facilities were closely intertwined.

122.     The SISTER FACILITY is located directly beside the FACILITY, with FACILITY property completely surrounding the SISTER FACILITY. Operations and facilities were shared. For decades, mercury-contaminated products were sent directly from the FACILITY to the SISTER FACILITY for further processing. In addition, the mercury-contaminated parts and equipment were serviced on the SISTER FACILITY side. The Rubber Rebuild Unit was also located on the SISTER FACILITY side. In this area, workers rebuilt contaminated mercury cells, cell parts, and ancillary equipment. This area was grossly contaminated with mercury. The Workers from the FACILITY and the

SISTER FACILITY shared common areas. Sharing these common areas, while contaminated with mercury, spread this contamination to workers on both sides of the site.

123.    As discussed earlier, the FACILITY and SISTER FACILITY were both owned by OLIN until approximately 1999. The FACILITY and SISTER FACILITY continued to share a number of operations after OLIN sold the SISTER FACILITY. OLIN continued to supply products directly to the SISTER FACILITY.

124.    Plaintiff Worker Jerry L. Pendergrass worked at the FACILITY as an intern for OLIN from approximately June of 1998 until 1999. Jerry L. Pendergrass became an employee of ARCH from approximately 2000 to approximately 2022. He describes it this way:

> I was an intern at the FACILITY and the SISTER FACILITY in 1998. I worked as an intern from approximately 1998 until 1999. As an intern at the FACILITY and the SISTER FACILITY, I changed out their computers, installed new equipment, and pulled cables. I did all the general stuff. Part of my job was to make sure that cabling and wiring were properly installed for all the IT and OT needs. It was my job to go into the control rooms, offices, and anywhere they had a computer to assess and determine what was needed to make connections work. In doing this work, I got on the floor with all the dust and chemicals. Chemicals, especially chlorine, would get on my clothes and hands. I do not know all the different types of chemicals, but I knew that these were chemicals due to their smell and texture. They would leave a gritty feeling on my hands. As I completed my IT and OT tasks, the FACILITY and the SISTER FACILITY were both in production. There was a contract of services with OLIN and ARCH (the SISTER FACILITY where chlorine was used). They needed one another to survive and make their own products. There were services between the two that were exchanged daily. I do not know each service, but I do know that there were different departments at the FACILITY that were cross utilized by OLIN and ARCH. Here are the following comingled areas: Industrial hygiene (where employees would shower in and out), laundry, medical surveillance, unloading and offloading, security, maintenance, and the ARCH IT office. J. Pendergrass Aff, Ex. 14, page 2.

Before 2013, OLIN was operating a mercury cell FACILITY, and their products had mercury contamination. Mercury was in all the chlorine products that ARCH had to use: Cal Hypo (Calcium Hypochlorite), High Test Hypochlorite (HTH), and J3 in the form of shock, duration tablets, and powder. One of our customers, Walmart, began complaining about mercury in the chlorine products, so we, ARCH, had to force OLIN into making a change from the old cell process to the new membrane process. ARCH notified OLIN that they had to stop producing mercury-contaminated products or they would buy products elsewhere. During several managerial meetings and traditional town halls, the topic of OLIN producing mercury-contaminated materials would arise. I recall several high-level meetings. I'm sure that our local FACILITY management staff, plant managers Tom Wilkerson and Cindy Storelli, plant controller Bob Flynn, the safety representative (probably Melanie Krauss), maintenance supervisor Winton Westbury, and the production supervisor (probably Ron Masterson), were told by the Norwalk, Connecticut corporate office that they needed to put a stop to the mercury-contaminated products. Everything that the FACILITY produced was required for the final products of ARCH. So, due to the interconnected nature of OLIN and ARCH, the mercury-contaminated products would have also gotten to the ARCH site. I do not know the period of time that OLIN knew or understood that the levels of mercury contamination in the chlorine products being sent to ARCH were unacceptable or too high. J. Pendergrass Aff, Ex. 14, page 13.

I was told by Rick McCormick, my supervisor for ARCH in June of 2000, that mercury levels at the FACILITY were safe. He told me I was safe because I was only IT. While working in all the areas with computer equipment, I asked about the chances of getting mercury in my body and he stated we only work on the equipment not actual production, so I was safe. J. Pendergrass Aff, Ex. 14, page 17.

125.    Jerry Pendergrass suffers from a number of health problems including:

Since working at the FACILITY and SISTER FACILITY, I have had problems with depression and suicidal ideations which I am not proud to admit. My suicidal ideation is getting worse. Considering that I have worked very hard to get where I am, my depression and suicidal ideation have worsened because of being let go. I would say that my wife complains that I am moody or overreacting. My wife has noticed changes in my personality over the years. She says I used to be so mellow but now anything will flip a switch. I have problems with anger management and

volatility. My wife noticed these changes in my personality during my time at the FACILITY and SISTER FACILITY, and these personality changes are still issues I experience today. J. Pendergrass Aff, Ex. 14, page 15.

126.     Tonya R. Black-Hylton worked for PEN as a Plaintiff Contractor Worker from 1995 to 2000, and then as a Plaintiff Direct Worker from 2000 to 2010, at the FACILITY and SISTER FACILITY. She describes it this way:

> "When I started, OLIN had two major "sides" as we called them. The FACILITY was the Chlor-Alkali "side" and the SISTER FACILITY was the chlorine "side". As I understand it, the SISTER FACILITY was part of OLIN until approximately 1998 when it started going by the name of Arch Chemicals. My first position was in the HTH Building at the SISTER FACILITY. I worked in several locations at the FACILITY - the Thermal Recovery Unit ("TRU") Building, the Track, the Valve Shop, and the Tank Testing Area." Affidavit of Tonya R. Black-Hylton, Exhibit 26, page 1

127.     Gerald J. Cline was a Plaintiff SISTER FACILITY Worker. Gerald worked at the SISTER FACILITY from approximately 2010 to 2015. He was employed by ARCH from approximately 2010 to 2014 and then by LONZA from approximately 2014 to 2015.

> I worked in the packaging of HTH (High-Test Hypochlorite) and did a little maintenance throughout the SISTER FACILITY. The SISTER FACILITY was across the fence from the FACILITY. We got our chlorine from OLIN.

> HTH Building – The Chlorine Packaging and Production FACILITY is known as the HTH Building. There are two major sections to the HTH Building. The front part of the building is where packaging is done and it's fairly clean and well kept. The back part of the building is all pipes and meters, gauges, motors, filters, etc. It's where the product is actually manufactured and it's much less clean back there. There were small piles of concentrated chlorine on the floor here and there. Any of those piles would immediately combust if you spilled water, or even dripped too much sweat on one. I spent most of my time up front in packaging, but I did spend time every day in the back, too. Over the course of my six years there, I learned and performed every job there was up front. From filling one-ton chlorine bags for industrial sale to pressing chlorine into the small tablets that people toss into

swimming pools and everything in between, I did all those jobs.
Affidavit of Gerald J. Cline, Exhibit 24, pages 2 and 3.

128.    Testimony from additional Plaintiff Sister Facility Workers further shows that the FACILITY and SISTER FACILITY remained interconnected after the SISTER FACILITY was split off from OLIN. As a result, mercury contamination was present at the SISTER FACILITY as well.

129.    Plaintiff Contractor Worker Jimmy A. Jack who worked for BILFINGER, formerly known as FRUCON, from 1995 to 2006, performed maintenance on the SISTER FACILITY, such as replacing motors, fans in the walls, siding, floors, pumps, installation, and drains for the sump pumps in the HTH Building. He described it this way:

> The SISTER FACILITY is a separately-owned facility of a few buildings on OLIN property. These buildings used to be owned by OLIN until approximately 1998, when ARCH took over ownership of those specific buildings. I worked here as a FRUCON contractor worker for the first few years of my time onsite in the HTH Building and the Liquid PNP Building, performing different maintenance and construction projects. Our work was instructed and supervised by both FRUCON Supervisors and SISTER FACILITY Supervisors. While working at the SISTER FACILITY before and after ARCH purchased it, I would observe mercury on the ground and on the equipment as we would observe it at other locations of the plant. The ARCH side was dealing with the chlorine products produced by the mercury cell process. I now realize this meant that mercury was still in the chlorine as it was transmitted to the chlorine production equipment. The equipment that would transport this chlorine and process was contaminated by mercury. It would be in the equipment and in the ground in this area. DUNCAN contractor workers worked here on this side as well. I think one of the DUNCAN electricians was named Mike Smozzle. CMC did some work here, but I didn't see them often on the SISTER FACILITY side. PEN and ARCH Maintenance workers and other workers were also present. My FRUCON crew and I were performing maintenance, replacing motors, fans in the walls, siding, floors, pipes, insulation, drains from the sump pumps all on the first floor of the HTH Building. PEN was there sandblasting and DUNCAN was here replacing electrical wires and equipment. I drove a forklift to take waste out of the building from the 3rd floor. I

washed down the 2nd and 3rd floor Control Rooms, replaced insulation on the heaters and on the dryers, and replaced plastic and metal pipes. I replaced concrete, built forms and poured concrete in the building. I also took waste out of the J3 Building on the SISTER FACILITY side weekly. I cleaned the J3 Building when there were fires and explosions. There was once an explosion that was so big ARCH upper management thought it was a terrorist attack, but it had just exploded because a worker was running it too hot. This explosion blew a hole about 16 feet tall and 20 feet long out of the side of the J3 Building wall. It blew chemicals all over the Maintenance Shop. We had to use the sump pump and pick up all the metal from the side of the building. We cleaned up the chemicals from the ground. The explosion blew the top off a valve, and it flew all the way to the laydown pond. We had to take a mobile crane to the pond to pick up the valve, wash it off, and replace it. My crew and I replaced the screens in the building once a Safety worker cleared the building for re-entry. Affidavit of Jimmy A. Jack Aff, Ex. 49, pages 4 and 5.

I recall there being a SISTER FACILITY Cafeteria, but most SISTER FACILITY workers crossed to the FACILITY to eat at their Cafeteria and break rooms. I crossed between the FACILITY and the SISTER FACILITY during my workday. I crossed to the SISTER FACILITY side to go to the ARCH Maintenance Building for new cartridges during work in the Cell House. I now realize that I was tracking mercury from the Cell House on my work clothes and boots onto the SISTER FACILITY side when I was doing so. I also used the same tools I used in the Cell House when I went to work on the SISTER FACILITY side. No FRUCON, OLIN, or ARCH Supervisor instructed me to shower or change clothes before crossing to the SISTER FACILITY side, nor did they tell me to leave my tools in the Cell House before doing so. I now realize that mercury had contaminated most everything at the FACILITY. So, when we contractor workers did work, this work accelerated this contamination exposing others. All the contractor work that involved contaminated systems would stir the mercury up and increase the contamination of others that were working or that just came onto the area. Based upon my observations, the work of FRUCON, PEN, ARCH, CMC, DUNCAN and even OLIN all stirred up the mercury and made the contamination of others on the site greater. Jack Aff, Ex. 49, page 6.

130.    Plaintiff Christopher H. Brooks worked in the laboratory at the SISTER FACILITY

when it was owned by ARCH. He described it this way:

"Mercury-laden chlorine gas was piped over from OLIN'S chlor-alkali side of the operation and converted into an array of products. They [ARCH] made everything from the smallest chlorine tablet (used in swimming pools) to chlorine "cakes" (used in toilets and urinals) to fifty-five-gallon drums that were generally sold to other chemical industries." Affidavit of Christopher H. Brooks, Exhibit 27, page 1.

131.    Plaintiff Matthew Ownby provides similar testimony from his time working for

ARCH at the SISTER FACILITY:

I went through two days of orientation before starting to work. It was a lot of watching videos. They had one showing how to properly put on and wear a respirator. They had one on slips, trips, and falls. It was all safety-related information designed to prevent reportable injuries and keep OSHA from poking their nose in. That was the extent of any safety training. We had what ARCH called safety meetings randomly after that. It must have been up to the supervisor on duty. There was no schedule for them. It was not once a week, or even once a month. It seemed to be when the supervisor felt like it. When they did call a meeting, it was always at the beginning of a shift, and it was always a rehash of one of the original training videos. Nothing new was ever presented that I can recall. In all of the safety training I received, I do not recall any mention of mercury. Affidavit of Matthew T. Ownby, Exhibit 28, pages 2 and 3.

The SISTER FACILITY piped in mercury-laden chlorine gas from the Mercury Cell Building at the FACILITY gas. The product that was used to fill in railroad tankers had been condensed and liquefied to make it more stable for travel. The product I worked with started as the same mercury-laden chlorine gas but was processed into powder instead of liquid. Ownby Aff, Ex. 28, pages 1-2.

132.    Mr. Ownby only worked at the SISTER FACILITY, yet he was forced to take

unpaid leave due to a mercury test. He explains it this way:

Out of the clear blue, I was asked one day by my Supervisor to submit a urine sample for mercury testing. Mercury was not something that those of us who worked at ARCH were supposed to be exposed to. Chlorine was the danger. Chlorine was what the filters on my respirator were designed to protect me from. I had no idea why they wanted to test me for mercury exposure, but that is what they said. This was in 2004 and was either right before or right after the SISTER FACILITY made the move to swing shifts.

I gave them what they wanted. I handed my specimen over to a laboratory technician that worked in the same building I primarily worked in. When the results came back, I was told that I had tested slightly high for mercury. "We need you to take a few days off," is how my supervisor put it to me. His name was Tommy. I cannot recall his last name. I think he is deceased now. They sent me home for two days without pay, When I returned on the third day, they tested me again and declared me fit for duty. They did not have me follow up with the company doctor or anything. The same lab tech that said I had too much mercury in my system, then, said I was fine to go back to work. It was just weird. Mercury had never been mentioned to any of us. Ownby Aff, Ex. 28, page 3-4.

133.    Mr. Brooks later worked in the laboratory on the FACILITY side and found out

firsthand about the continuing presence of mercury:

"The Mercury Cell Building was decommissioned late in 2012, but there were still massive deposits of mercury onsite when I worked at OLIN. That was evidenced by the fact that I was instructed to test for it daily. In just over four years of employment, there was not one day when mercury was not part of the equation." Brooks Aff, Ex. 27, page 2.

134.    Plaintiff Contractor Worker, Alex Shaw, worked for BILFINGER, formerly known

as FRUCON, and provides in his second supplemental affidavit what he observed on the

SISTER FACILITY side, where the Sandblasting and Paint Yard were located. He

describes it this way:

In my Prior Affidavit, I discussed cross-contamination of the Change House amongst FACILITY direct workers and contractor workers. I supplement that testimony with the following information. I observed SISTER FACILITY direct workers using the Change House, and some laundered their uniforms with the OLIN and contractor workers uniforms. This cross contaminated all of the uniforms worn by ARCH, OLIN, and the contractor workers on site that were required to wear uniforms.

There was a Sandblasting/Paint Yard (aka Contractor Yard) that I identified on the map of my Prior Affidavit. It was on the SISTER FACILITY side, close to the Wastewater Ponds. As the name entails, it's where contractor workers sandblasted and painted parts and equipment. The only parts not brought over there for sandblasting were from the Mercury Cell House. Those were brought to the Rubber Shop, as I described previously. The Yard

was shared by PEN and FRUCON contractor workers. To my knowledge, FRUCON was mainly working on the SISTER FACILITY side while PEN was on the FACILITY side. Looking back, I now realize that my coworkers and I were tracking mercury and carrying it on our clothing and tools from the Cell House to the Sandblasting/Paint Yard, which contaminated this area on the SISTER FACILITY. FRUCON contractor workers would then bring back that contamination to the SISTER FACILITY. There was also a break area for all contractor workers in that area. We were wearing our work clothes in this area, some of us having come straight from the Mercury Cell House. This was an area where cross-contamination from the FACILITY side was making its way to the SISTER FACILITY side, contaminating its employees. This was not something I thought of at the time. Second Supplemental Affidavit of Alex Shaw, Ex. 52, pages 5 and 6.

## G. OWNER & CONTRACTOR – CROSS-CONTAMINATION

*As we have discussed in detail above, the Operating Defendants and Contractor Defendants worked in proximity to one another at the FACILITY and SISTER FACILITY.*

**135.** Plaintiffs are bringing claims against their non-employer Defendants for the negligent acts of these Defendants in exposing them to additional mercury contamination. As the Owner Operator and the Contractor Defendants performed the work they were assigned, they contaminated those others around them. This will be termed Owner Operator and Contractor cross-contamination. This cross-contamination occurred in two basic forms: (1) Mercury contamination from the actual work being performed and (2) contamination resulting from spending time together in common areas. First, much of the work done by these workers created mercury vapors that exposed workers employed by other companies that were working in close proximity. Additionally, these workers shared common areas such as the Break Rooms, Restrooms and other shared team areas. These workers were working in teams that consisted of Owner Operator and Contractor workers, all working within close proximity to one another. During much of this work, they were creating mercury vapors being inhaled by those around them.

136.    To grasp the severity of the overall working conditions, assessing the modest utilization of PPE and the extent of the cross-contamination while including the specificity regarding each Contractor Defendant is paramount. Thus, the accompanying sworn testimony delineates the tasks performed by each Contractor Defendant. The testimony specifically elaborates on where the jobs were conducted, the PPE that Plaintiff Workers and Plaintiff Contractor Workers wore when performing their jobs and includes the other Direct Workers and Contractor Workers who were performing tasks with them. Testimony further supports that when performing these jobs, the tasks of each Worker increased the mercury exposure for those working around them at the FACILITY and SISTER FACILITY.

137.    For ease of reference, the following subsection inserts information from Exhibit 1, see *Exhibit 1 - Matrix of Claims*, to outline with particularity each specific Contractor Defendant and for whom each Plaintiff Contractor Worker was employed at the FACILITY and/or SISTER FACILITY. This is the same information that is included for all Plaintiffs in the full Exhibit 1. *See Exhibit 1 - Matrix of Claims.*

138.    In addition, relevant Plaintiffs have submitted their affidavits wherein the specific facts are demonstrated proving the increase in mercury exposure of other workers around them.  Below we will cumulatively excerpt testimony from the affidavits of the following party Plaintiffs. Jimmy Jack, Rodger Walden, Michael Fife, James Abernathy, Charles Sluder, Samuel Goings, Charles Kincaid, Tim Kelly, and Alex Shaw.  We will now turn to each Contractor Defendant wherein a claim of Negligence is asserted regarding this cross-contamination.

Case 1:24-cv-00096-TRM-CHS    Document 191    Filed 02/05/26    Page 84 of 345
PageID #: 7163

**CROSS CONTAMINATION – BILFINGER, formerly known as FRUCON, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, CUSTOM MECHANICAL, ROBINS & MORTON, and PEN**

**BILFINGER, formerly known as FRUCON**

139.     Contractor Defendant BILFINGER, formerly known as FRUCON, was contracted to work at the FACILITY and SISTER FACILITY. They provided General Maintenance and construction throughout the FACILITY and SISTER FACILITY, which also included hydro-blasting, Mercury Recovery, D&D, pipe removal, and Cell Maintenance.

140.     The Plaintiff Contractor Workers for BILFINGER, formerly known as FRUCON are as follows: *Joseph K. Akins, James W. Armstrong, Donald E. Beal, David G. Berens, Kenneth S. Bridges, Jody M. Brown, Joyce A. Caskins, Tonya L. Cassady-Pendergrass, Patricia L. Cavitt, Rodney S. Christian, Christopher L. Clark, Jesse S. Cook, Michael D. Dailey, George B. Davis, John F. Gant, Jr., Van G. Gibson, Samuel L. Goins, Zachary C. Goins, Dustin J. Grainger, Elizabeth S. Hayes, Michael K. Heiskell, Billie R. Hembree, Jeffrey T. Hicks, Belinda F. Howard, Jimmy A. Jack, Sean T. Jacobs, Joseph H. Jerfie III, Kennith A. Johnson, John M. Keeling, David D. Kincaid, Charles D. Kincaid, Cynthia L. Lankford, Robert D. Lankford, Larry L. Lankford, Randy L. Lee, John F. Marshall, Jr., Brady F. Martin, Joshua C. McCartney, Richard D. Mcleod, Shelia A. Millaway, Mary A. Moore, David K. Parrott, Christopher K. Pruitt, Donald R. Riebeling III, William A. Roach, William B. Roberts, Michael E. Rogers, Jr., Alex S. Shaw, Ricky L. Sigler, William G. Spuhler, David A. Stafford, Scott V. Stearman, Donald R. Stephens, Tony L. Thompson, Roger L. Walden, Bobby D. Waldrop, Jason M. Walker, James V. Ward, Jr., Donald L. Warden, Jr., Timothy C. White, Fred J. Wilcoxon, Leonard Williams, David C. Winkler, Daniel G. Withrow, Paula A. Worley, and William E. York II.*

141.    While BILFINGER, formerly known as FRUCON, performed assigned tasks at both the FACILITY and the SISTER FACILITY, its work exposed workers for PEN, WHITE ELECTRICAL, formerly known as DUNCAN, CUSTOM MECHANICAL, OLIN, and ARCH (SISTER FACILITY), as shown by the testimony set forth below.

142.    Additionally, upon information and belief, BILFINGER, formerly known as FRUCON's work at the FACILITY and the SISTER FACILITY exposed additional Plaintiff Workers who were in close proximity.

143.    Plaintiff Contractor Worker, Jimmy A. Jack was employed by BILFINGER, formerly known as FRUCON, at the FACILITY and SISTER FACILITY. Jimmy A. Jack provides in his sworn testimony that while working in and around the Cell House, his work included performing tasks within the Cell House structure itself, outside of the Cell House, and throughout the FACILITY and SISTER FACILITY. His experience from approximately 1996 until approximately 2007 was the following:

> As we did the work we were assigned to do, we would often all work together when there were different trades involved. OLIN and other contractor workers would be working together to get the jobs done. The increase in mercury we saw increased our exposure as well as the other contractor workers and OLIN direct workers involved with the work.

> I worked in the Cell House for approximately four years, off and on. There were weeks when I worked in the Cell House multiple days in a row. During my work in the Cell House, I worked in close proximity with PEN, DUNCAN, Custom Mechanical Contractors, Inc. ("CMC") contractor workers, and OLIN direct workers. CMC drove white trucks with CMC on them. They wore white hard hats with CMC on them as well. PEN did a bit of everything, such as sand blasting and pipe insulation and installation. They had welders and painters. They did a bit of everything. My brother Scott Jack ("Scott") worked with PEN, so I remember well. They wore white hard hats that said Pen Gulf across the front. DUNCAN was there doing electrical work all over the FACILITY. I saw them at the SISTER FACILITY as well as the FACILITY. They were all over. They wore hard hats with

Duncan across the front. The mercury that all these other contractor workers were exposed to was increased by the work I and other FRUCON contractor workers performed while working at the FACILITY. I performed many jobs in the Cell House with my FRUCON crew. We assisted in the replacement of pumps and equipment. We assisted in the cell rebuilds and general maintenance of the cells. We cut and maintained pipe, and we flushed systems. We performed mercury recovery. We did structural and concrete repairs. While we did all of this work, there were OLIN direct workers and other contractor workers next to us or within close proximity to us. All of these jobs required some level of contact with mercury. It would flow out of the materials, especially when we heated the materials by cutting, grinding, or sawing. When we performed concrete removal or repair, the concrete would have visible mercury in it. When we were cutting and busting it up, this dust and mercury would fly through the air. When we worked on the metal structures, mercury was present. If we applied heat or pressure, it would bubble out of the equipment. If we were sanding, mercury would fly into the air. We were working in crews with different contractor workers alongside each other. These other contractor workers would sometimes be helping with the work we were doing, or they would just be doing their work in close proximity to the work we were doing. When I worked in the Cell House as a FRUCON contractor worker, I worked on equipment in the Cell House that needed repair, like pipes and pumps, every four to six weeks. I also worked with a grinder there for a couple of weeks. I saw mercury on and leaking from the cells every time I worked there. I remember my brother, Scott, and his PEN crew were about ten feet away from me when I was working with the grinder. I now realize that this grinder was throwing mercury particles and vapors into the air while we, and workers around us, were not wearing respirators. Jack Aff, Ex. 49, pages 2 and 3.

We FRUCON contractor workers constantly worked around and with other contractor workers, such as Pen Gulf, Inc. ("PEN") and Duncan Electric, later White Electric ("DUNCAN"), as well as OLIN direct workers. In addition to working together, we would take breaks and often eat together. I now realize that by sharing restrooms and break areas contaminated with mercury, we would increase the levels of mercury exposures for each other. During outages especially, PEN and DUNCAN, along with multiple other contractor companies would send their workers to work in areas alongside us FRUCON workers. I did just about everything at the FACILITY and the SISTER FACILITY other than electrical work. Now, since I have joined the Tennessee Mercury Investigation, I believe that the work I was doing at the FACILITY as a FRUCON

worker was increasing the mercury exposure to myself, the other contractor workers, and OLIN direct workers near me. Jack Aff, Ex. 49, page 2.

144.    Furthermore, as reflected by Plaintiff Contractor Worker Jimmy A. Jack's, Mr. Jack and other Contractor Workers were misled that they were safe with the PPE they were required to wear by upper management.

> My brother, Scott, was a PEN contractor worker who was required to wear stricter PPE than I was, including a uniform, as well as to shower before leaving the FACILITY. Because they knew that OLIN direct workers and PEN contractor workers were exercising more stringent PPE requirements, they had to have known that we were in danger. They did not tell us this. They did the exact opposite. They told us we were being protected and to just do what they said to. They misled us by not telling us the truth about our exposures.

> The FRUCON Supervisors told me "You do not need any additional PPE. The PPE we are giving you keeps you safe. You do not need a uniform or to change in and out or shower. They are monitoring and you are safe. Follow what we tell you to do." Eddie Yearwood, Ricky Dougan, and Dewayne Johnson were all FRUCON Supervisors. They told me I was safe on multiple occasions.

> The only one that did not tell me that I was safe was Tim Yearwood. The ARCH team leader, Barry Strickler, also told me I was safe on several occasions. I remember asking my coworker, James Armstrong, if I needed any additional equipment or PPE before entering the Cell House to work one day. He told me that there were no further requirements and that I was "doing just fine."

> My FRUCON Supervisor, Ricky Dougan, told me, "You're doing a good job. Get on in there and get it done. You are safe, just do what we tell you to do." I felt pressured to stop asking questions so I could hurry up and get to work. I was led to believe I didn't need any extra equipment because my FRUCON Supervisors were in direct contact with OLIN. Jack Aff, Ex. 49, pages 6 and 7.

145.    Jimmy A. Jack suffers from a number of medical issues:

> I struggle with insomnia. I have been diagnosed with depression and anxiety. I deal with bouts of irritability, feelings of isolation, and anger issues. I have mood swings, attention span problems, and paranoia. I have joint pain and muscle spasms. I've had unexplained weight loss, persistent nausea, and significant hair

loss. I get dizzy and have tingling/pain or numbness in my arms, hands, legs, and feet. My problems with short-term memory loss make me worry that I will have early onset dementia. My vision is diminished. I deal with hearing loss and learning deficits and a diminished immune system. Jack Aff, Ex. 49, page 9.

146. Plaintiff Contractor Worker, Roger L. Walden, an employee of BILFINGER, formerly known as FRUCON, from 1995 to 1998 and he describes his experience this way:

Later in 1995, I began working for FRUCON at the FACILITY as strictly a Pipefitter so I could move up in the ranks. I became a Supervisor in approximately 1995 and stayed at the FACILITY until approximately 1998. I had a few supervisory roles, first Lead Man, then Foreman, then General Foreman. In these roles, I received instruction directly from FRUCON Project Managers Rich Donlin and Tim Yearwood to distribute to my team. As General Foreman, I oversaw the work of approximately forty to fifty FRUCON contractor workers and the projects they performed. Tim Yearwood and I would have meetings with OLIN management to discuss project scope before the work started. I dealt directly with OLIN direct engineers Dan Lamb and Charlie Hawk. Walden Aff, Ex. 51, pages 1 and 2.

FRUCON had their own craftspeople. They had their own Backhoe Operators, Carpenters, Concrete Finishers, Iron Workers, Forklift Operators, Pipe Welders, and Structural Workers. They were full service. During my employment, there were always contractor workers around. Given that I was there to do maintenance work, I did whatever I was instructed to do. That meant that I crossed paths with the work that other contractor workers were doing on a daily basis. If one group needed to come in and pull a pump, we would have to take all the piping off. Either we would pull it or the rigging crew would come in and pull it before the carpenters would come in and bust up the concrete slab or the foundation of the pump. The carpenters would then build back or pour a new concrete pad. After that, we would set a new pump. We participated in the finishing of some of the same projects, but we did our part while they did theirs. Walden Aff, Ex. 51, page 2.

Throughout the year, OLIN put band-aids on aging and damaged equipment to keep the FACILITY running. Outages were scheduled twice a year to work, repair, demo and rebuild new systems while production temporarily ceased. During this period of time there was a lot more mercury and mercury vapor because

of all the work being done, which I did not realize at the time. I assisted with outages wherever I was needed. The areas I assisted in were the Brine Area, Cell House, Sulfur Tank Area, HTH Building, and the Compressor Building. I remember pulling tube bundles out of the Compressor Building during each outage to have them cleaned and hydroblasted as part of regular maintenance. We replaced valves that weren't working properly and piping that was deteriorated beyond repair in the Brine Area. Outages were also the time to fix as many steam leaks as we could there. We tore out old equipment, pipes, and tanks in the Cell House during outages. During outages, I did a substantial amount of hot work. This included performing hot work on contaminated cell systems, parts, and structures. When we put heat to this equipment, smoke would be generated, and it contaminated the area around us. During most of this work, we were not wearing respirators that protected us from mercury. Those working around us were not wearing respirators either. The only time I recall being required to wear a respirator was during work in the HTH Building because the chlorine would make it impossible to breathe. During outages, several more contractors were brought on-site, sometimes up to 50 to 100 more contractor workers. I recall FRUCON, DUNCAN and PEN being around us while we did this work.

During production and outages, FACILITY direct workers and the contractor workers would use common areas to congregate, eat and use the restroom. While I was with BLOUNT, BROWN, and FRUCON, my coworkers and I ate in the Cafeteria. We would often eat while wearing the clothing that we had worn while doing work in a mercury contaminated area, like the Mercury Cell House. While doing our work, we contaminated the clothing we were wearing and then we were eating with other contractor workers, such as DUNCAN, PEN, and FRUCON, as well as FACILITY direct workers in these clothes.

I saw many other employees with mercury mud on their clothing as well. We were cross-contaminating each other without realizing it. Walden Aff, Ex. 51, page 6.

147.    Plaintiff Contractor Worker Roger Walden provided further sworn affidavit testimony about his experience working in the Cell House at the FACILITY this way:

I worked in the Cell House doing maintenance consistently throughout my time at the FACILITY, with BLOUNT, BROWN, and FRUCON. I spent most of my time on the basement level of the Cell House. I replaced rubber lined piping and fiberglass piping in this area. The majority of the work I completed in the

Cell House was hot work because I was a welder and pipefitter. We often used sanders, grinders, impact wrenches, and torches to complete our tasks. We commonly used a torch while performing this work because that's how we were able to remove swollen bolts from the fiberglass pipes. We would have to burn the heads off of them before using a hammer, sledgehammer, and bullpen to drive the bolts out. We had to beat them out because they were so swollen into the fiberglass. When we put heat to the pipes, equipment, and structures in the Cell House mercury cell, smoke came off the pipes. This smoke would contaminate the air for those of us doing the work and for those around us. Often, we would be assisted by other contractor workers. I also helped replace some of the big tanks here. I would take out the old tanks and demolish the concrete before replacing them and tying in pipes. I put in a new tank and concrete slab in the decomp area.

I was not aware if my respirator was protecting me from mercury. I was only aware of it protecting me from chlorine and other similar chemical hazards.

My team would unknowingly be contaminating the air where OLIN, PEN, and DUNCAN were working in close proximity. Walden Aff, Ex. 51, pages 3 and 4.

148. Plaintiff Contractor Worker, Roger Walden, provides his testimony of Safety

Training for his work at the FACILITY and SISTER FACILITY:

Comparing the safety training I received at OLIN to other chemical companies I've worked for, OLIN's training was lackluster. I say this because the orientation I experienced at another chemical plant, Eastman Chemical, lasted a full day and covered an array of chemicals and hazards. OLIN's orientation lasted only an hour or two. There was no comprehensive training in regard to mercury hazards and the severity of the effects of mercury exposure. Unless there was a puddle of mercury on the floor, mercury was not discussed. There was more emphasis on hot work safety because there were flammables everywhere and the chlorine exposures. At the FACILITY, I recall them talking a lot more about caustic issues than they ever did mercury. Caustic, sulfuric acid, and hydrochloric acid were more of a big deal to them. Every morning, I attended a safety meeting, which was also called a "toolbox meeting." Every Monday morning, there would be a specific topic such as fire extinguisher training and other basic safety topics. We were handed a piece of paper to sign to show that we were present for the meeting. I was not informed of the dangers of mercury by any BLOUNT, BROWN, or FRUCON Supervisor. Mercury was just something that was present on-site

and used in production. It was not mentioned as a danger to me. Walden Aff, Ex. 51, page 6.

During my time as a FRUCON Supervisor, I was not given any instruction on what to tell my crew about mercury hazards. I was given drawings or basic instructions about the jobs they wanted us to complete. Some of the jobs we completed were cutting and replacing pipe as well as performing line breaks. We did a lot of work in the Compressor Building. We updated the compressors and took out a lot of the old equipment there. Walden Aff, Ex. 51, page 5.

We had to secure daily work permits from OLIN. Our permits were almost always red. Red permits were for hot work. There was also a yellow work permit for line breaking. We even had to have a general work permit to be in the area at all. Walden Aff, Ex. 51, page 5.

149.    Plaintiff Contractor Worker, Alex Shaw, worked for BILFINGER, formerly known

as FRUCON, from approximately 1999 until 2000. He describes his experience this way:

As I stated in my Prior Affidavit, I worked in the HTH Building at the SISTER FACILITY when I was a FRUCON contractor worker. My FRUCON crew was installing a sprinkler system. We had to arrive at the SISTER FACILITY at 6:30 a.m. for a brief safety meeting to discuss the tasks and PPE for the day. Mercury was not mentioned during these meetings. In doing this work we had to cut and drill into the structures of the building. This created heat and smoke that we inhaled. No member of my team was instructed to wear respirators while we did this work There would be some PEN workers on the scissor lift and some on the ground below. There were also ARCH workers that were on the ground doing their normal jobs around the scissor lift. In addition to the sprinkler system, my coworkers and I took demoed piping from the HTH Building to the wash down pad that was on the FACILITY side. It was just on the other side of the fence next to the TRU Building. I only did this once, but my coworkers did it several other times. The equipment was washed down, put in a hopper, and sent to a landfill. We did not have to decontaminate after crossing back to the SISTER FACILITY side. I saw another FRUCON crew onsite installing new pipes after we demoed the old ones.

When my crew and I worked on the "powder side" of the HTH Building, we all put on half-mask respirators with chlorine filters. My FRUCON coworkers, not FRUCON Supervisors or SISTER FACILITY Supervisors, suggested I wear the chlorine half-mask

respirator. I was the new guy on the crew, so they were just helping me out. We had to wear them the entire time we were on that side due to the chlorine powder in the air. Shaw Second Suppl. Aff, Ex. 52, page 2.

Looking back, I now realize that my coworkers and I were tracking mercury from the Cell House to the Sandblasting/Paint Yard, which contaminated the area. FRU-CON contractor workers would then bring back that contamination to the SISTER FACILITY. There was also a break area for PEN contractor workers in that area. There were four picnic tables under a canopy where we could take breaks. There was a golf cart at the Cell House that was used by workers to get to areas across the FACILITY. Shaw Second Suppl. Aff, Ex. 52, page 4.

150.     Plaintiff Contractor Worker, Charles Kincaid, worked for BILFINGER, formerly known as FRUCON, beginning in approximately 2011, while also still working for Contractor Defendant CUSTOM MECHANICAL. Charles Kincaid describes his experience with BILFINGER, formerly known as FRUCON in 2015 this way:

In approximately 2015, while I was employed by BILFINGER, I was sent with my crew (including William "Billy" York, Ricky Sigler, and David Kincaid) to work on two brine tanks located on the FACILITY side during an outage. Prior to this job we had been on a job at Wacker where I was foreman, and William York (Billy) was our general foreman. When we began the job at OLIN, Tim Yearwood cut my pay by $2.00 an hour which dropped me from foreman to a lead worker and Billy took my place as Foreman. Billy followed the letter of the law, he did things by the book, exactly as he was instructed.

Billy communicated directly with OLIN's Maintenance personnel about the details of the work we were to perform. Before beginning the job, Billy asked OLIN personnel directly if the area contained any mercury and was told that it did not; that the area was "mercury free" because all the mercury on-site had been contained. Tim and Eddie Yearwood told us that those lines were clear, though we soon found out that was not the case.

When we began demolishing the tanks, we started by tearing out the old blow pipe across the top of the tanks and realized that the lines were still full of product. I reported this to Billy, who reported it to OLIN personnel, and I was instructed to bring the Lab a sample of the contents. I scraped the contents out of this line by hand and placed them into a galvanized bucket (a half-gallon

bucket we used as tool or grease buckets) and brought it to the lab as I had been instructed to do. Naturally, we assumed that the Lab workers had tested the product and it had been acceptable for us to work in the tank. After bringing this sample to the Lab, we continued our work demolishing the tanks, torching, cutting, and welding. My son David almost passed out while welding during this time.

Several days after I brought the sample to OLIN's Lab, the safety officer of OLIN came to us and told us that we needed to stop work immediately because they had found traces of mercury in the sample I brought them. I can tell you for sure his first name was Nick, but I cannot recall his last name. Nick told us to get out of the area and take a shower because the sample we provided from the product line had tested high for mercury and sent us to the onsite doctor, Dr. Snoddy. Dr. Snoddy then sent us to the hospital for testing to be performed.

The safety officer for BILFINGER, Matthew Abercrombie, took us to Sky Ridge Hospital in Cleveland himself. When we got to the hospital, we had to fill out paperwork, a questionnaire about what happened, and we provided them with a urine sample. After providing them with the urine sample, I asked the medical staff for the results, but they told me that OLIN owned the results and they couldn't release them. We were only at the hospital for a couple hours. Matthew brought us back to the BILFINGER shop afterwards, and we all went home for the day. I believe that we returned to work the following business day. I do not recall being placed on any restrictions. It seemed that both BILFINGER and OLIN were trying to brush it under the rug. The fact that one of the workers was my son, and another was my brother, concerned me; however, Dr. Snoddy assured me that we were safe from being harmed because we were within the tolerable limits of mercury. So, we continued on with the job. Affidavit of Charles D. Kincaid , Ex. 57, page 4.

Now, I realize that since the product in the line tested positive for mercury, moving the old tanks and pipes was contaminating the air, soil, and our tools with liquid mercury and mercury vapors.

Based upon my observations during my time at the FACILITY, my work with BILFINGER and CMC, as well as the work that Duncan Electric Company, later White Electrical Construction, Co.. ("DUNCAN') contractor workers and OLIN direct workers did, stirred up the mercury and made the contamination of others on-site greater. Kincaid Aff, Ex. 57, pages 4 and 5.

151.	Plaintiff Contractor Charles Kincaid remembers safety training for his work at the FACILITY and SISTER FACILITY this way:

> I recall going through a short safety class for CMC and BILFINGER when I hired on at each. Before working at the SISTER FACILITY, I watched a five-to-ten-minute video giving a basic overview of the site. I do not believe mercury was mentioned during that video. Tim Yearwood, the BILFINGER Supervisor, held a regular "safety" meeting when I worked for BILFINGER, but it was general safety training, like ladder and fall safety. I remember most of the training being about avoiding reportable injuries. There was never any serious training regarding the dangers of mercury in general or in regard to the work we were doing. I assumed I was safe while working at the FACILITY because no Supervisor—OLIN, CMC, or BILFINGER— told me otherwise.
>
> For CMC, we went through a yearly training course, and I was required to keep my credentials up to date. These credentials included my 10 and 30 OSHA credentials. I do not recall receiving any specific training about mercury. I only recall being told that mercury was not a concern and that it was within the limits of tolerance. I do not recall any specific training about mercury when we went on-site at OLIN.
>
> In my experience, all contracting companies require you have to have basic training. This training includes four to one ratio ladder training and other general training that has to be recertified once a year. Kincaid Aff, Ex. 57, pages 5 and 6.

152.	From the preceding testimony, it is clearly established that as workers for BILFINGER, formerly known as FRUCON, were performing their tasks, were creating mercury exposures for those employees working for PEN, WHITE ELECTRICAL, formerly known as DUNCAN, CUSTOM MECHANICAL, OLIN, and ARCH (SISTER FACILITY).

153.	These exposures caused and/or contributed to the injuries suffered by Plaintiffs employed by these companies and Plaintiffs working for other companies in close proximity to BILFINGER, formerly known as FRUCON's work.

## CROSS CONTAMINATION- TURNER

**154.** Contractor Defendant TURNER was contracted to work at the FACILITY and SISTER FACILITY providing General Maintenance, which included repairing and replacing steel structures, pipe work and repair, removing, repairing and adding vessels, changing valves, and installing insulation throughout the FACILITY and SISTER FACILITY. Contractor Defendant TURNER assisted with mercury clean-up and recovery, as well.

**155.** The Plaintiff Contractor Workers for TURNER are as follows: *Dereck V. Burns, Christopher L. Clark, Ward C. Donaldson, Michael W. Fife Jr., Zachary C. Goins, Mitchell C. Kaehler, John M. Keeling, Paul F. Lafortune II, Brandy M. Lafortune, Joseph D. Martin, Steven R. Miller, Gabriel L. Perez, Tony E. Stanley, Bobby D. Waldrep, Jason M. Walker, and Donnie R. Webb.*

**156.** While TURNER workers performed assigned work at both the FACILITY and the SISTER FACILITY they cross-contaminated workers for BILFINGER, formerly known as FRUCON, PEN, WHITE ELECTRICAL, formerly known as DUNCAN, CUSTOM MECHANICAL, OLIN, and ARCH (SISTER FACILITY), as shown by the testimony set forth below.

**157.** Additionally, upon information and belief, TURNER's work at the FACILITY and the SISTER FACILITY exposed additional Plaintiff Workers who were in close proximity.

**158.** In his supplemental affidavit, Plaintiff Contractor Worker, Michael Fife Jr., provides sworn testimony about working as a maintenance Supervisor for TURNER from approximately 2017 until 2020. He explains his experience this way:

> I started working for TURNER in 2017, one year after the company acquired the general maintenance contract. During production and outages, TURNER contract workers were assigned

to perform maintenance and repairs throughout the FACILITY. Not long after I was hired, TURNER promoted me to supervisor. I supervised work such as revamping piping systems, repairing and replacing steel structures, adding additional structures and vessels, removing and replacing vessels, and changing valves. Maintenance was supposed to be exclusively TURNER's work, but OLIN routinely brought in other contracting companies, such as PEN and Wright Brothers Electrical, to perform the same general maintenance, but for a lower price. There were a few buildings separated as a sister facility (the "SISTER FACILITY") that were outfitted for production and packaging of chlorine. I remember Bilfinger Industrial Services Inc. ("BILFINGER"), was on-site when I worked at the FACILITY, and was a contracting company that performed maintenance and repair work at the SISTER FACILITY. During production, TURNER would have between 30 to 40 workers on-site, and I would work alongside 20 other workers from different contracting companies. Supplemental Affidavit of Michael W. Fife Jr., Ex. 54, pages 1 and 2.

By the time I was hired by TURNER, the mercury Cell House had been demolished. OLIN stated that the FACILITY was "mercury-free," but I saw liquid mercury and mercury mud while working on the FACILITY side of the plant. Mercury was on the ground all over the FACILITY site. My crew performed hot work, line breaks, and other metal work in areas or on equipment deemed contaminated with mercury. They worked in other areas where we were told there was no mercury. Since joining the Tennessee Mercury Investigation, I now believe that this work spread mercury vapors to the surrounding workers (this included workers from BILFINGER, PEN, Wright Brothers, and Tri-State Electrical) and environment. Adequate measures were not taken to contain or protect us from this mercury vapor. Now, I know that mercury vaporizes at a higher rate at high temperatures and therefore contaminated the nearby environment. The simple barricades and PPE measures used did not effectively prevent the mercury vapor from contaminating others in the vicinity. All we had to do was put up a tape line about twenty feet from where we were working as a perimeter. OLIN workers could come and go in and out of the perimeter as they pleased. There were no measures to even attempt to contain or direct mercury vapors. Further, those closest to the work being done were exposed to higher levels of mercury. Also, we were instructed to work in areas that we were told was "mercury free" and we still saw mercury. Fife Jr. Suppl. Aff, Ex. 54, page 2.

159.    The deliberate carefree environment and the reckless approach to safety were

further emphasized by Plaintiff Contractor Worker Fife Jr. in this testimony:

> We were instructed to work on old pipes and equipment that were part of the old mercury system. Sometimes we were told it was free of Mercury. Now I know that as a part of the old system these materials would have been contaminated whether you saw liquid mercury or not. If it was suspected that the piping or equipment was contaminated, then those doing the work would wear a ½ mask mercury respirator. Many of these jobs required additional crews to assist. Those not performing hot work did not wear a mercury respirator. Those working to assist and those working in the vicinity were exposed to mercury vapors without protection. Other employees for OLIN, PEN, TriState Electrical, and Lonza were exposed to this mercury vapor while TURNER performed its work. Fife Jr. Suppl. Aff, Ex. 54, pages 2 and 3.

> "Ryan Beeson was the highest-ranking TURNER contractor worker at the FACILITY, and I was his second-in-command. Neither Ryan Beeson nor Robert Harrell informed me well enough to keep my crew safe from mercury exposure. I was not informed of the severity of the health problems that could happen from being exposed to mercury. This prevented us from adequately protecting our employees and also prevented us from effectively protecting OLIN and other contractor workers on site. It wasn't until the Tennessee Mercury Investigation that I learned of all the damage mercury could do to the human body. I was never informed of the dangers of working at the FACILITY. Safety protocols changed depending on which Operators were working that day. Now, I realize that the TURNER and OLIN Safety workers should have informed me much more than they did. I needed much more information to keep myself; my crew, OLIN, and Contractor workers protected from mercury exposure. Fife Jr. Suppl. Aff, Ex. 54, page 3.

160.    Plaintiff Contractor Worker, Michael Fife Jr., further elaborates on the reckless

withholding of necessary information to Contractor Workers:

> "OLIN knew much of the old mercury cell product production piping and systems that had been connected to the old mercury cell were still in use. TURNER and other contractors maintained and repaired these old systems. Due to mercury's absorption characteristics, much of this old system was highly contaminated. OLIN withheld this information from me and other contractors. OLIN also conducted environmental monitoring and withheld this

data from TURNER and other contractors. This withholding of information negatively impacted my ability to keep myself and my men safe." Fife Jr., Suppl. Aff, Ex. 54, page 4.

161.    By 2017, industrial hygiene and OSHA standards as applicable to the Chlor-Alkali industry had coalesced into much the same framework that we have today. They start with robust process safety engineering to "design out" as many hazards as possible. This is followed by assessments of the remaining hazards, selection of PPE, and the establishment of administrative controls. These controls, many of which replicate common sense safety practices used by the general public in everyday life, such as keeping food preparation and dining areas clear of chemicals, or removing soiled clothing, are used to help guide behaviors and reduce anthropogenic exposure.[40]

162.    Administrative controls are often thought of as "manners" or "good housekeeping" as they are less overt than wearing PPE and less scientific than monitoring protocols or process safety engineering. Nonetheless, they are a critically important pillar of industrial hygiene and the maintenance of OSHA standards.[41]

163.    Plaintiff Contractor Worker Fife Jr. further testified about the housekeeping that he observed while working for TURNER:

> Before COVID-19 guidelines, the FACILITY had a lunchroom that workers shared. Before COVID I saw other workers still wearing their mercury PPE in the lunchroom and breakroom. Some workers were from TURNER, like Steve "Smiley" McDermott and Chris Clear. I noticed that some of these workers were from BILFINGER SE, PEN, and OLIN, but I can't recall specific names. Now, I realize that Ryan Beeson and Robert Harrell, the BILFINGER SE Supervisors, the PEN Supervisors, and the OLIN direct Supervisors should have been enforcing this rule. A hard hat on an eating surface is a huge no no. It is an unspoken professional courtesy among people that take the job seriously. I made sure the guys on my crew adhered. I could not

---

[40] 29 CFR § 1910
[41] *Ibid.*

write up the other 4 people that did not care. They were not part of my crew and I had no jurisdiction. Any mercury present on these workers' uniforms, boots, and skin, was partially transferred to the lunchroom seats and vaporizing, exposing the surrounding workers. I know that even some Turner workers wore mercury contaminated clothing in common areas such as bathrooms and break areas where meals were taken. This cross contaminated OLIN, PEN, Turner and potentially other workers. The Change House & Clean Room Lockers were not clean of mercury and mercury mud. Men that changed out for TURNER and other contractors were not trained and clean practices were not enforced. This created cross-contamination of all using the Change House. Also, the uniforms had all been laundered together for years and this also created a cross-contamination situation. TURNER cross contaminated other OLIN and contractor workers by its use of the Change House. Fife Jr. Suppl. Aff, Ex. 54, pages 3 and 4.

164.    From the preceding testimony, it is clearly established that those working for TURNER while performing their tasks at the FACILITY and SISTER FACILITY, were creating mercury exposures for those employees working for BILFINGER, formerly known as FRUCON, PEN, WHITE ELECTRICAL, formerly known as DUNCAN, OLIN, and ARCH (SISTER FACILITY).

165.    These exposures caused and or contributed to the injuries suffered by Plaintiffs employed by these companies and Plaintiffs working for other companies in close proximity to TURNER's work.

166.    The exaggeration that the FACILITY was "mercury-free" created a false sense of safety for TURNER contractors and posed great harm to the workers on-site.

167.    Plaintiff Contractor Worker Fife Jr. explains how OLIN's knowledge was withheld from contractor workers, like him, during the supposedly "mercury-free" period:

"OLIN knew much of the old mercury cell product production piping and systems that had been connected to the old mercury cell were still in use. TURNER and other contractors maintained and repaired these old systems. Due to mercury's absorption characteristics, much of this old system was highly contaminated. OLIN withheld this information from me and other contractors.

OLIN also conducted environmental monitoring and withheld this data from TURNER and other contractors. This withholding of information negatively impacted my ability to keep myself and my men safe." Fife Jr. Suppl. Aff, Ex. 54, page 4.

**COSS CONTAMINATION- WHITE ELECTRICAL, formerly known as DUNCAN**

168.    Contractor Defendant WHITE ELECTRICAL, formerly known as DUNCAN, was contracted to work at the FACILITY and SISTER FACILITY, providing Electrical Maintenance, General Maintenance, Cell Maintenance, Maintenance Parts Rebuild, Mercury Recovery, and was part of the construction of the hydrogen plant.

169.    The Plaintiff Contractor Workers for WHITE ELECTRICAL, formerly known as DUNCAN, are as follows: *James W. Albury, Sr., Timothy L. Choate, George J. Crye, Floyd M. Green, Jason E. Hames, Kenneth E. Haney, Gary L. Swafford, William C. Thurman, Wilson W. Weaver.*

170.    While WHITE ELECTRICAL, formerly known as DUNCAN, workers performed assigned work at both the FACILITY and the SISTER FACILITY they exposed workers for PEN, BILFINGER, formerly known as FRUCON, CUSTOM MECHANICAL, OLIN, and ARCH (SISTER FACILITY), as shown by the testimony set forth below.

171.    Additionally, upon information and belief, WHITE ELECTRICAL, formerly known as DUNCAN's work at the FACILITY and the SISTER FACILITY exposed additional Plaintiff Workers who were in close proximity.

172.    When working for WHITE ELECTRICAL, formerly known as DUNCAN, James W. Albury Sr., provides in his supplemental affidavit that he performed a spectrum of services while working as an electrician from 1989 until 2015 at the FACILITY and SISTER FACILITY. He explains his observations like this:

> During my time at the FACILITY, I mainly worked in the old Cell Buildings known as the "812" Building and "510 Building." I had

a hand in almost everything electrical in this area and ended up there for eighteen years. I mainly worked on switches, anode motors, and mercury pumps. While working on these cell processes you would see mercury regularly. In doing the work I was doing mercury was increased by the removal of the parts (opening the system), mercury in and on the equipment, and adding heat by disassembling. The system was leaking so badly that we would put buckets under the system to catch the mercury leaking. I don't think there was a day that went by that I didn't have to wash mercury off the floor. This was especially the basement of the Cell Building. There were always other contractor workers present in the Cell Building. They would be performing pipe work, concrete work, cell repair, welding, and any other assigned tasks. Other contractor workers maintained a presence in the Cell Buildings throughout my time there. So, while I did my work, I was increasing the exposures to other contractor workers and direct workers. They were also increasing mercury exposure to me and my co-workers. Some of the contracting companies I remember working alongside us were YEARGIN, PEN, CMC, and FRUCON. Also, OLIN direct workers were frequently around the work I was doing assisting or inspecting the work as it was being performed.

On the top floor of the Cell Building, there was a little room off to the side of the OLIN control room where I kept my computer and spare parts. I even saw mercury in the Control Room. I performed electrical work on the Control Room equipment, and this area was contaminated as well. They all said it was mercury free, but it was not. There certainly mercury even there. Supplemental Affidavit of James W. Albury, Sr., Ex. 56, pages 3 and 4.

While doing all kinds of electrical work, we had to perform structural modifications for the conduit and other electrical components. In doing this electrical support work, we would have to drill, cut, grind, and make other modifications so we could complete the job. I would do this work in a mercury contaminated environment. I have had it on my clothing, in my hair, and on my skin. I know now that this work increased the mercury vapor around us. So, my DUNCAN co-workers, myself, and other contractor workers as well as OLIN and ARCH direct workers were exposed to mercury vapors as a result of my work and the work of direct workers. Albury, Sr. Suppl. Aff, Ex. 56, page 2.

As I have stated, I worked all over this site for years. Mercury was everywhere. When we were up in the ceiling of the cell house you could look down on the beams and see it shimmering. Sometimes you could look out into the air and see it like dust. Dust that was contaminated with mercury was everywhere. Red Dust,

Grey Dust, Shiny Dust. We saw this stuff all the time. The metal materials we were working on had been in this mercury vapor for many years if not decades. Sometimes you would see mercury beads on it. I would work in a mercury contaminated environment. I have had it on my clothing, in my hair, and on my skin. It was also on the ground in our common areas, and we would see mercury on the ground outside. When decomposers were pulled out and taken down the road, mercury would leak out and end up on the street. I recall washing mercury out of the street and into the sump between the Cell Building and the Brine Area. Let's just say this, after many years mercury was all over the place. Albury, Sr. Suppl. Aff, Ex. 56, page 5.

173.     Plaintiff Contractor Worker, James W. Albury, also contends the common areas between the FACILITY and SISTER FACILITY were interconnected, increasing mercury exposure to Direct Workers and Contractor Workers in those areas. He observed this while on-site:

While working on-site, if I was working in the Cell Building doing what they said was high exposure work, I wore company uniforms. If I was not doing this type of work, I would wear my street clothes. The change house dirty side was contaminated by mercury mud. When we finished our work, we would have dirt, dust, mercury, and mercury mud on our uniforms. We would leave our dirty uniforms, and they would be washed with all of the other dirty uniforms. In this process, I know now that this was simply cross contaminating our uniforms with this mercury. When it was time for us to take a break, they wanted us to take a shower and put on clean clothes if we were going out front away from the Cell Buildings. If we just wanted to go to the breakroom that was on the top floor of the 510 Cell Building, then we did not have to shower and put on clean clothes. Lunch breaks were taken in this same breakroom. I remember there was mercury mud in the Break Room. Because we did not have to shower for regular breaks, this meant that our mercury contaminated clothing was worn into the breakroom where contractor workers might have been eating. There was a bathroom in the Cell Building, so we did not have to shower out to use it. This bathroom definitely wasn't the cleanest, and we wore our mercury contaminated clothing inside. Albury, Sr. Suppl. Aff, Ex. 56, page 4.

I was told by my direct DUNCAN supervisor, James "Lefty" Wills, and OLIN direct worker and supervisor, Charles "Marty" Sluder, to always keep mercury underwater. They both said, **"do**

**what we tell you to do, how we tell you to do it and you will be safe"** We were made to believe that if mercury was underwater, we would be protected from the fumes it gave off. Neither my supervisor, nor any OLIN direct worker, told me what would happen to me if I was exposed to those fumes. Albury, Sr. Suppl. Aff, Ex. 56, page 5.

174. When working at the FACILITY and SISTER FACILITY from approximately 1979 until approximately 2014, Plaintiff Direct Worker, Charles M. Sluder, provides in his sworn testimony that while working in the Cell House for OLIN, he worked with and around Contractor Defendants. He testifies about his experience working around workers with Contractor Defendant WHITE ELECTRICAL, formerly known as DUNCAN, this way:

Generally, throughout my employment, I worked alongside DUNCAN contractor workers during operations and outages. When contractors performed work onsite in my area they worked directly alongside OLIN and other DUNCAN and PEN contractor workers. If work that was being done created an increase in mercury release, this would increase the levels of mercury exposure to those OLIN and other contractor workers in close proximity. This increase in environmental exposure and cross contamination happened on a daily basis during my entire employment at this site. I will now discuss areas of the FACILITY in which I worked and provide direct examples of this increase in mercury exposure and cross contamination. Affidavit of Charles M. Sluder, Ex. 50, pages 2 and 3.

DUNCAN was the electrical contractors onsite. I remember that Wayne Albury, Leroy Felty, and Floyd Green worked as DUNCAN contractor workers at the FACILITY. The work that DUNCAN performed also increased the mercury vapor exposures for those around their work environment. The mercury cell process creates tremendous static electrical currents. Metal tools would fly through the air and adhere to steel structures. This current was so powerful that tools would be pulled out of our hands. This static current environment contributed to making the electrical system and its components highly contaminated with mercury. These electrical currents and the molecular absorption of mercury into other metals made the electrical systems highly contaminated. All the electrical wiring and components were highly contaminated by mercury. DUNCAN performed most of

the electrical contracting on the site. While working on electrical components of the Cell House and other system areas with mercury contamination such as the Hydrogen Plant, Brine Area, Loading, HTH, Retorts and Utilities, components were inevitably contaminated with mercury. In the Cell House working on the electrical components of the cell system was a high exposure job. The anodes and attendant equipment were highly contaminated with mercury. The DUNCAN contractor workers rebuilt the anode motors from the cell top on the desk in their office in the Control Room. Wiring from the mercury pump was repaired on the desk, too. They would eat their lunch on the same desk. As these systems were maintained and disassembled, they increased the mercury exposures for all those working around them. While DUNCAN workers performed electrical maintenance in the cell house they regularly worked on and disassembled mercury contaminated parts. In doing so they increased the mercury vapor exposures of those OLIN direct workers and other contractor workers within the Cell House. While doing this work they contaminated the clothing they were wearing and while they were in common areas with the other OLIN direct workers and contractor workers they increased the mercury vapor inhalation of these other workers on the site. DUNCAN had two of their employees permanently in the Cell House. They had their own satellite office that was connected to the control room which was between the 812 and 510 Cell Buildings. They were there at least 40 hours a week. They had lockers and kept their tools there. They would just come in and out doing electrical jobs constantly in the Cell House. For example, if the mercury pumps shorted out we'd just go get them in their office and they would come out and fix it. They worked a lot. They would change out anode motors, and other electrical components among other electrical tasks. Sluder Aff, Ex. 50, pages 3 and 4.

175.     Plaintiff Direct Worker, Charles M. Sluder, also explains in his sworn affidavit the

consistent lack of training and PPE worn by contractor workers that he observed:

I observed some contractor safety communications with workers, but it was general workplace safety, like ladder safety, not information about mercury exposure. These contractors were PEN and DUNCAN. The contractor meetings were about 15 to 20 people. Based upon my observations and experience, I do not believe that the contractor workers received mercury exposure training. If they had they would not have been working without the proper PPE. I never witnessed contract workers getting this training from their employers, OLIN or any other contractor. I know that PEN and DUNCAN contractor workers working in the Cell House were supposed to submit urine samples for mercury

testing. Because of this, I believe that the contracting companies may have had some knowledge of mercury exposure risks. Although, I do not know if this information was shared with the contracting companies. Also, many contractor workers would come and work temporarily in the Cell House and were not required to receive particular training or urine evaluations. My experience at the FACILITY was that the culture, in practice, led all workers to believe that as long as we weren't actively testing high for mercury, we were okay to keep working in the Cell House and other departments and there would be no health risk. We saw Management come in and walk around the cells in their normal shoes which gave us the impression PPE wasn't that important. Again, this led us to believe that they were monitoring and that they would keep us safe. Sluder Aff, Ex. 50, page 5.

176.     Plaintiff Direct Worker, Charles M. Sluder, also discusses the illusion of safety presented by OLIN's upper management that led the Plaintiffs to believe they were safe.

His sworn testimony includes the following:

I also observed members of a regional group walking throughout the Cell House without wearing respirators. They would come in and gather information on OLIN's technology so they could develop patents. OLIN Operators conducted inspections, so OLIN was therefore aware of the conditions within the Cell House. On some occasions, OLIN management personnel, other contractors, Engineers, and Technology Center personnel walked throughout the Cell House wearing their regular shoes and then returned directly to their offices. Based on my current understanding of how readily mercury vapors disperse, I believe that both workers and management were exposed to mercury vapors regardless of whether the cell tops were installed. In my opinion, mercury vapors were consistently present in the air. I was told by my Supervisors that my PPE was sufficient for the work I was performing. Seeing management take such a relaxed attitude regarding the dangers of mercury vapor reassured all of us that the mercury in and around us was safe and we had no real reason to be concerned. I believe that this was also the attitude of those contractor workers that were working around us. Sluder Aff, Ex. 50, page 5.

177.    Sluder continues to discuss in his sworn affidavit the relaxed working environment and minimal decontamination required when taking breaks after working in the Cell House.

178.    Per the standards enumerated in 29 CFR § 1910.132 it is expected that employers will assess for the unique hazards within their workplace and engineer the processes to prevent them, or failing an ability to engineer these hazards out of the system, protect their employees from "injury or impairment in the function of any part of the body" through the proper use of Personal Protective Equipment (PPE) when "hazards are present, or are likely to be present."

> There was also a little Lunch Room or Break Room they made later at the back of the 510 Building. This was right off the Cell Floor. There were a couple of doors and then plexiglass in between. The Cell Crews, and Maintenance would go in there during short breaks. You could see the cells through the plexiglass. We would work out there in the Cell Room and then go into the room with the plexiglass and put down our hard hats and stuff. We would be in our coveralls and everything and we would go there to take a break or eat, or whatever. Sluder Aff, Ex. 50, page 6.

179.    Moreover, Plaintiff Contractor Worker Samuel Goins, when working for another contractor at the FACILITY in the Cell House from approximately 1985 to 1991 and from approximately 1992 to 2007, observed Contractor Defendant WHITE ELECTRICAL, formerly known as DUNCAN, in this way:

> Lefty" Wills and James "Wayne" Albury were DUNCAN contractor workers who worked in the Cell House when I did. DUNCAN contractor workers ran conduit and wire in the Cell House. In addition, they performed electrical repairs and replacement. "Lefty" was a DUNCAN Superintendent . I would often talk to and sometimes help out Wayne Albury, a DUNCAN contractor worker, if he needed someone to help him hold equipment or other similar small tasks. The Cell House electrical system was highly contaminated with mercury. I now realize that as they performed conduit work, hot work and sawing this heated the mercury and increased the

mercury exposure for myself and those others working around us. As parts were replaced, heat would again increase the mercury exposures for all of us around them. DUNCAN did the electrical work when Reductone was being built, so I was around them a significant amount of time when I was with YEARGIN, who was building the structural parts. Supplemental Affidavit of Samuel L. Goins, Ex. 55, page 3.

180.    Plaintiff Contractor Worker, Samuel Goins, further attests to the increase in mercury exposure while he performed work in the Cell House with other Contractor Workers:

The work I was doing while working for YEARGIN and PEN also increased the mercury exposures for those working for DUNCAN, OLIN, and FRUCON. I remember that I performed work including coating, painting, sandblasting, hydroblasting, and floor coating work. I also performed Cell Maintenance. That included work not only around but also inside decomposers and open cells. In doing the sandblasting and hydroblasting, this would throw mercury and mercury dust into the air. This increased the exposures of everyone in the Cell House. The coating work would also include busting concrete. This concrete was visibly contaminated with mercury. Busting up the concrete would throw mercury dust into the air, contaminating all those in the Cell House. The decomposers were full of mercury and mercury waste. I now realize that even just opening the decomposers exposed the air and workers around them to the mercury vapors that were inside them. Based on what I know now of mercury, the work I did and the work that I saw other contractor workers doing while working at the FACILITY increased the mercury exposures for all of those around the work area. I mentioned that DUNCAN did the electrical work while Reductone was being built. At the same time, YEARGIN was building the structure and framing. My crew and I were digging into the ground, where mercury would emerge. This exposed me, the crew I was working with, and DUNCAN contractor workers to mercury. Goins Suppl. Aff, Ex. 55, page 4.

Based on what I observed through my own experiences and through other FRUCON and DUNCAN workers' experiences, contractor workers were not given complete information about mercury hazards. During my early employment period, contractor workers were not told that mercury could harm us or that we could absorb it through the skin. We were told that as long as mercury was on the floor, it was not something to worry about, and that respiratory protection was only needed in limited circumstances

(such as when a cell top was open or when working on a decomposer).

Contractor crews generally wore similar basic PPE. During my earliest period at the FACILITY, contractor workers did not have half-mask respirators. At that time, contractor workers were only issued a chlorine escape respirator. It had a single chlorine filter and fit into the mouth like a pacifier with a small clip to put on the nose. By comparison, OLIN direct workers had half-mask respirators much sooner than contractors. It looked like their protection was of higher quality than the contractor workers. Contractor workers were not issued half-mask respirators until after the major mercury spill in the 812 Cell Building (around 1985). At times, for specific jobs, full-face respirators were issued, but they were even more difficult to wear in the heat and often could not be used by workers who needed eyeglass inserts, which were not provided. Goins Suppl. Aff, Ex. 55, page 5.

## CROSS CONTAMINATION - CUSTOM MECHANICAL

181. Contractor Defendant CUSTOM MECHANICAL was contracted to work at the FACILITY and SISTER FACILITY, providing mechanical work, pipe removal, pipe fabrication, pipe installation, and Mercury Recovery.

182. The Plaintiff Contractor Workers for CUSTOM MECHANICAL are as follows: *David D. Kincaid, Charles D. Kincaid, Shelia A. Millaway, and Larry J. Newport II.*

183. While CUSTOM MECHANICAL workers performed assigned work at both the FACILITY and the SISTER FACILITY, they exposed workers for OLIN, ARCH and DUNCAN, as shown by the testimony set forth below.

184. Additionally, upon information and belief, CUSTOM MECHANICAL's work at the FACILITY and the SISTER FACILITY exposed additional Plaintiff Workers who were in close proximity.

185. Plaintiff Contractor Worker, Charles Kincaid, worked for Contractor Defendant CUSTOM MECHANICAL at the FACILITY and SISTER FACILITY from approximately 2004 until approximately 2022. He performed numerous repairs for the

FACILITY and SISTER FACILITY, such as fabrication work, installation work, and insulation work. He describes his work as a Contractor Worker for CUSTOM MECHANICAL this way:

> My main boss at CMC was Steve Boring. He ran the FAB Shop at 545 Urbane Road. Steve stayed in the office, and he did not work on-site. My first supervisor on-site was the Lead Mechanic. They called the Supervisor the Lead Mechanic. They called the Supervisor the Lead Mechanic until something went south. After that, things got kind of blurry. I do not recall the name of the first "Lead Mechanic" I worked under. The first time I did any kind of work at OLIN through CMC I was a "do boy." That meant that I did whatever was needed when I was told to do so. Kincaid Aff, Ex. 57, page 3.

> On-site at the FACILITY as a CMC contractor worker, my crew and I would check the job out and do measurements onsite, fabricate any equipment needed at the FAB Shop on the SISTER FACILITY side, then install it on-site at the FACILITY. The FAB Shop was in a back lot on that side where we could get to the materials we needed to cut up. I did duct work in the Cell House during production. We fabricated materials on the SISTER FACILITY side for installation on the FACILITY side. Many times, we would have to remove old, contaminated materials while doing our job. Much of what we installed was new materials; however, there were times when we removed old materials, fabricated them, and reinstalled them. While creating new materials in the SISTER FACILITY side's shop, we would not be creating any new mercury vapors. When we were working on old, contaminated materials, we would then create new mercury vapors on the SISTER FACILITY side which brought more mercury exposure to this location. Kincaid Aff, Ex. 57, page 2.

> In approximately 2010, CMC got what I believe to be one of the biggest contracts they ever secured for the busbar job at OLIN. There are only two companies in the country that weld the way OLIN needed it to be done. My son and I trained on how to do the bus bar job, and we did ninety-five percent of the welding ourselves. Our lead mechanic on the busbar job was Jeremy Dixon. I was the guy under him. Travis Nichols bid for that job at 2.2 million dollars, but a higher up at OLIN told a CMC co-worker of mine that OLIN would have paid 5 million dollars for the job. Travis Nichols was safety for CMC, and he was the boss over any OLIN projects. He told us that he had the busbars tested for

contamination and the results came back as "in tolerance" so we were safe to begin welding. We were instructed by both OLIN and CMC to refurbish and refabricate the old busbars (aluminum strips that were approximately one inch thick and twenty inches wide for electrical distribution) from the Cell House to use in the new Membrane Building. OLIN supplied the materials and Travis Nichols with CMC gave the go ahead for us to get started. The busbars painted black were to be re-used, and the silver pieces were new; anything painted black came out of the old cell building. Travis said that all the materials had been tested and were within tolerance, meaning they were safe to begin working on.

For the first six or seven months, the majority of the fabrications were done at CMC's shop on Urbane Road. All the dynamics of the project were put into a computer so we could determine how to weave the busbars through the building. As we did the pre-fabrication, we went back and forth between CMC's shop and OLIN to stage them on-site at the FACILITY as they were being built. We fabricated what we could at on-site, but the more intricate stuff was built at the shop. After the first six or seven months of working on this job, we were shipped to the "field" (the FACILITY) and we began welding the joints.

One of the old Cell House buildings was already torn down, but the last one was still standing with no kind of containment wrapped around it while my CMC co-workers and I were working on the new building in the same area. Workers were actively demolishing this old cell building as we were working next to it.

All the materials from the old Cell House were painted black, I would see most of the new stuff in the towers that came off the steel to power points on the ground. Most of the new pieces were at the bottom of the tower, the old pieces were on steel 45 feet up. They ran through the building like a jigsaw puzzle. The old busbars were part of the old mercury cell process and had been contaminated by mercury and mercury vapors for decades. If you had to heat up the old busbars while removing them or working on them, smoke would come off them.

I felt like I was going to pass out when I was welding the old busbars. I was wearing my welding hood, but my CMC Supervisors did not tell me to wear a respirator. When I said I was feeling dizzy and lightheaded, I was told that my welder may have had a gas leak. My CMC Supervisors, nor OLIN Supervisors, told me that the mercury that was present on the busbars could have been causing me to feel lightheaded as I was welding. Now, I realize that the hot work we were doing on the old Cell House

equipment at the FAB Shop was releasing mercury vapors from the equipment into the air at the SISTER FACILITY.

As we did this fabrication work from the old mercury cell system we would increase the mercury exposure to OLIN, Arch Chemicals, Inc. ("ARCH"), and other contractor workers nearby.

While we performed this work on these old, contaminated parts we were not wearing mercury respirators nor were any of the other contract workers that were around us. Kincaid Aff, Ex. 57, pages 2 and 3.

186.     From the preceding testimony, it is clearly established that as the workers for CUSTOM MECHANICAL were performing their tasks, they were creating mercury exposures for those employees working for OLIN, ARCH, and WHITE ELECTRICAL, formerly known as DUNCAN.

187.     These exposures caused and or contributed to the injuries suffered by Plaintiffs employed by these companies and Plaintiffs working for other companies in close proximity to CUSTOM MECHANICAL's work.

188.     From the preceding testimony, it is clearly established that as the workers for ROBINS & MORTON were performing their tasks, they were creating mercury exposures for those employees working for BILFINGER, formerly known as FRUCON, WHITE ELECTRICAL, formerly known as DUNCAN, PEN, and OLIN. These exposures caused and or contributed to the injuries suffered by Plaintiffs employed by these companies.

**CROSS CONTAMINATION - PEN**

189.     PEN was contracted to provide a range of services for the FACILITY and SISTER FACILITY, such as: maintenance, construction, insulation for piping, tanks, boilers, and equipment, mechanical fabrication and installation, and capital projects, concrete repairs, piping fabrication, and steel installation. PEN is associated with numerous associations: Associated Builders and Contractors ("ABC"), National Association of Corrosion

Engineers NACE, National Insulation Association ("NIA"), and Steel Structures Painting Council ("SSPC").

190.     The Plaintiff Contractor Workers for PEN are as follows: *James W. Armstrong, Mark A. Barber, Donald E. Beal, Johnny B. Bingham Jr., Justin E. Bivens, Tonya R. Hylton a/k/a Tonya R. Black-Hylton, Rex A. Blassingame, Franklin E. Brannon, Kenneth S. Bridges, Eric A. Brokish, Dereck V. Burns, Kevin D. Campbell, Patricia L. Cavitt, Christopher L. Clark, Clyde V. Cross, Mitchell H. Culberson, Clyde E. Dill, Ward C. Donaldson, Christopher D. Ellis, Matthew L. Farmer, Michael W. Fife Jr., Bradley S. Froemke, Tommy G. Gibby, Van G. Gibson, Adam J. Goforth, Samuel L. Goins, Zachary C. Goins, Rebecca S. Gregory, Steven D. Gregory, Ceacila B. Guzzetti, Wesley A. Hamm, Eric S. Harris, Edward G. Harvey, Grover E. Hedgecoth, Billie R. Hembree, Travis L. Hembree, Charles H. Hill, James C. Inman, John C. Jaegar, Kennith A. Johnson, Mitchell C. Kaehler, John M. Keeling, Timothy K. Kelley, Ted A. Krouse, Larry L. Lankford, Shane F. Lawson, Mauricio Ledesma, Jason E. Malone, Odin Maradiaga-Contreras, John F. Marshall, Jr., Joseph D. Martin, Chrystephor G. Mashburn II, Joshua C. McCartney, Brian K. McNabb, Roberto C. Mendez-Rodriguez, John A. Morrison, Basil H. Nunley III, Gabriel L. Perez, Anthony M. Phillips, Tim E. Powers, Jonathan E. Raburn, Donald R. Riebeling III, Jimmy F. Robinson, Jr., Callene P. Scruggs, Alex S. Shaw, Benjamin L. Shelton, Nicholas R. Shepherd, Jerry T. Sledge, Dillon A. Smith, Gary D. St. Clair, David A. Stafford, Arthur E. Standridge, Tony E. Stanley, Codey A. Taylor, James B. Thompson, Robert E. Tucker II, Marty A. Turner, Henry C. Urquhart, Cesar Augusto Vasquez, Carlos R. Vasquez Mejia, Jason M. Walker, Donald L. Warden Jr., Donnie R. Webb, Jon N.*

*Wilkins, Gregory S. Williams, Leonard Williams, Tony W. Wilson, Daniel A. Wingard, and Kenneth M. Wyatt.*

191.     While PEN workers performed assigned work at both the FACILITY and the SISTER FACILITY, they exposed workers for BILFINGER, formerly known as FRUCON, WHITE ELECTRICAL, formerly known as DUNCAN, ROBINS & MORTON, CUSTOM MECHANICAL, ARCH and OLIN, as shown by the testimony set forth below.

192.     Additionally, upon information and belief, PEN's work at the FACILITY and the SISTER FACILITY exposed additional Plaintiff Workers who were in close proximity.

193.     Plaintiff Contractor Worker, Samuel L. Goins, worked for Contractor Defendant PEN at the FACILITY and SISTER FACILITY from approximately 1985 to 1991, then from 1992 to 2007. He performed work including coating, painting, sandblasting, and floor coating work. He also performed Cell Maintenance. This included working not only around but inside decomposers and open cells. He remembers performing numerous repairs for the FACILITY and SISTER FACILITY.

> Because I worked inside and outside of the Cell House for both YEARGIN and PEN, our work was done near OLIN Operators, Maintenance personnel, and other contractor crews, including DUNCAN and FRUCON. I now realize that their work and ours disturbed mercury contaminated surfaces and materials, and it increased the likelihood that mercury-contaminated dust, debris, and vapors would be present in shared work areas. Some examples of this included, cleaning, moving tools, performing maintenance or repair tasks, especially those that required using any tool that produced friction and heat. This was true during periods of normal production operations but was magnified during outage and maintenance periods because there was always a massive influx of additional contractor workers from all contracting companies during those times. This included DUNCAN, PEN and FRUCON, and they would each bring in at least a dozen more contractor workers.

I have personal knowledge of other contracting companies'
presence, work, and conditions at the FACILITY because other
contractor workers were working with me. In fact, during my
entire employment at this site, I worked closely with contractor
workers. The statements I offer here are based on my personal
observations and experiences with these contractor workers.
However, the dangers of mercury surrounding my work with these
other contractor workers is something I discovered in the
Tennessee Mercury Investigation. Contractor crews were in and
out of the FACILITY for months at a time depending on the
project and outage schedules, while others maintained a constant
presence. I recall DUNCAN was already onsite as the electrical
work contractor company. Brown & Root ("BROWN") was the
main general maintenance contractor company onsite for a bit
when I worked there in the mid-1980s, and then FRUCON took
over their contract. Even though we worked for different
contractor companies, we worked in the Cell House together. I
worked with FRUCON shoulder-to-shoulder more often when I
worked as Cell Maintenance with PEN. If there was an electrical
problem while Cell Maintenance was doing a job, DUNCAN
would come in and do their job while we did ours. This would
sometimes be in close proximity. I saw DUNCAN more frequently
when the Reductone area was built. I now believe that the
electrical work DUNCAN was doing was increasing mercury
exposure to the rest of us contractor workers because they were
disturbing the mercury-contaminated materials in the Cell House.
When they ran their conduit through the beams in the Cell House,
they would be knocking mercury off the metal before they could
drill. Goins, Suppl. Aff, Ex. 55, pages 2 and 3.

194. Plaintiff Contractor Worker, Samuel L. Goins, worked for Contractor Defendant

PEN and a non-named Contractor YEARGIN, at the FACILITY and SISTER FACILITY

from approximately 2006 until 2020:

Depending on the job they were performing, some contractor
workers had access to the Change House, which had a "clean" side
and "dirty" side. Some workers were instructed to shower and
change clothes before going to the Cafeteria and before going
home; however, these rules were not enforced. Many contractor
workers, including myself, and OLIN direct workers walked
through the shower area and into the cafeteria without showering
and changing. I observed more contractor workers than direct
workers doing this. Goins Suppl. Aff, Ex. 55, page 6.

195.     In addition, Michael W. Fife, Jr., worked for TURNER and then PEN between 2017 and 2022. He states the following regarding the PEN workers' contribution to cross-contamination in the Common Areas:

> Before COVID-19 guidelines, the FACILITY had a lunchroom that workers shared. Before COVID I saw other workers still wearing their mercury PPE in the lunchroom and breakroom. Some workers were from TURNER, like Steve "Smiley" McDermott and Chris Clear. I noticed that some of these workers were from BILFINGER SE, PEN, and OLIN, but I can't recall specific names. Now, I realize that Ryan Beeson and Robert Harrell, the BILFINGER SE Supervisors, the PEN Supervisors, and the OLIN direct Supervisors should have been enforcing this rule. A hard hat on an eating surface is a huge no no. It is an unspoken professional courtesy among people that take the job seriously. I made sure the guys on my crew adhered. I could not write up the other people that did not care. They were not part of my crew and I had no jurisdiction. Any mercury present on these workers' uniforms, boots, and skin, was partially transferred to the lunchroom seats and vaporizing, exposing the surrounding workers. I know that even some Turner workers wore mercury contaminated clothing in common areas such as bathrooms and break areas where meals were taken. This cross contaminated OLIN, PEN, TURNER and potentially other workers.

> The Change House & Clean Room Lockers were not clean of mercury and mercury mud. Men that changed out for TURNER and other contractors were not trained and clean practices were not enforced. This created cross-contamination of all using the Change House. Also, the uniforms had all been laundered together for years and this also created a cross-contamination situation. TURNER cross contaminated other OLIN and contractor workers by its use of the Change House. Fife, Jr. Aff, Ex. 54, page 4.

196.     When working for PEN, Timothy K. Kelley provides in his supplemental affidavit that while working in Cell Maintenance, and later as a Cell Maintenance Supervisor, he observed this in his sworn supplemental affidavit testimony at the FACILITY from approximately 2006 until 2020:

> I was a Cell Maintenance worker, and later a Cell Maintenance Supervisor for PEN, from approximately 2006 until 2012. I worked at the FACILITY during regular operations, outages and

during the decommissioning and demolition (D&D) of the mercury cell system. During regular production periods, there were about 50 to 60 workers in the Cell House. During Outages, there were 100 to 150 workers in and around the Cell House. During these periods, there were OLIN and other contractor workers on site. We all worked in close proximity to one another and assisted each other in getting the work done. Although companies had their defined responsibilities, we often helped each other's teams to get the work done. Supplemental Affidavit of Timothy K. Kelley, Ex. 53, page 1

These contractor workers worked for Fru-Con Construction, later Bilfinger ("FRUCON"), Duncan Electric Company, later White Electrical Construction, Co. ("DUNCAN"), and Custom Mechanical Contractors, Inc., ("CMC"). I worked closely with a crew of eight to ten people who worked for PEN and OLIN. It was an everyday occurrence for FRUCON, DUNCAN, CMC, and OLIN direct workers to work near me and around the mercury cells. Each contracting company performed different jobs in the Cell House. As we (PEN workers and OLIN direct workers) worked alongside each other repairing and rebuilding the cells, the mercury exposure significantly increased for both OLIN direct workers and other contractor workers. Each time we opened and drained a mercury cell, mercury vapors were significantly released. When we flushed the system, significant mercury was released. When we pulled pumps, anodes, pipe, plates, bolts, and other component parts, mercury would leak and run out of these systems. Mercury would pool onto the parts and fall to the floor. While mercury recovery teams worked to collect the liquid mercury, the exposure had already occurred for everyone in the immediate work area. These repeated mercury discharges directly increased exposure levels for workers from multiple companies, including OLIN, FRUCON, DUNCAN, and CMC workers. Kelley Suppl. Aff, Ex. 53, page 2

During regular outages, contractor workers would drastically increase to around 100 to 150 people, as the FACILITY would bring in more contractor workers from FRUCON, DUNCAN, and CMC to help with these regular outages. OLIN would also bring in other contractor workers that were not usually present on-site to help with the workload during outages. Since there were more workers present at the FACILITY at this time, they would have a quick job briefing with the different contractor workers, and then we would be rushed to our assignment. I noticed a lot of these contractor workers had minimal PPE. They had a hard hat, safety glasses, steel-toed boots, and a chlorine escape respirator. During outages, teams would perform maintenance work that was

impossible to perform during regular operations. There was an increased amount of hot work and pipe cutting. These tasks included repairing cells, repairing pipelines, changing out pumps, performing maintenance on equipment and decomposers, and washing down mercury into sumps. So much liquid mercury was generated by these tasks that mercury recovery teams were operating throughout the FACILITY for all shifts. While the system was off, the teams were working around the clock to cut, pull, replace, redesign, and repair all the systems throughout the FACILITY. During this process of opening systems and creating increased mercury releases, the exposure to every worker was greater than in operations. All the work performed by the contractor workers during this process increased the exposure of all other employees on the site. This process caused an excess amount of mercury exposure in the air, ground, water, and materials throughout the FACILITY. FRUCON, DUNCAN, and CMC had been on-site some time before I started working at the FACILITY. Turner Specialty Services, LLC ("TURNER") took over PEN's general maintenance contract at the FACILITY after the Cell House was demolished. Without a doubt in my mind, all the contractors who performed work on-site during outages added to the release of mercury and exposed everyone on-site to higher levels of mercury contamination. I learned this when I saw the Mercury Investigation materials. Kelley Suppl. Aff, Ex. 53, pages 2 and 3.

The work we were doing as contractors was often seen by us as the dirtiest jobs on the site. Most of the OLIN direct workers did not want to work in Cell Maintenance because of how difficult and dirty the job was. Many of these jobs would require opening the mercury cell system, which would cause mercury to pour out and drip off the equipment. All of us contractors, while doing this dirty work, would get mercury, mercury mud, and mercury liquid on our clothing, PPE, and skin on a regular basis. This mercury would be on us as we did our work during the day, and while other contract workers were in close proximity. Both OLIN workers and other contractor workers would be interacting with us, as we were highly contaminated. Even as we would take breaks, we would not shower, change, or clean before visiting the break room or break at other locations. We were cross contaminating the OLIN direct workers, SISTER FACILITY workers, and other contractor workers by being in close proximity, as well as contaminating the common areas we were all using. Kelley Suppl. Aff, Ex. 53, page 5.

197.     From the preceding testimony, it is clearly established that as workers for PEN were performing their tasks, they were creating mercury exposures for those employees working for OLIN, ARCH, BILFINGER, formerly known as FRUCON, and WHITE ELECTRICAL, formerly known as DUNCAN.

198.     These exposures caused and or contributed to the injuries suffered by Plaintiffs employed by these companies and Plaintiffs working for other companies in close proximity to PEN's work.

## CONTRACTOR CROSS CONTAMINATION – SUPPORTED BY OLIN EMPLOYEES

199.     In addition to the direct affidavit testimony of Contractor Defendant workers, there is also considerable affidavit testimony from OLIN's own workers that demonstrates this cross-contamination caused by the work activities of Contractor Defendants BILFINGER, formerly known as FRUCON, PEN, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL. One such OLIN employee is Charles M. Sluder.

200.     Further sworn testimony from Plaintiff Direct Worker Charles M. Sluder discusses working with Contractor Workers this way:

> I have personal knowledge of contractor presence, work, and conditions at the FACILITY because contractor workers were working with me. In fact, during my entire employment at this site I worked closely with contractor workers. The statements I offer here are based upon my personal observations and experiences with these contractor workers. However, the dangers of mercury surrounding my work with these contractor workers was discovered in the Tennessee Mercury Investigation Based on my observations at the FACILITY, some of the work contractor workers performed was cell repairs, maintenance work during production and outages in and around the Cell House, mechanical repair and replacement, electrical, pipe maintenance, large construction projects, equipment and systems repair and replacement, building and structural repair, general operations and work associated with moving and handling mercury-contaminated

equipment. All the equipment, structures, buildings, foundations, tools, clothing, PPE, and systems in and around the Cell House were exposed to elemental mercury and/or mercury vapors. Fru-Con later Bilfinger Industrial Services, Inc. ("FRUCON") construction workers handled a lot of construction and general maintenance work, including pipe work.

Custom Mechanical Contractors ("CMC") performed some mechanical work. Duncan Electric Company, later White Electrical Construction, Co. ("DUNCAN")

performed the electrical work. Contractor Supervisors from Pen Gulf ("PEN") would come into areas to coordinate job tasks. The PEN foreman was Dave Dorman. Contractors from PEN and DUNCAN were present when I started at the FACILITY in 1979, and they continued to have a presence onsite during my employment. James C. Wills ("Lefty") and James "Wayne" Albury worked for DUNCAN. He was then the foreman and when he retired Josh Stockton took his place.Other Contracting Companies such as FRUCON and CMC were brought in during my time working there. The FACILITY brought in many more contractor workers for additional labor during outages to complete the workload in a shorter amount of time. During my time working in Cell Maintenance, other OLIN direct workers and DUNCAN contractor workers, performing electrical work, worked together in close proximity on tasks that I now realize were spreading elemental mercury onto equipment, tools, structures, clothing and PPE. This clearly increased the mercury vapor present in the air, water, soil and materials in and around the FACILITY. These tasks included repairing cells, repairing lines, changing out pumps and equipment, performing maintenance on cell systems and decomposers, washing down mercury into sumps, and structural repairs to structures and systems. Cell House workers, both PEN contractor workers and OLIN direct workers, entered shared spaces like the Cafeteria and bathrooms without showering and changing out of their work clothes. This, I now realize, was contaminating these areas that were shared by workers who did not have direct contact with mercury, such as SISTER FACILITY workers who shared these areas. Sluder Aff, Ex. 50, page 2.

201.    When working for the FACILITY, Charles M. Sluder provides in his affidavit his

personal knowledge of working with other Contractor Defendants.

During the time I worked in and around the Cell House in Cell Maintenance I worked around and with FRUCON workers. The statements I make herein regarding FRUCON workers are based upon my own personal observations and working with or around

them. I recall that Mark Wilson and James Thompson were FRUCON contractor workers, and they both later became PEN contractor workers. FRUCON contractor workers were assigned various tasks. They also assisted in structural repair of the Cell House itself. This work along with cell pipe repair and installation required the cutting of metal structural components. These structures had, for many years, absorbed mercury vapor and as a result were highly contaminated with mercury.

Applying heat to these contaminated structures and components would release both mercury and mercury vapor. While this work was being performed, OLIN direct workers, including myself, were adjacent to it. While this work was being performed OLIN direct workers, including me, were not required to wear respirators. This work was increasing the mercury exposure of OLIN direct workers, including myself, and other contractor workers as well. Sluder Aff, Ex. 50, page 3.

Cell House workers, including both PEN and DUNCAN contractor workers and OLIN direct workers, entered shared spaces like the cafeteria and bathrooms without showering and changing out of work clothes. I also regularly saw OLIN direct workers and contractor workers' uniforms and safety equipment contaminated with mercury as they were eating or snacking in the cafeteria. The Change House had a designated "dirty" side to enter when workers were in their dirty work uniforms and a designated "clean" side to enter when workers were in their clean personal clothes, but workers would use whichever side was most convenient. This, I now realize, was contaminating these areas that were shared by workers who did not have direct contact with mercury, such as SISTER FACILITY workers who shared these areas. I did not witness an OLIN direct Supervisor, or any contracting company Supervisor enforce this. I would regularly observe mercury mud on the floor and in the showers of the Change House. Contaminated uniforms were regularly worn into the Change House and were stored prior and post laundering. Boots were highly contaminated and were worn throughout both sides of the Change House. Changing in and out and other safety requirements were not enforced, and cross-contamination occurred throughout my time at this FACILITY. Sluder Aff, Ex. 50, page 7.

202.     Even the testimony of OLIN's own employee establishes that the workers for

CONTRACTOR DEFENDANTS, BILFINGER, formerly known as FRUCON,

TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, CUSTOM

MECHANICAL, and PEN all performed work and used common areas in a way that created mercury cross-contamination of Plaintiff Workers at the FACILITY and SISTER FACILITY.

203.     Through the preceding affidavit testimony, these affiants have provided factual evidence supporting that the work performed by CONTRACTOR DEFENDANTS BILFINGER, formerly known as FRUCON, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, CUSTOM MECHANICAL, and PEN all increased and contributed to the mercury exposures of the other Plaintiffs. Further, the use and practices associated with common spaces created additional unnecessary exposures to the Plaintiffs.

## CHAPTER IV – ENVIRONMENTAL REGULATORY HISTORY OF THE FACILITY

*The FACILITY has a History of Environmental Contamination and Violations of Environmental Regulations.*

204.     In addition to sworn affiant testimony, records of regulatory interaction between the FACILITY and environmental agencies such as the United States Environmental Protection Agency (EPA) and the Tennessee Department of Environment and Conservation (TDEC) are crucial in understanding the extent to which the environment in and around the FACILITY was contaminated with mercury. Every day that mercury continued to be utilized at the FACILITY, the risk to human health increased—both locally and globally. Due to the prevalence of environmental mercury contamination in and around the FACILITY and the SISTER FACILITY, an ever-present exposure potential for workers and the surrounding community persists to this day.

205.     The "Mercury Emissions" section of the EPA's 2007 Final Test Report based on ultraviolet differential optical absorption spectrometer (UV-DOAS) measurements and evaluation of fugitive mercury air emissions at the FACILITY in Charleston, TN from

August 18th through October 2nd, 2006, adequately summarizes point and fugitive sources of mercury:

> At a mercury cell chlor-alkali plant, mercury is emitted from point sources and fugitive sources. There are three primary point sources at mercury cell plants: the end-box ventilation system vent, the by-product hydrogen system vent, and mercury thermal recovery unit vents. While every mercury cell plant has a hydrogen by-product stream and an end-box ventilation system, Olin's Charleston, Tennessee plant is one of five plants having a thermal mercury recovery unit.
>
> In addition to point sources, there are mercury fugitive emissions. The majority of fugitive mercury emissions occur from sources in the cell room such as leaks from cells, decomposers, hydrogen piping, and other equipment. Fugitive mercury emissions also occur during maintenance activities such as cell or decomposer openings, mercury pump change-outs, endbox seal replacements, etc. All of this equipment and activities occur in the cell room, so these fugitive mercury emissions would be emitted via the cell room ventilation system. [42]

206.   A summary report released by the EPA to supplement the 2007 Final Test Report, which is based on the same cell room monitoring data, reported that over the 45-day monitoring period from August 18, 2006, to Oct 1, 2006, an average of $\approx 500$ grams per day of mercury was measured in fugitive emissions across the ventilation system of all cell rooms, which equates to 182,500 grams (402.3 pounds) per year. The maximum measurement over a 24-hour period was 1,256 g/day which equates to 458,440 grams (1,010.7 pounds) per year. [43]

207.   The EPA reports suggest that the cell rooms were not running at full capacity during the approximately six-week period they underwent UV-DOAS measurement in 2006, so the actual emissions may have been significantly higher before the test period.

---

[42] EPA, Final Test Report: Measurement and Evaluation of Fugitive Mercury Emissions at a Mercury Cell Chlor-Alkali Plant, (2007).
[43] EPA, Office of Air Quality Planning and Standards, Summ. of Cell Room Mercury Emissions Data for Olin Mercury Cell Chlor-Alkali Plant: Charleston, Tenn. (2007).

**208.**     The August 2007 EPA Summary report also states the following regarding mercury emissions to the air and relevant regulatory changes.[44]

**209.**     While mercury emissions from the point sources have been accurately measured for some time, uncertainty remains regarding the level of mercury emissions from fugitive sources at mercury cell Chlor-Alkali plants. This is largely due to the difficulties (and, in some cases, the impossibility) of accurately measuring the flow rate from the cell rooms. This difficulty, and the fact that no regulation has required the quantification of these emissions, resulted in a very limited data set on fugitive mercury emissions at mercury cell Chlor-Alkali plants. Mercury cell Chlor-Alkali plants have typically reported 1,300 grams per day (g/day) fugitive mercury emissions from the cell room, which is the emissions level assumed to be allowable (by difference from the total plant limit of 2,300 g/day and the stack limit of 1,000 g/day) by the National Emission Standards for Hazardous Air Pollutants (NESHAP) to which mercury cell plants were previously subject (40 CFR 61, subpart E).

**210.**     On December 19, 2003 (68 FR 70904), EPA promulgated 40 CFR subpart IIIII - National Emission Standards for Hazardous Air Pollutants: Mercury Emissions from Mercury Cell Chlor-Alkali Plants. These standards, commonly referred to as the Mercury Cell Maximum Achievable Control Technology (Hg Cell MACT) regulation, contain emission limitations for mercury emissions from point sources and work practices for fugitive sources at mercury cell Chlor-Alkali plants.

**211.**     In 2004, EPA agreed to reconsider aspects of the Hg Cell MACT. As part of this reconsideration, EPA embarked on a testing and information-gathering effort to obtain

---

[44] EPA, Office of Air Quality Planning and Standards, Summ. of Cell Room Mercury Emissions Data for Olin Mercury Cell Chlor-Alkali Plant: Charleston, Tenn. (2007).

better estimates of fugitive mercury emissions from mercury cell Chlor-Alkali plants. Under this effort, EPA collected mercury fugitive emissions data from two sources: (1) continuous mercury measurement systems installed by facilities in their mercury cell C plant cell rooms, and (2) EPA-sponsored testing. The data discussed in this document are from both of these types of sources. OLIN reported that it had installed and operated continuous mercury measurement systems in all three of its cell rooms. In addition, EPA sponsored a six-week test in one cell room at the FACILITY.

212.    Throughout the regulatory RCRA process at the FACILITY since the early 1980s, at least 25 solid waste management units (SWMUs) were designated, and there were two hazardous waste management units (HWMUs): 1) Hazardous waste disposal unit which is a surface impoundment (or landfill) located East of the plant proper, and 2) Hazardous waste storage unit which is a structure wherein waste is stored in containers located West of the Dry Caustic area of the FACILITY. The hazardous waste disposal unit HWMU is the same landfill commonly known as the "Hazard Dome" due to its dome-like, air-filled covering. [45]

213.    Three of the SWMUs onsite are closed landfills or disposal areas containing mercury-contaminated wastes.[46]

214.    The FACILITY has continued to dispose of mercury-contaminated wastes in the hazardous waste landfill since its construction in 1980. In 1986, the unit was retrofitted with an air-supported roof structure constructed of heavy polyester fabric with polyester webbing and steel support cables (a/k/a the Hazard Dome). The structure was built approximately 290 feet wide by 380 feet long and 35 feet high at the center. Wastes placed

[45] EPA, Hazardous Waste Permit Application, Olin Chemical Corp., Charleston, Tenn.(1983).
[46] EPA, Certified Letter to Olin Corp, Joint Conditional Approval (1994).

in this landfill have included dewatered brine muds (EPA ID# K071), wastewater treatment sludge from the mercury cell process (EPA ID# K106), and miscellaneous mercury-contaminated wastes (EPA ID# D009)[47]

215.    In the Part B Reapplication dated March 27, 1992, it was noted that the hazardous waste landfill contained over 40,000 tons of mercury-contaminated waste and that the approximate capacity of the landfill was 50,000 tons. At the time, the landfill was expected to reach capacity by the year 2000, however, the life of the landfill was anticipated to be extended to the year 2007 due to the disposal rate being reduced with the initiation of thermal recovery unit (TRU) operations scheduled to begin in 1993.[48]

216.    The United States EPA conducted a multi-media inspection at the FACILITY during the week of May 24, 1993. As part of the inspection process, EPA personnel arrived at the FACILITY on May 26, 1993, to conduct an unannounced Case Development Investigation Evaluation (CDIE); however, they were refused access to collect soil samples by an attorney representing OLIN.[49]

217.    Eventually, months later in mid-September, the EPA gained access to the FACILITY wherein soil sampling was utilized to confirm releases of mercury. The results were documented in a January 1994 report titled "RCRA Case Development Investigation Evaluation– (CDIE) - Olin Chemicals Corporation, Charleston, Tennessee" prepared by EPA's Environmental Services Division (ESD-Athens, GA), and a copy of the report was given to OLIN.[50]

---

[47] Olin Corp., RCRA Part B Permit Application §21 (1992).
[48] Olin Corp., Responses to Notice of Deficiency - Part B Reapplication (1992).
[49] EPA, Olin Corp., Denied Access for CDIE (1993).
[50] EPA, Certified Letter to Olin Corporation: Notification of Newly Identified SWMUs with Releases and Request for SWMU Assessment Plan (1994).

126

218.    According to the "Background" section of the aforementioned CDIE, "during a shutdown to replace equipment in August of 1988, the plant experienced a release of mercury. Mercury was reported to have spilled from old pipes onto the basement floor of the Cell Building (E-812) and onto the ground outside of the building."[51]

219.    Also in 1988, the EPA with technical assistance from the Agency for Toxic Substances and Disease Registry (ATSDR) conducted a health study to assess the extent of mercury exposure to workers of HARBERT-YEARGIN who were contracted by OLIN on August 22, 1988, to replace pipes and fittings at the FACILITY. The resultant report of December 1990 stated the workers were exposed to high levels of elemental mercury and transported mercury into their homes.[52]

220.    During sampling activities conducted on September 15-16, 1993, EPA measured elevated levels of total mercury in the soil at two separate FACILITY locations (E-812 spill site and paint area). A total mercury level of 35 mg/kg was detected in the soil at the spill site just outside of the E-812 Cell Building, and multiple soil samples taken within the paint area ranged from 4.8 to 33 mg/kg. These elevated levels of mercury were 20-130 times greater than the background soil level which was measured and reported to be 0.24 mg/kg. [53 & 54]

221.    Commonly found background concentrations of mercury in topsoil range from "0.03 to 0.1 mg/kg, with an average value of 0.06 mg/kg."[55]

---

[51] EPA, RCRA Case Development Investigation Evaluation (1994).
[52] ATSDR, Technical Assistance to the Tenn Dept of Health & Env't Mercury Exposure Study (1990).
[53] EPA, Certified Letter to Olin Corporation: Notification of Newly Identified SWMUs with Releases and Request for SWMU Assessment Plan (1994).
[54] EPA, RCRA Case Development Investigation Evaluation (1994).
[55] Barbara Gworek, Mercury in the terrestrial environment: a review. *Envtl Sci Eur* 32, 128 (2020).

222. A preliminary review of the groundwater data during the multimedia inspection conducted by EPA on May 25, 1993, indicated mercury concentrations exceeded the maximum contaminant level (MCL = 0.002 ppm) for drinking water at SWMUs 2, 3, 4, and 9. [56]

223. The FACILITY has long been designated a Large Quantity Generator ("LQG") of hazardous wastes (RCRA/Handler/Site ID: TND003337292). Hazardous wastes, generated by the FACILITY included brine purification muds (K071), wastewater treatment sludge (K106), KOH filter sludge (D009), mercury-contaminated material including Reductone Filters (D009), and other wastes such as hexane/acetone (D001), waste paint solids (D001/F003/F005) and paint thinners (F003/F005/D001), trichlorofluoromethane (U121) and various lab wastes (D001, U122, U220, U125, U031, U003, U154, U019, U159, U140, U169, U002, U123, D002, U037, U077, U226, U070, U211, U188, U207, U151).[57]

224. D009 is the hazardous waste code given to a solid waste whose extract under the Toxicity Characteristic Leaching Procedure ("TCLP", 40 CFR § 261.24) contains mercury at concentrations greater than those specified in the "Maximum Concentration of Contaminants for the Toxicity Characteristic" Table. TCLP testing simulates the mobility of various toxic wastes upon disposal. [58] & [59]

225. According to the EPA RCRA "Handler Site Detail Report," OLIN reported that at least 9,697 tons of hazardous waste were generated from 2001 to 2019.[60]

---

[56] EPA, Certified Letter to Olin Corporation: Notification of EPA Initiated Confirmatory Soil Sampling and Request for Pre-RFI Information (1994).
[57] Olin Corp., RCRA Part B Permit Application (1992).
[58] University of Maryland, EPA Hazardous Waste Codes (2024).
[59] EPA, SW-846 Test Method 1311: Toxicity Characteristic Leaching Procedure (2024).
[60] EPS, Handler Site Detail Report -TND003337292 (2024).

226.    After completing a first review of OLIN's RCRA Part B Permit Applications received on April 1, 1992, for the landfill and storage units located at the FACILITY, the TDEC determined that the applications were incomplete and issued a Notice of Deficiency letter to OLIN dated July 7, 1992. The five-page enclosure to the Notice identified 31 items to be addressed in the reapplication where OLIN had failed to meet application requirements outlined by Rule 1200-1-11-.07 of the Rules Governing Hazardous Waste Management in Tennessee. [61]

227.    The following are instances of significant spills or leaks, regulatory violations, and other relevant incidents of note (chronological order):

228.    On May 2, 1996, OLIN reported the release of 500 gallons of 2.5% calcium hypochlorite solution from the HTH® FACILITY decomposition sump. This spill did present the potential to impact stormwater from the FACILITY due to the high available chlorine levels.

229.    On October 10, 1998, OLIN experienced a fire at the sulfur dioxide plant. There was a large amount of water applied to the fire and surrounding structures to mitigate the spread of the fire. There was a reportable quantity release of 63 pounds of sulfur dioxide resulting from the firefighting activities.

230.    On March 30, 2000, OLIN over-chlorinated a sodium hypochlorite tank which caused a spill of part of the contents of the tank and a release of a Reportable Quantity of Chlorine. This resulted in a NPDES violation in one of the stormwater outfalls.

231.    On December 26, 2000, OLIN experienced a spill of mercury-contaminated caustic. About 1500 gallons of liquid was spilled, partly into containment and partly onto

---

[61] Tenn Dept of Env't & Conservation, Notice of Deficiency: RCRA Part B Permit Applications(1992).

gravel. The amount spilled was a reportable quantity and caused a violation to the NPDES permit.

232. On January 12, 2001, an NPDES violation occurred when mercury from the Thermal Recovery Unit (TRU) pad was accidentally washed into the river.

233. On October 14, 2003, OLIN reported the release of 300 pounds of chlorine from a process upset that occurred in the 812 Cell Building. This was a gaseous release into the atmosphere at the 812 Cell Building ventilators.

234. On August 5, 2004, a chlorine leak developed on the sample line from the tertiary Chlorine condenser on 'B' train to the Orsat Analyzer. The compressor and the 812 Cell Building were shut down and the operators isolated the piping. The chlorine release resulted in a reportable quantity of 40.93 pounds.

235. On September 5, 2004, ARCH had a caustic leak on the 50 percent caustic line in the main pipe bridge west of TRU at the corner of the dry caustic warehouse. The leaking caustic did make it into the storm sewer, with pH over 11 measured in a grab sample from Outfall 003. Approximately 80 gallons of caustic escaped.

236. On March 15, 2008, approximately 200 pounds of mercury spilled onto the paved area outside of the 812 Cell Building.

237. On March 18, 2008, 45 gallons of 50% caustic spilled to a graveled area from a leaking four-inch supply line.

238. On August 14, 2008, approximately 30 gallons of sulfuric acid overflowed the sump and spilled onto the ground at the Compressor Area.

239. On November 17, 2008, 228 gallons of 20 percent caustic spilled to the ground when a casing on the HCL scrubber pump failed.

240.     On December 10, 2008, a failed repair to a leak on the 20 percent feed line to the wastewater ponds resulted in 3,000 gallons of 20 percent caustic being spilled to the ground. Most of the material was subsequently pumped back into Pond Three, but some material made It into the Hiwassee River.

241.     On May 25, 2011, a pipe joint failure on a weak brine supply line to Arch released brine containing low levels of mercury to the ground for approximately five minutes. Some of the spilled material migrated to a storm sewer and was discharged through Outfall 003. The daily maximum concentration was exceeded for mercury in the outfall composite sample. The release was an unauthorized discharge.

242.     On July 30, 2011, approximately 320 gallons of sulfuric acid leaked into the gravel around the unloading station at the Compressor Building.

243.     On September 5, 2011, approximately 40 pounds of mercury was released into the Hiwassee River due to flooding caused by 13 inches of rain in 24 hours. The chemical sewer backed up into stormwater drains, and Secondary Treatment was bypassed due to excessive wastewater.

244.     On January 11, 2012, during a rain event, material that would normally be directed to the chemical sewer overflowed the sump and into the adjacent storm drain due to a faulty pump. This resulted in two periods exceeding 60 minutes above 9.0 pH from Outfall 003. The first individual excursion ranged between a pH of 9.0 and 9.57 for a period of 158 minutes. The second ranged between a pH of 9.0 and 9.4 for a period of 121 minutes.

245.     On August 11, 2012, effluent exceeding the pH of 9.0 was discharged for less than 62 minutes from Outfall 001.

**246.** On October 9, 2012, approximately 26 gallons of 47.8 percent sodium hydroxide overflowed from a concrete pad for 77 minutes, went into a storm drain, and then discharged from Outfall 003. The release was an unauthorized discharge.[62]

**247.** On November 5, 2012, approximately 175 gallons (495 pounds) of 45 percent potassium hydroxide leaked from a valve for 25 minutes, went into a storm drain, and discharged from Outfall 003. The release was an unauthorized discharge.

**248.** On July 18, 2013, approximately 24 gallons (30 pounds) of 12.5 percent sodium hypochlorite spilled from a hose and discharged from Outfall 003 to "Waters of the State of Tennessee" which is an unauthorized discharge.[63]

**249.** On July 26, 2013, a crew was cleaning an empty molten sulfur tank when the sulfur ignited and burned for approximately 10 to15 minutes before the fire was noticed and extinguished. An unknown quantity of sulfur dioxide was released as a result of the incident.[64]

**250.** In addition to the regulatory record, sworn testimony demonstrates that mercury was not confined to just the Cell House and its constituent parts, pipes, and equipment. In fact, according to affidavit testimony of Plaintiff Workers, mercury contamination was witnessed routinely on indoor and outdoor walking and working surfaces; in, on, and around plant structures, tools, and process equipment; in and on the ground, concrete, and gravel; and in ditches and other low-lying areas of the FACILITY. The extent to which mercury contamination was prevalent throughout indoor and outdoor areas of the

---

[62] Olin Corp., Stormwater Pollution Prevention Plan & Best Management Practice Plan (2013).
[63] Tenn. Dept. of Env't & Conservation, Chattanooga Env't Field Office, Compliance Evaluation Inspection (2013).
[64] Email from Mark A. Barb to Michael Bascom (July 26, 2013, 11:44 CST) (on file with author).

FACILITY is indicative of unmitigated worker exposure potential. Johnkins Aff, Ex. 4, pages 6 and 7; Brokish Aff, Ex. 9, page 7; Carson Aff, Ex. 5, page 9.

251.　Based on eyewitness testimony, OLIN had its workers take special steps to avoid testing positive for mercury. Plaintiff Christopher Brooks explains it this way based on his time working in OLIN's laboratory:

> The EPA had given OLIN a specific number of mercury contamination that was allowed in the Chem Sewer and the ponds at any given time. I do not remember what that number was. Anytime I got a result that was not in line with the EPA's number, I was instructed to retest. I would pull a second sample from the beaker, but this time I pulled from the top instead of the middle or bottom of the beaker. We were taught to do that as part of our initial training. Heavy metals, like mercury and any other dirt, debris, or particulates will settle to the bottom. We were taught that pulling from the top gave us a greater chance of getting a 'good' result and lessened the chances of a false positive. It was SOP (standard operational procedure) and something my supervisors instructed me to do. If a sample tested high on the retest, which happened frequently, I was told to dump the original sample, go back to that testing port or pond, get another sample, and start over again. (Remember the testing ports are connected to the Chem Sewer at various points.) That usually happened several times per shift.
>
> If the new samples continued to test high, it was time to involve the Environmental Supervisor (Stacie Campbell-Eckhoff) and let her decide how to proceed. She usually told us to shut the ponds down so nothing else could go into the river. The ponds were the last stop where water could still be treated before being released into the Hiwassee. The purpose of shutting the ponds down was to allow them and the Chem Sewer to settle, just as I described earlier about a beaker. It was giving the material extra time to allow the heavier parts to fall to the bottom. One of the characteristics of mercury is that it binds easily at the molecular level. Mercury can attach itself to virtually anything so even the tiniest particulate floating around the top can be contaminated. The highest mercury levels I recorded were always just after something with high chlorine concentrations was dumped into the Chem Sewer. Brooks Aff, Ex. 27, page 3.

252. Mr. Brooks also witnessed times when OLIN's procedures allowed mercury-contaminated water to be released into the river:

> There were times, and it was a common occurrence, when no action was taken and water that was out of spec got flushed into the river anyway. It was always due to a "lack of data." Loosely translated, that means people got lazy. Guys would come in and get the samples they were supposed to at the beginning of their shift. If they had to retest to get the result they needed, they did, but that was it. They would just coast for the rest of the shift and do no further testing. They had the right numbers in the right places on the right forms. Everything looked fine until the next shift came in and started doing some more actual testing. It was pretty easy to see that things had been trending in the wrong direction for several hours according to the test results. Again, the right numbers were in the right places on the right forms. There was plausible deniability for the lab workers and supervisors. A lot of water that was not treated to specification got flushed into the Hiwassee while lazy lab workers sat on their backsides and apathetic supervisors covered for them. The problems always got fixed. The water got treated. It just got treated much later than it should have and after some of it was already miles downstream. Brooks Aff, Ex. 27, pages 3-4.

253. There is also sworn testimony from Mr. Brooks about the levels of mercury contamination in the four treatment ponds at the FACILITY:

> The Chem Sewer ran to the four treatment ponds. The storm sewers went straight to the Hiwassee. There were problems with the ponds, and they were all caused by mercury.… I was told that the ponds cannot be dredged. I will explain. We used a term called the "freeboard" at the FACILITY. The freeboard is the amount of room (in inches) left before maximum capacity. The more freeboard available, the better, because that opens more treatment options for what is in a pool. Less freeboard means fewer options. When I worked at the FACILITY, they had roughly eleven inches of freeboard in each pond. Just a few months into my employment with OLIN, I began to wonder why they did not close off a pond and dredge it to alleviate the lack of freeboard. It seemed simple to me. Closing them off one at a time and dredging them would add enormous amounts of freeboard and resolve that problem, potentially for years to come. That was when Stacie Campbell-Eckhoff told me they could not be dredged because of the mercury levels. She said there was no place to dispose of material with mercury concentration that high and that even dredging it up and

exposing it to open air would be catastrophic. This information was verified weekly in an ORC (OLIN Responsible Care) report that went to Steve Barnette. Steve shared that, and any current information with Stacie Campbell-Eckhoff, who reported directly to him. Brooks Aff, Ex. 27, page 7.

254.    Finally, Mr. Brooks had firsthand knowledge of the Chem Sewer system and how heavy rainfall would allow contamination into the Hiwassee River:

> I spoke earlier about the Chem Sewer lines numbered 002, 003, and 004. There was also a number 001. Number 001 was just a straight rainwater runoff from the FACILITY to the Hiwassee. There were no valves, no shunts, and no cutoffs. There were a couple of problems with the entire system from 001 through 004, to the ponds, and all the way to the river. First, it was either poorly designed or poorly constructed, maybe both. It got backed up too easily. Anytime it rained a lot, the system got overwhelmed. Big rain events negatively affected the safety of the ponds and sewers. Everything got backed up way too easily and took too long to even out. Second, number 001 was a problem because there was no way to stop it. That should not be a problem for something that is supposed to be strictly for rainwater runoff, but if there was a chemical spill (and chemical spills happen at chemical plants) or if the sewers backed up and overflowed, contaminated water got into the 001 and headed straight for the Hiwassee. Sewer line 001 was supposed to be monitored constantly. I spent numerous shifts standing in the rain and quite literally treating water as it flowed into the river. There was no time for anything else. We just tried to get the pH levels as close to right as possible under the circumstances. Incidents like that caused ongoing problems for weeks or even months. Brooks Aff, Ex. 27, pages 7 and 8.

255.    OLIN knew about these numerous environmental and mercury-contamination issues at the FACILITY. OLIN failed to address them, creating harm to the Plaintiffs and the surrounding community.

256.    Eyewitness testimony in conjunction with the state and federal environmental records of this FACILITY clearly demonstrates the indoor and outdoor gross mercury contamination that presented an ever-present threat to the health of those working in and around the FACILITY and SISTER FACILITY.

## CHAPTER V - CROSS-CONTAMINATION OF PLAINTIFF FAMILY MEMBERS

**257.** In addition to allowing contaminated materials to leave the FACILITY, the Defendants allowed their workers to transport toxic mercury home to their family members. Allowing clothing contaminated with mercury to leave the FACILITY and be laundered at the houses of their workers added devastating injuries.

**258.** By allowing Plaintiff Workers to wear contaminated clothing home, the Defendants have exposed individuals and some children to high levels of mercury. These individuals are the Plaintiff Family Members. As a direct and proximate result of the exposure by Plaintiff Workers at the FACILITY, the Plaintiff Family Members were exposed to mercury and other toxicants from the FACILITY and, in direct and proximate relationship thereto, suffered personal injuries and damages including, but not limited to: death, direct injury to organs and organ systems, neurological injuries, severe emotional distress, pain and suffering, impairment of earning capacity, medical expenses, temporary or permanent, partial, or complete disability, and will suffer these personal injuries and damages for the remainder of their lives. Counsel for the Plaintiffs reserves the right to add Additional Family Members as named Plaintiff Family Members in the future.

**259.** An example of a Plaintiff Family Member is Rebecca E. Allison, husband regularly worked at the FACILITY resulting in mercury contamination on his work clothes, jackets, and boots. She explains it this way:

> I remember Tom would always smell like a harsh chemical odor when he came home. His clothes were always dirty, even after OLIN started requiring him to shower and change out before he left the FACILITY. That shower and dressing out requirement was put in place about ten years after he started working at the FACILITY. I saw mercury mud on his clothes and his boots, but I didn't know what it was at the time. He wore his watch that he had on during work (he was not allowed to wear his wedding ring, though). He wore his work boots inside the house when he came

home. He also brought his lunch box, hard hat, tools, and respirator to and from work every day. He usually left them in his vehicle. He had to take his hard hat, tools, and respirator home with him in case OLIN needed him to travel. He didn't change immediately when he got home. He spent time with the family and probably sat around on our family furniture in the clothes that he worked in. When he changed to shower at home, he put his personal clothes in a hamper with the rest of the family's laundry, and we would wash them all together. For ten years, before he was required to shower and dress out at work, those personal clothes were the clothes he had worked in all day. When he came home from his work trips, he had a suitcase full of dirty clothes. I had a dedicated drawer in our dresser to store his work clothes. Affidavit of Rebecca E. Allison, Exhibit 17, pages 1 and 2.

260.      Another example of a Plaintiff Family Member is Michael K. Heiskell. His dad,

Benny Heiskell ("Dad"), and mom, Joy Rogers ("Mom"), both performed work at the

FACILITY when he was living with them. Here is how M. Heiskell described it:

My Dad, Benny Heiskell, worked at the FACILITY from 1984 to the early 2000s. He was born on October 17, 1955. He was a contractor for DUNCAN. He worked in the Plumbers and Steamfitters UA Local 43. DUNCAN hired him to do instrumentation and small plumbing, like tubing and hooking up instruments. Dad took a lot of pride in his work. He worked hard and never turned down work. He would be asked for by name to do his contract work. He described working at the FACILITY as dirty and difficult. He did Electrical Work, Pipe Work, and some General Maintenance at the FACILITY. He did a lot of work in the Cell House.

My Mom, Joy Rogers, worked hard at the FACILITY as well. She was born on October 21, 1962. She was 22 when my Dad started working at the FACILITY. Mom worked at the FACILITY for about three years, on and off, from 1996 to 1999. Her supervisors were Tim Yearwood and Eddie Yearwood. She worked there as a General Laborer with FRU-CON. She was also in the Ironworkers Union Local 704, and in 1999, she returned to the FACILITY as a subcontractor for S & H. She worked for about eight months until that job ended with the union. Her supervisor was Randall Perry. She also said it was hard working at the FACILITY. As a general laborer, she worked everywhere around the FACILITY. She worked wherever she was needed. She worked in the Cell House a couple of times, and she worked a lot in the HTH (High Test Hypochlorite) Building. During outages, she welded, did pipe

insulation and installation, used grinders and cutting torches to cut, and ran tools and supplies as needed.

Both my Mom and my Dad said they were treated a little differently as contractors since they weren't OLIN employees. The safety practices and general treatment indicated that the FACILITY didn't care as much about the contractors. They both worked all over the FACILITY, wherever they were needed.

I worked at the FACILITY and the SISTER FACILITY for one month each in 2007. I was a Mechanical Contractor. I worked during an outage. At both FACILITIES, I did any maintenance that needed to be done. I rebuilt heat exchangers and tore out flooring that had rotted from the chemicals in the HTH building. This is where chlorine was separated into powder or liquid form and packaged for sale. The chlorine and other chemicals had riddled that floor. I did a lot of structural refurbishments in the Powder House, which is where chlorine in powder form was pressed into tablets for swimming pools and such. I had to get into a scrubber, (an air pollution control device that can be used to remove some particulates and gases from industrial exhaust streams) in the HTH Building and clean it out. I was provided with a full-face respirator and a Tyvek suit for cleaning out the scrubber. I remember that the Tyvek suit was nasty. I did some hot work using cutting torches, grinders and welders. I did a lot of welding in the Powder House as well. While performing these tasks, I wore a hard hat, safety glasses, and a chlorine escape respirator on my side. I wore my personal work clothes and my personal boots. I was not required to shower before leaving the FACILITY.

My Mom and Dad were both dirty when they came home from work. Neither of them was required to dress out or shower when they worked at the FACILITY. I remember my Mom was dirtier than Dad after work. They were both covered in mercury mud. My Dad brought home his lunchbox and tools. They did not change their personal work clothes immediately when they came home from work. They wore their work boots inside the house. They would wind down and interact with us kids, then get some chores done around the house. They sat on furniture in the personal work clothes they had worked in. When they took off their personal work clothes, they put them in the basket with all the family laundry. All the kids' baby clothes were separated from the shared laundry until we got a little older. Then, everyone's laundry was together. My Mom saw mercury in our house and in her and my Dad's cars. Dad brought home mercury in vials. Each vial had a bead of mercury about three times bigger than a BB, and I would roll it around and play with it. Affidavit of Michael K. Heiskell Exhibit 18, pages 1 and 2.

261.     Michael K. Heiskell suffers from a number of health problems, including:

Medical Issues –I have insomnia. I took Ambien for a while, but now I take over-the-counter Benadryl, Tylenol PM, and an ashwagandha melatonin mix. Sometimes I end up sleeping for an hour at a time, but other times I sleep only one hour total. I manage to sleep for three hours occasionally. During the day, I experience fatigue. I take phentermine here and there as a diet pill, and it helps me stay awake during the day."

I have joint pain. I have back problems from my L2 vertebrae all the way down to my L5. The L5- S1 disc in my spine is herniated. My doctor said I more than likely will need to have surgery.

I have felt overwhelmed with my sleeping issues and my pain. I have had trouble being able to juggle different things going wrong at once. I have noticed increased problems with my attention span and memory. Someone could ask me to do something, and the next morning, I might wake up and forget that a conversation even happened. I have to rely on notes for reminders. I have projects around the house that I leave undone. Projects that I just cannot bring myself to focus on and complete. I had really bad anger issues in the past and now that my partner, Lindsay, is helping me work through. I remember one time I got so mad that I picked up the back end of my little S10 pickup truck and was trying to throw it in a ditch.

My Dad passed away in 2020 from cancer. I remember him having lung problems with shortness of breath and a diagnosed heart condition that caused his heart to swell. My Mom has health problems too, but she does not like to talk about them. I know she has bad knees and something bad going on with her lungs, because she has shortness of breath just like my Dad did. Heiskell Aff, Ex. 18, pages 2 and 3.

262.     Another example of a Plaintiff Family Member is Tonya L. Cassady-Pendergrass.

Tonya Cassady-Pendergrass is the wife of Jerry L. Pendergrass, who is discussed in

paragraphs 94, 119, 347, & 418. Tonya Cassady-Pendergrass worked at the FACILITY in

2000. Jerry L. Pendergrass worked at the FACILITY in 2000, until he was laid off in 2022.

Tonya Cassady-Pendergrass lived with Jerry Pendergrass his entire time of employment

at the FACILITY and SISTER FACILITY. She was exposed to mercury during her time

at the FACILITY, and through cross-contamination after she left the FACILITY.

During my time and Jerry's time at the FACILITY, we were never offered protective clothing. We wore personal work clothes and shoes when we left home, wore them all day at work, and wore them home. Neither Jerry nor I were required to change or shower in and out. I was told by my IT Services Manager, Phyllis Harris, that I was not allowed to work in the cell room since I was a female employee, but I remember Jerry's conversations about his time there. Jerry was in and around the FACILITY's production areas as production continued and he worked 40-hour work weeks. When he was employed by the SISTER FACILITY, he continued to perform tasks at the FACILITY Affidavit of Tonya L. Cassady-Pendergrass, Exhibit 19, page 1.

263.    Living in the same house as her husband, Tonya Cassady-Pendergrass was exposed

to his mercury-contaminated clothing. This is how she describes it:

Jerry's day-to-day routine was repetitive. He would put his personal work clothes on and go to the FACILITY and THE SISTER FACILITY. He wore the same clothes and shoes in and out every 2 day. When he came home, he would wear his boots inside and come straight into the living room. There would be a dark, gray type of dust on my boots and Jerry's boots. It was not the red mud or dark dirt that we are used to in this area. It was different. When they were smaller, our daughters, Courtney and Caycie, would meet Jerry at the door and give him hugs and kisses. Then, he would ask how their day went. He would hug me as well. After greeting everyone, he would sit down for a few minutes to decompress. After decompressing, he would take his clothes off and place them in the laundry basket with the rest of the family's clothes to be washed. Cassady-Pendergrass Aff, Ex. 19, page 2.

264.    Tonya Cassady-Pendergrass suffers from a number of health problems, including:

Stomach Surgeries – The first, which was a stapling of the stomach, happened in 2003. During this surgery, the top part of my stomach was stapled off and stapled back. For whatever reason, something went wrong. There was a revision, somewhere between 2007-2010, because this surgery had created two stomachs. They had to perform another surgery in 2017 and cut out most of my stomach and do a Roux-en-Y Gastric Bypass. I kept having problems with ulcers.

Anger Issues – I have aggression that comes and goes. I thought it was because I was going through "the change of life." This aggression has been going on for a few years, and it progressively gets worse. Jerry and I can be talking about something we saw on TV, and I will get a burst of anger and rage for nothing more than

somebody being crazy on TV. I get my feelings hurt easily now and I take it to heart when I feel like Jerry looks at me like I am "loony." I have been like this for the past five years.

Dental Issues – My dental issues began around 2007-2008. I have deterioration of my dental bone. I have lost my entire top row of teeth and have a partial denture on the top of my mouth.

Depression – I have not been diagnosed with depression, but I have had depression-like symptoms for several years. I isolate myself.

Gall Bladder surgery and partial hysterectomy- I have had gall bladder surgery and a partial hysterectomy. My gall bladder surgery took place in 2004, and the partial hysterectomy took place in approximately 2000. My current family doctor is Katherine Hall, MD with Athens Family Practice in Athens, Tennessee. Cassady-Pendergrass Aff, Ex. 19, pages 2 and 3.

265. Another example of a Plaintiff Family Member is William A. Hobbs, who at a young age watched his father bedridden from an accident at the FACILITY in the late 1980's. He said this about the accident:

My father was involved in an accident at the FACILITY sometime in the late 1980s. He was on top of a (railroad) tank car loading the industrial caustic produced at the FACILITY (acid, as he called it) into the tanker. Somehow the hose attached to the car came loose or burst. I'm not certain. Whatever the case, my father was completely covered with powerful caustic liquid and fell from the tanker. A nearby construction worker saw the accident and pulled my father to an outdoor emergency shower and may have saved his life. Dad spent the next three weeks or so bedridden. He laid there, naked, while skin from his shoulders all the way to his toes peeled off in dead sections. He was in a great deal of pain for some time. It was awful for him and brutal for mother and me to watch. I felt quite helpless, tough guy my father was. Hobbs Aff, Ex. 13, page 5.

266. Hobbs' father suffered from a number of health problems, including:

I know he suffered from some of the same physical ailments with his thyroid, cholesterol, and arthritis. He also had heart issues and had to endure open-heart surgery. He started bleeding internally when he was seventy-six and the doctors couldn't find the problem. He ended up getting a blood transfusion every other week for two months until they finally found the problem. Dad had to swallow one of those little pills with a camera in it and let

the medical people follow it through him until they found colon cancer and the source of the bleeding. They operated successfully, and Dad took chemotherapy by mouth for a handful of months to finish it off. He beat it. My father was a tough guy. Hobbs Aff, Ex. 13, page 5.

## CHAPTER VI: HOW MERCURY HARMS AND INJURES PEOPLE

**What is Mercury?**

267.     Mercury is an uncommon yet naturally occurring element. Typically, Mercury is sequestered in the Earth's crust and rendered more or less inert by the elements it may be bound to. Mercury is a metal which has several forms. At room temperature, elemental mercury is a shiny, silver-white, odorless liquid metal. If heated, it becomes a colorless, odorless gas. Elemental mercury is used in industry to produce chlorine gas and caustic soda, and is also used in thermometers, dental fillings, and batteries. [65]

268.     Mercury and its compounds exist in three general forms:

- Elemental (or metallic).

- Inorganic. Mercury can combine with other elements (mainly chlorine, sulfur, and oxygen) to form inorganic mercury compounds.

- Organic. Mercury may combine with carbon or carbon-containing substances to make organic mercury compounds.

**Utilization of Mercury by the Chlor-Alkali Industry.**

269.     Mercury has been used in industrial processes for centuries. The occupational hazards of mercury were established as early as 1860.[66] Hat manufacturers once used a mercury wash to separate fur from pelts.[67] The earliest documentation of the occupational

---

[65] ATSDR, ToxFAQs for Mercury (2022).
[66] Richard P. Wedeen, *Were the Hatters of New Jersey "Mad"?*, 16 AM. J. IND. MED. 225 (1989).
[67] SAM KEAN, THE DISAPPEARING SPOON: AND OTHER TRUE TALES OF MADNESS, LOVE, AND THE HISTORY OF THE WORLD FROM THE PERIODIC TABLE OF THE ELEMENTS (1st Back Bay paperback edition ed. 2011).

hazards of mercury and mercurial disease was among hat makers.[68] The phrase "mad as a hatter" was associated with industrial felt hat workers in nineteenth-century England. Mercurial disease was common among hatters and included such symptoms as tremors, irritability, and mental instability.[69]

270.     In the United States, the Chlor-Alkali Industry began to utilize the Castner-Kellner mercury-cell process in 1897.[70] As of 2018, according to the Global Mercury Assessment published by the United Nations Environment Program ("UNEP"), the Chlor-Alkali production sector was the ninth largest contributor to global mercury emissions.[71] Through the use of mercury, this industry is able to produce Chlorine ($Cl_2$) and alkaline products like potassium and sodium hydroxides ($NaOH$ and $KOH$ respectively) through the electrolysis of a salt solution.

271.     In the 1970s the membrane cell production method emerged in the Chlor-Alkali industry, which produced Chlorine and alkaline products without the use of mercury.[72] In the United States, following the introduction of Nafion® membranes by DuPont in 1970, research efforts in membrane-cell technology intensified. In 1972, a commercial size electrolyzer and pilot plant were placed in operation in Painesville, Ohio. Four years later, a 20-ton per day membrane-cell demonstration plant was built and integrated into an existing mercury-cell operation in Muscle Shoals, Alabama. [73]

272.     Many production plants in the United States remained committed to the less safe and less efficient mercury-cell method until either closing or converting to membrane-cell

[68] M Buckell et al., *Chronic Mercury Poisoning. 1946.*, 50 BR. J. IND. MED. 97 (1993).
[69] *Ibid.*
[70] THOMAS O'BRIEN, ET AL., HANDBOOK OF CHLOR-ALKALI TECHNOLOGY 17–36 (First ed. 2005).
[71] EPA, Mercury Emissions: The Global Context (2021).
[72] Eur. Comm'n, Indus. Emissions Directive, Best Available Techniques (BAT) Reference Document for the Production of Chlor-Alkali (2014).
[73] THOMAS O'BRIEN, ET AL., HANDBOOK OF CHLOR-ALKALI TECHNOLOGY 17–36 (First ed. 2005).

Case 1:24-cv-00096-TRM-CHS    Document 191    Filed 02/05/26    Page 143 of 345
PageID #: 7222

technology. The mercury-cell technology had a dominating world share until it began to decline following the mercury poisoning cases in Minamata and Niigata, both in Japan, in 1972. Japan was the first country to convert away from mercury-cell technology, and currently there is no mercury-cell operation in Japan. [74]

273.     The plants that committed themselves to the mercury-cell method even after the advent of the membrane-cell did so in an environment that clearly understood the risks. The history of mercury utilization on an industrial scale, as noted throughout this complaint, is well documented. Therefore the understanding of the risks does not solely originate from regulations and legal obligations, in fact, many forms of notice originate within industry forums and working groups.

274.     True notice of the injury and damage of mercury on an industrial level did not, however, begin with Japan. It began to arise from the ill-fated hatters of St. Petersburg in 1820's Russia, in New Jersey in 1860, and in Victorian England in 1864.[75] These notices were preceded in time by reports from Pliny the Elder describing mercurialism as a disease and by Gabrule Fallopius in his work *De Metallis et Fossilibus* where he noted that workers in quicksilver mines could work for only three years.[76] Andre Mattioli of Siena, Pister van Foreest of Delft, Bernard de Lussien, and Giovanni Scopoli all made similar reports regarding miners and their health outcomes in mercury mines around Europe.[77]

275.     In fact, the first industrial hygiene legislation known to human history was made to protect workers from the effects of mercury.

          "The first legislation directed against an occupational hazard was drafted in 1665 in Idria, now part of [Slovenia, formerly

---

[74] *Ibid.*
[75] Monamy Buckell et al., *Chronic Mercury Poisoning*, 3 BR. J. IND. MED. 55 (1946).
[76] *Ibid.*
[77] *Ibid.*

Yugoslavia]. The workday for [cinnabar] (mercury ore) miners was restricted to 6 hours as a preventive measure to reduce the occurrence of tremors."[78 & 79]

276.     Not only was mercury the genesis of the field of Industrial Hygiene, it was also a catalyst for the specialty of Occupational Medicine. Dr. Alice Hamilton, one of the founders of the field and one of the earliest and most well renowned experts in the field, studied, among other "dangerous trades" Hatters' mercurialism in the early twentieth century.[80]

277.     Dr. Hamilton's works, and many of those listed above, were published in industrial, academic, and scientific circles appearing in journals, treatises, and government reports. These soon began to coalesce into the regulatory and scientific landscape of today.

278.     In 1924, the Chlorine Institute was founded as "a technical trade association of companies involved in the safe production, distribution and use of chlorine, sodium and potassium hydroxides and sodium hypochlorite, the distribution and use of hydrogen chloride and the distribution of vinyl chloride monomer." The founding member companies were as follows: *Belle Alkali Company, Canadian Salt Company, Limited, Great Western Electro-Chemical Company, Hooker Electrochemical Company, Isco Chemical Company, Inc., Mathieson Alkali Works, Inc., Monsanto Chemical Company, Niagara Alkai Company, Pennsylvania Salt Manufacturing Co., Inc., and The Roessler & Hasslacher Chemical Company.*[81]

---

[78] *Preventing Illness and Injury in the Workplace (Part 5 of 25),*  (last visited Jan. 31, 2026).
[79] Buckell et al., *supra* note 75.
[80] ALICE HAMILTON, EXPLORING THE DANGEROUS TRADES - THE AUTOBIOGRAPHY OF ALICE HAMILTON (1943).
[81] The Chlorine Institute,(last visited Feb. 1, 2026).

279.    In 1948, the Federal Water Pollution Control Act (FWPCA) was enacted, the amendments to which are known collectively as the Clean Water Act. This act created a structured and cooperative framework for assessing and preventing water pollution.[82]

280.    On April 21, 1956, the first case of what would come to be known as Minamata disease (Japanese: 水俣病) was identified in Minamata, Japan. This disease would become formally identified as methylmercury poisoning resultant from industrial waste being released directly into Minamata Bay. The Japanese Ministry of Health and Welfare's Minamata Food Poisoning Subcommittee released such findings on November 12, 1959.[83] & 84



*This image shows the simplified biological mechanism by which mercury is able to cross the Blood Brain Barrier. Note how the methylmercury binds to the sulfur on the Cystine molecule making it similar in shape and size to methionine, an essential amino acid.* [85]

281.    A second such outbreak occurred in Niigata, Japan, six hundred thirty (630) miles away in 1965. Together, Minamata disease and Niigata Minamata Disease (Japanese: 新潟水俣病) make up two of the four major anthropogenic pollution diseases in Japan

---

[82] History of the Clean Water Act, U.S. Envtl. Prot. Agency,(last updated June 10, 2025) (last visited Feb. 1, 2026).
[83] *Minamata Disease | Minamata Disease*, (last visited Feb. 1, 2026).
[84] Minamata Disease: The History and Measures – Summary, Ministry of the Environment, Government of Japan, (last visited Feb. 1, 2026).
[85] *Minamata Disease | Minamata Disease*, (last visited Feb. 1, 2026).

(Japanese: 四大公害病, lit. four big pollution-related illnesses). These twin diseases started the process for the removal of mercury from industrial processes in Japan.[86]

**282.** In 1973 the National Institute of Occupational Safety and Health (NIOSH) published its "Criteria for a Recommended Standard: Occupational Exposure to Inorganic Mercury." In this document, NIOSH emphasized the importance of actionable awareness, effective training, and process safety engineering prior to and during all operations. The following are direct quotes from the NIOSH "Criteria for a Recommended Standard: Occupational Exposure to Inorganic Mercury." Note that all quotes are selected from the first three pages. [87]

 a. On page one: "The standard is designed to protect the health and safety of workers for an 8-hour day, 40-hour week over a working lifetime. Compliance with the standard should prevent adverse effects of inorganic mercury on the health and safety of workers. The standard is measurable by techniques that are valid, reproducible, and available to industry and governmental agencies and is attainable with existing technology."[88]

 b. On page two: "Comprehensive medical examinations (which should include complete urinalysis) shall be made available to all workers subject to 'exposure to inorganic mercury' prior to employee placement and annually thereafter. These examinations should place emphasis on any symptoms or signs of unacceptable mercury absorption such as loss of weight, sleeplessness, tremors, personality change, or other evidence of central nervous system involvement."[89]

---

[86] *Ibid.*
[87] CRITERIA FOR A RECOMMENDED STANDARD: OCCUPATIONAL EXPOSURE TO INORGANIC MERCURY (1973).
[88] *Ibid.*
[89] *Ibid.*

c. On page two: "The following warning shall be posted to be readily visible at or near entrances or access ways to work areas where there is potential exposure to inorganic mercury."[90]

```
WARNING!

MERCURY WORK AREA

Unauthorized Persons Not Permitted
```

*This is the exact signage recommended as part of NIOSH's criteria for potential exposure*.[91]

d. On page two: "The following warning shall be posted in readily visible locations in any work area where there is potential exposure to inorganic mercury."

```
WARNING!

MERCURY

High Concentrations

Are Hazardous to Health

Maintain Adequate Ventilation.
```

*This is the exact signage recommended as part of NIOSH's criteria for potential exposure.*[92]

e. On page three: "When the limits of exposure to inorganic mercury prescribed in paragraph (a) of Section 1 cannot be met by limiting the concentration of mercury in the work environment, an employer must utilize a program of respiratory protection to effect the required protection of every worker exposed."[93]

283. Also, in 1973 the National Emission Standards for Hazardous Air Pollutants for Mercury Cell Chlor-Alkali Plants (NESHAP) was released which specifically addresses emissions from Chlor-Alkali plants utilizing the Mercury cell method. This action promulgates national emission standards for hazardous air pollutants (NESHAP),

---

[90] *Ibid.*
[91] *Ibid.*
[92] *Ibid.*
[93] *Ibid.*

specifically mercury emissions, from mercury cell Chlor-Alkali plants. The final rule limits mercury air emissions from these plants. The final rule implements section 112(d) of the Clean Air Act (CAA) which requires all categories and subcategories of major sources and area sources listed under section 112(c) to meet hazardous air pollutant emission standards reflecting the application of the maximum achievable control technology (MACT).[94]

284.     On June 30, 1976, a memorandum for the OSHA Regional Administrators was published by the Assistant Secretary of Labor Morton Corn which clarified 29 CFR § 1910.1000's application to mercury. Secretary Corn stated in full:

> "29 CFR 1910.1000, Table Z-2 contains the ceiling value for mercury. Historically the values in this table relate to the maximum allowable concentrations defined by ANSI as 8 hour time-weighted average."

> "Therefore, the allowable airborne concentration of mercury shall be interpreted as 0.1 mg/m$^{(3)}$ as determined on the basis of the full shift time-weighted average."[95]

285.     Later in 1976 the Resource Conservation and Recovery Act (RCRA) was enacted which directed the US Environmental Protection Agency (EPA) to promulgate standards for the regulation and containment of hazardous waste.[96] It further defines hazardous waste directly:

> "The term 'hazardous waste' means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may— (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to

---

[94] Mercury Cell Chlor-Alkali Plants: National Emissions Standards for Hazardous Air Pollutants (NESHAP), EPA, (last updated Mar. 27, 2025) (last visited Feb. 1, 2026).
[95] Morton Corn, Assistant Sec'y of Labor, U.S. Dep't of Labor, Memorandum to OSHA Regional Administrators, Interpretation of Allowable Airborne Concentrations of Mercury (June 30, 1976).
[96] Resource Conservation and Recovery Act 42 U.S.C. §6901 et seq., 94–580.

human health or the environment when improperly treated, stored, trans ported, or disposed of, or otherwise managed."[97]

286.     In 1986 the Emergency Planning and Community Right-to-Know Act (EPCRA) was enacted requiring federal and industrial facilities to monitor, track, and report emissions and fugitive released into environmental media.[98]

287.     On September 7, 1988, the EPA, through its Integrated Risk Information System (IRIS) published a Chemical Assessment Summary of elemental mercury. This summary reflected both the carcinogenicity and the risks of inhalation exposure. The categories were reviewed and updated in May and June of 1995 respectively. It also assessed for the lowest observed adverse effect level (LOAEL). This report incorporates studies from 1953-1995.[99]

288.     In 1989 the Bureau International Technique du Chlore (BITC) became EuroChlor which is a sector group of the European Chemical Industry Council (CEFIC), which is in turn a forum of chemical companies across Europe. EuroChlor represents ninety-seven (97%) of all European chlorine production capacity and has set a goal "that the cell rooms using mercury cell technology should be shut down over the next years (2020 at the latest)."[100]

289.     In December of 1989, The Agency for Toxic Substance and Disease Registry published its "Toxicological Profile for Mercury" which  represented one of the most complete and scientifically rigorous analyses of mercury's toxic effects. This report contained information on the three species of mercury and broke the health impacts down by body system. This report underwent rigorous scientific scrutiny and was subjected to a

---

[97] *Ibid.*
[98] *Toxics Release Inventory Guidance for Reporting Mercury and Mercury Compounds Category.*
[99] MERCURY, ELEMENTAL (CASRN 7439-97-6) (1998).
[100] EURO CHLOR PUBLICATION, GUIDELINE FOR DECOMMISSIONING OF MERCURY CHLOR-ALKALI PLANTS (2009).

period of sustained public comment. This report was updated in 1994, 1999, an addendum was added in 2013, and the most current version released in 2024.[101 & 102]

290.    In 1998, the Chlorine Institute published its "Pamphlet 156: Guidelines to Physicians in Conducting Mercury Medical Surveillance Programs," which provided information curated for the commissioning of medical surveillance programs and medical care related specifically to the Chlor-Alkali industry.[103]

291.    In April of 2001, the Chlorine Institute published its "Guidelines for Mercury Cell Chlor-Alkali Plants Emission Control: Practices and Techniques," which is a prepared set of voluntary emission control practices specifically oriented to the Chlor-Alkali industry.[104]

292.    On October 14, 2008, the Mercury Export Ban Act (MEBA) was enacted. MEBA amended the Toxic Substances Control Act which prohibits any government agency from selling or distributing elemental mercury, except when facilitating storage, and prohibits elemental mercury from being exported from the Unites States.[105]

293.    On October 10, 2013, the United Nations ratified the Minamata Convention on Mercury, which is a multilateral treaty named in memory of the victims of the Minamata mercury poisoning event. The goal of the convention is to attenuate and eliminate anthropogenic emission of mercury into the environment and protect human health from the impacts of mercury intoxication.[106]

---

[101] DR. JOHN RISHER & DR. ROB DEWOSKIN, TOXICOLOGICAL PROFILE FOR MERCURY (1999).
[102] ATSDR, *Toxicological Profile for Mercury* (2024).
[103] The Chlorine Institute, *Pamphlet 156; Guidelines to Physicians in Conducting Mercury Medical Surveillance Programs*, (1998).
[104] The Chlorine Institute, *Guidelines for Mercury Cell Chlor-Alkali Plants Emission Control: Practices and Techniques* (2001).
[105] S.906 - 110th Congress (2007-2008): Mercury Export Ban Act of 2008, S.906, 110th Cong. (2008).
[106] *Minamata Convention on Mercury,* Oct. 10, 2013, 55 I.L.M. 582 (2016).

294.     The development of this knowledge of mercury as an occupational hazard has, as illustrated above, historically occurred in spaces governed by industry, sheltered in the ivory towers of science, and in deliberative governmental bodies. Space to which the lay person has little, and often, no access.

295.     The common assessment of mercury as a toxin in food only truly entered the American consciousness in the early 2000s after the work of Dr. Jane Hightower, a full 40 years after the results of the Japanese Ministry of Health and Welfare's Minamata Food Poisoning Subcommittee were first published. To further complicate this matter, the mercury was only detected by rigorous scientific testing capabilities not available to the lay person.[107]

296.     That is not to say that the toxic effects of mercury were unknown, they have been known since the Classical Era. It is the proximity of mercury to a person, its access to their physiology that is much closer than any person would likely have considered forgoing the benefit of the knowledge we hold today.

297.     Therefore, it must be presumed that an abstract knowledge, even an understanding, of the toxic effects of mercury amongst the workers onsite at the FACILITY and/or SISTER FACILITY would be unlikely to be associated with their individual and specific risks, particularly in the context of whatever meager occupational safety and health practices were being utilized at the relevant time of employment. Without the benefit of the information provided and available to the highest levels of this industry and the access to testing and monitoring data to identify risk, no person, lay or otherwise, would be

---

[107] Mercury in Fish, Yale University Press, Feb. 20, 2020, (last visited Feb. 1, 2026).

Case 1:24-cv-00096-TRM-CHS     Document 191     Filed 02/05/26     Page 152 of 345
PageID #: 7231

capable of making informed decisions regarding their safety or the situationally-appropriate steps they should take to ensure it.

298.     With such a clear, accessible, and specifically curated history of regulations, recommendations, and scientific development it is difficult to conclude logically that the lack of appropriate interventions by the DEFENDANTS was anything other than reckless, wanton, and flagrant disregard for the health, longevity, and safety of their employees, the employees of others, the families, and the surrounding communities.

299.     Even still, the use of elemental mercury in the Chlor-Alkali Industry remained prevalent in the United States market into the 2000s. Although elemental mercury is poorly absorbed through the gastrointestinal ("GI") route, it is highly toxic when inhaled. Mercury is highly volatile in the environment and vaporizes readily. This vapor, if inhaled, is easily absorbed into the body, often attaching to the structures of the central nervous system ("CNS") and peripheral nervous system ("PNS")[108]. This makes it a highly dangerous airborne respiratory hazard when aerosolized or vaporized.

---

[108] L. W. Chang & R. B. Tjalkens, *Neurotoxicology of Metals*, *in* COMPREHENSIVE TOXICOLOGY (SECOND EDITION) 483 (Charlene A. McQueen ed., 2010).



*Work Area at the FACILITY*

**Mercury Exposure Can Result in Life-Threatening and Debilitating Injuries to Humans.**

    **300.** When considering how mercury in the workplace mobilizes to expose workers, one must understand how mercury behaves, what forms workers may interact with, and how those forms can enter and move through the body. Notably, mercury can combine with other elements, such as chlorine, sulfur, or oxygen, to form inorganic mercury compounds or "salts" such as mercuric chloride. These forms are typically white powders or crystals. Mercuric chloride is, of course, likely to be found in an environment where mercury is utilized to produce chlorine and can be kicked up or ingested by workers unknowingly. [109]

---

[109] ATSDR, ToxFAQs for Mercury (2022).

301.    Aside from its ability to combine and form various compounds, mercury on its own is highly volatile. Volatilization of mercury increases significantly when it is heated. This heat can come from the atmosphere, from the bodies of workers, or from work that creates heat. The vapor pressure characterization for mercury indicates that as the temperature increases in a room from 32°F to 68°F, the amount of mercury vaporizing increases six-fold. When the temperature of a room is increased from 68°F to 140°F, the amount of mercury vaporizing into the atmosphere increases 21 times. [110]

302.    Vaporization can be hastened by aerosolization, which often occurs when metallic mercury is vacuumed. The use of vacuums to collect liquid mercury greatly increases the risk of exposure. In fact, a worker vacuuming mercury and those in close proximity are running the risk of inhaling mercury vapor, which is easily absorbed into the body through the lungs. In its vaporized state, elemental mercury is nearly completely absorbed across the alveolar membrane, the gas-exchanging region of the lungs, with a retention of 75 to 80 percent.[111]

303.    Neither liquid mercury nor mercury vapor has an odor nor provides any warning of hazardous concentrations in the air.[112] Workers cannot smell, taste, or feel the mercury vapor as it enters and injures their bodies. Mercury vapor is heavier than air and may therefore accumulate in poorly ventilated or low-lying areas.[113]

304.    Injury from exposure to mercury is not limited to individuals working in the Chlor-Alkali plant. In fact, many exposures occur outside these facilities and are equally, or even more, harmful than those that occur onsite. Workers are able to track the mercury home

---

[110] N.Y. Dept of Health, Assessing Mercury Exposure.
[111] LEWIS R. GOLDFRANK, GOLDFRANK'S TOXICOLOGIC EMERGENCIES (5th ed. ed. 1994).
[112] ATSDR, Mercury Mgmt. Guidelines, (2015).
[113] *Ibid.*

on contaminated tools, clothing, or other items from the worksite. These items have absorbed mercury and then such items can release mercury into the workers' homes. [114]

305.     Mercury exposure of any amount can result in potentially harmful and injurious effects. There are three primary routes of exposure: inhalation, ingestion, and injection (transdermal permeation).

A.  Inhalation is often the route of exposure in the most extreme cases of mercury poisoning. Mercury can vaporize at room temperature, and it becomes a colorless, odorless gas. Given that up to eighty percent (80%) of all mercury vapor inhaled is absorbed into the body through blood-gas exchange ("BGE") in the alveoli of the lungs, this route is the fastest avenue for mercury to enter the bloodstream and begin mobilizing through the body. [115]

B.  Ingestion, unlike inhalation, is a slower route of exposure but mercury can cause damage to the alimentary canal and other tissues of the gastrointestinal ("GI") system.

C.  Transdermal permeation of mercury depends a great deal on the species of mercury and the polarity of the molecule. However, the transdermal route is the least common of the exposure pathways. It often results in rashes or other skin reactions. Still, there can be significant absorption of mercury through the skin if mercury or mercury vapor is in continuous contact with the skin.

**The Dangerous Nature of Mercury in Vapor Form.**

306.     Elemental mercury and inorganic mercury salts can enter the body through inhalation, skin contact, and ingestion. Inhalation of mercury vapor and/or particles of

---

[114]ATSDR, Toxicology Profile for Mercury (2022).
[115] The Chlorine Inst., Inc., Pamphlet 125 Guidelines - Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (4th ed. 2004).

mercury chloride are the major route of entry from industrial exposures. Approximately 80 percent of inhaled mercury is absorbed. [116]

307.     There can be significant absorption of mercury through the skin if mercury or mercury vapor is in continuous contact with the skin. Uptake via the skin of elemental mercury vapor, with whole body exposure, is only 2.2% (or 1.76 percent of contacted material) of uptake via inhalation. Vapor at $0.050$ mg/m$^3$ penetrates the skin at a rate of about $7.2 \times 10\text{-}8$ mg/cm$^2$/hr. [117]



*Visible Mercury on surface at FACILITY*

**Mobilization of Mercury – Creating Secondary Exposures**

308.     At the FACILITY, acute exposures were often the result of compromising the closed mercury-cell system, or system upset conditions, in the Cell Room. Such conditions

---

[116] *Ibid.*
[117] *Ibid.*

include cell explosions, mercury leaks, and maintenance work. Whenever that closed system was opened, elemental mercury would vaporize and be released into the atmosphere. The process of vaporization was often expedited by "hot work," such as the use of saws, torches, or other tools to break down the mercury cell system. This heat-producing work exacerbated the vaporization problem by increasing vaporization exponentially.[118] In addition to these acute exposure events are chronic exposure events. Slow exposures due to environmental conditions present a chronic exposure risk. Here the FACILITY itself was a source of mercury exposure. These environmental conditions created an ever-present mercury plume within which the Plaintiff Workers were chronically breathing. See Carson Aff, Ex. 5, Powers Aff, Ex. 3, and Webb Aff, Ex. 15.

309.    The Chlorine Institute's Pamphlet 154 (which is the Chlorine Manufacturers Association) states, "In addition, shoes and/or clothing contaminated with mercury transported into clean areas including those away from work may result in additional exposure to the employee or possibly to family members. As a result, contaminated materials (e.g., clothing, tools) should be isolated and kept at the workplace."[119] Even the Chlorine Manufacturers' Association themselves recognize this ever-present danger.

310.    Such cross-contamination creates an exposure hazard in the home which can be very dangerous for both the workers and their families. This was confirmed by a study performed by the Agency for Toxic Substances and Disease Registry (an agency of the U.S. Department of Health and Human Services) where it was found that workers performing a scheduled maintenance operation including replacement of pipes and fittings

---

[118] Euro Chlor, Guideline for Decommissioning of Mercury Chlor-Alkali Plants (5th ed. 2009).
[119] The Chlorine Inst., Inc., Pamphlet 154 Guidelines for the Handling of Rubber-lined Cell Parts Potentially Contaminated with Mercury, (1st ed., 1998).

in the cell room did carry mercury home on their clothing.[120] There the items would be stored, washed, or otherwise incorporated into the home environment. Washing machines in these circumstances have been shown to carry mercury from workers' clothes and spread it to the other clothes in the load, or in any load done thereafter. This store of mercury can be used to contaminate clothing, linens, and even the air in the home for years. Any gray water from these machines is also contaminated and, in some cases, is released into the worker's yard.

311.     The vaporization characteristics of mercury combined with the gross mercury contamination of the FACILITY created a highly dangerous setting for significant mercury exposures by the Plaintiff Workers, both chronic and acute, as well as exposure to their family members.

**Harmful Effects of Mercury Exposure**

*Exposure to Toxic Mercury Can Result in Myriad Health and Physical Injuries, Including, but not Limited to: Death; Neurological Damage; Neuropsychological Impairment; Auto-immune Diseases; Organ Damage/or Failure; Memory Loss; Seizures; Loss of Vision; and a Host of Gastrointestinal Issues.*

312.     Mercury toxicity is generally characterized by a wide spectrum of "nonspecific symptoms such as fatigue, gingivitis, gastrointestinal disturbance, insomnia, shyness, increased excitability, loss of memory, personality changes, and depression. These symptoms are sometimes referred to as erethism or micromercurialism."[121] In addition, mercury is a recognized toxin causing organ system damage throughout the body. Mercury toxicity can manifest with a broad constellation of symptoms and may not manifest identically in people even if they share identical exposures. This can complicate the

---

[120] ATSDR, Technical Assistance to the Tenn Dept of Health & Env't Mercury Exposure Study (1990).
[121] LARS FRIBERG & JAROSLAV J. VOSTAL, MERCURY IN THE ENVIRONMENT: AN EPIDEMIOLOGICAL AND TOXICOLOGICAL APPRAISAL (3. Pr ed. 1976).

diagnostic process. Additionally, elemental, organic, and inorganic mercury have different exposure pathways and therefore different constellations of symptoms initially. Due to the lack of specificity of symptoms, and differences between individuals in their resilience to mercury, it is often hard to track and diagnose mercury toxicity. Therefore, national health standards recommend that anyone who may be exposed to mercury receive appropriate testing.

313.	All species of mercury can cause significant manifestations of symptoms and many overlap with chronic exposure. The National Institutes of Health, the Centers for Disease Control and Prevention, and the Environmental Protection Agency have defined classifications for mercury symptomologies. [122 & 123]

314.	Inorganic mercury is poisonous when swallowed; it infiltrates the bloodstream and attacks internal organs. Symptoms of this species include burning sensations in the gastrointestinal tract (if ingested), nausea, vomiting, diarrhea, gastrointestinal bleeding, and changes in urination. [124]

315.	Organic mercury results in primary neurological symptoms; it may be symptomatic only after prolonged, chronic exposure or it can be imminently lethal, depending on its form. Symptoms of this toxicity include pain or numbness in different parts of the body, memory loss, tremors, seizures, loss of balance, loss or deterioration of vision, and death. [125]

---

[122] ATSDR, Toxicology Profile for Mercury (2022).
[123] ATSDR, ToxFAQs for Mercury (2022).
[124] Jung-Duck Park & Wei Zheng, *Human Exposure and Health Effects of Inorganic and Elemental Mercury*, 45 J. PREV. MED. PUB. HEALTH 344 (2012).
[125] ATSDR, Toxicology Profile for Mercury (2022).

316.    Elemental mercury causes coughing, respiratory illness, difficulty breathing, nausea, vomiting, bleeding gums, and a metallic taste in the mouth. [126]

317.    Elemental mercury will cross the blood-brain barrier and become oxidized to the Hg(II) oxidation state. The oxidized species of mercury cannot re-cross the blood-brain barrier and thus mercury accumulates in the brain.[127] Mercury in other organs is removed slowly from the body via the kidneys.[128] The average half-time for the clearance of mercury from different parts of the human body is as follows: lungs: 1.7 days; head: 21 days; kidney region: 64 days; chest: 43 days; whole body: 58 days. The evacuation of mercury from the body is generally complete after sixty (60) days, but may take as long as ninety (90) days or as few as forty (40) days based on the level of exposure and species in question.[129, 130, & 131] However, mercury that crosses the blood-brain barrier can persist for up to twenty years in nervous tissues, specifically grey matter. [132] Although certain levels of mercury are cleared from the body, significant portions of this mercury are absorbed into the tissue of the body and thus reside there to cause neurological damage over an extended period of time.

318.    The nervous system of the human body is very sensitive to all forms of mercury.[133] Organic methylmercury and elemental mercury vapors are more harmful than other forms.

---

[126] Jung-Duck Park & Wei Zheng, *Human Exposure and Health Effects of Inorganic and Elemental Mercury*, 45 J. PREV. MED. PUB. HEALTH 344 (2012).
[127] ATSDR, Toxicology Profile for Mercury (2022).
[128] *Ibid*.
[129] ATSDR, Mercury Mgmt. Guidelines, (2015).
[130] Byeong-Jin Ye et al., *Evaluation of Mercury Exposure Level, Clinical Diagnosis and Treatment for Mercury Intoxication*, 28 ANN. OCCUP. ENVIRON. MED. 5 (2016).
[131] Elizabeth Brodkin et al., *Lead and Mercury Exposures: Interpretation and Action*, 176 CMAJ CAN. MED. ASSOC. J. 59 (2007).
[132] Jung-Duck Park & Wei Zheng, *Human Exposure and Health Effects of Inorganic and Elemental Mercury*, 45 J. PREV. MED. PUB. HEALTH 344 (2012).
[133] ATSDR, Toxicology Profile for Mercury (2022).

This is because more mercury in these forms reaches the brain. Exposure to high levels of elemental, inorganic, or organic mercury can permanently damage the brain, kidneys, developing fetus, and other organs. Effects on brain functioning may result in irritability, shyness, personality changes, tremors, changes in vision or hearing, and memory problems.[134]

319.    Mercury vapor is an irritant to both the skin and eyes. Prolonged contact may lead to ulceration of the skin and damage to the ocular nerve. Allergic reactions (i.e., rashes, welts) may occur in sensitive individuals. Short-term over-exposure to high concentrations of mercury vapors can lead to breathing difficulty, coughing, and acute and potentially fatal lung disorders. Depending on the concentration of inhalation, over-exposure, heart problems, damage to the kidney, liver, or nerves and effects on the brain may occur.[135]

320.    Short-term exposure to high levels of elemental mercury vapors may cause effects including lung damage, nausea, vomiting, diarrhea, increases in blood pressure or heart rate, skin rashes, and eye irritation.[136]

321.    The length and dose of exposure also play a significant role in determining the effects of the mercury toxicity. Chronic exposures, which develop slowly and last for months or years, can be latent and go undiagnosed for years. They can also have a longer latency, or the time between exposure and the development of symptoms, such as in children, and become more severe.

---

[134] ATSDR, ToxFAQs for Mercury (2022).
[135] Acros Organics N. V., Materials Safety Data Sheet Mercury, 99.999%, (5th rev., 2007)
[136] *Ibid.*

322.  A review of manufacturers' Safety Data Sheets ("SDS") indicates short term and long-term effects from mercury exposure. The Hazard Communication Standard (HCS), 29 CFR § 1910.1200(g), requires chemical manufacturers to create SDS sheets for the chemicals they produce. These sheets must be made available through the manufacturer, distributor, and seller of these products. [137 & 138]

323.  Short term effects of mercury exposure are observed as skin irritation and allergic reactions. Additional effects that have been observed due to mercury exposure are: redness and swelling of the skin, redness and swelling of the mouth, redness and swelling of the gums, coughing, sweating, metallic taste, thirst, chills, fever, drooling, nausea, vomiting, diarrhea, frequent urination, chest pain, difficulty breathing, headache, weakness, muscle pain, sexual disorders, impotence, lung damage, heart disorders, kidney damage, liver damage, nerve damage and effects on the brain. Additional effects may include metallic taste, digestive disorders, kidney damage, and nerve damage.

324.  The long-term effects, in addition to the effects from short-term exposure, include blue lines on the gums, loosening of the teeth, lack of appetite, weight loss, an inability to urinate, anemia, difficulty walking, sleeplessness, twitching, loss of memory and hallucinations may occur. It may also cause reproductive effects.

325.  Additionally, mercury is known to accumulate in various tissues of the body. Particularly vulnerable to this sequestration are the kidneys. As a part of the urinary system, a route for somatic mercury evacuation, the kidneys are the primary location for

---

[137] *Ibid.*
[138] 29 CFR § 1910.1200(g).

mercury accumulation. They are vulnerable to and will sequester both inorganic and organic forms of mercury. [139]

326.    All forms of mercury can be nephrotoxic (i.e., damaging to structures in the kidneys called nephrons). The damage to the nephrons ultimately reduces kidney function. [140]

327.    This targeting of renal tissue is not limited to exogenous exposure in adults. Exposure during childhood and in utero can create permanent developmental injury to the kidneys and result in life-long disease.[141]

328.    Jennifer L. Lawson was a Plaintiff Facility Worker. Jennifer worked at the FACILITY from approximately 2011 to 2018. She explains her time at the FACILITY this way:

> My immediate supervisor for the first six years was a man named Jon Diminnie. My final year, my supervisor was Tim Baker. I worked well with both of them. At OLIN, I had the title of Division Chemist, which meant the North American Division. The work I did at the FACILITY and the SISTER FACILITY was replicated at all OLIN's North American chlor-alkali facilities. I did the analysis and developed superior methods. Once I had those methods written and defined, they were sent to the other plants for them to adhere to. I was the sole employee with the Division Chemist title. Mr. Diminnie was the Senior Division Chemist. The job required some traveling. I went to other OLIN chlor-alkali plants in Niagara Falls (New York), Bécancour (Canada), McIntosh (Alabama), Augusta (Georgia), Henderson (Nevada), Santa Fe Springs (California), and Tracy (California). Later, when OLIN went global, my title was upgraded to Global Division Chemist. My paycheck reflected this title upgrade. Affidavit of Jennifer L. Lawson, Ex. 36, page 2.

> I worked with all areas of the FACILITY and the SISTER FACILITY. The samples I tested came from all over the property and dealt with nearly every process and product that the

---

[139]Sarah E. Orr & Christy C. Bridges, *Chronic Kidney Disease and Exposure to Nephrotoxic Metals*, 18 INT. J. MOL. SCI. 1039 (2017).

[140] *Ibid.*

[141]Stephan Bose-O'Reilly et al., *Mercury Exposure and Children's Health*, 40 CURR. PROBL. PEDIATR. ADOLESC. HEALTH CARE 186 (2010).

FACILITY and the SISTER FACILITY made. I tested, analyzed, and made improvements in Liquefaction, Potassium Carbonate Processing (Pot Carb), the Hydrogen Building, Arch Chemical, Wastewater Processing, the Mercury Cell Building, the Membrane Cell Building, and the list goes on. The SISTER FACILITY was where they finished production and packaged chlorine for swimming pools and such. ARCH (later known as LONZA) supplied mostly pool chemicals, while OLIN supplied "drinking water" applications. The FACILITY and the SISTER FACILITY still shared OLIN's grounds, the cafeteria, bathrooms, fitness room, even the company doctor. There were still pipelines for chlorine and caustic running from the FACILITY into the SISTER FACILITY's building. I do not know what the business arrangement was, but we all acted like one big happy family. Lawson Affidavit, Ex. 36, page 3.

329. She explains her son's kidney functions this way:

Cameron was born with only one kidney. The other kidney never fully formed or functioned at all. Cameron's disease is not hereditary. Neither I, nor anyone in our families has any history of this. We had Cameron's DNA genetically tested. There are two types of polycystic kidney diseases that are hereditary. That is not what Cameron has. Cameron's was caused by a genetic mutation due to environmental exposures. His one functioning kidney was not fully developed at birth. He had to stay on antibiotics for over a year because of urine reflux that continuously caused urinary tract infections and pain in his bladder and kidney. After almost eighteen months, his kidney matured on its own and stopped the reflux without needing surgery. Aside from getting him into the world, it felt like our first victory. At that time, I had no idea my work environment could be contributing to medical issues for my baby and me. Affidavit of Jennifer L. Lawson, Ex. 36, page 5.

"I have decreased kidney function and deal with frequent urinary tract infections. I have inexplicable pain in my kidneys and bladder. I often feel that my bladder is full when it is not. This began while I was still employed at the FACILITY and the SISTER FACILITY." Lawson Affidavit, Ex. 36, page 11

330. Rebecca Lynch was a Plaintiff Facility Worker. Rebecca worked at the FACILITY

from approximately 1984 to 2011. She explains her time at the FACILITY this way:

HR was in the Administration building when I first started working in that department at the FACILITY. My office was moved above the Lab for about two years from approximately 1995 to 1997. They were trying to achieve an open floor plan with

the offices, so it'd be easier for the employees to know where to go. This was above the lab where mercury samples were housed. They moved us back into the Administration building in approximately 1997. When ARCH spun off from OLIN and I started working for them, my office was above the Lab on OLIN property leased by ARCH. They had redesigned the space from an open floor plan to cubicles and offices. I was in the same office when LONZA took over, as well. When I worked at OLIN, I only dealt with OLIN employees. When I worked at ARCH and LONZA, I only handled those employees. Affidavit of Rebecca Lynch, Exhibit 33, page 2.

331.     She explains her functions this way:

"I have Stage 3 chronic kidney disease. I was diagnosed with Stage 1 kidney disease in about 2009. I don't remember when I was diagnosed with Stage 2 or 3. My kidney function went from a glomerular filtration rate ("GFR") of 62 to, currently, 41. My doctors had to change some of the medication amounts for my heart due to my kidney disease." Lynch Aff, Ex. 33, page 5.

332.     Rhonda J. Collins is an example of a female Plaintiff Family Member who has experienced kidney problems. Rhonda Collins' husband worked regularly at the FACILITY from 1978 to 2010. She describes her time at the FACILITY this way:

"I visited Jerry at the FACILITY Cafeteria during lunch with our daughters about once every six months. I worked at the FACILITY for about two years in the mid-1970s before my husband started working there. I worked as a secretary for some of the engineers there. Our daughter Stacey worked at the FACILITY for their pool care hotline during the summer after she graduated high school, in 1996." Affidavit of Rhonda J. Collins, Exhibit 32, page 2.

She explains her kidney function this way:

I was diagnosed with polycystic kidney disease in 2008. I am on dialysis three times a week. I also have Myasthenia Gravis disease. It is a chronic autoimmune disorder wherein my nerves and muscles are destroyed by antibodies. It affects my eyesight and my muscle strength. I was diagnosed with it about three years ago

I have joint pain in my fingers. It started several years ago. I can't grip anything anymore, and my hands ache a lot. Almost every day, I get dizzy and have problems with my balance. This has been going on for about four or five years. It comes out of the blue. I can just be standing and out of nowhere, I'll feel dizzy and

stumble. I feel tired every single day. This fatigue started about four years ago when I had to start dialysis for my kidney disease. I just get so tired that I must nap. I get nauseated many mornings. I do not urinate as much as I used to before my diagnosis. I have frequent diarrhea. Since approximately 2008, I get night sweats a few times a month. Lately, this has been happening more frequently. I stay cold all the time through the day, though. For approximately a year, I've been struggling with insomnia. I've been dealing with it more since Jerry died. I have had gradual hair loss over the last three or four years. I have lost several of my back teeth over the years. It started before I married Jerry, but I lost them more frequently after Jerry started working at the FACILITY. I don't drive much at all, and never at night anymore because my vision has deteriorated so much. I had some anxiety in the past, but it increased significantly when Jerry died. Now, I get worried when my kids go on vacation for a short time because I think something bad might happen to them. This plays a role in my trouble getting to sleep. I'll mull over anything nerve-wracking when I lay down to go to bed, and it keeps me awake. Affidavit of Rhonda J. Collins, Exhibit 32, page 3

**Toxic Mercury Exposure Causes More Severe Injury to Women**

**333.** Mercury can have significant effects on the female reproductive system. Mercury, as a neurotoxin that targets brain tissues, can affect the hypothalamic-pituitary-gonadal axis ("HPGA"). The HPGA, comprised of the hypothalamus, anterior pituitary gland, and the gonads, is the system in the body that regulates the hormonal functioning of the female reproductive system. Rates of menstrual disorder in occupationally exposed subjects has been found to be as high as sixty-seven percent where an unexposed population under otherwise similar conditions only expressed a rate of disorder of forty-six percent.[142] Additionally, inhaled mercury vapor has been shown to increase the occurrence of adverse

---

[142] Simon Mamuya, Shuku C Kaishwa & Jane Mlimbila, *Mercury Exposure and Associated Reported Menstrual Disorders Among Women in Artisanal and Small Scale Gold Mining in Nyang'hwale District, Geita, Tanzania*, 9 MOJ PUBLIC HEALTH (2020).

reproductive outcomes.[143]  The following excerpt describes the mechanisms of harm in the female reproductive system:

> "In women, infertility is influenced by an imbalance of the female hormonal system due to Hg exposure. The progesterone/estrogen ratio changes in favor of estrogen growth, which inhibits the release of LH-luteinizing hormone. Thus, Hg may induce feminine infertility by increasing the prolactin secretion— analogous to the dopamine effect at the pituitary and midbrain level, with negative effects on galactopoiesis and female genitalia." [144]

334.    The proportion of toxic mercury in the body has been shown to negatively correlate with the number of mature oocytes (the mother cells of ova) in the body. [145]

335.    Exposure to mercury in women can result in many reproductive symptoms: amenorrhea (the absence of menstruation), dysmenorrhea (excessively painful menstruation, typically including abdominal cramping), early menopause, reduced fecundability (probability of conception during each menstrual cycle), irregular menstrual cycles, endometriosis (cells similar to those lining the inside of the uterus grow outside the uterus), polycystic ovary syndrome (enlarged ovaries with cysts on the outside), benign breast disorders, galactorrhea (a milky discharge from the breasts unrelated to lactation), premenstrual syndrome, and general abdominal pain. [146]

336.    Natasha A. Henegar was a Plaintiff Facility Worker. Natasha worked at the FACILITY from approximately 2000 to 2012. She explains her time at the FACILITY this way:

> I performed mercury cell maintenance in the Cell House, I prepared shipments, and I also ran the mercury kiln in the TRU Building. My supervisors in the Cell House were Perry King,

---

[143] Geir Bjørklund et al., *Mercury Exposure and Its Effects on Fertility and Pregnancy Outcome*, 125 BASIC CLIN. PHARMACOL. TOXICOL. 317 (2019).
[144] *Ibid.*
[145] *Ibid.*
[146] *Ibid.*

Junior Handy, and Mike Dunn. My supervisor for Shipping was Tim (I do not remember his last name). My supervisor in the TRU Building was a man whose name I do not remember, and then Lori Purdy. I worked during production and outages. I left when the FACILITY was getting ready to decommission the Cell House. They were moving people to different work areas and restructuring jobs to prepare for the process of decommissioning and demolition. When I was let go, I was training someone to do my job in the TRU Building, and I was going to be moved back to Shipping. Affidavit of Natasha A. Henegar, Exhibit 29, page 1.

337.     She explains her menstrual cycle this way:

I was on a birth control pill from 1994 to 2012, off and on. I had to go off birth control when OLIN let me go because I no longer had health insurance. I experienced abnormal, excessively painful cramping during my menstrual cycle. They got progressively worse over the years. I had premenstrual dysphoric disorder ("PMDD"), which involved physical symptoms like bloating and cramps, but also mental symptoms like increased anxiety, depression, and mood swings. My blood flow was so heavy during my periods that I would have to change tampons every thirty minutes. I could feel clumps of blood coming out of me. I stopped having periods in approximately 2013. I thought I was going through very early menopause in my mid-30s. I had minimal spotting once, but not a full period. I mentioned it to doctors, but they all brushed it off and said, "You're just going through early menopause." I didn't push the issue because I was relieved to no longer have a period. Suddenly, when I moved to Florida in September of 2023, I started having periods again. I thought something was wrong with me the first month since I hadn't had one in ten years. Then, I had two more right on schedule for the next two months. I had to get on birth control again to avoid the symptoms I experienced before. Henegar Affidavit, Ex. 29, page 11.

338.     Eva VanHook was a Plaintiff Facility Worker. Eva worked at the FACILITY from

approximately 2008 to 2009. She explains her time at the FACILITY this way:

"I was essentially hired because I was a licensed medical laboratory technician and could perform the in-house employee mercury monitoring testing. I also tested production samples for quality assurance and tested containers and the environment for mercury." Affidavit of Eva VanHook, Exhibit 30, page 1.

There was a specific area in the Laboratory where we did environmental testing like this. It was a process of using different

chemical reagents to combine and trigger a chemical reaction. Samples would go into a flask, then a reagent would be mixed with them to make a chemical reaction occur. The solution would turn purple, then something that I can't recall was mixed with the purple solution. This cleared out the purple making the solution clear again. This process brought the mercury out of the samples to be measured. There were different hoods and designated spaces for different samples. I have been told to retest environmental samples containing mercury if the results did not meet standards. I either had to retest the same sample or go out and get another sample from that area the sample came from. Moe Moiser, an Environmental Supervisor, talked about doing this as part of my Environmental training, and Jon Diminnie, my direct Supervisor, reinforced it. High mercury results from environmental samples were treated like a mistake or a fluke. If results were still showing high mercury levels after retesting, it was procedure to shut down the Wastewater ponds. I do not recall the ponds being shut down during my time there. I believe that a lot of the equipment we used was acceptable in OLIN's eyes, but it was actually older and outdated. VanHook Aff, Ex. 30, page 2.

She explains her menstrual cycle this way:

"Periodically, I will experience an excessively painful menstrual cycle where I get excruciating cramps for the first two days. This occurs every few months. I don't know when this started, but it has gotten worse recently." VanHook Affidavit, Ex. 30, page 6.

**339.** Shelia A. Millaway was a Plaintiff Facility Worker. Shelia worked at the FACILITY

from approximately 1997 to 2001. She explains her time at the FACILITY this way:

When my coworkers and I reported for work, we had safety meetings for the location we were going to be working and what our job duties would be. "Hoss", the FRU-CON General Foreman, would receive the job duties from the OLIN Supervisors, and then instruct us. Hoss was only there half of my employment. A guy named Eddie took over after he left. If we were reporting to work in the Control Room, we'd have to sign into the building once we got there to work. I'd always be assigned to the hardest possible areas to work due to my small size. I could squeeze into places that no one else could. I'd be up on the tallest rack of pipes, 150 feet in the air. As a Journeyman Pipe Welder, I welded nickel, titanium, and other semi-precious metals. Welders, like me, would get called in to do new construction, demo, redo pumps, reset equipment, and other related tasks. A welding job I would do in all areas was tie two pipes together by heating up one pipe to weld it

to the other. This was a time-consuming task that took trial and error. Affidavit of Shelia A. Millaway, Exhibit 31, page 2.

She explains her menstrual cycle this way:

> In 1997, I started having an irregular menstrual cycle where I experienced heavy flow. Along with that, I suffered from abnormal and excessively painful cramping. I was diagnosed with endometriosis in 2000 by Dr. Faye Ameredes, and I had to have surgery on August 29, 2000. I had a full hysterectomy in 2002 when I was 35 because the surgery in 2000 didn't help me. The doctor who did my hysterectomy was Christopher Mullins. I was in the hospital for about a month. Dr. James Knabb at Tennova Hospital in Cleveland, Tennessee, was the emergency physician who cleaned out my bowel and fixed my rectum the day after my hysterectomy. I also experienced milky discharge from my breast in 1997. It was dismissed by my OBGYN, and it went away on its own. Millaway Aff, Ex. 31, page 5.

**340.** Rhonda J. Collins is an example of a female Plaintiff Family Member who experience menstrual problems. Rhonda Collins' husband worked at the FACILITY on a regular basis. She explains her menstrual cycle this way:

> "I was on birth control on and off from approximately 1973 to 1985. Around 1978 to 1980, after I had my second child, I started having awful problems with my periods. They lasted an abnormally long time, and the cramps were intensely painful. I had a miscarriage in approximately 1982. I had a total hysterectomy in 1985 due to all the issues I was having." Affidavit of Rhonda J. Collins, Exhibit 32, page 2.

**341.** Gloria S. Olinger is an example of a female Plaintiff Family Member who experienced menstrual problems. Gloria Olinger's husband worked at the FACILITY on a regular basis. She explains her menstrual cycle this way:

> When I was pregnant with Kristopher, I was very sick. I was throwing up every day for seven months straight. I was hospitalized three or four times for dehydration during this time. The final two months of my pregnancy, I was having false labor pains on a regular basis. I had no issues when I was pregnant with Todd. I had a hysterectomy in about 1988 when I was 34 years old. I had cysts on my ovaries that kept coming back. Before my hysterectomy, my menstruation was irregular. I would bleed multiple times a month. My periods were heavy to the point where

I was anemic. My cramps were severe the first couple days of menstruation, and I had migraines. I did not have problems with my menstruation until Mike started working at OLIN. Affidavit of Gloria S. Olinger, Exhibit 34, page 3.

342.     An example of a Plaintiff Family Member is Laura F. Casteel. Her husband worked

regularly at the FACILITY. She explains it this way:

> Jeff worked in automation and also in many other areas throughout his four and a half decades at the FACILITY. He really worked all over. He worked in Engineering, Maintenance, Production, Research Development, and more. He would talk about cell floors, railcars, and processes. I remember him specifically mentioning cell floors and high temperatures. He talked about a lot of things at the FACILITY that I didn't really understand. I know that he did work in mercury. He was always working on projects and would have to go in and stay for shutdowns. OLIN would call him in the middle of the night to fix things onsite. He told me that he was stuck there during the blizzard of 1993 for four or five days. He talked about having to go to the OLIN doctor several times. The doctor gave him codeine to drink in order to flush the mercury out of his body when his levels tested high. Jeff told me that there was a huge, like five-gallon, container of codeine on the wall, and workers would divvy up bottles. I think that the first OLIN doctor during his employment was Dr. Whittle. I know the last doctor during his employment was Dr. Snoddy.

> I saw a gray, muddy substance on his pants, shoes, in the floorboard of his truck, and on the floor of our home. Now that I have learned more about mercury recently, I believe that gray muddy substance was mercury mud. He would bring home his computer in a computer bag. He would sit on our furniture in the clothes he had worked in. He sometimes would change clothes as soon as he got home, but other times, he would hang out with the family in his personal work clothes. It depended on how dirty his personal work clothes were. Affidavit of Laura F. Casteel, Exhibit 20, page 1.

343.     Laura F. Casteel suffers from a number of health problems:

> "I was diagnosed with breast cancer in July of 2015. I also had fertility issues. I had three miscarriages during my relationship with Jeff: one in December of 1998, one between 1998 and 2002, and one with twins on Mother's Day in 2002. I had in vitro fertilization for us to conceive the twins. The doctor said that Jeff had a low sperm count, lower than his sperm count earlier in his life. In 2003, I got pregnant, without IVF, with Larkin. I had a

hysterectomy and reached surgical menopause in May 2016 at age 52." L. Casteel Aff, Ex. 20, page 2.

"I have been diagnosed with depression, anxiety, ADHD, and hypertension. I was prescribed bupropion and Zoloft for depression, lorazepam occasionally for anxiety/panic; Adderall for ADHD; and lisinopril, amlodipine, and clonidine for hypertension." L. Casteel Aff, Ex. 20, page 2.

**344.**     OLIN went to great lengths to attempt to shelter itself from liability when it came

to female workers working directly around mercury. Female Plaintiff Worker Natasha A.

Henegar was required by OLIN to sign a waiver in order to work in the Cell House. She

explains it this way:

> I was one of two female employees who worked in the Cell House. Stacy (I think her last name was Rogers or Smith) and I were the only women working in the Cell House at the time. The FACILITY had reasons for not wanting female employees working there. I had to sign a waiver that stated that I would not become pregnant while working at the Cell House. It stated that if I did become pregnant while working there, I would not hold the FACILITY accountable for any birth defects. I think I remember that the waiver specifically mentioned the mercury in the Cell House was the reason for this. I was on birth control to keep my periods manageable, and my ex-husband had a vasectomy for personal reasons. There was no chance of my becoming pregnant while working in the Cell House. However, I was not informed that mercury exposure or working with mercury could have lasting effects on my health.  Henegar Affidavit, Ex. 29, page 2

**345.**     In addition, Female Plaintiff Worker Tonya R. Hylton also had to sign a waiver.

The one Hylton signed was called "Form A Information Concerning Prenatal Chemical

Exposure" (the "OLIN Waiver for Females"). A copy of the waiver signed by Hylton is

attached as Exhibit 42. Here is her testimony:

> I began training with the ERT sometime in 2000, about the same time I made the move out of the HTH Building and onto the Track as an OLIN employee. OLIN actually made it mandatory for me. It was another first, because I was the only female, and I was determined to make a good showing. This was not the kind of training that anyone, male or female, could take lightly. Forty-eight hours of annual training was required to get, and to maintain

the certification necessary to stay on the ERT. We were sent to train with TVA (Tennessee Valley Authority) emergency responders at their Nickajack Lake FACILITY once a year. Another sixteen hours of training was required at OLIN. This was not a waste of time when someone taught us how to use a fire extinguisher. This was mentally and physically taxing instruction on the different kinds of fire, how to identify them, and what methods and materials were best to combat them. We learned about the different kinds of fire extinguishers and what type of fire each is best suited for. We practiced using our equipment and were instructed by people who had the certifications and the real-world experience to be credible. I enjoyed it. I applied myself to it. I wasn't there to be the token female or a mascot. I learned how to be a firefighter and I stayed with it for ten years. Hylton Aff, Ex. 26, page 5.

I was on the Depo-Provera birth control shot from approximately 1995 to 2010. I stayed on birth control the whole time I was at OLIN to make sure I didn't get pregnant. All female employees had to sign a waiver stating that if we got pregnant, OLIN would not be held responsible for any health issues that the baby may have. During my menstrual cycles, I had abnormal, excessively painful cramping. I felt like my ovaries were jumping up and down. I was diagnosed with endometriosis and enlarged ovaries in approximately 2000. I don't remember what year, but I had my tubes tied. In approximately 2016, Dr. Emily Bienvenu (my OB-GYN) told me I had a cancerous mass three-quarters of the way inside my uterus. She removed it. The surgery was successful, and I was told that they had been able to remove all the cancerous material. I didn't have to go through chemotherapy or radiation treatments. For the first few years after the surgery, I had to go back twice a year for checkups. I only go once a year now and, as of the last checkup, I'm still cancer free. Hylton Aff , Ex. 26, page 12

346.     The OLIN Waiver for Females says "Revised 6/13/95" at the bottom of it. OLIN Waiver for Females, Ex. 42. At least as early as 1995, OLIN knew that it had a big problem with the exposure to females at the FACILITY. Instead of taking steps to address the danger, OLIN decided to have them sign a waiver to try to avoid liability.

347.     Importantly, OLIN does not mention the word "mercury" anywhere in the OLIN Waiver for Females. OLIN Waiver for Females, Ex. 42. OLIN vaguely refers to "certain

chemicals and/or physical agents." Instead of being specific, OLIN just says that "there are a few work areas where such agents are present, we believe it is unsafe for the fetus of a pregnant woman." OLIN Waiver for Females, Ex. 42.

348.    OLIN knew specifically about the dangers of mercury. As early as January of 2000, OLIN was using a safety checklist for "Safety Orientation of [OLIN] employees and contractors" (the "OLIN Orientation Checklist"). See OLIN Orientation Checklist, attached as Exhibit 43. This OLIN Orientation Checklist, as revised January 2000, identified mercury this way under the "Chemical Hazards" section: "Mercury (Program/Fetal Vulnerability)" Exhibit 43. This demonstrates that OLIN knew, at least as early as 2000, that mercury at the FACILITY was specifically involved with "fetal vulnerability".

349.    The use of the OLIN Waiver for Females clearly demonstrates OLIN's subjective understanding of the present epidemiological studies linking harmful chemicals, including mercury, to the symptoms complained of by the female Plaintiffs in this case.

350.    With this subjective knowledge, OLIN clearly failed to exercise its duty of care to the Plaintiff Workers working in and around the FACILITY and SISTER FACILITY. Additionally, OLIN failed to exercise its duty of care to the Plaintiff Family Members who were exposed to mercury through cross-contamination.

**Toxic Mercury Exposure Causes More Severe Injury to Children**

351.    The exposure of a child to mercury is a vastly dangerous health threat. The latency of mercury toxicity in children can be longer than that of adults. Additionally, the effect on the development of children is often permanent and can be debilitating.

352.    Plaintiff Worker Alex Shaw discusses the health issues of his children during his time at the FACILITY:

Cody was born with Hydrocephalus and a seizure disorder. A brief time later, he was also diagnosed with Macrocephaly and Sub Ventricular Tachycardia. There was no history of problems like this on either side of the family. Cody's medical team never made the decision or recommended that we put a shunt in, but he was on a lot of medication for a long time. We spent a tremendous amount of time at his neurologist's office. Some things got better. Others got worse. Cody grew out of having seizures at about age five. As you can imagine, that was a great relief, but the trauma from his birth defects left him severely dyslexic and with other learning disabilities. He has also dealt with terrible migraine headaches since birth. Affidavit of Alex S. Shaw, Ex.37, page 12.

Cody is twenty-one now. He still lives at home. He wants to work and tries extremely hard, but his dyslexia is so severe that reading is still a challenge. He can do it. He cannot do it quickly. He has been through a couple of jobs that just did not pan out in the end. He currently has a part time job with M&M Mars. He works a couple of days a week in a packaging area. He sees a neurologist regarding the migraine headaches that still plague him. The search for long term relief continues. Shaw Aff, Ex. 37, page 13.

Alexandra started having headaches when she was five or six years old. They were not usually to the severity of Cody's, but they were bad and they were too frequent for a child her age. They were severe on occasion. We once had her admitted to the hospital because of one that had been raging for three days. None of the medical professionals we have consulted over the years has been able to do more than guess at the cause. It is a problem she continues to deal with today. Alexandra started her period for the first time when she was nine. There were problems immediately. There was no regulation. She might bleed for a month, even six weeks. Then nothing at all would happen for two or three months. When she was fourteen, her OB/GYN thought it might help to go ahead and put her on birth control. Instead, it almost killed her. They gave her a Depo-Provera shot which her body promptly rejected violently. She started bleeding. She went through sixteen pads in five hours. We did not know she was also hemorrhaging internally. By the time we got her to the emergency room, she was in terrible shape. They considered giving her a transfusion but decided that they had been able to stop the bleeding in time. She could quite literally have bled to death. In the aftermath, we were told to stay away from any form of birth control for her. She has never tried again. Shaw Aff, Ex.37, page 13

353.    "A study in the USA assessed the impact of industrial mercury emissions on children's health and found that an estimated 300,000-600,000 American children could

have reductions in IQ related to mercury. Estimates are that the loss of productivity due to loss of intelligence caused by methylmercury are on average 8.7 billion USD (US Dollars) annually, with emissions from American power plants accounting for 1.3 billion USD. Another study assessed, globally, the societal damages caused by ingestion of methylmercury for the year 2020 and estimated the annual cost to be approximately 3.7 billion USD due to a loss of IQ. The corresponding cost of damages due to inhalation of methylmercury was estimated to be 2.9 million USD." [147]



*This figure demonstrates the general trends in prenatal exposure to mercury.* [148]

---

[147] Stephan Bose-O'Reilly et al., *Mercury Exposure and Children's Health*, 40 CURR. PROBL. PEDIATR. ADOLESC. HEALTH CARE 186 (2010).

[148] *Ibid.*

**354.**     Mercury exposure in early childhood may result in skeletal malformations, brittle bones, neurological development issues, psychological issues, kidney toxicity, acrodynia, respiratory system issues, cardiovascular diseases, reduced IQ, memory issues, language skills impediment, spatial reasoning impairment, and attention deficits. [149]

**355.**     The symptoms of mercury exposure in middle childhood and adolescence include psychiatric issues, neurological issues, kidney toxicity, respiratory system issues, cardiovascular diseases, tremors, seizures, loss of balance, anxiety, depression, emotional dysregulation, memory issues, insomnia, anorexia, erethism, and fatigue. [150]

**356.**     Autosomal Dominant Polycystic Kidney Disease (ADPKD) is an inherited condition that results in cyst development in the renal tissue.[151] There are two known genes that cause this disorder: PKD1 which accounts for roughly 78 percent of cases, and PKD2 which results in 15 percent of cases.[152] The course of this disease is highly variable, however most cases are detected between the ages of 30 and 50, approximately when the growth of cysts begins to impede kidney function.[153]

**357.**     Given that this disease is an inherited genetic disorder, most cases will be passed from parent to child. Some cases may be the result of *De Novo* variants that occur during the formation of the sperm, ova, or in early embryonic development.[154] Mercury is a known cause of genetic mutations in sperm cells.[155] Therefore, paternal exposure to mercury around the time of conception can result in a genetic mutation to PKD1 or PKD2,

[149] WHO, Children's Exposures to Mercury Compounds, (2010).
[150] *Ibid*.
[151] Mayo Foundation for Medical Education and Research, Polycystic Kidney Disease, Mayo Clinic (2022).
[152] NHS, Autosomal Polycystic Kidney Disease, NHS Choices (2023).
[153] *Ibid.*
[154] MedlinePlus, Risk Assessment and Inheritance Patterns (2021).
[155] Magda Carvalho Henriques et al., *Exposure to Mercury and Human Reproductive Health: A Systematic Review*, 85 REPROD. TOXICOL. ELMSFORD N 93 (2019).

Further, given the dominance of these genes, only one parent must past them down for the disease to present in their offspring.

358.     This disease course is further complicated by the fact that mercury targets the renal tissues as they are central to the evacuation of mercury. It is well established that in the case of ADPKD healthy lifestyle choices can slow the progression of the disease and mitigate some of its effects. Conversely, the injury the kidneys incur from mercury can exacerbate and expedite the worsening of ADPKD.

359.     An example of a Plaintiff Family Member is Jeffery L. Casteel ("J.L. Casteel"). J. L. Casteel's father worked at the FACILITY on a regular basis. J.L. Casteel suffers from ADPKD and explains it this way:

> I've had stomach issues for most of my childhood. My stomach pain kind of kickstarted when I was about ten, and it has lasted ever since. I had a lot of intense stomach cramps as a kid to the point where I missed school a lot. I've had a constant struggle with various aches and pains, and feeling like my stomach was torn up all the time. Doctors told me I was allergic to things I was eating, so I completely switched my diet around. Then, when I went back to the doctor, they said I was allergic to all the new things I had switched to eating. I had to just decide to eat whatever I wanted since I was going to end up having stomach trouble with whatever I ate, anyway.
>
> I have a rare kidney disease, Autosomal Dominant Polycystic Kidney Disease ("ADPKD"). I was diagnosed with it when I was around 13. I didn't even know I was having kidney issues. I had just been to the doctor because of my stomach issues. The doctor ran an ultrasound on my stomach, and they found the cysts in my kidneys. That opened up a whole new can of worms. I had to go to a nephrologist, Dr. Mihail Subtirelu at Children's Hospital in Knoxville, Tennessee, to figure out what it was. I was diagnosed with ADPKD. ADPKD is supposed to be hereditary. I have the same mutated gene that causes the disease as Dad does. Dad's parents did not have the gene. Doctors have already told me that if I ever want to have kids, I will have to go through in vitro fertilization so that I do not pass on the gene. I don't so much struggle with physical symptoms right now, but I struggle with the mental aspect of the disease. Ever since I was diagnosed, I feel

like I'm carrying a constant weight, and like there's a sword hanging over my neck. In the back of my mind, I'm always thinking, "This is going to come back to get you one day. The odds are that your kidneys are going to fail. If you're lucky, there will be some sort of cure within the next fifty years, but you are more likely going to end up on dialysis." I'm just kind of stuck with this. There were times when thinking about the prognosis terrified me. I've grown a lot since my diagnosis, and I've kind of come to terms with it. The thing is, it's still just always in the back of my mind. Affidavit of Jeffery L. Casteel, Exhibit 21, page 2.

"J.L. Casteel takes Adderall XR for ADD; Lexapro, Wellbutrin, Zoloft, and Klonopin for depression and anxiety." L. Casteel Aff, Ex. 20, page 2.

360.    Laura F. Casteel explains her son J. L. Casteel's medical issues:

He has Autosomal Dominant Polycystic Kidney Disease ("ADPKD"). He was diagnosed when he was around 13 or 14. ADPKD is supposed to be inherited from your parents. The doctor said that it had to have been inherited, but the test they did on Larkin showed that it is a brand-new mutated gene that they had never seen before. They asked to test Jeff, and lo and behold, he had the same mutated gene. Neither one of Jeff's parents had it. We can't find anybody in his family who has had it. Jeff's kidneys are filled with cysts. He's having trouble breathing now because the cysts are so big, his kidneys are the size of footballs. Jeff is in Stage 3B of renal failure right now. He will eventually need a new kidney. His kidney doctor has been treating him, medically, as if he were a diabetic. Our son is headed down the same path. I now feel like something at the FACILITY caused the gene to mutate in Jeff and be passed down to Larkin. The doctor told Larkin that he won't be able to have children naturally so as not to pass down the gene. The whole thing is really an awful thing for him to have to go through. It is also very expensive to deal with. It tears me up that our 20-year-old kid is having to go through his life with this problem. He'll go through all the treatments and take all the expensive medication, but he will still have to end up on dialysis. L. Casteel Aff, Ex. 20, page 2.



*This figure shows the deteriorating handwriting of a nine-year-old female at monthly intervals after accidental mercury exposure.* [156]

**361.** The primary reproductive effects in the mother from mercury exposure are reduced fertility due to challenging intrauterine environments and reduced fecundability. However, mercury is a known teratogen and has many negative health impacts on a developing fetus. Some of these effects are spontaneous abortions (miscarriages up to 20 weeks), stillbirth (miscarriages after 20 weeks), infertility, subfertility, fetal malformations, and Minamata

---

[156] Stephan Bose-O'Reilly et al., *Mercury Exposure and Children's Health*, 40 CURR. PROBL. PEDIATR. ADOLESC. HEALTH CARE 186 (2010).

disease (in infants). Additionally, some research indicates that the mother may use the fetal route (via the placenta) as an excretory route for mercury. [157, 158, 159, & 160]

**Detection, Testing, and Treatment of Individuals Exposed to Toxic Mercury**

362.    Biological detection of mercury in the body requires laboratory testing. Most commonly this is urine testing, but mercury may also be detected in blood tests, among others. Mercury is detectable in the urine only for between thirty and ninety days after exposure.[161] Thereafter, blood panels, symptom analysis, and environmental evaluations must be used to diagnose mercury poisoning. There are three pillars in assessing the general or potential health consequences of exposures: [162]

- Amount and species of mercury available in the environment

- Duration of exposure

- Sensitivity of an individual to mercury

363.    Mercury, as discussed in the previous sections, needs varying amounts of time to infiltrate the body based on the route of exposure. This is a key factor in assessing potential exposures.[163] The inhalation of vapor often takes less time than transdermal absorption.[164] Therefore, determining whether vapor was present is critical.

364.    Currently, the standard of care for mercury toxicity detection is laboratory testing involving samples of urine (most commonly), blood plasma (in clinical settings), fecal

---

[157] Magda Carvalho Henriques et al., *Exposure to Mercury and Human Reproductive Health: A Systematic Review*, 85 REPROD. TOXICOL. ELMSFORD N 93 (2019).
[158] *Ibid*.
[159] Wash. Dept of Health, Mercury Best Practices (2016).
[160] Minai Mandana, Methylmercury & Human Embryonic Development, Embryo Project Encyclopedia (2016).
[161] N.Y. Dept of Health, Assessing Mercury Exposure.
[162] ATSDR, Evaluating Mercury Exposure (2019).
[163] WHO, Mercury and Health (2017).
[164] *Ibid*.

matter, hair, and nails. These samples allow for the determination of the volume of mercury in the system and generally the severity of the exposure. [165]

365.     The standard treatments for mercury poisoning are chelation (the use of chemical bonding to allow heavy metals to be excreted), fluid transfusions (to remove metals from the blood manually), and supportive care like intubation for respiration, endoscopic treatment for the GI tract, and IV fluids to supplement where needed. [166 & 167]

366.     Unfortunately, chronic exposures leave lasting damage that is not easily undone. Rehabilitation, physical therapy, psychiatric care, and continuous clinical treatment are requisites of many victims' care. In many cases, these treatments only stop the progression, rather than reverse the damage.[168] Furthermore, there is some indication that mercury poisoning sequelae worsen over time. As victims age, these symptoms increase in severity.

**Biomarkers for Mercury Exposure[169]**

367.     The following charts describe the biomarkers for mercury and the length of time mercury can be detected via these markers and their relevant tests.

---

[165] ATSDR, Mercury Mgmt. Guidelines, (2015).
[166] Cleveland Clinic, *Mercury Poisoning* Cleaveland Clinic, Mercury Poisoning (2022).
[167] Robin A. Bernhoft, *Mercury Toxicity and Treatment: A Review of the Literature*, 2012 J. ENVIRON. PUBLIC HEALTH 460508 (2012).
[168] *Ibid*.
[169] N.Y. Dept of Health, Assessing Mercury Exposure.

| | Biomarker | Form of Mercury Exposure | | Comments |
|---|---|---|---|---|
| | | Hg[0] | MeHg | |
| Common Back-ground Source | | Dental amalgams | Fish diet | |
| Useful Biomarkers | | Urine, blood | Blood, hair | |
| Half-life[1] | Urine | 30-90 days | NA | |
| | Blood | Phase 1: 1–3 days Phase 2: several weeks | Phase 1: 1-3 days Phase 2: 30-90 days | |
| U.S. General Population Background Level (95th percentile) | Urine[3] | 6–11 yrs: 0.89 mcg/L 1.1 mcg/gC 12–19 yrs: 1.0 mcg/L 0.85 mcg/gC ≥ 20 yrs: 1.8 mcg/L 1.8 mcg/gC | | Represents primarily Hg[0] and inorganic Hg |
| | Blood[3] | 1–5 yrs: 1.2 mcg/L 6–11 yrs: 1.6 mcg/L 12–19 yrs: 1.9 mcg/L ≥ 20 yrs: 4.9 mcg/L | | |
| U.S. Women Population Background Level (95th percentile 16-49 yrs) | Hair[4] | 1.7 ppm | | Primarily MeHg |
| NYS Reportable Level [2] | Urine | 20 mcg/L | NA | Represents primarily Hg[0] and inorganic Hg |
| | Blood | 5 mcg/L | | All forms of Hg |

| Mercury (total) in Urine | Comments |
|---|---|
| **Typical Levels of Total Mercury in Urine** | |
| 2.8 mcg/L<br>2.6 mcg/gC | 95th percentile, U.S. adults, ☐20 years old, 2007–2008 (n=1861) [CDC, 2011] |
| 1.82 mcg/L<br>1.18 mcg/gC | 95th percentile, U.S. young adults, 12–19 years old, 2007–2008(n=375) [CDC, 2011] |
| 1.82 mcg/L<br>1.71 mcg/gC | 95th percentile, U.S. children, 6–11 years old, 2007–2008 (n=398) [CDC, 2011] |
| <1 – 7 mcg/gC | Commonly (~99% of US population) associated with dental amalgams (n=520) [Barregard et al., 1995]. |
| 1 – 2 mcg/gC | Mean level in children (6–10 yrs old) without dental amalgams (n=521) [Bellinger et al., 2006; DeRouen et al., 2006] |
| 1 – 3 mcg/gC | Mean level in children (6–10 yrs old) with dental amalgams (n=520) [Bellinger et al., 2006; DeRouen et al., 2006]; no neurological effects observed. |
| Highest Levels Associated with Dental Amalgams: Estimated Highest 1% of US Population. | |
| 7 – 50 mcg/gC | Highest values are from case reports of nicotine gum chewers. [Barregard, 1995, 2005]. |
| **Health Effects of Chronic Occupational Exposure (many years) to Mercury Vapor** | |
| ≥ 200 mcg/L | High incidence (80%) of *erithism* (fatigue, emotional lability, insomnia, shyness) (n=77 exposed workers) [Urban et al., 1996] |
| 100+ mcg/L | Subtle cognitive deficits: attention, memory, reasoning, manual dexterity [reviewed by Echeverria et al., 2005] |
| 30 – 100 mcg/L | Inconsistent effects: fatigue, mood, tremor, memory, confusion [reviewed by ACGIH (2001) and Echeverria et al. (1995, 2005)] |
| 25 – 35 mcg/gC | Low effect levels for early biochemical markers of kidney toxicity (chloralkali workers) (n=89 exposed, 75 control) [Langworth et al., 1992]. |
| 20 mcg/gC | Low effect level for increased hand tremor (chloralkali workers). Highly dependent on duration of exposure (15 yea r mean, n=26) [Fawer et al., 1983]. |
| 5.3 mcg/gC<br>(1.6 – 26 mcg/gC) | Mean (range) in dental professionals where urine mercury concentration was correlated with an early biomarker of kidney toxicity (p=0.001) (n=44) [Langworth et al., 1997]. |
| Dentists:<br>3.32 mcg/L<br>(0 – 18 mcg/L)<br>Dental Assistants:<br>1.98 mcg/L<br>(0 – 15 mcg/L) | Mean (range) in dental professionals where urine mercury concentration was related to deficits in attention, visual memory, manual coordination, complex coordination in male dentists (n=194) and female dental assistants (n=233) (p<0.05); [Echeverria et al., 2005]. |

# CHAPTER VII: DIAGNOSTIC & MEDICAL CHALLENGES OF MERCURY TOXICITY

## An Overview of Diagnostic & Medical Challenges Related to Mercury Toxicity

368.     Mercury, as an etiologic agent, presents with a wide and varied constellation of symptoms. Due to the complexity of mercury intoxication and that this intoxication varies by route of exposure and the form of the mercury a person is exposed to, characterizing the exposure and injury can often present a challenge for clinicians and patients alike.

369.     Mercury intoxication can present as one of five defined syndromes, as follows:[170]

a.  Acute inhalation of elemental mercury vapor,

b.  Acute ingestion of mercuric salts,

c.  Chronic inorganic mercury intoxication,

   a.  Chronic elemental mercury,

   b.  Chronic sequalae of inorganic salts, and

   c.  Aryl and long-chain alkyl mercurials.

d.  Acrodynia, and

e.  Methylmercury intoxication.

370.     The most significant barrier to early treatment and characterization of exposure is the latency period of most chronic mercury intoxications. Many victims of mercury intoxication do not develop detectable symptoms for weeks, months, or years after exposure.[171 & 172]

---

[170] LEWIS R. GOLDFRANK, GOLDFRANK'S TOXICOLOGIC EMERGENCIES (5th ed. ed. 1994).
[171] ATSDR, Toxicological Profile for Mercury (2022).
[172] Jung-Duck Park & Wei Zheng, *Human Exposure and Health Effects of Inorganic and Elemental Mercury*, 45 J. PREV. MED. PUB. HEALTH 344 (2012).

**371.**     In spite of the amorphous appearance of mercurial injuries, science has settled, beyond reasonable certainty, that exposure to mercury vapor, or other species of mercury, will result in injury. [173, 174, 175, 176, & 177]

**372.**     Many Physiologically Based Pharmacokinetic (PBPK) and Pharmacodynamic (PBPD) models have been developed to demonstrate the movement and sequestration of mercury throughout the human body. They use mathematical analysis to track the exposure. These models are highly specific and are designed for a specific species of mercury (i.e., elemental, inorganic, or organic). Additionally, these models utilize medical case data to calibrate the system and to compare the results. [178]

**373.**     These models provide such critical insights as:

> "Mercury toxicity can be very difficult to identify with multisystem involvement. It is imperative to have a high index of suspicion and obtain a thorough history while always keeping in mind the complex of symptoms found in the toxidromes. Symptoms of mercury exposure and toxicity can easily be misdiagnosed as normal medical problems such as gastritis, GI bleeding, and respiratory distress. A keen awareness leading to early identification and treatment is critical due to the severe and potentially irreversible damage." [179]

**374.**     This necessary awareness of the pathology of mercury intoxication, or lack thereof, by even the most well-meaning medical practitioners, can result in misdiagnoses or missed diagnoses.

---

[173] ATSDR, Toxicological Profile for Mercury (2022).
[174] Jung-Duck Park & Wei Zheng, *Human Exposure and Health Effects of Inorganic and Elemental Mercury*, 45 J. PREV. MED. PUB. HEALTH 344 (2012).
[175] LEWIS R. GOLDFRANK, GOLDFRANK'S TOXICOLOGIC EMERGENCIES (5th ed. ed. 1994).
[176] Yuan-Seng Wu et al., *The Toxicity of Mercury and Its Chemical Compounds: Molecular Mechanisms and Environmental and Human Health Implications: A Comprehensive Review*, 9 ACS OMEGA 5100 (2024).
[177] Caicheng Long et al., *Adsorption-Improved MoSe2 Nanosheet by Heteroatom Doping and Its Application for Simultaneous Detection and Removal of Mercury (II)*, 413 J. HAZARD. MATER. 125470 (2021).
[178] ATSDR, Toxicological Profile for Mercury (2022).
[179] Shawn L. Posin, StatPearls, Mercury Toxicity (2014).

375.     Mercury is evacuated from the body by various routes between fifteen (15) and ninety (90) days from the last exposure. Many diagnostic tests become unusable after that window closes. Additionally, symptoms of mercury intoxication have a delayed onset that often gives the victim no notice or reason to seek medical attention. The major neurological symptoms can be delayed and then persist for many decades after exposure.[180] This can leave victims completely unaware of the nature of their injury until they are beyond the timeframe of simple diagnostic tests.

376.     The symptomology of mercury intoxication is based on its sequestration in, or route of evacuation through, the body. The brain, the lungs and the kidneys are the primary target organs for mercury burden. Mercury has a high affinity for selenium and sulfur groups, both of which are abundant and critical to the function of the central nervous system.[181]

377.     Due to this affinity and relative abundance, the brain takes on a significant burden of the somatic mercury load.[182]

378.     The kidneys, however, get their burden from their primary functionality as primary organs of the primary evacuation route of mercury. Fifty-five percent (55%) of the somatic mercury load will be excreted through the kidneys, resulting in high mercury levels and constant exposure in those tissues.[183]

379.     The lungs become early targets of elemental mercury as its primary route of toxicity is through inhalation. Between seventy-five (75%) and eighty percent (80%) of all

[180] *Ibid.*
[181] Thomas W. Clarkson & Laszlo Magos, *The Toxicology of Mercury and Its Chemical Compounds*, 36 CRIT. REV. TOXICOL. 609 (2006).
[182] Jung-Duck Park & Wei Zheng, *Human Exposure and Health Effects of Inorganic and Elemental Mercury*, 45 J. PREV. MED. PUB. HEALTH 344 (2012).
[183] ATSDR, Toxicological Profile for Mercury (2022).

elemental mercury that enters the lungs will be absorbed into the body tissues through blood gas exchange. Significant exposures can lead to respiratory injury, respiratory depression, and potentially death due to hypoxia.[184]

380.    A primary example of mercury's relationship with neurological injury is that mercury exposure has been linked to Alzheimer's Disease. Although the link to this particular pathology is not precisely clear, it remains the subject of much inquiry. The results of that inquiry have shown that the mercury burden in the brain can persist for decades, up to an estimated twenty (20) years.[185] Furthermore, this persistence in the brain has shown itself to be causal to many significant neurodegenerative diseases. In many cases the full deleteriousness of those injuries does not become clear until years after exposure, well past the time when they might have been attenuated or prevented.[186]

381.    The Plaintiffs in this case have symptoms consistent with the symptomology of mercury intoxication. *See* Plaintiffs' Summary of Symptoms, Exhibit 44.

### CHAPTER VIII: ENVIRONMENTAL, HEALTH, AND SAFETY

382.    In this chapter, Plaintiffs will discuss the unique intersection of Environmental, Health and Safety regulations, guidelines and duties that are applicable to the FACILITY and SISTER FACILITY (collectively the "EH&S Guidelines"). The EH&S Guidelines include Process Safety Engineering, accepted Chemical Engineering safety practices, international industrial safety standards, national and global chlorine trade associations (e.g. Euro Chlor and the Chlorine Institute), applicable governmental regulations, and

---

[184] Jung-Duck Park & Wei Zheng, *Human Exposure and Health Effects of Inorganic and Elemental Mercury*, 45 J. PREV. MED. PUB. HEALTH 344 (2012).
[185] *Ibid.*
[186] *Ibid.*

non-governmental scientific associations (e.g. ATSDR, ACGIH and NIOSH). These EH&S Guidelines will be discussed in detail in this chapter.

383.     However, these EH&S Guidelines are not being used to establish claims by any Plaintiff against his or her employer for the time he or she was an employee of one of the Defendants.  Plaintiffs are using the EH&S Guidelines to establish the general standard of care that Defendants should have exercised at the FACILITY and the SISTER FACILITY.

384.     Although certain EH&S Guidelines, such as OSHA and/or EPA regulations, are not mandated for the purpose of non-employees, they provide the superior knowledge that Defendants should have exercised to protect other workers and the public. The non-employee Plaintiffs placed their trust and confidence in these Defendants to protect them and not to conceal material information regarding the dangers associated with the working conditions at the FACILITY and SISTER FACILITY.    Said knowledge should have been disclosed to protect the non-employee Plaintiffs in this case.

**Duty of Care - Process Safety Engineering**

385.     Process Safety Engineering ("PSE") represents one of the most valuable and informative methods to prevent injury to workers in a wide array of industries. However, it is critically important to safety in industries handling or producing hazardous chemical constituents, products, or waste. This strategy allows for systems to be analyzed, designed, and revised prior to operations, thereby minimizing the major risks to workers. PSE is the first part of a Process Safety Management ("PSM") program. Employers with potentially hazardous operations are required by OSHA to perform Process Safety Engineering to reduce risk to their employees. This is codified in 29 CFR § 1910.119.

386. OSHA requires employers to inform and consult with their employees on the development and implementation of the Process Safety Management program.[187] They must also release to their employees the results of their process hazard analyses.[188] This information should be compiled into a written plan that is available to all employees working at the site.[189] The goal here, as stated by 29 CFR § 1910.119(d), is to "enable the employer and the employees involved in operating the process to identify and understand the hazards posed by those processes involving highly hazardous chemicals." This statute continues to enumerate the exact information that must be acquired and provided to employees. That information includes toxicity information, permissible exposure limits, physical data, reactivity data, corrosivity data, thermal and chemical stability data, hazardous effects of inadvertent mixing, and technology in the process.

387. Process Safety Engineering aims to reduce all risks to a worker's health. The process is also designed and should be implemented to protect others from harm who may be within the zone of danger. It achieves this by breaking the system in question, and its design, into parts. First, PSE will evaluate the process as a whole and, in particular, will evaluate known and potential risks. Then, it will identify and isolate each unique risk from the others so that they may each be addressed individually. This allows for each risk to be properly monitored. After that, the risks are designed out of the system. The redesign phase has the potential to introduce new risks that must also be designed out. Those new risks and any risks left in the system will be worked on until there is no reasonable way to design out the risks and maintain the function of the system. From that point onward, it

---

[187] 29 CFR § 1910.119.
[188] 29 CFR § 1910.119(c)(3).
[189] 29 CFR § 1910.119(d).

becomes the onus of the operators, who should now understand all the risks to their workers and the public, to properly monitor and protect against the remaining risks. The results of this monitoring program, which should include environmental monitoring and medical surveillance (biological monitoring and medical examinations of workers), should be used not simply to protect workers and the public, but also to confirm the efficacy of the system's safeguards.



*Deteriorating metal structures demonstrating significant corrosion at the FACILITY.*

388.    It is the vehement contention of the Plaintiffs that the Defendants failed to initiate and/or implement a proper safety analysis and program to protect those in and around the FACILITY. Below is an informative flow chart that presents some of the fundamental Safety Engineering steps that are required. OSHA, with its "Standard Duty Clause" (29

U.S.C. § 654(a)) and regulations, clearly establishes the legal duty of care owed by employers to their employees. In addition, Process Safety Engineering requires the institution of measures designed not only to protect workers but also members of the general public who may be in harm's way.

389.     Process Safety Engineering and established, accepted chemical-handling, and engineering practices comprise critical parts of the applicable standard of care that is required of the chemical industry in protecting both the workers and the general public. These fundamental principles are well-recognized within the chemical engineering community as well as the global chlorine industry.

390.     The following chart was produced with data from 29 CFR § 1910.119, the American Institute of Chemical Engineers (AIChE), Euro Chlor, and The Chlorine Institute.

# Process Safety Engineering

The goal of Process Safety Engineering is two-fold. First, it identifies hazards and determines their likelihood to interact with (i.e., potentially harm) employees. Second, it attempts to design out or protect against those hazards. Ultimately, PSE aims to reduce all risks to an employee's health while working in the analized system. There are many routes that PSEs take. This chart represents a generic path.



**Mercury Exposure – Standards and Limits**

*Established Standards and Limits Relative to Mercury Exposure have been Identified by Myriad Regulatory Agencies and Institutes for Decades. These were all Known within the Chlor-Alkali Industry.*

**391.** The workroom air standard, or Permissible Exposure Limit ("PEL"), for elemental/inorganic mercury established under the OSH Act of 1970 for airborne mercury is 0.1 mg/m$^3$ as an eight-hour Time-Weighted Average ("TWA").[190] A TWA is used to calculate a worker's daily exposure averaged to an eight-hour workday, taking into account the average levels of the substance and the time spent in the area. The OSHA workplace mercury exposure is not a ceiling PEL, but rather an eight-hour TWA.[191] In 1978, the National Institute for Occupational Safety and Health ("NIOSH") recommended the OSHA PEL for elemental/inorganic mercury be lowered to its own Recommended Exposure Limit ("REL") of 0.05 mg/m$^3$.[192 & 193]

**392.** The American Conference of Governmental Industrial Hygienists ("ACGIH") is a private, not-for-profit, nongovernmental corporation whose members are industrial hygienists or other occupational health and safety professionals dedicated to promoting health and safety within the workplace. While ACGIH is not a regulatory or official standards-setting body, regulatory bodies should view the recommendations of ACGIH as an expression of scientific opinion.[194]

**393.** Professional industrial hygienists, as defined by the American Industrial Hygiene Association ("AIHA"), "are scientists and engineers committed to protecting the health

---

[190] OSHA, Permissible Exposure Limit (PEL) for General Industry, 29 C.F.R. § 1910.1000 tbl. Z-2 (2024) (see also Directive CPL 2-2.6).
[191] OSHA., Memorandum: PEL for Inorganic Mercury (Corrected 2005).
[192] U.S. Dept of Health & Human Servs., Occupational Health Guideline for Inorganic Mercury (1978).
[193] ACGIH, About the ACGIH (2024).

and safety of people in the workplace and the community. The industrial hygienist is part of a broader family of professionals often referred to collectively as the practice of occupational and environmental health and safety."[195]

394.     ACGIH publishes guidelines known as Threshold Limit Values ("TLVs") and Biological Exposure Indices ("BEIs") to be used by professionals trained in the practice of industrial hygiene.[196] The TLV of a chemical substance is a level to which it is believed a worker can be exposed day after day for a working lifetime without adverse health effects. This level of exposure should be corrected for an extended work shift.

395.     Since 1994, ACGIH has recommended a TLV of 0.025 mg/m$^3$ as an eight-hour TWA standard for elemental and inorganic mercury.[197]

396.     The ACGIH BEI for mercury in urine and blood are 20 µg/g creatinine and 15 µg/L, respectively. BEI indices are values used by safety and health professionals for guidance in the assessment of biological monitoring results. With respect to mercury exposure, biological monitoring is the measurement of the concentration of a chemical marker in a human biological media that indicates the extent to which mercury exposure has occurred.[198]

397.     The Chlorine Institute ("CI") is an industry trade association of companies that are involved in the production, distribution, and use of chlorine, sodium and potassium hydroxides, and other related chemicals.[199]   The CI recommends that mercury-in-air exposures be controlled at 0.05 mg/m$^3$ for an 8-hr work shift. The level of mercury-in-air

[195] Am. Indus. Hygiene Ass'n,, Occupational & Envtl. Health & Safety Careers (2024).
[196] ACGIH, Threshold Limit Values & Biological Exposure Indices (2022).
[197] N.J. Dept of Health, Hazardous Substance Fact Sheet (2009).
[198] *Ibid.*
[199] The Chlorine Inst., Inc., About Us (2024).

196

exposures should be corrected for an extended work shift. As an example, the TWA for a 10-hour work shift would be 0.04 mg/m$^3$ and 0.033 mg/m$^3$ for a 12-hour work shift.[200]

**398.** The Chlorine Institute also recommends a Short-Term Exposure Level ("STEL") of 0.15 mg/m$^3$. ACGIH defines a Threshold Limit Value – Short-Term Exposure Limit ("TLV-STEL") as a 15-minute TWA exposure that should not be exceeded at any time during a workday even if the eight-hour TWA is within the TLV-TWA. The TLV-STEL is the concentration to which workers can be exposed continuously for up to 15 minutes without suffering from irritation, chronic or irreversible tissue damage, dose-rate-dependent toxic effects, or narcosis of sufficient degree to increase the likelihood of accidental injury, impaired self-rescue, or materially reduced work efficiency. [201]

**399.** A summary of the relevant organizations and their established exposure limits for mercury follows:

1. OSHA Permissible Exposure Limit ("PEL") [202]: 0.1 mg/m$^3$
2. NIOSH Recommended Exposure Limit ("REL")[203] : 0.05 mg/m$^3$
   a. Ceiling: 0.1 mg/m$^3$
   b. IDLH: 10 mg/m$^3$
3. ACGIH ("mercury-in-air") [204]
   a. Threshold Limit Value ("TLV-TWA"): 0.025 mg/m$^3$
   b. TLV-TWA was lowered from 0.05 to 0.025 mg/m$^3$ in 1994
4. ACGIH ("mercury-in-urine")[205]
   a. ACGIH BEI: 20 µg/g creatinine
   b. BEI was lowered from 35 µg/g creatinine (1993 BEI) to 20 in 2012
5. Chlorine Institute ("CI") ("mercury-in-air") [206]
   a. 8-hour TWA exposure limit: 0.50 mg/m$^3$
   b. 15-min STEL: 0.15 mg/m$^3$

---

[200] Peter Bellin, Calculations & Occupational Exposure Limits.
[201] ACGIH, Threshold Limit Values & Biological Exposure Indices (2006).
[202] 29 C.F.R. § 1910.1000 tbl. Z-2.
[203] NIOSH, Pocket Guide to Chemical Hazards, Pub. No. 2005-149 (2007).
[204] ACGIH, Threshold Limit Values & Biological Exposure Indices (2013).
[205] *Ibid*.
[206] The Chlorine Inst., Inc., Pamphlet 125 Guidelines - Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (1994).

197

6. Chlorine Institute ("CI") ("mercury in urine") [207]
   a. 1994 recommendation for removal from Mercury exposure: 200 µg/L
   b. CI lowered removal level from 300 µg/L to 200 µg/L in 1994
   c. 2004 recommendation for removal from Mercury exposure: 100 µg/g creatinine
   d. CI recommends urine samples be standardized to incorporate creatinine levels in 2004

400. The knowledge required to mitigate harmful mercury inhalation has been established and certified for decades. There is no reason for individuals working in a potentially dangerous environment to have suffered over-exposure events.

401. Through the implementation of a proper Safety Monitoring Program, the over-exposure of workers and their family members can easily be assured.

**Elemental Mercury Vapor Exposure Limits and Health Effects[208]**

| Exposure Limit | Limit Values | HE Codes | Health Factors & Target Organs |
|---|---|---|---|
| OSHA PEL Construction Industry | 0.1 mg/m$^2$ | HE3 | Gingivitis, Stomatitis |
| | | HE3 | Renal effects: Proteinuria, nephritic syndrome |
| | | HE7 | Erethism |
| | | HE11 | Mercurial pneumonitis |
| | | HE14 | Dermatitis |
| National Institute for Occupational Safety and Health ("NIOSH") Recommended Exposure Limit ("REL") | 0.05 mg/m$^2$ | HE3 | Gingivitis, stomatitis accompanied by excess salivation or a metallic taste |
| | | HE3 | Renal damage (nephritic edema, nephritic syndrome, renal failure) |
| | | HE7 | Erethism and micromercurialism |

---

[207] *Ibid*.
[208] OSHA, Sampling & Analytical Methods.

| | | HE10 | Respiratory effects – pneumonitis, bronchitis, chest pains, dyspnea, coughing |
|---|---|---|---|
| | | HE14 | Dermatitis, greyish-brown or yellowish haze on the lens of the eye |
| American Conference of Governmental Industrial Hygienists ("ACGIH") Threshold Limit Value ("TLV") (2001) | 0.025 mg/m$^3$ | HE3 | Gingivitis, stomatitis, ocular and vision changes, hearing loss |
| | | HE3 | Renal effects |
| | | HE5 | Teratogenic effects |
| | | HE7 | Central nervous system changes resulting in tremors, emotional instability and irritability, peripheral neuropathy |
| CAL/OSHA PELs | 0.1 mg/m$^3$, ceiling | HE5 | Reproductive effects |

CODES

HE3 – Chronic (Cumulative) Toxicity – Long-term organ toxicity other than nervous, respiratory, hematologic or reproductive

HE5 – Reproductive Hazards – Teratogenesis or other reproductive impairment

HE7 – Nervous System Disturbances – Nervous system effects other than narcosis

HE10 – Respiratory Effects Other Than irritation – Cumulative lung damage

HE11 – Respiratory Effects – Acute lung damage/edema or other

HE14 – Irritation-Eyes, Nose, Throat, Skin – Marked

**Duty of Care-Mandatory Medical Evaluations required by OSHA Standards**

**402.** According to 29 CFR §1910.134(c) employers are required to "develop and implement a written respiratory protection program with required worksite-specific

procedures and elements for required respirator use. The program must be administered by a suitably trained program administrator."[209] Additionally, this section goes on to state that in any workplace where respirators are "necessary to protect the health of the employee," the employer must produce a workplace specific respiratory protection program (RPP) and that "medical evaluations of employees required to use respirators" are specifically mandated in 29 CFR §1910.134(c)(1)(ii).[210]

403.     EH&S Guidelines, as specifically defined above pertaining to Process Safety Engineering, accepted chemical-handling, and engineering practices,,), also mirror those requirements set forth by OSHA. This establishes the standard of care for those within the zone of danger.

404.     Based on the sworn testimony from Plaintiff Workers, OLIN and its CONTRACTOR DEFENDANTS [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN and CUSTOM MECHANICAL] failed to meet the standard of care under the EH&S Guidelines. *For example, see Affidavits of Thomas Allison (Exhibit 23), Lamotta McMahan (Exhibit 16), Jerome Johnkins (Exhibit 4), Jerry Pendergrass (Exhibit 14), Eva Vanhook (Exhibit 30), Shelia Millaway (Exhibit 31), and Tim E. Powers (Exhibit 3).*

405.     Plaintiff Contractor Worker Ward C. Donaldson worked for PEN while at the Facility and he describes the fit testing process this way:

> Masks were supposed to be fit tested every three to six months. Sometimes I would be fit tested on time for my mask. Other times, I would not be fit tested for months. The FACILITY would fall behind on fit testing, so it would not always happen on time or as frequently. The OLIN safety manager, Tony Nimmo, and the PEN

---

[209] 29 CFR § 1910.134(c).
[210] *Ibid.*

safety guy, Chris Shelton, were in charge of fit testing. W. Donaldson Aff, Ex. 22, page 10.

406.    Timothy K. Kelley describes his experience as a Contractor Worker for Contractor Defendant PEN at the FACILITY this way:

> I was given a half-face respirator with dual cartridges that had to be replaced from time to time. I don't remember the model, but I think it was a 3M product. I don't think it was a top-of-the-line model because when I got sweaty (and I was constantly sweaty), it just slid all over my face. I'd be trying to make a repair on an open cell with mercury all in the bottom, and fumes coming off it from the heat, and my respirator would slide up over my forehead or down around my throat. It would not stay securely on my face. Again, the OLIN Employees had better quality PPE, and they were actually fit tested from time to time to ensure a good seal. None of the Contract Employees I worked with were ever fit tested. I don't think they tested any Contract Employees at all. / Despite the overwhelming presence of mercury, I was never issued mercury filters for my respirator, only chlorine. / Neither PEN nor OLIN ever gave me a fit test for my respirator, or told me how to clean it, or even that I should clean it. T. Kelly Aff, Ex. 7 Page 3, 4, 6 & 8.

## CHAPTER IX: DEFENDANTS' CONDUCT DEMANDS LEGAL LIABILITY

*This Complaint has introduced the Chlor-Alkali process used at the Charleston FACILITY, the dangers associated with mercury, and the proper safety systems and processes to protect both workers and the public from the harmful effects of mercury exposure. Now let us turn to specific allegations against the Defendants in this matter.*

**Process Hazard Analysis**

*OPERATING DEFENDANTS and their CONTRACTOR DEFENDANTS Failed to Properly Conduct a Process Hazard Analysis and, as a direct result, Subjected the Plaintiff Workers to a Dangerous Work Environment, thereby Exposing their Family Members.*

407.    A Process Hazard Analysis ("PHA") or evaluation is one of the most important elements of the OSHA PSM program. A PHA is an organized and systematic effort to identify and analyze the significance of potential hazards associated with the processing or handling of highly hazardous chemicals. [211] A PHA analyzes potential causes and

---

[211] 29 CFR § 1910.119.

consequences of fires, explosions, releases of toxic or flammable chemicals, and major spills of hazardous chemicals. The PHA focuses on equipment, instrumentation, utilities, human actions (routine and non- routine), and external factors that might affect the process. The PHA will formulate recommendations for appropriate engineering and administrative controls for the production, maintenance, and D&D activities to mitigate an inherent physical or chemical hazard that has the potential for causing harm to people, the environment, or the property. [212]

408.     The failure of Defendants to satisfy requirements for conducting a PHA as part of compliance with PSM standards (29 CFR § 1910.119) in the development of the production, maintenance, and D&D work scope resulted in dangerous conditions to the workers who were performing said work. The Defendants failed to adequately analyze the dangers produced and to effectively prevent the exposure to the Plaintiffs. This was a breach of industrial safety practice and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Exposure Assessment and Air Monitoring**

*OPERATING DEFENDANTS and their CONTRACTOR DEFENDANTS failed to Undertake Appropriate Exposure Assessment and Conduct Personnel Air Monitoring, Which Deprived the Plaintiff Workers of Necessary Protections Established by Industry Standards, Regulations, and Organizations that Study Mercury Exposure, Resulting in Plaintiff Workers being Exposed to Toxic Levels of Mercury.*

409.     The first step in protecting workers from hazardous chemicals such as mercury is the Exposure Assessment. 29 CFR § 1910.134(d)(1)(iii), codified since 2006, states, "The employer shall identify and evaluate the respiratory hazard(s) in the workplace; this

---

[212] OSHA, Process Hazard Analysis, OSHAcademy, Course 736 (2024).

evaluation shall include a reasonable estimate of employee exposures to respiratory hazard(s) and an identification of the contaminant's chemical state and physical form."

410.    OSHA requirements for air monitoring are set forth in the Hazardous Waste Operations and Emergency Response standards at 29 CFR § 1910.120(h). Specifically, § 1910.120(h)(1)(i) states that monitoring must be performed "where there may be a question of employee exposure to hazardous concentrations of hazardous substances in order to assure proper selection of engineering controls, work practices, and personal protective equipment [PPE] so that employees are not exposed to levels which exceed permissible exposure limits [PELs], or other published exposure levels." The regulations also require air monitoring for use in identifying health hazards to determine the appropriate level of PPE. Once the appropriate PPE is selected, personal air sampling should be continued to ensure that personnel exposures do not exceed established exposure limits. [213]

411.    Therefore, based on site, hazard, and exposure-specific considerations, a range of monitoring techniques may be employed to comply with section (h) requirements, to include personal protection equipment decision-making. These techniques might include NIOSH standard methods, direct reading instruments, colorimetric indicator tubes, and other methods appropriate to the site conditions. The OSHA rule directs the conduct of initial, periodic, and ongoing air monitoring for all hazardous substances of exposure concern. [214]

---

[213] EPA, Personal Air Sampling and Air Monitoring Requirements Under 29 CFR 1910.120, EPA Pub. No. 9360.8-1 (1993).
[214] OSHA., Interpretation Letter.

412. The Chlor-Alkali industry's own Chlorine Institute recommends "that a program of monitoring breathing-zone air mercury concentration be in place and documented" for any employees potentially affected by the volatility of mercury. [215]

413. According to standards and practices established by NIOSH, a half-face respirator with cartridges appropriate for mercury vapor (except organo alkyl molecules) has an assigned protection factor ("APF") of 10 which means it provides adequate respiratory protection for mercury concentrations in air up to 1.0 mg/m$^3$. In the context of mercury Chlor-Alkali production, maintenance, and D&D activities, concentrations of mercury in air exceeding this level would likely require the use of a full-face respirator and/or some type of supplied air.[216] Additionally, a half-mask respirator is not recommended for mercury organo alkyl molecules.[217]

414. 29 CFR § 1910.134(d)(1)(iii) also states, "Where the employer cannot identify or reasonably estimate the employee exposure, the employer shall consider the atmosphere to be IDLH." Unknown concentrations or concentrations exceeding 2.5 mg/m$^3$ should be treated as IDLH conditions, a situation that would be expected with any torch cutting, welding, or any other hot work taking place in the cell house, or any other area contaminated by mercury. [218]

415. The employer shall provide the following respirators for employee use in IDLH atmospheres: [219]

---

[215] The Chlorine Inst., Inc., Pamphlet 154: Guidelines for the Handling of Rubber-Lined Cell Parts Potentially Contaminated with Mercury, 1st ed. (1998).
[216] NIOSH, Pocket Guide to Chemical Hazards, Mercury Compounds (Except Organo Alkyls) (2019).
[217] NIOSH, Pocket Guide to Chemical Hazards - Mercury (Organo) Alkyl Compounds (as Hg) (2019).
[218] NIOSH, Pocket Guide to Chemical Hazards, Pub. No. 2005-149 (2007).
[219] 29 C.F.R § 1910.134(d)(2).

A.  A full facepiece pressure demand SCBA certified by NIOSH for a minimum service life of thirty minutes, or

B.  A combination full facepiece pressure demand supplied-air respirator (SAR) with auxiliary self-contained air supply.

416.   At the FACILITY, an exposure assessment and personnel monitoring program should have been conducted for all activities taking place throughout the FACILITY where mercury exposure is possible. The exposure assessment and personnel monitoring program is necessary to quantify mercury exposure levels to ensure that workers wear the correct level of respiratory protection. As shown by the testimony of the Plaintiff Workers, proper industrial hygiene exposure assessments and personnel monitoring were not routinely conducted at the FACILITY by the OPERATING DEFENDANTS and/or CONTRACTOR DEFENDANTS in accordance with 29 CFR § 1910.120(h) and 29 CFR § 1910.134. *See* Fife, Jr., Aff, Ex. 10, and Hobbs Aff, Ex. 13.

417.   The failure of OPERATING DEFENDANTS and/or CONTRACTOR DEFENDANTS to perform an exposure assessment including personnel air monitoring is a failure to quantify and mitigate hazardous workplace conditions which denied the Plaintiff Workers the protections afforded by the standard of care duly established by industry standards, applicable regulations, and recommendations of scientific organizations.

418.   The failure of OPERATING DEFENDANTS and/or CONTRACTOR DEFENDANTS to establish adequate workplace controls, engineering, administrative, and PPE, as part of an industrial hygiene exposure assessment of the workplace resulted in a failure to properly recognize, evaluate, and control hazardous workplace conditions to which the Plaintiff Workers were exposed during operations.

419. This failure of OPERATING DEFENDANTS and/or CONTRACTOR DEFENDANTS to meet the standard of care for worker protection resulted in unknown worker exposures to mercury. Unless they had quantified the mercury-in-air concentrations during operations, OPERATING DEFENDANTS and/or CONTRACTOR DEFENDANTS should have known to treat the workplace atmosphere as IDLH until mercury-in-air concentrations were known for the work scope being performed by accepted methods of measurement.

OPERATING DEFENDANTS and/or CONTRACTOR DEFENDANTS should have known to provide employees with respirators that are "applicable and suitable" for the purpose intended, i.e., for the protection of employee health. DEFENDANTS failed to provide employees with such respirators. The failure of DEFENDANTS to perform worker exposure assessments and the failure of DEFENDANTS to require the performance of exposure assessments resulted in unquantified mercury exposures and injury to the Plaintiff Workers at the FACILITY.[220]

420. These failures by the DEFENDANTS constitute a breach of industrial safety practice and legally constitute a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Worker Protection Should Have Been Insured Through a Properly Implemented Medical Surveillance Program**

*A Medical Surveillance Program Should Have Been Implemented to Ensure Workers Exposed to Mercury are not Experiencing Adverse Health Effects.*

---

[220] OSHA., CPL 02-00-124 Multi-Employer Citation Policy (1999).

421.     Medical Surveillance Programs, a cornerstone of proper industrial protections for employees in hazardous industries, are a multi-faceted approach to maintaining and protecting human health.

422.     These programs can be broken down into Biological Monitoring (the regular and routine sampling of various media from the human body), Medical Examinations (regular treatment and assessment by a qualified medical professional), Baseline Physiological Assessments (collection of medical, biological, and psychological data prior to exposure), Post-Exposure Assessments (collection of medical, biological, and psychological data after exposure), and various comparisons between an employee's medical results and known variables in the environment.

423.     The goal of medical surveillance programs is to monitor human health in environments where exposure to toxic substances is likely and, if exposure does occur, catch it early enough to enable effective medical interventions to mitigate injury. Therefore, these programs function as the backstop to the various on-site environmental monitoring programs that should determine the possible severity and likelihood of exposure.

424.     Biological monitoring refers to any number of laboratory tests, including urinalysis, that are used to detect the level of mercury in or leaving the employee's body. Medical Examinations refer to assessments of an employee by a qualified medical professional.[221]

425.     Per NIOSH, the following tests are indicated for employees exposed to inorganic mercury compounds: Whole Blood (Chemical/Metabolite) Tests, Biologic Tissue/Biopsy, Blood    Urea    Nitrogen    Test,    Nerve    Conduction    Studies,    Neurologic

---

[221] OSHA., Medical Screening and Surveillance (n.d.).

Examination/Electromyography Tests, Thyroid Function Test/Thyroid Profile, Urine (Chemical/Metabolite) Tests, & Urinalysis (Routine) Tests.[222]

426.     Per NIOSH, the following tests are indicated for employees exposed to organo alkyl mercury compounds: Body Hair Sampling, Whole Blood (Chemical/Metabolite) Tests, Neurologic Examination/Electromyography Tests, Urine (Chemical/Metabolite) Tests, & Urinalysis (Routine) Tests.[223]

427.     A Medical Surveillance Program is required for employees, including contract employees, who are or will be exposed to airborne concentrations of mercury vapor or dust or its inorganic compounds above the PEL.[224] The potential for exposure to mercury is to be determined by the exposure assessment.[225] The program should provide each employee with an opportunity for biological monitoring and medical examination performed by or under the supervision of a licensed physician and provided during the employee's normal working hours without cost to the employee. [226 & 227]

428.     Medical surveillance should be under the overall direction of a qualified physician.[228 & 229] Portions of the program can be implemented by a qualified medical professional. The interpretation of the group medical surveillance data should be undertaken only by a trained occupational health physician or other physician with expertise in performing such analyses. The results of the physical examinations should

---

222 NIOSH, Specific Medical Tests or Examinations Published in the Literature for OSHA-Regulated Substances, Pub. No. 2005-110 (2005).
223 Ibid.
224 OSHA., Medical Screening and Surveillance (n.d.).
225 The Chlorine Inst., Inc., Pamphlet 125 Guidelines - Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (4th ed. 2004).
226 OSHA., Instruction CPL 2-2.6: Inorganic Mercury and Its Compounds (1978).
227 Euro Chlor, Determination of Mercury and Creatinine in Urine, Analytical 11, 1st ed. (2007).
228 Ibid.
229 Euro Chlor, Audit Questionnaire Mercury, Health 6, (2nd ed. 2006).

also be evaluated on a group basis. This is important because early mercury poisoning might cause only very mild, clinically insignificant increases in symptomatology in everyone which, when seen in the aggregate, might nonetheless provide an important clue that toxic exposure to mercury is taking place.

**429.** The minimum requirements for a medical surveillance program are defined by OSHA. [230]

## Base Line Medical Examination

**430.** According to OSHA, an initial (baseline) medical examination should be performed on all employees exposed to potentially hazardous levels of mercury. This baseline examination will provide a reference for comparison of future health monitoring.[231]

**431.** The examination should include a complete medical history and symptom work-up, with emphasis on the nervous system (target organ system for chronic exposure), the kidneys (target organ for acute and chronic exposure), the oral cavity (target region for chronic exposure), the lungs (target organs for acute exposure), the eyes (affected by chronic exposure), and the skin (mercury is a known skin sensitizer). Examinations should test for symptoms of the earliest stages of mercury exposure; these include personality changes, weight loss, irritability, fatigue, nervousness, loss of memory, indecision, and intellectual deterioration. Complaints of tremors and loss of coordination should also be thoroughly examined. Physical examinations should include the target organs described above. [232]

---

[230] *Ibid.*
[231] *Ibid.*
[232] *Ibid.*

**432.**     In addition to the physical examination, a baseline handwriting sample should be obtained, and any laboratory evaluation should include at minimum a complete urinalysis.[233]

**Routine Medical Examination**

**433.**     Once the baseline has been identified, routine medical examinations should be repeated annually. Results should be compared with the findings on the baseline examination for changes indicative of mercury toxicity. Handwriting samples should be compared to the baseline sample for evidence of tremors. Interim evaluations should be conducted if symptoms suggestive of mercury intoxication are occurring. [234]

**434.**     Each employer is required under OSHA to make available or provide a medical examination for employees exposed, or potentially exposed, to mercury. These examinations typically should include a complete medical history, a physical examination, a complete blood count, a routine urinalysis (specific gravity, sugar, protein determinations, and microscopic examination), and a voluntary pregnancy test, where appropriate.

**435.**     Medical examinations should be made available under the following non-routine conditions:

- To employees prior to their assignment to areas where airborne concentrations of mercury are above the permissible exposure limit;

- At least annually for each employee exposed to airborne concentrations of mercury or its inorganic compounds above the permissible exposure limit at any time during the preceding six months;

---

[233] *Ibid.*
[234] *Ibid.*

- For each employee whose urine analysis sampling series indicates elemental mercury level at or above 0.02 mg per liter of urine or total mercury level in excess of .200 mg per liter of urine, which is not receding;

- Immediately upon notification by the employee that the employee has developed signs or symptoms commonly associated with toxic exposure to inorganic mercury or its compounds. [235]

436.    Where medical examinations are performed, the employer should provide the examining physician with the following information:

- The reason for the medical examination requested;

- A description of the affected employees' duties as they relate to the employee's exposure;

- A description of any personal protective equipment used or to be used;

- The results of the employees' exposure measurements, if available;

- The employee's anticipated or estimated exposure level;

- The results of the employee's biological monitoring; and

- Upon request of the physician, information concerning previous medical examination of the affected employee. [236]

**Biological Monitoring Program**

437.    Biological monitoring is a necessary element of a proper Medical Surveillance Program. However, biological monitoring is meant to complement, not substitute for, industrial hygiene exposure assessment.[237] Urine sampling and analysis is the appropriate biological monitoring method used in order to verify that the respiratory protection

---

[235] *Ibid.*
[236] *Ibid.*
[237] The Chlorine Inst., Inc., Pamphlet 156: Guidelines to Physicians in Conducting Mercury Medical Surveillance Programs (1998).

program is working properly. The method of analysis for total, ionic, and elemental mercury in urine is described in the American Industrial Hygiene Association Journal, September 1974, pp. 576-580. For the analysis at least 100 mL of urine should be collected during a workday when sampling is scheduled.

438.    Even if the OPERATING DEFENDANTS and/or CONTRACTOR DEFENDANTS had an effective medical monitoring program, they knew or should have known of the need to continue the medical monitoring program after the use of mercury at the FACILITY was discontinued. They should have adopted the CI document Pamphlet 125, "Guidelines – Medical Surveillance and Hygiene Monitoring Practice for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry." This document establishes the following requirements for a medical surveillance program.[238]

439.    A Medical Surveillance Program should be established for workers, including employees of contractors, who have the potential for exposure to mercury as determined by the exposure assessment. The medical surveillance program should be under the overall direction of a qualified physician. Many portions of the program can be implemented by any qualified medical professional. The detailed nature of pre-placement and periodic physical examinations is left to the professional judgment of the physician. The physician should be knowledgeable about both the job requirements and the health effects of mercury. Participation should be based on potential for exposure (e.g. job classification), or an appropriate alternate method. The medical examinations should:

- Be performed by a qualified medical professional experienced in addressing occupational medicine and mercury related issues.

---

[238] The Chlorine Inst., Inc., Pamphlet 125: Guidelines for Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (2004).

- Include pre-placement, periodic (e.g., annual), and exit-from-program exams for all participants.

- Include employees who may have been exposed to relatively large quantities of mercury during an emergency such as a massive spill or fire.

**Medical Surveillance and Biological Monitoring – Early Detection**

440.     To detect the adverse effects of mercury exposure as early as possible, at a stage where the damage is still reversible, a physical examination must be performed. This examination would also make it possible to prevent future adverse effects of exposure. The physical examination program should be integrated with industrial hygiene and biological monitoring information. Biological monitoring is also an integral part of the medical review and surveillance program. [239]

441.     As required by the EH&S Guidelines, the OPERATING DEFENDANTS and the CONTRACTOR DEFENDANTS [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN and CUSTOM MECHANICAL] failed to perform pre-placement biological baselines for workers such that the levels of exposures could be determined. The Defendants failed to perform follow-up physicals for workers exposed or potentially exposed to mercury. The results of the workers' biological monitoring program were not provided to occupational medicine professionals for evaluation contrary to OSHA regulations and other accepted standards of care. [240 & 241] No adequate yearly exams after hiring were performed on most of the Plaintiffs and no post-employment medical monitoring (exit examinations) were

---

[239] *Ibid.*
[240] OSHA., OSHA Instruction CPL 2-2.6: Inorganic Mercury and Its Compounds (1978).
[241] The Chlorine Inst., Inc., Pamphlet 125: Guidelines for Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (2003).

performed to evaluate the health of former workers following acute and chronic exposures to mercury.

442.    Upon the completion of the employee's physical examination, a qualified medical professional's opinion is to be written addressing the following:[242]

- The ability of the affected employee to perform the work with the appropriate personal protective equipment including respiratory protection.

- Any limitations in the ability of the employee to perform the work or use any necessary personal protective equipment should be discussed.

- Whether the employee has any medical condition that would place him/her at risk of health impairment from exposure to mercury.

443.    If the routine medical surveillance and non-routine medical review (first screening level) reveal objective signs compatible with mercury absorption, referral to an appropriate specialist may be considered for verification (second level). More complex diagnostic procedures or referrals to third-level specialists, such as a specialist in Occupational Neurology, may be required for more complex cases.[243]

444.    DEFENDANTS should have implemented a proper medical surveillance program under the direction of a physician or other qualified health professional. The failure to do so created a dangerous condition for workers.

445.    DEFENDANTS failed to perform proper pre-placement biological baselines to establish baseline levels of mercury in urine for workers performing work. Such a failure resulted in the levels of exposure to go undetected, which created a risk of injury and a dangerous condition for workers.

---

[242] *Ibid.*
[243] *Ibid.*

446.     The DEFENDANTS had an obligation to properly perform follow up physicals to evaluate the acute and chronic exposures to mercury. Their failure to do so created a dangerous condition for these workers.

447.     Through their Counsel, the Plaintiff Workers have formally requested the results of any biological monitoring or medical test results for the Plaintiff Workers.

448.     The DEFENDANTS should have performed proper post-employment medical monitoring. No exit medical examinations were performed to evaluate the health of former workers following acute and chronic exposures to mercury. The DEFENDANTS' failure to do so created dangerous conditions for workers.

449.     The DEFENDANTS should have provided proper written opinions following medical surveillance and non-routine medical reviews. The DEFENDANTS' failure to do so created a dangerous condition for workers.

450.     Upon information and belief, some of these DEFENDANTS improperly performed incomplete portions of a medical surveillance program. Nevertheless, failure to select and properly perform a complete medical surveillance program, which proximately caused the injuries suffered by the Plaintiffs.

451.     The failure of the DEFENDANTS to properly institute a complete and effective Medical Surveillance Program constituted a breach of industrial safety practice and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Written Respiratory Protection Program**

*EH&S Guidelines Required the DEFENDANTS to Establish a Written Respiratory Protection Program to Ensure Respirators Used by Workers are in Proper Form, Free from Mercury Contamination, and Effectively Used in the Field.*

452.   OSHA regulation 29 CFR § 1910.134(c)(2)(ii) states that "the employer must establish and implement those elements of a written respiratory protection program necessary to ensure that any employee using a respirator voluntarily is medically able to use that respirator, and that the respirator is cleaned, stored, and maintained so that its use does not present a health hazard to the user." Also, 29 CFR § 1910.134(h)(1) states that "the employer shall provide each respirator user with a respirator that is clean, sanitary, and in good working order. The employer shall ensure that respirators are cleaned and disinfected using the procedures in Appendix B-2 of this section, or procedures recommended by the respirator manufacturer, provided that such procedures are of equivalent effectiveness." [244 & 245]

453.   Respirators may be washed by hand or in the respirator washer. When it is suspected that respirators have been contaminated by mercury-contaminated materials, workers should use Mercon™ wipes to clean the respirator surface before placing it in the washer. Respirators are to be washed in the respirator washer after the Mercon wipe is applied. Escape respirators for SCBAs can be decontaminated by using Mercon wipes on the outside shell. Anything other than bleach and water on the mouthpiece should not be used.

454.   Based upon sworn testimony, such a respiratory protection program did not exist. If such a written document did exist, respirators were not made available, as required, nor were the workers required to wear them to prevent hazardous mercury exposure. For example, Plaintiff Direct Worker Jerry L. Pendergrass worked at the FACILITY and SISTER FACILITY longer than most, from 1998 until 2022. J. Pendergrass' sworn testimony describes it this way:

---

[244] 29 C.F.R. §1910.134.
[245] 29 C.F.R. §. 1910.134 App B2.

While I was working at the FACILITY and SISTER FACILITY, I was told that if I wore the PPE assigned to me and followed instructions, I would be safe. I did just this. I was never informed of the real dangers of mercury or mercury vapor and the symptoms of mercury poisoning we should look out for. People working at the FACILITY and the SISTER FACILITY would watch me and knew all the work that I was doing. No one from the FACILITY or the SISTER FACILITY ever told me that I was in danger of mercury poisoning. I was never warned by any of them that I would get mercury poisoning from doing the job the way I was doing it. I was aware that the FACILITY and the SISTER FACILITY were watching out for exposures and that some monitoring was being done. This made me trust that they were watching out for us and could be trusted to keep me and others safe. J. Pendergrass Aff, Ex. 14, page 17.

455.     The failure of the DEFENDANTS to create and implement an adequate written Respiratory Protection Program constituted a breach of Industrial Safety Practice and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

## Appropriate PPE Protection

*The Dangers of Mercury are so Significant that Personal Protective Equipment Must be Worn by all Individuals Working in Close Proximity to Mercury.*

456.     In addition to respiratory protection, protective clothing necessary to prevent dermal exposure to mercury was regulatorily mandated. Again, through sworn testimony, many of the Plaintiff Workers were not provided with appropriate protective clothing while working in and around mercury hazards. For example, Plaintiff Contractor Worker Michael W. Fife Jr. who worked for TURNER and PEN while at the FACILITY says:

"I wore my personal work clothes home. I had my personal boots, pants, shirt, and welding cap that I wore underneath my hard hat. I left the hard hat at work. Every now and then, I would sit down on the recliner when I got home, but usually the very first thing I did was change out of my clothes. I put them in with the family laundry. My wife says we went through two washing machines because of the chemicals on those clothes." Fife, Jr. Aff, Ex. 10, page 7 and 8.

**457.**     As another example, Plaintiff Direct Worker Stephen Price says:

> One time, I was working underneath a cell to repair a mercury alarm switch, which was connected to the cell switches. I was standing on a brine receiver pipe looking up at the floor of the cell. I used to do that frequently because I was small enough to operate between the other obstacles under the cell floor. I had a coworker or two that couldn't because of their size so it usually fell to me. It took OLIN more than two decades to decide that me standing on that pipe might not be the safest practice and find us another way to do it with less risk. One of the brackets that held this particular switch had mercury on it. I didn't know it. I turned the bracket to give myself enough room to remove the switch and that little splash of mercury fell into my mouth and ran straight down my throat. I didn't even have time to swallow or react. It was in my mouth and went down the back of my throat before I could blink. I had to remove mercury directly from my skin on a weekly basis for the twenty plus years I did this job. I had to remove mercury from my wrists or forearms where gloves didn't cover my skin and off my neck. This happened at least two or three times a week. S. Price Aff, Ex. 6, pages 2 and 3.

**458.**     For those provided with clothing, this clothing was particularly unsuited and created additional exposure hazards. Many of the uniforms provided were made of a cotton blend material. This material is highly absorbent. As mercury vapor filled the air in and around the employee workers, this vapor was absorbed into the clothing tasked with protection. Thus, the clothing worn became a source of mercury vapor exposure. These workers were walking around in a plume of mercury vapor sourced by the clothes they were wearing.

**459.**     Compounding the contamination was the fact that many of these contaminated uniforms were laundered together. While washing these uniforms together, they were cross-contaminating each other. The washing machines and dryers were also being cross-contaminated, thereby contaminating all that was washed therein. Therefore, for those Plaintiff Workers who were provided uniforms, these uniforms were contaminated with mercury and were another source of mercury exposure to these Plaintiff Workers.

**460.**     This is supported by the testimony of Plaintiff Workers. Here is how Plaintiff Direct

Worker William A. Hobbs describes his use of uniforms:

> We were issued several sets of cotton coveralls and a pair of steel
> toed rubber boots. Those were laundered at the FACILITY. I was
> issued a dual mercury/chlorine cartridge half-mask respirator
> ("Comfo II"). Safety goggles were made available to us, just not
> issued as standard. I did make use of them when unloading lime
> in the Shipping/Receiving department. We were issued safety
> glasses and leather gloves, not chemical gloves for mercury. They
> only came up to your wrists so if you stretched, your arm would
> be exposed. In the warm months I'd get liquid mercury or mercury
> sludge on my bare skin daily, but in the winter, I would go home
> with mercury sludge on the sleeves of my long johns every night.
> Hobbs Aff, Ex. 13, page 3.

**461.**     Plaintiff Contractor Worker Michael W. Fife Jr. explains the uniform process this

way:

> The FACILITY provided us with hygiene dress out clothes for
> tasks they designated as "mercury hazardous," like when the guys
> were working on cutting pipes and OLIN said there was potential
> mercury in them. We were given old, worn-out coveralls (they felt
> like denim), rubber boots, underwear, long johns in the winter,
> rubber gloves, a COMFO II (half-mask dual mercury and chlorine
> cartridge) respirator, and a full-face respirator for supplied air. The
> coveralls were in really bad shape. They were supposed to cover
> all of the body, hence the name, but most of them were so torn up
> that they had half of the sleeves missing, or entire sleeves gone
> altogether. They were too short in the legs for a lot of the guys,
> and there were holes in them. I do not know if my guys got
> chemicals splashed on them when they were wearing these, but I
> know they got wet in them a few times and the coveralls were so
> dilapidated they could not protect their bodies. The coveralls were
> not assigned to each person. They were hung up according to size
> in the clean side of the change house, and each person would grab
> clean ones in their size. I was fit-tested every year for the COMFO
> II (dual mercury and chlorine cartridge) half-mask respirator and
> was given a video every year on cleaning it. but I never wore it.
> We called the supplied air a "12 pack." There were 12 fresh air
> bottles and a bundle. The guys wearing the 12 packs would be
> hooked up to tanks with a full-face respirator. This supplied air
> would be required for those mercury exposure jobs even if they
> were outside. I was observing my guys who would be doing jobs
> that required them to wear supplied air, but I was not required to

wear it because I was supervising. The FACILITY did not tell me that I was in danger of exposure, too. There was a hot work barricade set up because hot work was considered dangerous with a potential for mercury to be released into the air. The guys inside the barrier would have to dress out and wear supplied air. I would stay behind the barricade in my personal clothes, without supplied air or other PPE. I had on my personal boots, pants, shirt, and welding cap that I wore underneath my hard hat. I left the hard hat at work, but I wore those personal clothes home and washed them with the family laundry. Fife Jr., Aff, Ex. 10, page 6.

462.     The Defendants, by implementing a defective PPE program, directly increased the mercury exposure suffered by the Plaintiff Workers. When working in the presence of mercury, protection is required for the eyes, face, and any additional exposed skin. Respiratory protection is also necessary for Plaintiff Workers and only those respiratory protection devices which meet the minimum respirator and filter requirements set by the National Institute of Occupational Safety and Health under the provision of 42 CFR Part 84 should be used. [246, 247, & 248] For the protection of the eyes, chemical safety goggles are required. A face shield (with safety goggles) may also be necessary. There should also be an established in-FACILITY procedure with means and facilities provided to issue respiratory protective equipment, to return used contaminated equipment, to decontaminate and disinfect the equipment, and to repair or exchange damaged equipment.[249]

463.     This is supported by the testimony of Plaintiff Contractor Workers. Here is how Plaintiff Contractor Worker Timothy K. Kelley, describes his use of cartridges for his respirator:

        None of the Contract Employees I worked with were ever fit tested. I don't think they tested any Contract Employees at all. The

---

[246] 42 C.F.R. § 84 4.
[247] 42 C.F.R. § 84 (2024).
[248] 42 C.F.R. § 84 (1997).
[249] OSHA., Instruction CPL 2-2.6: Inorganic Mercury and Its Compounds (1978).

really frustrating thing was that we could only get chlorine filters for the mask. I never had a mercury filter the whole time I worked at the FACILITY, and I was literally getting saturated with mercury working in the Cell House. If you needed to change filters, there were only certain times of the day when they'd accept them. By accept them, I mean I had to turn in my old ones with a date on them to indicate how long I'd had them before they would issue me another set. I usually kept a pair for about three weeks. After that they'd clog and get hard to breathe through. I wanted those chlorine filters for the occasional chlorine "gassing" that was inevitable. Everybody walked through little unseen clouds of chlorine gas from time to time. It would escape from a cell or a pipe. I don't know that they were doing me any good with the mercury vapor, and that was an all day everyday thing in the Cell House. Kelley Aff, Ex. 7, page 4.

**464.**     Plaintiff Contractor Worker Ward C. Donaldson describes his use of cartridges for

his respirator like this:

> We were supposed to have both mercury and chlorine cartridges in the respirator, but what cartridges we had in our respirators depended on which cartridges the FACILITY had available. Sometimes we had only a mercury cartridge in the respirator, sometimes we had only a chlorine cartridge in the respirator, and sometimes we had both. It depended on what cartridges the FACILITY had in stock. We complained about this to the PEN safety man Bob Davis and the PEN vice president Dave Dorman, but the FACILITY did not provide more cartridges to us. It did not matter to the FACILITY what cartridges we had in place as long as we wore the respirator. The FACILITY would not enforce or properly stock the cartridges. Affidavit of Ward C. Donaldson, Exhibit 22, page 2.

**465.**     This is further supported by the testimony of Plaintiff Contractor Worker Tim E.

Powers, who says:

> "When I first started working at the FACILITY operating the water truck and garbage truck, I wore my personal work clothes, steel toe boots, rubber gloves (leather gloves sometimes), safety glasses, a hard hat, and a dual cartridge half-mask ("COMFO II") respirator on my side. There were supposed to be mercury and chlorine cartridges in the respirator. I was never sure which cartridges I had in my COMFO II respirator. Both were pink. When it was time to change the cartridges, Dave Dorman, my PEN

supervisor, handed us new pink cartridges. He did not tell us which ones they were." Powers Aff, Ex. 3, page 7.

466.    When working in the presence of mercury, clothing which protects the skin is necessary. An evaluation of hazards and exposure assessment must be conducted to establish which protective measures to assign for the task. In some operations, it may be necessary to wear a chemical protective, full body encapsulating suit and self-contained breathing apparatus (SCBA) or supplied air respirator.

467.    NIOSH recommends the following respiratory protection options provided all respiratory protection equipment and filter media are NIOSH-approved:

- For the presence of organo alkyl mercury compounds in the air at a concentration not to exceed 0.1 $mg/m^3$, or the presence of up to 1.0 $mg/m^3$ of elemental mercury, any air-purifying half-mask respirator operated in continuous-flow mode with appropriate cartridge(s) and end-of-service life indicator ("ESLI"), or a supplied air respirator can be utilized; up to 0.25 $mg/m^3$ of organo alkyl mercury compounds or 2.5 $mg/m^3$ elemental mercury, any supplied-air respirator operated in a continuous-flow mode or any powered air-purifying respirator with appropriate cartridge(s) and ESLI can be utilized;

- Up to 0.5 $mg/m^3$ organo alkyl mercury or 5.0 $mg/m^3$ elemental mercury, any air-purifying full-facepiece respirator equipped with cartridge(s) and ESLI, or any air-purifying, full-facepiece respirator (gas mask) with a chin-style, front- or back-mounted canister and ESLI, or any supplied-air respirator that has a tight-fitting facepiece and is operated in a continuous-flow mode, or any powered air-purifying respirator with a tight-fitting facepiece and appropriate canister, or any self-contained breathing apparatus with a full facepiece, or any supplied-air respirator with a full facepiece can be utilized;

- Up to 2 $mg/m^3$ of organo alkyl mercury or 10 $mg/m^3$ elemental mercury, any supplied-air respirator operated in a pressure-demand or other positive-pressure mode, or any self-contained breathing apparatus that has a full facepiece and is

operated in a pressure-demand or other positive-pressure mode, or any supplied-air respirator that has a full-facepiece and is operated in a pressure-demand or other positive-pressure mode in combination with an auxiliary self-contained breathing apparatus operated in pressure-demand or other positive-pressure mode can be utilized[250] & [251]

**468.** Based upon sworn testimony, many workers were assigned half-mask respirators with mercury cartridges. Although these masks were assigned, the DEFENDANTS determined when the Plaintiff Workers were required to wear them. However, in order to be able to make such a determination, the DEFENDANTS would need to be regularly monitoring the environment for mercury as a hazard, assess objectively the likelihood for such a hazard to be present based on quantitative data as no other detection methods are available, and have identified all engineering and administrative protections. From there the DEFENDANTS would need to assess the overall combinate effectiveness of these protocols. Once such an assessment is complete, then they would be able to make an appropriate decision regarding the use of a respirator at a given time. In lieu of such activities, the true hazardousness is unknown and the environment should be treated as Immediately Dangerous to Life or Health (IDLH), which demands the highest levels of protection. [252] & [253]

**469.** An example of a Plaintiff Direct Worker's testimony regarding respirators is that of Donnie R. Webb. He worked at the FACILITY and SISTER FACILITY from 1998 until 2021, he was laid off in 2022. Here is how he describes the use of masks:

---

[250] NIOSH, Pocket Guide to Chemical Hazards, Mercury Compounds (Except Organo Alkyls) (2019).
[251] NIOSH, Pocket Guide to Chemical Hazards - Mercury (Organo) Alkyl Compounds (as Hg) (2019).
[252] 29 CFR § 1910.132.
[253] Ludwig, Howard R. et al. "Documentation for Immediately Dangerous to Life or Health Concentrations (IDLHs)" , 1994.

I was fit-tested for the COMFO II respirator every six months. We were trained on cleaning them. We were told to take out the old cartridges when they turned brown, put them in a baggie, and throw them away in a red barrel hazardous disposal area in the dirty side of the change house. We then were supposed to wash the respirator in the sink with hand soap and water. Sometimes, the hand soap dispenser at the sink was out of soap, so we had to just wash our respirators with water. Then, we put in new cartridges. It was our personal responsibility to check the cartridges and change them. The replacement cartridges were in the tool room. The cartridges were expensive, and I remember that Dave Dorman, the Vice President of PEN, was a penny-pincher. There were a few times when I was working at the FACILITY that he inspected old cartridges to make sure that they were truly brown and needed to be changed to new cartridges. Sometimes, if those old cartridges were just starting to turn brown, indicating that they were starting to become saturated with mercury, the workers in the tool room would tell us to wait to change them until a new shipment of cartridges came in. Ex. 15, pages 11 and 12.

470. For much of the work the Plaintiff Workers were doing, they were not required to wear their assigned half-mask respirators. Furthermore, many were not instructed on the proper replacement protocols for the mercury cartridges, proper cleaning, or proper storage of their masks. Based upon sworn testimony, much of the maintenance required "Hot Work". This work elevated the mercury vapor exposure, thus requiring supplied air respiratory protection. This higher grade of protection was often not provided.

471. Plaintiffs were often required to use "Shop Vacs" to vacuum mercury. This was often done with no respiratory protection. Such work, again, required supplied air respiratory equipment.

472. Evidence of this is found in the testimony of Plaintiff Contractor Worker Donnie R. Webb. He says this about vacuums:

I recall, once, in about 2016 or 2017, one of those big industrial dryers went out. OLIN maintenance went over and unhooked everything on that old dryer and took it out. I do not know what happened to it. After they took it out, Tony Nimmo notified me and Eddie to dress out in mercury hygiene PPE and get our

224

mercury-specific Shop-Vac to take care of a situation in the laundry room. There was about half a pint of beads of mercury underneath where that old dryer was. We vacuumed up the mercury and disposed of it in the pots like we were supposed to. All that mercury came out of the clothes. Mercury-contaminated clothing was being laundered repeatedly in these washers and dryers. I now realize that this was re-contaminating the clothing, so laundry was an endless loop of mercury contamination. Eddie and I were only required to wear our assigned cotton/polyester mix coveralls and rubber gloves while doing the laundry; we were not required to wear respiratory protection. Webb Aff, Ex. 15, page 18.

**473.** The failure of the Defendants to create and implement a proper PPE Program constituted a breach of EH&S Guidelines and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Job Safety Analysis Program**

*DEFENDANTS Failed to Properly Implement a Job Safety Analysis Program Resulting in Plaintiff Workers being Exposed to Toxic Mercury.*

**474.** Job Safety Analysis ("JSA") is an OSHA procedure that helps integrate accepted safety and health principles and practices into a particular task or job operation. In a JSA, each basic step of the job is analyzed to identify potential hazards and to recommend the safest way to do the job. [254]

**475.** A properly performed JSA will identify hazards and increase the job knowledge of workers. An exposure assessment, which is the process of estimating or measuring the magnitude, frequency, and duration of exposure to mercury, is a necessary component of the JSA. An exposure assessment will identify the number and characteristics of the workers that may be exposed. The exposure assessment will also describe the sources, pathways, routes, and uncertainties in the assessment. A JSA with an exposure assessment

---

[254] OSHA, Job Hazard Analysis, OSHA 3071, (rev. 2002).

will elevate the safety and health awareness of the job to be performed, improve the communication between workers and supervisors, and promote the acceptance of safe work procedures. [255]

476.    A JSA, or better still, a written work procedure based on it, can form the basis for regular contact between supervisors and workers. It can serve as a teaching aid for initial job training as well as a briefing guide for infrequent jobs. It may be used as a standard for health and safety inspections or observations, and a JSA will assist in completing comprehensive accident investigations.

477.    The four basic stages in conducting a JSA are as follows:

A.  Selecting the job to be analyzed;

B.  Breaking the job down into a sequence of steps;

C.  Identifying potential hazards;

D.  Determining preventive measures to overcome these hazards.

478.    Based upon sworn testimony, there was some form of Job Safety Analysis Program initiated by some of the Defendants. Nevertheless, it is clearly proven to be ineffectual since high mercury exposure work was being performed without the proper PPE. The current assignment of and required wearing of appropriate PPE is the product of the Job Safety Analysis Program. Failure to require proper PPE is prima facie evidence of an improper Job Safety Analysis Program.

479.    The sworn testimony shows that the PPE requirements were poorly managed in multiple departments of the FACILITY.

---

[255] *Ibid.*

480. Plaintiff Direct Worker Tim E. Powers had this to say about the lack of requirements for a respirator in the "812 Building" and the "510 Building":

> "Garbage Truck Operator- The FACILITY did not require all contaminated PPE to be left at the FACILITY. In fact, for those of us who did not have lockers, we had to take home our COMFO II respirators. If we left those at the 4 FACILITY, other people stole them because there were not enough COMFO II respirators at the FACILITY." Powers Aff, Ex. 3, page 7.

> "Cell Maintenance - The FACILITY did not require all contaminated PPE to be left at the FACILITY. In fact, for those of us who did not have lockers, we had to take home our COMFO II respirators. If we left those at the 4 FACILITY, other people stole them because there were not enough COMFO II respirators at the FACILITY." Powers Aff, Ex. 3, page 7.

481. The experience was similar for Plaintiff Direct Worker Eric A. Brokish:

> Mercury Recovery- If there was a lot of mercury on the floor, like thirty to forty gallons we would "squeegee" (a brand of tool that removes or controls liquids across surfaces) the mercury down instead. We also sprayed the backs of decomposers, the steps, and under any equipment that had dripped mercury since the day before. While performing this work, we were told that we were safe from mercury vapors because mercury could not vaporize with water. This is why all the catch basins had a dip leg on top: to catch and hold water. There would be a constant film of water over the top. The catch basins would fill up with mercury and the water overflow, then it would go around with a mercury pump into a three-legged pot.

> The pots of mercury we moved from cell to cell had lids, while others in storage did not. The lids had a three-inch flask with a bolt, and a rubber gasket that could be rotated around. We would have a paper with a list of cells that were low and needed to be filled with this potted mercury. Brokish Aff, Ex. 9, page 2.

482. Similarly, Plaintiff Direct Worker William A. Hobbs said this about the respirator requirements:

> I was issued a dual mercury/chlorine cartridge half-mask respirator ("Comfo II"). Safety goggles were made available to us, just not issued as standard. I did make use of them when unloading lime in the Shipping/Receiving department. We were issued safety glasses and leather gloves, not chemical gloves for mercury. They

only came up to your wrists so if you stretched, your arm would be exposed. In the warm months I'd get liquid mercury or mercury sludge on my bare skin daily, but in the winter, I would go home with mercury sludge on the sleeves of my long johns every night. I was fitted and fit tested for a mask that covered my mouth and nose when I first hired in, but never after. I was never shown how to clean that mask or even told that I needed to, so I rarely did. In fact, all of us left our masks hanging on an I-beam in the cell house when we were off duty. I didn't know it was soaking up mercury vapor while it hung there. From time to time, I would take my mask to a sink and rinse it out. Filter changes were not on a set schedule or any sort of regulation. I changed them out when they got hard to breathe through. We hardly ever wore them anyway. I wore it when I felt like I needed it. OLIN never considered this a problem while I was working there. Neither Mr. Thomason nor Mr. Odom ever said the first word to me about not wearing the respirator. We didn't even have to wear them when OSHA inspectors were in the building. All the production personnel were sent to the Break Room during inspections. Most of the time, those inspectors never got out of the van they were being driven around in anyway. Hobbs Aff, Ex. 13, page 3.

**483.**     This testimony is further supported by Plaintiff Contractor Worker Eric A. Brokish

when he was working for Defendant PEN at the FACILITY:

> Mercury would splash on me during rail change outs and fall on me when I was in the basement of the 812 Building. I often had mercury in my gloves, on my boots, and on my face. If I was doing a full rubber line, I would get half a cup to a cup of mercury splattered on me during one shift. Whenever I lifted a handrail, mercury would fall on my boots. If I took my respirator off, occasionally, I would get hit in the face with mercury and it would be in my respirator. A lot of times, mercury would get on my boots when I got inside a decomposer to swap the graphite out. I had to stand on what I was digging, and those rough graphite rocks were full of mercury. Brokish Aff, Ex. 9, page 9.

**484.**     This is supported by the testimony of Plaintiff Contractor Worker. Here is how

Timothy K. Kelley describes his use of cartridges for respirators when he was working for

Defendant PEN at the FACILITY:

> The really frustrating thing was that we could only get chlorine filters for the mask. I never had a mercury filter the whole time I worked at the FACILITY, and I was literally getting saturated with

mercury working in the Cell House. If you needed to change filters, there were only certain times of the day when they'd accept them. By accept them, I mean I had to turn in my old ones with a date on them to indicate how long I'd had them before they would issue me another set. I usually kept a pair for about three weeks. After that they'd clog and get hard to breathe through. I wanted those chlorine filters for the occasional chlorine "gassing" that was inevitable. Everybody walked through little unseen clouds of chlorine gas from time to time. It would escape from a cell or a pipe. I don't know that they were doing me any good with the mercury vapor, and that was an all day everyday thing in the Cell House. Kelley Aff, Ex. 7, page 4.

485.     At this time, it is unknown the extent to which the JSA process was followed at the

FACILITY. Regardless, the OPERATING DEFENDANTS and CONTRACTOR

DEFENDANTS knew or should have known that their implementation, if any, of the JSA

process was not effective to identify potential hazards and to ensure the jobs at the

FACILITY and SISTER FACILITY were performed in the safest possible way.

486.     The failure of the OPERATING DEFENDANTS and CONTRACTOR

DEFENDANTS to implement an effective Job Safety Analysis Program constitutes a

breach of EH&S Guidelines and legally constitutes a breach of the duty of care owed to

the Plaintiffs, which proximately caused their injuries.

## Chemical Safety Training – Mercury

*Due to the Extremely Dangerous Nature of Mercury, DEFENDANTS were Required to Undertake Extensive Safety Training of its Workers Relative to Chemicals Present at the FACILITY, Including, but not limited to, Mercury.*

487.     Safety Training and Education is required under OSHA Standard 1926.21, "Safety

Training and Education." Standard 1926.21(b)(2) states that "the employer shall instruct

each employee in the recognition and avoidance of unsafe conditions and the regulations

applicable to his work environment to control or eliminate any hazards or other exposure

to illness or injury." [256] Such programs as may be necessary to comply with OSHA Standard 1926.21 shall provide for frequent and regular inspections of the job sites, materials, and equipment to be made by competent persons capable of identifying existing and predictable hazards in the surroundings or working conditions which are unsanitary, hazardous, or dangerous to workers, and who have authorization to take prompt corrective measures to eliminate them, designated by the employers.

488.     Further, this standard also specifically mentions in 1926.21(b)(3) "Employees required to handle or use poisons, caustics, and other harmful substances shall be instructed regarding the safe handling and use, and be made aware of the potential hazards, personal hygiene, and personal protective measures required."[257]

489.     An employer who has a workplace in which elemental mercury or its inorganic compounds are stored and used, and where airborne mists, fumes, vapors, or dusts may be accidentally or intentionally be produced and released in the work environment due to handling, storage, or use is required by OSHA to inform employees who work or will be working with mercury or its inorganic compounds occasionally of potential health hazards.[258] Employers are required by OSHA to provide and perform the following:[259]

A. Inform employees of the correct work and storage practices, written emergency procedures to be followed in case of spills or leaks, and the personal protective equipment necessary in emergencies;

B. Provide employees equipment and/or materials necessary to control mercury-containing spills or leaks in quantity sufficient to control the entire amount of mercury or compound used;

---

[256] OSHA, Training Requirements in OSHA Standards and Training Guidelines, OSHA 2254 (1998).
[257] Ibid.
[258] OSHA, Instruction CPL 2-2.6: Inorganic Mercury and Its Compounds (1978).
[259] Ibid.

C. Provide written procedures and means for removal of mercury or its compounds from body surfaces and working surfaces, machinery, or tools to be used later for other work activities;

D. Establish limited areas within the workplace where mercury or its compounds can be used; and

E. Assure that the permissible exposure limit is not exceeded in the work environment during the occasional uses.

490. Employees are to be trained at the time they are assigned to work with a hazardous chemical such as mercury.[260] The intent of Hazard Communication, the act of informing persons likely to come into contact with a hazardous substance about the dangers it may present and how they might be exposed, is to provide information to the employee prior to exposure to prevent the occurrence of adverse health effects. The training provisions of Hazard Communication are not satisfied solely by giving employees the Safety Data Sheets ("SDS") to read.[261] An employer's training program is to be a forum for explaining to employees not only the hazards of the chemicals in their work area, but also how to use the information generated in the Hazard Communication Program. This can be accomplished in many ways (audiovisuals, classroom instruction, interactive video), and should include an opportunity for employees to ask questions to ensure they understand the information presented to them. Training need not be conducted on each specific chemical found in the workplace but may be conducted by categories of hazard (e.g., carcinogens, sensitizers, acutely toxic agents) that are or may be encountered by an employee during the course of their duties. Furthermore, the training must be comprehensible.

---

[260] 29 CFR § 1910.1200(h).
[261] *Ibid.*

**491.** With respect to mercury, the training program should:

- Advise the affected employees of the signs and symptoms of over-exposure to mercury;

- Instruct affected employees to advise the employer of the development of the signs and symptoms of overexposure to mercury;

- Inform employees of the specific nature of operations which could result in exposure to mercury above the permissible exposure limit, as well as safe work practices for the handling, use, release, storage, or disposal of the mercury or its compounds in normal operations;

- Instruct employees in proper housekeeping practices, decontamination procedures in the event of a mercury or mercury compound spill, and fire emergency procedures;

- Emphasize the possibility of ingesting mercury by hand-to-mouth contact when good personal hygiene is not practiced;

- Inform employees of measures necessary to protect them from exposures in excess of the permissible exposure limit. The wearing and turning-in of protective clothing should be stressed;

- Instruct employees as to the purpose, proper use, and limitations of respirators;

- Provide employees with a description of, and explain the purposes for, the medical surveillance program; and

- Inform employees where written procedures and hazard information are available on the premises.

**492.** Based upon sworn testimony, a complete and full disclosure of the hazards of mercury was never provided to Plaintiff Workers. Quite the contrary is true. Plaintiff Workers were assured that the mercury at the FACILITY would not harm them. They were

further assured that if they were to be exposed, the levels of their exposure would not harm them.

493.    Tim E. Powers, the Plaintiff Contractor Worker we have heard from on other issues, said it this way:

> "When I first started at the FACILITY, during orientation, I was told mercury was safe to be around. Dave Dorman, my supervisor for PEN, told me that mercury levels at the FACILITY were safe." Powers Aff, Ex. 3, page 12 .

> While I was working at the FACILITY, I was told that if I wore the PPE assigned to me and followed instructions, I would be safe. I did just this. I was never informed of the real dangers of mercury or mercury vapor and the symptoms of mercury poisoning we should look out for. People working at the FACILITY were aware of all the work that I and others were doing. No one from the FACILITY ever told me that I was in danger of mercury poisoning. I was never warned by any FACILITY employee that I would get mercury poisoning from doing the job the way I was doing it. I was aware that the FACILITY was watching out for exposures and that some monitoring was being done. This made me trust that they were watching out for us and could be trusted to keep me and others safe at our FACILITY. Powers Aff, Ex. 3, page 12.

494.    Plaintiff Direct Worker Johnny L. Carson had a similar experience. Carson trusted what he was told about mercury:

> The biggest part of my twenty-seven years at the FACILITY was spent worrying about one thing, mercury. When working as an Environmental Technician, part of my job was testing and actively monitoring the air in every building onsite to monitor the mercury in it. The Cell House was a persistent problem and the warmer temperature got outside, the harder it was to control. There were times when I had to "post" areas for high mercury content where I did not see mercury. Vapors go where they are carried, and I had no control over that. I just had to do my job as best I could and provide warnings along the way using the guidelines I was given. All the rest of it was up to OLIN.

> When working as an Environmental Technician, another part of my job was testing and actively monitoring the dirt. I tested the dirt around the drains and sump pumps between buildings. I tested the dirt in landfills that the FACILITY had long ago covered over

and tried to forget about. I tested dirt at the bottom of wells that most FACILITY officials didn't even know was on the property. I tested dirt by the river, and by the roads. I tested dirt from the waste ponds and the Hazard Dome. I tested all that dirt from all those places and for all those years for one thing, mercury. I did not always like what I found, because very often I found too much mercury. There were places where mercury readings far exceeded what was allowable by government standards. I knew those standards. It was my job to know those standards. There was too much mercury for the FACILITY to control. It was in puddles on the Cell House floor and ran down the rafters and beams into the basement. At the end of a shift, those Cell House guys just took a water hose and washed what was lying on the floor of the maintenance shops down a drain. They did that every day, more than once a day. The TRU was awful. Everything that was taken to that building went for one reason. This has too much mercury on it or in it, and we can't use it anymore. The FACILITY would burn it and get as much of the mercury back as they could. The kiln was old, and it leaked and that whole building was mercury soaked. I'm not sure all that testing and monitoring I did was worth much. At the end of the day, the FACILITY did as it pleased. I think now that a lot of people got hurt, including me. There was just too much mercury. Carson Aff, Ex. 5, pages 9 and 10.

"While I was working at the FACILITY, I was told that if I wore the PPE assigned to me and followed instructions, I would be safe. I did just this. I was never informed of the real dangers of mercury or mercury vapor and the symptoms of mercury poisoning we should look out for." Carson Aff, Ex. 5, page 12.

495.    Plaintiff Contractor Worker Tim E. Powers sums it up this way:

"I did not know to assume anything that officials at the FACILITY told me was anything other than true. I trusted the nurses and the supervisors to keep me safe." Powers Aff, Ex. 3, page 12.

496.    Informative training and information were clearly not provided to the Plaintiff Workers; quite the contrary is evidenced. Defendants fraudulently informed the Plaintiff Workers that the exposures they were experiencing would not harm them. Plaintiff Workers believed that Defendants would keep them safe at the FACILITY.

497. The failure of the Defendants to create and implement a proper Chemical Safety Program constitutes a breach of Industrial Safety practices and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

498. Plaintiff Worker Alex Shaw worked for a Contractor Defendant at the FACILITY and on what OLIN described as the "Dirty Deeds Crew". Here is an example of the dirty and harmful tasks he performed when he was employed by Contractor Defendant BILFINGER, formerly known as FRUCON:

> What we were expected to do was clean out what they called a gravity filter. This was not a filter that could be changed out like the air filters in a home. This was a filter that you climb down into. It was eight feet square and about twelve feet deep. There were thirty of them, fifteen for each side of the Cell House. We cleaned a couple of them every two to three months. Those Maintenance guys wanted us to replace some sensors on the floor of the gravity filter. That was the end game. Before we could do that, they wanted a couple of us from the "Dirty Deeds Crew" to climb down into the filter and use the Hurricane truck to suck out a bunch of spent carbon. Hurricane is a brand name. They make trailer or truck mounted high-powered industrial vacuums. The FACILITY owned one that was trailer mounted and pulled around the FACILITY by truck. Everyone just called the whole set up the "Hurricane truck." The operators told us we should "dress out," as we called it. To "dress out" meant changing into coveralls and rubber boots like we would wear in the Cell House. They said there was no mercury in the Brine Area, but it would be a dirty job and we would not want all that carbon on our clothes. I thought that made sense. I asked if we needed a respirator or supplied air. They said, "No, everything's good." I was young. I believed them. They didn't give me any reason not to. Anytime someone needs to work inside a tank or enclosed area like that, one of the safety guys used a "sniffer" to make certain there was no danger of an explosion. (Sniffers are handheld devices that test for different things. You can buy them to check for hydrogen, mercury, or other hazardous materials.) I am assuming the sniffer he used that day was for hydrogen gas. He could have been testing for mercury or chlorine. I did not ask. Once he cleared us to go in, we did. The Operators were right. It was nasty. I took a black, corrugated hose with me

from the Hurricane truck and used it to remove the carbon buildup. When all that was done, the carbon was emptied into what they called a "super sack." It was a heavy-duty bag that was transported by a forklift. Then, they took the bag to the Thermal Recovery Unit ("TRU") to be incinerated. If it were not hazardous material, they could have dumped that carbon into any dumpster onsite. It would not have to be burned. Non-hazardous waste could go into any landfill. They took that carbon to be burned every time I cleaned the gravity filter. Almost a decade later, I found out why. I was already down in the filter doing the job when OLIN's Supervisor over the Brine Area showed up with a mercury sniffer. His name was Tyrone Calfee. I do not know why he had a mercury sniffer that day, but he stuck it down into the filter with us. The next thing I knew, he was shouting at us to get out. He said the mercury reading was "off the chart," and instructed us to go shower immediately. Further, we were ordered never to go back into the gravity filter without a respirator. I found out later that the brine system was on a loop that sent freshly mixed brine into the Cell House and brought used (and highly contaminated) brine back out to be remixed. I climbed in and out of those gravity filters dozens of times, breathing air so contaminated it was "off the chart," as Mr. Calfee said. I did so without a respirator because I was told I did not need one. Those Maintenance men told us there was no mercury in there. Shaw Affidavit, Exhibit. 37, pages 4 and 5.

499.    The testimony of Plaintiff Worker Alex Shaw demonstrates that Contractor Defendant BILFINGEER, formerly known as FRUCON, had the Dirty Deeds Crew doing clean up work in multiple areas of the FACILITY that increased the chemical exposure for other workers.

500.    The failure of the OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS to implement an effective Chemical Safety Program constitutes a breach of EH&S Guidelines and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Decontamination of Workers' Bodies to avoid Cross Contamination**

*Individuals Working at Chlor-Alkali Facilities, Like the Plaintiff Workers, Must Decontaminate Their Bodies and Clothes in Order to Avoid Contaminating Their Homes and Loved Ones.*

501.    Workers performing tasks where mercury exposure has occurred must decontaminate their hands prior to entering any clean room area. Hands should also be cleaned prior to eating and using tobacco products should be prohibited. Bar soaps are not recommended because they can transfer contamination. [262] OSHA makes the following minimum requirements regarding workers exposed to mercury:[263]

A. Workers subject to skin contact with liquid mercury should wash with soap or a mild detergent and water any areas of the body which may have contacted mercury at the end of a workday.

B. Skin that becomes contaminated with mercury should be promptly washed or showered with soap or mild detergent and water to remove any mercury.

C. Eating and smoking should not be permitted in areas where mercury is handled, processed, or stored.

D. Employees who handle mercury should wash their hands thoroughly with soap or a mild detergent and water before eating, drinking, or using toilet facilities.

E. Employers should provide hand brushes and employees should be instructed to use hand brushes on fingernails while their hands are submerged in water.

F. Used paper or fabric towels exposed to mercury should be treated as contaminated.

G. Personal belongings normally worn on the hands and wrists should not be brought into contact with mercury or it compounds and frames of eyeglasses should be cleaned thoroughly following every shift.

---

[262] Ross Healthcare, Inc., Mercury Hygiene Program Decontamination Procedure (2007).
[263] OSHA, Occupational Health Guideline for Inorganic Mercury, (1979).

H. Contact lenses should not be worn in areas where one may be exposed to mercury vapors, dusts, or mists.

502.     According to Euro Chlor, clothing worn by personnel who are working in a Chlor-Alkali plant using the mercury process will be contaminated with mercury, and persons who handle such clothing have a potential for exposure. Clothing awaiting collection or being transferred to the laundry should be kept in a sealed bag or closed container clearly labelled as "mercury contaminated clothing," and, additionally, Euro Chlor offers the following recommendations:[264]

    a. In order to avoid exposure of external personnel, it is highly recommended that laundering should be done at the work location, separated from laundering of other work clothes from the plant.

    b. If this is not feasible, the management of the external laundry should be informed about the health effects of mercury exposure, possible exposure routes, best practical working procedures and medical surveillance. A risk assessment for external laundering should be carried out.

    c. Mercury is very retentive in clothing. Oxidative bleach and acidic rinsing will assist in removal of mercury from clothing.

    d. Occasional measurements for mercury contamination of cleaned work clothes could be made to ensure that laundering has been effective.

    e. Waste mercury in washing water should be handled as contaminated mercury water and must be disposed of following national guidelines.

---

[264] Euro Chlor, HEALTH 2 - Code of Practice: Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (6th ed. 2010).

503. The Chlorine Institute states that "all work clothing should be removed in change rooms and deposited in marked laundry containers. If clothing is not laundered at the plant, the laundry that will be cleaning the clothes should be informed that the clothes may be contaminated with mercury. Contaminated clothing or footwear should not leave the plant except in packages for laundry, decontamination, or disposal." [265]

504. Based on sworn testimony, the OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS failed to exercise due diligence regarding decontamination in the basic ways. First, they failed to make available decontamination showers to many Plaintiff Workers. Secondly, they failed to supply and properly decontaminate uniforms to protect from dermal exposure.

505. OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS operated in an unsafe manner that injuriously caused mercury to be transmitted outside the FACILITY and SISTER FACILITY to the Plaintiff Family Members who were in close contact to the mercury contaminated clothing of Plaintiff Workers.

506. Plaintiff Workers were clearly not able to properly decontaminate themselves prior to leaving the site and returning home to their families.

507. Additionally, the OPERATING DEFENDANTS and the CONTRACTOR DEFENDANTS allowed contaminated uniforms to be cross contaminated with each other.

508. Based upon sworn testimony, some Plaintiff Workers were supplied with work uniforms. Most of these uniforms were washed onsite by the OPERATING DEFENDANTS' workers. These uniforms were contaminated with mercury. As they were

---

[265] The Chlorine Inst., Inc., Pamphlet 125 Guidelines - Medical Surveillance and Hygiene Monitoring Practices for Control of Worker Exposure to Mercury in the Chlor-Alkali Industry (2004).

laundered, they often cross-contaminated the other uniforms. In addition, this process cross-contaminated the washing machine and the dryer.

509.     As the OPERATING DEFENDANTS laundered these uniforms week after week, these uniforms were cumulatively contaminated, increasing their toxicity week after week. As a result, those wearing these contaminated uniforms were wearing a mercury vapor source every day while they worked.

510.     During the course of operations, OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS    failed to protect the Plaintiff Workers from contamination. This affected both Plaintiff Direct Workers and Plaintiff Contractor Workers.

511.     These dramatic events are illustrated in the following sworn testimony from Plaintiff Contractor Worker Donnie R. Webb, who worked at the FACILITY from 1978 until 2020.

> The change house was made of three rooms: the clean room, the shower room, and the dirty room. In the morning when I came to work, I would take off my personal clothes and put them in my locker on the clean side. I would put on my clean uniform for the day and walk around to get my work boots from the dirty side. At the end of the shift, I would take everything off to put in the laundry in the dirty room. Everyone was supposed to go over to some little tubs on the floor, step in them with our boots on and run them over some brushes. Whoever was doing the laundry would wash mine and everyone's work boots off. Then I would shower and go to the clean room to put on my personal clothes to leave the FACILITY.  Webb Aff, Ex. 15, page 17.

512.     The failure of these OPERATING DEFENDANTS to properly decontaminate contaminated uniforms created added sources of mercury contamination increasing the exposure of mercury vapor to Plaintiff Workers as well as creating cross-contamination exposure to the Charleston Community, thus creating a public health threat.

513.     In addition to not properly decontaminating uniforms supplied, these Defendants often failed to supply uniforms at all. Many of those working at the FACILITY were not supplied uniforms, thus, they were working in a highly contaminated environment in their personal work clothes. Wearing these personal work clothes home clearly presented a health threat to their families.

514.     The contamination of personal work clothes is illustrated in the following sworn testimony from Plaintiff Direct Worker Johnny L. Carson, who worked at the FACILITY from 1977 to 2004:

> For most of my time at the FACILITY, I wore the same clothes and boots home that I had worn at work all day (my personal work clothes). I had a locker in the lab, so my hard hat, gloves, and glasses stayed there. I know there was mercury on the ground in the Cell House and TRU particularly. I know there was mercury mud at the Waste Ponds, around the RCRA Pad, around the central sump, and numerous other places around the FACILITY. Mercury would have been on my boots. I know there was liquid mercury on the walls and pipes and equipment in those places that I brushed up against while performing my duties for the Environmental Department. There would have been residual mercury on my personal work clothing. I know there was mercury in the air because I was the one testing for it. I was the one reading and recording the levels in every building. So, there was mercury vapor in my personal work clothing as well. My personal work clothes and my children's clothing all got washed and dried in the same machines at home. I stopped at the gas station on the way home, or the grocery store. I played with my sons when I got home, or helped with homework, or cooked a meal. I hugged and kissed my wife in those personal work clothes. Carson Aff, Ex. 5, page 11.

515.     Plaintiff Family Members saw mercury contamination of the clothes of the Plaintiff Workers living with them, which resulted in cross-contamination in the home. For example, Stephen Price describes this way regarding his wife Sherry:

> I spent a lot of time brushing up against equipment with mercury on it and in it. I spent twenty-seven years walking on floors that had elemental mercury on them. Because mercury was on the floor

and the equipment, it was in the air. I spent twenty-seven years walking on contaminated ground and walking through contaminated air in personal work clothes that I wore home for my wife to wash alongside my children's clothes. I hugged my wife and played with my kids in those personal work clothes. I'll never know how many little splashes of mercury I carried home on a shirt sleeve or a pant leg. I'll never know how wearing the personal work clothes home that I wore in contaminated air for twelve-hour shifts has affected all of them over the course of all those years." Price Aff, Ex. 6. page 8.

She shares many of the same symptoms that I currently experience. She's dealing with memory problems, particularly short-term. Hers is worse than mine already. She's also been diagnosed with Peripheral Neuropathy and deals with the accompanying leg pain. She also has very pronounced mood swings and emotional issues. She has similar bouts with depression. Despite taking (prescribed) Xanax to help her sleep, she still doesn't sleep very long at a time either. Somewhere between four to maybe six hours a night is all she can get. Price Aff, Ex. 6, page 9.

516.     The OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS were fully aware of the mercury exposure experienced by all Plaintiff Workers while at the FACILITY and SISTER FACILITY, whether employees of the OPERATING DEFENDANTS or the CONTRACTOR DEFENDANTS.

517.     These Plaintiff Workers went home in their vehicles and home to their families in the same work clothes and boots they had been wearing while working at the FACILITY and/or SISTER FACILITY.

518.     Failure of OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS to design, implement, monitor and enforce an appropriate Decontamination Program constitutes a breach of EH&S Guidelines and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Plaintiff Workers Were Highly Exposed During Decommissioning and Demolition**

*The D&D Process, Due to its Inherently Dangerous Nature, is Highly Regulated to Ensure That Systems are in Place to Manage the Safety of Those Involved in the D&D.*

519. The requirements that are essential for protecting workers during operation and maintenance of a Chlor-Alkali facility become even more important during the D&D Process. As the Chlor-Alkali industry knows, the risks increase exponentially during a D&D event.

520. Let us now turn to examples of Industry and Regulatory Agencies' considerations in other D&D sites.

521. The D&D at the Maine HoltraChem/Mallinckrodt site may be taken as an example of good planning. Their Phase 4 Supplement to the Decommissioning and Demolition Plan establishes the following air monitoring program in the work zone for the control of worker exposure. [266]

- Air monitoring will be performed within the active work zones to: 1) assess the appropriate level of health and safety respiratory protection required to perform the work, 2) evaluate the effectiveness of mercury vapor controls, and 3) assess the average ambient air concentration. Work zone ambient air measurements will be collected daily at a minimum, and once per shift if more than one shift is performed. Air quality measurements will be collected using either a Jerome Model 431X or Bacharach Model MV2 mercury vapor analyzer.

- If concentrations in ambient air exceed 0.1 mg/m$^3$, the activity creating the mercury vapors will be suspended and work practices will be evaluated and modified as needed to reduce vapor generation. These methods worked well in the cell process dismantling project and are

---

[266] Mallinckrodt, Phase 4 Supplement to the Decontamination and Demolition Plan, (2006).

anticipated to adequately protect workers and the environment during this phase.

522.     The Health and Safety Plan for Decommissioning and Demolition at the LCP Chemicals plant in Brunswick, Georgia offers another good example of sufficient planning and establishes the following air monitoring program in the work zone for the control of worker exposure. [267]

- Monitoring will be conducted in the breathing space of the workers. Air monitoring data will be entered in the site health and safety logbook. This will include calibration data and all readings collected. Two types of air monitoring will be undertaken: (i) direct reading; and (ii) air sampling. The direct-reading measurements will be used to evaluate local and immediate hazardous situations. Air sampling will be used to characterize the specific constituents present and to predict which constituents might pose a hazard for future operations at the site, specifically the removal action.

- The LCP FACILITY had an established mercury monitoring system in place for the Cell Buildings. This system continued during work in the cell rooms.

523.     The United States Government has established specific standards that governed several aspects of the D&D process at the FACILITY. First, OSHA has established regulations for Process Safety Management of Highly Hazardous Materials ("PSM"). The OSHA standard for PSM (29 CFR § 1910.119) emphasizes the management of hazards associated with highly hazardous chemicals and establishes a comprehensive management program that integrates technologies, procedures, and management practices.[268]

---

[267] LCP Chemicals, Inc., Health and Safety Plan,68-69 (1994).
[268] 29 CFR § 1910(h).

524. As a FACILITY that manufactures chlorine, the FACILITY is covered by the requirements of 29 CFR § 1910.119 including its requirements for the Management of Change ("MOC") which applied to the D&D process. The regulatory requirements of PSM remain in place until less than 1500 pounds of chlorine remain on site and the site is deregistered from the PSM program.

525. While OPERATING DEFENDANT OLIN owned and operated the FACILITY, it performed D&D of the mercury cell operations. Initially, while the mercury cell system was still being utilized to produce chlorine, OLIN performed D&D on two of its mercury cells. This was done to install a test system of the new mercury-free membrane production section.

526. While the remaining cells were in operation, OLIN performed additional D&D activities at the FACILITY. OLIN demolished additional cells as it transitioned to the mercury-free membrane cells.

527. Following these events, OLIN proceeded to Decommission the remaining portion of the mercury cell system. Once the mercury cells were Decommissioned, OLIN then performed Demolition of certain component parts of this system.

528. This sworn testimony of Plaintiff Direct Worker Jerry L. Pendergrass explains his work on the D&D at the FACILITY as follows:

> Every day or every other day during decommissioning, I would have been either in the HAN building (30 to 40 feet away from the Cell House), in the administration building (50 to 60 feet away from the Cell House), or in the Cell House removing old cables. So, for 40 hours a week during the entire duration of decommissioning, I would have been around the Cell House with no respiratory PPE. I know the FACILITY had monitoring systems and environmentalists and that monitoring should have been taking place, but I did not witness any monitoring taking

place during the time of decommissioning. J. Pendergrass Aff, Ex. 14, page 8.

529.    This sworn testimony of Plaintiff Direct Worker Jeffery D. Casteel explains his

work on the D&D at the FACILITY as follows:

> In my Prior Affidavit, I discussed how OLIN'S decommissioning of Cell Houses followed the same script. Tear it down. Save what you can. Get rid of the rest. Cover up all the mercury in the ground with asphalt, concrete, and a new building. OLIN had two specialized crews, one of which showed up at every decommissioning and demolition site. One was called Southeast Regional Engineering. The other was called Southwest Regional Engineering. Those were the guys that were responsible for making sure EPA and OSHA guidelines were followed, especially where contaminated equipment was concerned. They were the ones responsible for cleaning and testing everything that came out of the building. They were the ones to decide if materials were buried onsite, or if they were "clean" enough to be shipped to a non-hazardous landfill elsewhere. They decided if metal could be cut up and sold as scrap, if it needed more decontamination, or if it was hopeless and just had to be buried. Suppl. Affidavit of Jeffery D. Casteel, Ex. 39, page 2.

530.    Plaintiff Contractor Worker Donnie R. Webb talks about the involvement of

CONTRACTOR DEFENDANT PEN on the D&D work. Webb worked for PEN and his

mercury levels in urine tests were high:

> During the decommissioning and demolition of the old Cell Buildings, my mercury levels in urine tests kept climbing. I could not figure out why because I had switched to being an outside Lead Man at that point; I was outside with the roll-off dumpsters. I met another worker who had the same problem. We figured out the reason for this ourselves. It was so cold when we were working out there, and our rubber boots did not have any insulation. We would have to go inside the building to stick our feet under the steam heaters and warm up. We decided to quit doing that because we thought that heating our boots might have caused any mercury on them to heat and vaporize. After we stopped doing that, our levels started going back down. Webb Aff, Ex. 15, page 13.

531.    Plaintiff Contractor Worker Timothy K. Kelley talks about his work as a Foreman

during D&D of the 812 Cell Building and the 510 Cell Building:

I was named Foreman over a Crew of Demolition Workers when the time came to tear down the 812 Building and 510 Building in the Cell House. It was a long process to take those two buildings and every piece of equipment in them apart, piece by piece. There was a mountain of equipment carried off to the Hazard Dome to be buried and there was a massive amount of mercury. Most of the cell parts were carried off to the Hazard Dome, but I did see some of the cell tops cut up and sold as scrap. I think it was sold to an outfit out of Chattanooga called Ingraham, but I couldn't swear to it. I don't know if they cleaned the mercury off or out of that stuff before sending it off the property. None of that was my responsibility. I was too busy taking apart pipes, pumps, walls and girders, even the concrete flooring. It all had to go, and it all had mercury in it. I remember shoveling out ditches underneath concrete we had broken up and mercury falling off the shovel. You could see it running into any hole that the big back hoes dug under the old foundations. It just came flowing out of the dirt. It was obvious that mercury had been leaking for decades. I saw the same thing later at OLIN'S Augusta (Georgia) FACILITY. I proved myself in the process of taking those buildings down at the FACILITY, so OLIN had my superiors send me to run a crew in Augusta and do it all over again at a Cell Building there. I spent fourteen months there witnessing the same kind of mercury contamination. Kelley Aff, Ex. 7, page 7.

532.    While performing this work, OLIN elevated the mercury vapors and mercury exposures of all those working at the FACILITY and the SISTER FACILITY.

533.    Upon information and belief, OLIN failed to perform a proper pre-D&D safety analysis. It failed to design a new safety plan for this increased exposure potential and failed to increase safety practices to protect against these exposures.

534.    During the course of these events, again, OLIN failed to conduct a Safety Analysis, draft a Safety Plan and implement those Safety measures required.

535.    The failure of OLIN to perform these safety measures violated the accepted Industrial Standard of Care and constituted a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

536. Based upon affidavit testimony and further information and belief, OLIN contracted with certain CONTRACTOR DEFENDANTS to perform the D&D activities at the FACILITY.

537. The harmful actions of OLIN and certain CONTRACTOR DEFENDANTS during D&D of the FACILITY were done in an unsafe manner that created an unreasonable and foreseeable risk of harm to Plaintiff Workers at both the FACILITY and the SISTER FACILITY.

538. The failure of the OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS to implement an effective Job Safety Analysis Program constitutes a breach of EH&S Guidelines and legally constituted a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Contamination Transported Offsite**

*Materials Contaminated with Mercury were Routinely and Consistently Transported from the FACILITY, Resulting in Cross-Contamination.*

539. During the operation of the FACILITY by the OPERATING DEFENDANTS in conjunction with the work done by each of the CONTRACTOR DEFENDANTS , it was common for materials contaminated with mercury and other toxicants to be transported offsite as regular waste or scrap. Plaintiff Direct Worker Johnny L. Carson explains it this way in his sworn testimony:

> Once, a contracting company, which I don't recall the name of, was supposed to come to reline the kiln, which is where the mercury-contaminated materials were burned. The rubber would wear down over time due to the heat and chemicals. That morning, I was doing my routine mercury reading of the building. The mercury limit was 50 PPM, but my Jerome meter was reading 278 PPM. I put on my half-face respirator to continue my morning checks, which included airing out the building. When I checked later, it was still reading in the two hundreds. I couldn't let those

contractors in with the mercury levels being that high in the building. My boss, Laurie Purdy, came down to see why I wasn't letting the contractors in, and I showed her my readings. I told her I double checked it and it's giving me the same reading. I got called into a meeting with the OLIN supervisors about the incident, and they weren't happy with me. I thought I was doing my job by keeping those guys safe. They didn't have any PPE that would protect them from the mercury levels. I got reprimanded in front of everybody that day. They told me that the job needed to get done or the EPA was going to write them up for falling behind. These supervisors showed us all that they didn't care about the people they hired, they only cared about the job and money.

There was a storage pad where my co-workers and I could leave mercury-contaminated materials for up to a year. At the same time as the situation with the contractors was going on, materials had been sitting on that pad for nearly a year, so their time was almost up. I had emailed Laurie about it, but nothing happened, and another year passed. Laurie wrote everyone up in the building, and I refused to sign my write-up. I showed her the email that I sent her warning her that the materials were about to expire. Therefore, I did not get written up. Carson Aff, Ex. 5, pages 5 and 6.

540.     During the operation of the FACILITY, OLIN would send mechanical parts out for repair, rework and rebuild by outside contractors. These mechanical parts included anodes, pumps, decomposers, shafts, seals, and the sides and bottoms of the cells themselves. In doing so, OLIN failed to inform, train or warn these outside contractors that these materials were contaminated with mercury and other toxicants. When working on and with these contaminated materials, these outside contractors were exposing their workers to mercury and other toxicants. A recent example of contaminated parts being sent out of the FACILITY is provided by the sworn testimony of Plaintiff Direct Worker Johnny L. Carson:

The RCRA Pad was a combination of things. It was a short-term, ninety-day storage area for mercury-contaminated materials and a wash pad for other things that could be washed and reused. I used a mercury sniffer to test the things they washed there, and I would okay them for reuse, or I would insure they could be safely sent offsite. There is a more accurate test called drill sampling or core

sampling. It works just as you would think. You drill a hole into a piece that has been taken out of service and decommissioned and take a core sample for testing. It's a much more thorough test and gives a more accurate picture of the long-term condition of that metal. I never did any of that. I don't ever remember seeing anyone else use that method. We did it a lot with ground samples, taking cores from landfills and wells and such. I never did it on any piece of equipment that was going to the Hazard Dome or to an offsite storage FACILITY. I never understood why we didn't utilize that tool. A lot of the scrap from the FACILITY was sent to other OLIN sites. Some would be carried off by big scrapping companies, but nothing was supposed to leave the site if it didn't meet certain standards first. One big scrap outfit, I can't remember which one just now, had a terrible experience with some forty-gallon mercury pods. They had picked them up, after supposedly being cleared for transport offsite. I don't know if they were properly inspected and cleared before they got loaded up and carried off or not, but the scrap guys started doing what they do. They started cutting on one with a cutting torch and watched as mercury came pouring out. It could have been residual mercury that wasn't easy to see until the pod was heated by the torch. It could have been a pod that just got overlooked at inspection. The phone rang with a foreman from the scrap yard on the other end saying that there was silver stuff coming out of this flask we picked up. The FACILITY told them to hold everything, and they sent a crew to that scrap yard to bring the whole load back. It doesn't matter who made the mistake, it was a serious oversight. Carson Aff, Ex. 5, page 6.

541.     This sworn testimony of Plaintiff Direct Worker Thomas L. Allison, who worked

at the FACILITY for thirty-three years, explains his work in the Rubber Shop at the

FACILITY as follows:

The main body and top of a cell are comprised of four different metal and cast-iron parts. We put a thick rubber coating on those parts. That was the end game. It isn't nearly so simple a process in practice as it might look on paper. Before we could put new rubber on any parts, all the old rubber had to be removed first. That was never easy. These cells go through torment. They have a small river of mercury running across the cell floor. On top of the mercury is a layer of brine. Brine is a saltwater solution that is also critical to the process of making the chlorine gas (and a couple of other products) that the FACILITY wants to make. There are other, smaller parts involved, but the one remaining critical component is a bank of anodes that is lowered into the cell and must be

routinely adjusted to the right height in order to maximize cell production. The anodes deliver the high voltage doses of electricity necessary to begin and end a process called electrolysis. I mean seriously high voltage and lots of it. The process generates a tremendous amount of heat and all those cells lined up side by side and row by row makes for a very hostile atmosphere in the Cell House, especially during the warmer months of the year. It routinely hits one hundred and twenty degrees in the Cell House and stays that way until the temperature finally backs off sometime in the fall. T. Allison Aff, Ex. 23, page 2.

We would start by cleaning out the residual mercury from the cell bottom and walls. Then we would use one of a few types of torches we had available to heat a portion of the cell to try and break the old glue loose. Somewhere in the heated section would finally turn loose and a bubble would rise just like a blister on your skin. That was the weak point. That was our place to attack. That was also the place where there was now some extremely hot mercury, some of which was running free and some of which was vaporizing into the air we were breathing as we worked. Incidentally, I was not provided with a respirator that covered any of my face nor did I have a mercury filter for the first fifteen years or more. I had been there for a very long time before I had anything more than a single filter chlorine escape respirator. It was a small, in-mouth apparatus like a big pacifier with a filter that wasn't good for much more than five minutes of heavy usage. We would "pop" the blister and set to work on the surrounding area with long handled scrapers, getting off as much as we could. That process was repeated as many times as was necessary and often still was not enough. There were usually stubborn sections where I, or a coworker, would have to use an industrial chipping hammer (think jackhammer, just a little smaller) to break the rubber free. There was still mercury in that rubber through the entire process. Some of it turned loose and went wherever gravity took it when I put heat to the metal. Some of it vaporized into the air I was breathing. The long-handled scrapers and chipping hammers would send flecks of it flying in every direction. During this process mercury got on my boots, clothing, and skin. T. Allison Aff, Ex. 23, pages 2 and 3.

**542.** Plaintiff Direct Worker Jerome A. Johnkins talks about his work in the Rubber

Room at other sites owned by the FACILITY:

"We spent a lot of time on the road, doing this job at other sites owned by the FACILITY. We worked in Niagara Falls, McIntosh Alabama, Joliet Illinois, Beaumont Texas, Augusta Georgia, Lake Charles Louisiana, and Doe Run Kentucky. At times, they hired us

out to other outfits, like W.R. Grace in Chattanooga, to work on Hydrochloric Acid tanks and such. Instead of working on cells, we worked on larger holding tanks for mercury or whatever other chemicals the FACILITY wanted to store in them. The tanks had to be stripped clean of their old rubber lining, which was saturated with mercury or other contaminants. Once a tank was stripped, cleaned, sandblasted, and dried, we could start applying adhesive." Johnkins Aff, Ex. 4, page 6

Very often, we'd have to burn off part of the old liner from the lid or part of the tank itself and separate it using a long-handled scraper. Mercury would be all over the floor of the tank and behind the rubber that we were burning off. I almost passed out completely one day from the fumes. I had to climb out of the tank and then be helped off the ladder to get down on the other side. I was so dizzy. This was a persistent problem for all of us and several men did pass out. Remember, all we had was a chlorine escape respirator and we weren't dealing with chlorine. We learned to position a man at the top of the ladder to "watch the hole" at all times. It got bad enough that we all started wearing wristlets made of rope when we were working inside a tank, just so we could be tied onto and dragged out if it came to that. There were some exceptionally large men on that crew. Dragging dead weight is hard. Dragging dead weight up the side of large tank and over the top would have been next to impossible with some of those men. These were some of the legitimate day to day concerns for that job. Johnkins Aff, Ex. 4, page 6.

543.    Upon information and belief, OLIN failed to follow strict Federal materials

decontamination guidelines and toxic waste management regulations by allowing highly

contaminated materials to leave the site. This distribution of contaminated waste and scrap

has created a public health hazard to those unsuspecting victims handling these materials

and an environmental danger wherever these materials were taken.

544.    Failure of OLIN to comply with strict state and federal regulations regarding the

handling of transportation of, and disposal of mercury contaminated materials is a breach

EH&S Guidelines and of the duty of care owed to the Plaintiffs, which proximately caused

their injuries.

**OLIN Failed to Protect Plaintiff Contractor Workers**

*OLIN Failed to Ensure the Health and Safety of their Plaintiff Contractor Workers who Performed Work at the FACILITY.*

545.     OSHA standards provide that, to the extent that a subcontractor of any tier agrees to perform any part of the contract, it also assumes responsibility for complying with OSHA standards with respect to that part. Thus, the prime contractor assumes the entire responsibility under the contract and the subcontractor assumes responsibility with respect to his portion of the work. With respect to subcontracted work, the prime contractor and any subcontractor or subcontractors shall be deemed to have joint responsibility. [269]

546.     Plaintiff Contractor Workers were directed by OLIN to perform operations, maintenance, and D&D. OLIN knew or should have known that entering areas where mercury and the vapors from mercury were known to be present during these activities would pose a danger to workers. Dangerous conditions exist when the concentrations of mercury and its vapors exceed the level of protection afforded by the PPE. The actions of OLIN contributed to creating this dangerous condition.

547.     OLIN knowingly exposed their Plaintiff Contractor Workers to hazards by directing them into areas of the FACILITY where mercury was present.

548.     Upon information and belief, the persons who directed the schedule of work to be performed in the FACILITY were OLIN or their site managers. Under OSHA they were Controlling Employers.[270]

549.     Upon information and belief, hazardous conditions were created by OLIN by allowing work at the Chlor-Alkali FACILITY without first verifying that:

---

[269] OSHA, CPL 02-00-124: Multi-Employer Citation Policy (1999).
[270] *Ibid*.

- A sufficient, comprehensive Health and Safety Plan ("HASP") was developed for the work scope of D&D operations;

- Training was properly performed, and a plan was established to evaluate the effectiveness of said training throughout the work scope of operations, maintenance, and D&D operations;

- A Process Hazards Analysis ("PHA") was performed for the work scope of D&D operations;

- Based on the PHA, the administrative and engineering controls were in place to mitigate worker exposure to mercury;

- An industrial hygiene exposure assessment for the work scope of D&D operations was performed by an industrial hygienist or other qualified health and safety professional;

- A Respiratory Protection Program was developed based on results of the worker exposure assessment performed by an industrial hygienist or other qualified safety and health professional which established sufficiently protective PPE options for inclusion in the site HASP.

- Medical health baselines including biological monitoring baselines were established by a qualified physician for all workers who may be exposed to mercury, and a medical surveillance plan was instituted as a secondary protective measure to quantify and track worker exposures and to evaluate the effectiveness of both the Respiratory Protection Plan and the site HASP.

550.    As part of the FACILITY's safety management program, a safety representative for the FACILITY should have been designated by OLIN. The safety representative or designees were assigned the responsibility of a Correcting Employer.[271] A comprehensive

---

[271] *Ibid.*

safety and health management system should have been implemented at the FACILITY. OLIN's safety representative or designees should have regularly inspected the work environment, corrected hazards, and communicated the specific health and safety rules so workers could understand and mitigate the hazards of mercury. OLIN's safety representatives, designees or supervisors should have directed the correction of unsafe conditions as quickly as possible after discovery of a hazard based on the severity of the hazard. OLIN was a Correcting Employer.[272]

551.    Plaintiff Contractor Workers and others were exposed to the mercury hazard that OLIN created. While operations, maintenance, and D&D were taking place, the Site Safety Manager for OLIN failed to reasonably supervise and provide health and safety monitoring to the Plaintiff Contractor Workers. OLIN owed a duty to Contractor Workers to refrain from engaging in conduct that created an unreasonable and foreseeable risk of harm to the Plaintiff Contractor Workers.

552.    Based on sworn testimony, OLIN knew when OSHA and the EPA were coming to inspect the FACILITY. OLIN used this advance notice to clean up as much mercury as possible, trying to hide the day-to-day harm to the Plaintiff Contractor Workers. This is shown by the testimony of Plaintiff Direct Worker Lamotta McMahan:

> "OSHA and the EPA gave the FACILITY notice before they came to do their inspections. That gave OLIN time to get us to clean up before they did their "checks". Lloyd Thomason would tell me and the other Cell House workers, "OSHA's coming in, so we have a week to clean up." We still couldn't get everything cleaned up perfectly because production was still going. We cleaned up enough that the FACILITY would pass the inspections." McMahan Aff, Ex. 16, page 5.

---

[272] *Ibid.*

553.    The failure of OLIN to provide proper supervision, exposure monitoring, medical monitoring, or PPE to protect against the hazards of mercury, and the lack of training with respect to the hazardous condition of mercury, caused the workers performing operations, maintenance, and D&D to be exposed to dangerous levels of mercury.

554.    While operations, maintenance, and D&D were taking place, the Site Safety Manager for OLIN failed to reasonably supervise and provide health and safety monitoring to the Plaintiff Contractor Workers. Fife, Jr., Aff, Ex. 10, page 6; and Donaldson Aff, Ex. 22, page 10.

555.    As an example of this failure, Plaintiff Contractor Workers were not required to use the on-site shower facilities while performing their duties. This means that the Plaintiff Contractor Workers would wear their mercury-contaminated personal work clothing, boots, and PPE out of the FACILITY into their personal vehicles and into their homes. Albury, Sr. Aff, Ex. 8, page 2; Heiskell Aff, Ex. 18, page 2; and J. Pendergrass Aff, Ex. 14, page 5.

556.    The failure of OLIN to provide proper supervision, exposure monitoring, medical monitoring, or PPE to protect against the hazards of mercury and lack of training with respect to the hazardous condition of mercury caused the workers performing operations, maintenance, and D&D to be exposed to dangerous levels of mercury.

557.    The failure of OLIN to properly supervise these activities, their failure to properly perform exposure assessments, their failure to properly perform medical monitoring, their failure to provide proper PPE to protect against the hazards of mercury, and their failure to provide proper training regarding the hazards of mercury during work at the FACILITY

violated applicable industrial standards of care that resulted in the dangerous conditions not being identified and properly controlled.

558.     The failure of OLIN to properly conduct a safety analysis, develop and implement the appropriate safety plan, and enforce and maintain these safety implementations constitutes a breach of EH&S Guidelines and the duty of care owed to the Plaintiff Contractor Workers. This breach proximately caused injuries to both Plaintiff Contractor Workers and Plaintiff Family Members.

**Failure to Recognize and Follow Current Scientific Epidemiology**

*OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS Failed To Follow Scientific Evidence about Mercury Exposure Clearly Established Within The Scientific Community.*

559.     The Chlor-Alkali Industry has not only had the benefit of industry studies and governmental regulations. It has also had the results of epidemiological studies to help guide its decision making. Few industries enjoy the marriage of regulation and science as seen in the Chlor-Alkali industry. In spite of this, the Chlor-Alkali Industry has ignored and rejected every opportunity afforded to it to improve its processes. This rejection has led to the mercury intoxication of people and communities all over the country.

560.     The industry itself has been the subject of a number of epidemiological studies. These studies have asserted and repeatedly affirmed that this industry is a source of significant toxicity that has contributed to negative environmental and physiological outcomes. These studies have taken place around these facilities and in some cases even inside of them.

561.     In Charleston, Tennessee, the Agency for Toxic Substances and Disease Registry supported a study that followed Chlor-Alkali workers who had inadvertently tracked mercury out of the plant and into their homes. This study found that workers did bring

mercury into their homes and that normal housekeeping tasks (vacuuming and washing the floors) increased the levels of mercury in those families studied. [273]

562.     Another study from 1968 found that only thirty-one percent (31%) of mercury dedicated to chlorine production was retained. That was a reported loss of sixty-nine percent (69%) of mercury used in the system.[274] This represents the critical failings of the Chlor-Alkali industry to effectively combat the fugitive release of mercury and the contamination of the environment in and around the plant. This calls into question the monitoring within the plant itself as this study focused on the internal data from these plants. Also, this finding demonstrates the level of mercury that is entering the environment beyond where workers are performing tasks.

563.     Though the systems in place have improved and modern losses are somewhat more controlled, the industry has not made significant gains in waste management and systems control. This is exemplified by the sixty-five (65) ton loss of mercury from chlorine plants in Spain in 2000.[275]  These studies confirm that this industry routinely releases mercury into the environment either through negligence or through improperly managed safety programs. [276]

---

[273] NIOSH, Mercury Control Technology Assessment Study, Olin Chemicals Group, Charleston, Tennessee, Preliminary Survey Report for the Site Visit of July 21, 1981 (1981).
[274] Reinaldo Caban & Thomas W. Chapman, *Losses of Mercury from Chlorine Plants: A Review of a Pollution Problem*, 18 AIChE J. 892 (1972).
[275] Jose Maria Esbri, Leticia Baselga & Pablo Higueras, *Evaluation of Mercury Dispersion from Chlor-Alkali Industries in Spain*, in ENVIRONMENTAL ENGINEERING & MANAGEMENT 112 (2009).
[276] R. Ferrara, E. Lanzillotta & C. Ceccarini, *Dissolved Gaseous Mercury Concentration and Mercury Evasional Flux from Seawater in Front of a Chlor-Alkali Plant*, 22 ENVIRON. TECHNOL. 971 (2001).

564.    Additionally, studies performed in and around chlorine plants in the European Union have found that although outdoor releases may not rise to the IDLH standard in the surrounding environment, they do exceed permissible exposures. [277]

565.    It is important to note that from the epidemiological perspective, this industry has been studied for decades. These studies clearly indicate the high levels of mercury contamination generated by these industrial processes and the cross-contamination of communities and family members of the workers.

566.    Having these studies and data before them, the OPERATING DEFENDANTS and the CONTRACTOR DEFENDANTS continued to recklessly ignore the high levels of mercury contamination at the FACILITY and SISTER FACILITY. Ignoring the science, the Defendants continued to grossly expose the Plaintiffs and the Plaintiff Family Members to toxic mercury.

567.    The failure of the Defendants to review and apply this scientific epidemiological knowledge constitutes a breach of EH&S Guidelines and legally constitutes a breach of the duty of care owed to the Plaintiffs, which proximately caused their injuries.

## Defendants Recklessly Ignored Established Data & Information

*The OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS Recklessly and Deliberately Ignored Voluminous Published Materials Detailing the Proper and Appropriate Manner in which to Operate, Maintain, Decommission and Demolish Chlor-Alkali Facilities Utilizing Mercury.*

568.    In addition to the foregoing governmental, engineering, and epidemiological guidance provided to the Chlor-Alkali Industry, the industry practice itself demonstrates guidance on the in-the-field application of applicable safety principles. Let us now turn to

---

[277]Darija Gibicar et al., *Human Exposure to Mercury in the Vicinity of Chlor-Alkali Plant*, 109 ENVIRON. RES. 355 (2009).

the industry itself and observe how other manufacturers have applied safety standards to protect their workers and the environment.

569.    There were a number of resources that were available to the OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS providing guidance regarding workplace safety at the FACILITY.  Such resources included, but were not limited to: Euro Chlor publications, Chlorine Institute ("CI") pamphlets, US Environmental Protection Agency ("EPA") documentation, and lessons learned by other mercury cell Chlor-Alkali plants which had already completed similar operations, maintenance and D&D closure activities.

570.    Euro Chlor is an organization of European chlorine producers, representing more than 80% of worldwide  Chlor-Alkali production.[278]  The Euro Chlor Guideline for Decommissioning of Mercury Chlor-Alkali Plants provides recommendations, techniques, and standards that are based on the experiences and best practices adopted by member companies of Euro Chlor.[279] As of 2009, the European Chlor-Alkali Industry had closed, decommissioned, and/or demolished 55 such facilities. Utilizing the environmental, process safety and engineering data, much has been learned about the dangers associated with the operations, maintenance, and decommissioning and demolishing of these facilities. In 2009 Euro Chlor published much of this data and drafted its Guideline for Decommissioning of Mercury Chlor-Alkali Facilities. [280]

571.    For years the Euro Chlor organization provided the source of the standard of care for the safety, health and environmental practices in the manufacture, handling and use of

---

[278] Euro Chlor About Us , (2024).
[279] Euro Chlor, Guideline for Decommissioning of Mercury Chlor-Alkali Plants, Env. Prot. 3, (5th ed. 2009).
[280] *Ibid.*

Chlor-Alkali products. These practices are developed by Euro Chlor in order to assist their members in achieving continuous improvements. Euro Chlor has also developed state of the art practices for the management of mercury contaminated sites. [281]

572.     The Euro Chlor code of practice for the protection of workers' health establishes the standard of care and the controls required to mitigate and control personnel exposures to mercury. [282] Euro Chlor recommends air monitoring for mercury vapors so that the correct respirators can be selected. Euro Chlor warns that air concentrations of mercury vapor will likely increase 10 to 20 times over normal operations during D&D work due to the disturbance of liquid mercury, or due to mercury contacting hot surfaces. [283]

573.     During the 1990s, the United States Government as well as independent environmental organizations pushed for regulations to restrict the level of mercury emissions generated by facilities utilizing the mercury cell process. In addition to these efforts, governmental and non-governmental organizations increased efforts to study the physiological impacts of mercury toxicity. [284] Through this work, a greater scientific understanding was obtained regarding the true environmental and physiological damage associated with the mercury cell process. This new knowledge and understanding have been publicly available and thus was available to both OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS.

574.     The first D&D event of notoriety at a mercury cell Chlor-Alkali FACILITY in the United States was that of the LCP Chemicals site in Brunswick, Georgia. The 813-acre

---

[281] *Ibid.*
[282] Euro Chlor, HEALTH 2 - Code of Practice: Control of Worker Exposure to Mercury in the Chlor-Alkali Industry, (6th ed. 2010).
[283] *Ibid.*
[284] Kathryn R Mahaffey, *Mercury Exposure: Medical and Public Health Issues*, 116 Trans. Am. Clin. Climatol. Assoc. 127 (2005).

LCP site includes an area where various industrial facilities operated from the early 1920s to 1994. The US EPA placed the LCP site on the Superfund program's National Priorities List ("NPL") in 1996 because of contaminated groundwater, soil, and sediment resulting from FACILITY operations.[285] Following the demolition of this FACILITY, an EPA investigation resulted in federal criminal indictments of corporate executives. [286]

575.     A second mercury cell D&D event was undertaken at the HoltraChem Manufacturing Company FACILITY, owned by Mallinckrodt and located in Orrington, Maine. The HoltraChem site is located on 235 acres on the banks of the Penobscot River. Approximately 77 acres were affected by site operations including 50 acres that are developed and include the manufacturing FACILITY, five landfills, a surface impoundment and a waste pile. [287] The HoltraChem site opened in 1967 utilizing the mercury cell process and manufactured chlorine, caustic soda (sodium hydroxide) and chlorine bleach (sodium hypochlorite). The FACILITY closed in September of 2000. [288] Mallinckrodt's consultant Camp Dresser & McKee ("CDM") drafted Site Investigation Reports, Corrective Measures Studies, Health and Safety Plans and other documents related to the HoltraChem D&D as well as to the LCP site in Georgia and a third mercury cell D&D in New Castle, Delaware:

- CDM – Phase 4 Supplement to the Decontamination, 2006

- Cell Process Dismantling/ Perimeter Air Monitoring Program, 2–03

- CDM – Site Remediation/ Health and Safety Plan, 2002

- COM-Dismantling Quality Assurance Plan (2002, 2003, 2004)

---

[285] EPA, Superfund Program: LCP Chemicals Georgia Site, Brunswick, Georgia (2024).
[286] EPA, Officials of Georgia Company Indicted, Release (1998).
[287] Maine Dept of Envtl Protection, Mallinckrodt (formerly HoltraChem).
[288] Portland Press Herald, Maine High Court Clears the Way for Cleanup of Former HoltraChem Plant, (2014).

- OXYCHEM Delaware – Health & Safety Plan – Interim Measures, (Occidental Chemical – New Castle, Delaware), 2001

- LCP Chemicals Health and Safety Plan, (LCP Chemicals – Brunswick, Georgia, 1994)

**576.** All of these documents were available to the OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS to be used as reference material in conducting work at the FACILITY.[289]

**577.** Even more compelling is the fact that epidemiological studies have been completed in and around these plants for years. Scientists had definitively proven the personal injuries and cross-contamination from mercury occurring at these facilities in the early 1980s. All these defendants recklessly ignored this scientific work.

**578.** The failure of OPERATING DEFENDANTS and CONTRACTOR DEFENDANTS to avail themselves of this plethora of information was a reckless disregard of their recognized duty of care owed to the Plaintiffs, which proximately caused their injuries.

**Fraud by OLIN**

*Defendant OLIN Falsely, and with the Deliberate Intent to Mislead, Communicated to Plaintiff Contractor Workers and Sister Facility Workers that the FACILITY was Safe and Posed no Threat to Plaintiff Contractor Workers' Health or the Health of Their Families*

OLIN perpetuated two fundamental types of fraud. First, they overtly represented that they were maintaining safety processes at the FACILITY that would keep those at the FACILITY and SISTER FACILITY safe. OLIN even represented that they were monitoring urine to keep Plaintiff Contractor Workers safe. They further represented that

---

[289] EPA, Holtrachem Manufacturing, Waste Site Cleanup and Reuse in New England (n.d.).

if the Plaintiff Contractor Workers were presented with any danger, Plaintiff Contractor Workers would be informed. The second form of fraud perpetuated by OLIN was that of suppression or concealment. Despite having a duty to disclose, OLIN actively concealed information regarding the dangers present at the FACILITY and SISTER FACILITY. Let us now turn to this fraudulent conduct specifically.

**Fraudulent Misrepresentations**

> "My coworkers and I asked Lamar Smith about how effective the chlorine escape respirator was in our daily Cell Maintenance duties. He told me, "It's safe. It's certified for use in this job." Lloyd Thomason also told us that the chlorine escape respirator was safe for our normal work." McMahan Aff, Ex. 16, page 2.

> "While I was working at the FACILITY, I was told that if I wore the PPE assigned to me and followed instructions, I would be safe." Brokish Aff, Ex. 9, page 9.

579. The testimony of Plaintiff Workers demonstrates that OLIN falsely assured the Plaintiff Contractor Workers that the FACILITY was safe if they used the Personal Protective Equipment ("PPE") that was provided. *See* Donaldson Aff, Ex 22, page 14; Kelley Aff, Ex. 7, page 12; Albury, Sr. Aff, Ex. 8, page 11; Brokish Aff, Ex. 9, page 12; Carson Aff, Ex. 5, page 12; and Fife, Jr., Aff, Ex. 10, pages 10 and 11.

> "I was told by head of safety at the FACILITY that I was safe from mercury as long as I did what they told me to do." Carson Aff, Ex. 5, page 12.

580. Plaintiff Contractor Workers would regularly observe mercury on and around the work surfaces where they were working. They were required to report their observed mercury to their supervisors. Even with this information, OLIN assured the Plaintiff Contractor Workers that the conditions were safe.

> "OLIN personnel always led us to believe that mercury levels at the FACILITY were safe because mercury was out of production at the FACILITY. I heard people say, "This site is mercury-free," but my guys would be required to wear mercury hygiene PPE on

certain jobs, and we saw visible mercury at the FACILITY. It did not add up." Fife, Jr. Aff, Ex. 10, page 10.

581. OLIN was monitoring the urine mercury levels of select Plaintiff Contractor Workers. While monitoring these levels they would reassure the Plaintiff Contractor Workers that these levels were acceptable and that by temporarily removing them from these exposures they would be okay. Tim E. Powers explains it this way:

> I would be here for a couple of days to a week, until my urine test showed that my mercury levels had lowered to an acceptable level. While here, I would work on cell lids that had rubber glued to the bottom of them. We had the cell tops sitting on containers to hold that discarded rubber and any mercury that would leak. I had to remove this rubber from the cell lid which had mercury all over it for years during production. I had to take a cutting torch to make the rubber get hot so that the glue would unstick from the cell lid. I had to take a hole scraper to break the rubber apart. Mercury came leaking out into that container we set the cell tops on. Even though I was working with a cutting torch, the FACILITY did not require a hot work permit for this because I worked on it outside, and not inside a building. I was sent here to get my mercury levels down, but these materials were contaminated with mercury. Furthermore, I was not required to wear any respiratory protection from the mercury fumes that manifested from cutting torches. Powers Aff, Ex. 3, page 6.

582. Donnie R. Webb explains it this way:

> "During my time working at the FACILITY, the levels that were considered "safe" got lower and lower. When I started in about 1978, the Medical Department at the FACILITY told me that mercury levels in urine as high as 0.9 parts per million were safe for us. Then, it dropped to 0.6. Eventually, the "safe" mercury levels got to 0.35. There were times in the past when I had tested below the levels that the FACILITY told me were fine then, but above the levels that were later deemed acceptable." Webb Aff, Ex. 15, pages 13 and 14.

583. Lamotta McMahan explains it this way:

> In my Prior Affidavit, I stated that my coworkers and I asked if a simple urine test was enough to determine if I was safe from mercury. I stated that my supervisors assured me that I was safe and that the FACILITY had medical professionals who knew how to deal with mercury. I supplement this with the following

information: One of the OLIN Medical Directors, Dr. Jerry Devane, told us, "We know how to deal with mercury and check it through your urine. We don't have to test your blood for accurate mercury level readings. A urine test is sufficient to test for mercury levels." Dr. Herbert Whittle and Dr. Janet Snoddy, the other OLIN Medical Directors at other times, also assured us that the urine tests they were making us do were sufficient to test for mercury levels in our bodies. Suppl. Affidavit of Lamotta McMahan, Ex. 40, page 3.

**584.** Nicolas E. Hobson explains it this way:

It was my responsibility to notify Tim Smith, the OLIN representative, whenever we came across anything unusual. The first time we dug a footer and noticed the groundwater mixture, we halted work. I notified Tim Smith and within an hour, a FACILITY employee named Timothy J. Payne arrived to examine the groundwater mixture. After testing it, Tim Payne informed me that mercury was in the mixture, but he told me it was "no big deal," and said, "Hey, look, you're good. Just dig it out." He then instructed us on how to dispose of it. This became the standard protocol moving forward. Disposal involved using a sump pump to remove the groundwater mixture from the footer, which was then drained into a nearby storm sewer leading to the Hiwassee River. Then, we used shovels, excavators, and a skid steer to remove the mercury-contaminated soil, placing it on a tarp to dry out in the sun. This drying process could take up to three weeks. Once dried, we loaded the material into a dump truck and transported it to the Hazard Dome for disposal. My team and I made hundreds of trips to the Hazard Dome, using excavators to unload the material. One excavator remained at the Dome, while the rest of the equipment, owned by WRIGHT, was used for other jobs at different sites. Depending on the day, either I or other members of my team drove the trucks to the dome. During this project, my shifts were Monday through Saturday, 7 a.m. until 5:30 p.m. Nicolas E. Hobson Affidavit, Exhibit 38, pages 3 and 4.

**585.** OLIN would use its inadequate mercury urine program to falsely represent that Plaintiff Contractor Workers were being protected from harm from mercury when the urine results themselves clearly demonstrated toxic mercury exposures. *See* Albury, Sr., Aff, Ex. 8, page 7; Webb Aff, Ex. 15, pages 13 and 14; Brokish Aff, Ex. 9, page 9; Carson

Aff, Ex. 5, pages 8 and 9; Cline Aff, Ex. 24, page 3; Fife, Jr., Aff, Ex. 10, page 6; and Hobbs Aff, Ex. 13, page 3.

**Misrepresentation by Concealment by Olin**

*Dangers of physical harm from mercury exposure of the entire site.*

586. OLIN had the benefit of specific scientific knowledge regarding the physical harm caused by overexposure to mercury. With this knowledge, they concealed from all Plaintiff Contractor Workers, including their family members and the contractors coming in contact with the site or hazardous materials from the site, that the FACILITY and SISTER FACILITY, encompassing the indoor spaces, outdoor property, equipment, and material, was contaminated with high levels of mercury and the dangers of physical contact that such exposure could cause.

*Suppression of the physical symptoms of mercury toxicity.*

587. OLIN had the benefit of specific scientific knowledge regarding the physical symptoms caused by overexposure to mercury. With this knowledge, they concealed from all Plaintiff Contractor Workers, including their family members and the contractors coming in contact with the site or hazardous materials from the site, that the FACILITY, including indoors, outdoors, equipment, and material, was contaminated with high levels of mercury and the probability that significant physical symptoms from such exposure could occur. Furthermore, OLIN failed to communicate what these physical symptoms could be.

*Knowledge of the levels of mercury contamination of the entire site.*

588. OLIN had the benefit of scientific testing of the air, water, soil, equipment, and structure of the site. With this knowledge, they concealed from all Plaintiff Contractor Workers, including family members and contractors coming in contact with the site or

hazardous materials from the site, that the FACILITY, including indoors, outdoors, equipment, and material, was contaminated with high levels of mercury.

*Insufficiencies and inaccuracies of their Safety Plan and Policies*

**589.** OLIN had safety plans that were completely inadequate and non-compliant with EH&S Guidelines. These safety failures were concealed from the Plaintiff Contractor Workers, including those working on the site, their family members, and others working in contact with materials from the site.

*Inaccurate and Insufficient Air, Water, and Soil Monitoring*

**590.** OLIN implemented inaccurate and insufficient environmental monitoring practices based on EH&S Guidelines. These deficiencies were concealed from the Plaintiff Contractor Workers, including those working onsite, their family members, and others coming in contact with materials from the site.

*Inaccurate and Insufficient Medical Monitoring Program*

**591.** OLIN failed to disclose to the Plaintiff Contractor Workers that their Medical Monitoring Program was inadequate based upon EH&S Guidelines.

*Inadequate Personal Protective Equipment (PPE) Policies*

**592.** OLIN failed to disclose to the Plaintiff Contractor Workers that these PPE Programs were grossly inadequate based upon EH&S Guidelines.

*Urine Monitoring Data Demonstrated Mercury Contamination*

**593.** The Mercury Urine Monitoring conducted by OLIN clearly demonstrated that select workers were getting exposed to mercury vapor. This information was concealed from the Plaintiff Contractor Workers, including those working on site, their family members, and those coming into contact with contaminated materials onsite.

*Allowing Contaminated Materials to Leave the Site*

594.     OLIN routinely concealed from Plaintiff Contractor Workers and third parties who would come in contact with contaminated materials from the site, the levels or even the possibility of contamination of these materials.

595.     Contaminated materials would routinely leave the FACILITY with the authorization and direction of OLIN.  These materials were highly contaminated with mercury.  Said highly contaminated materials would be placed into the community with no disclosure or warning of the dangers they presented.  OLIN concealed this information.

596.     These contaminated materials exposed Plaintiff Workers, Plaintiff Family Members and members of the general public to dangerous levels of mercury vapor.

597.     Plaintiff Contractor Workers and Plaintiff Family Members commenced this action within one (1) year of the date on which they became reasonably aware that they had a potential claim.

598.     During the times of Plaintiff Contractor Workers' employment at the FACILITY by OLIN, and as a direct and proximate result of OLIN, continuing and fraudulent misrepresentations to same, and continuing and fraudulent nondisclosure and concealment, of their true exposure to mercury and/or the harmful nature of their true mercury exposure at the FACILITY, the same were reasonably unaware of their peril until within one (1) year of this lawsuit.

599.     During the times of Plaintiff Contractor Workers' employment at the FACILITY by OLIN, and as a direct and proximate result of OLIN, continuing and fraudulent misrepresentations to same, and continuing and fraudulent nondisclosure and concealment, of their true exposure to other toxicants and/or the harmful nature of their

true exposure to other toxicants at the FACILITY, the same were reasonably unaware of their peril until within one (1) year of this lawsuit.

600.    As a direct result of this concealment, Plaintiff Family Members were unaware of their exposure to mercury, or the injury derived from it. They have been unaware of these facts within one (1) year of this lawsuit.

601.    Plaintiff Family Members were exposed to mercury by cross-contamination through their sharing of the household with Plaintiff Workers, with said exposure being a direct and proximate result of the actions of the Defendants. Therefore, all of OLIN's actions that affected the Plaintiff Workers directly affected and injured the Plaintiff Family Members, as aforementioned.

602.    These fraudulent representations and fraudulent suppression by OLIN have proximately caused the injuries suffered by these Plaintiff Contractor Workers and the Plaintiff Family Members.

603.    OLIN was in a position of superior knowledge and had a duty to the Plaintiff Contractor Workers and Plaintiff Family Members to accurately represent the true potential of mercury toxicity and not to suppress their knowledge regarding the exposures and dangers of exposures.

604.    In failing to accurately represent and/or to conceal the true facts, OLIN proximately caused the physical injuries of the Plaintiffs.

605.    Plaintiff Family Members were exposed to other toxicants by cross-contamination through their sharing of the household with Plaintiff Contractor Workers, with said exposure being a direct and proximate result of the actions of OLIN. Therefore, OLIN's

actions that affected the Plaintiff Contractor Workers directly affected and injured the Plaintiff Family Members, as aforementioned.

**Misrepresentation by Concealment by Contractor Defendants**

606.    Plaintiff Direct Workers, Plaintiff Sister Facility Workers, while performing work at the FACILITY and SISTER FACILITY, placed their trust and confidence in each of the Contractor Defendants, whose work temporally overlapped, to disclose to them the hazards and potential physical harm associated with exposure to toxic mercury.

607.    Similarly, the Plaintiff Family Members who cohabitated with these Plaintiff Direct Workers and Plaintiff Sister Facility Workers placed their trust and confidence in each of the Contractor Defendants, whose work temporally overlapped with their workers, to disclose to these workers the hazards and potential physical harm associated with exposure to toxic mercury, thereby decreasing their take-home exposure.

608.    Plaintiff Direct Workers and Sister Facility Workers relied on the Contractor Defendants' superior knowledge regarding the governmental regulations involved with establishing safe work environments (such as those described above and incorporated herein), especially those associated with exposure to toxic mercury, to disclose to them the necessary actions needed to avoid potential harm to themselves and their Plaintiff Family Members.

609.    Had the Contractor Defendants disclosed this information regarding the potential hazards associated with exposure to toxic mercury and actions needed to properly protect themselves, Plaintiff Direct Workers and Sister Facility Workers would have taken appropriate action to avoid such harm to themselves and their family members. As a direct and proximate result of the Contractor Defendants' failure to disclose this information despite a duty to do so, these Plaintiffs have been harmed.

610. The Affidavits attached and incorporated herein provide multiple examples of the ways that the Contractor Defendants' work affected Plaintiff Direct Workers and Sister Facility Workers working at the FACILITY and SISTER FACILITY, including the dangerous conditions to which they were exposed. This evidence supports the trust and confidence these Plaintiffs placed in the Contractor Defendants not to conceal material information needed to prevent them from being harmed, including their Plaintiff Family Members.

*Dangers of physical harm from mercury exposure of the entire site.*

611. Contractor Defendants had the benefit of specific scientific knowledge regarding the physical harm caused by exposure to mercury. With this knowledge, they concealed from all Plaintiff Direct Workers, Plaintiff Sister Facility Workers, including their family members, that the FACILITY and SISTER FACILITY, encompassing the indoor spaces, outdoor property, equipment, and material, was contaminated with high levels of mercury and the dangers of physical contact that such exposure could cause.

*Misrepresentation and Concealment of the physical symptoms of mercury toxicity.*

612. Contractor Defendants had the benefit of specific scientific knowledge regarding the physical symptoms caused by exposure to mercury. With this knowledge, they concealed from all Plaintiff Direct Workers, Plaintiff Sister Facility Workers, including their family members, that the FACILITY, including indoors, outdoors, equipment, and material, was contaminated with high levels of mercury and the probability that significant physical symptoms from such exposure could occur. Furthermore, Contractor Defendants failed to communicate what these physical symptoms could be.

*Knowledge of the levels of mercury contamination of the entire site.*

613. Contractor Defendants had the benefit of scientific quantitative testing of the air, water, soil, equipment, and structure(s) of the site. With this knowledge, they concealed from all Plaintiff Direct Workers, Plaintiff Sister Facility Workers, including their family members, that the FACILITY, including indoors, outdoors, equipment, and material, was contaminated with high levels of mercury.

*Insufficiencies and inaccuracies of their Safety Plan and Policies*

614. Contractor Defendants had safety plans that were completely inadequate and non-compliant with industry standards, federal and state regulations, and scientific recommendations. These safety failures were concealed from Plaintiff Direct Workers and Plaintiff Sister Facility Workers, including their family members.

*Inaccurate and Insufficient Air, Water, and Soil Monitoring*

615. Contractor Defendants implemented inaccurate and insufficient environmental monitoring practices. These deficiencies were concealed from the Plaintiff Direct Workers and Plaintiff Sister Facility Workers, including their family members.

*Inaccurate and Insufficient Medical Monitoring Program*

616. Contractor Defendants failed to disclose to the Plaintiff Direct Workers and Plaintiff Sister Facility Workers, including their family members, that their Medical Monitoring Program was in inadequate based upon EH&S Guidelines.

*Inadequate Personal Protective Equipment (PPE) Policies*

617. Contractor Defendants failed to disclose to the Plaintiff Direct Workers and Plaintiff Sister Facility Workers, including their family members, that these PPE Programs were grossly inadequate based upon EH&S Guidelines.

*Allowing Contaminated Materials to Leave the Site*

618.     Contractor Defendants routinely concealed from Plaintiff Direct Workers and Plaintiff Sister Facility Workers, including their family members, the levels or even the possibility of contamination of these materials.

619.     Contaminated materials would routinely leave the FACILITY and SISTER FACILITY with the authorization of Contractor Defendants. These materials were highly contaminated with mercury.  Said highly contaminated materials would be placed into the community with no disclosure or warning of the dangers they presented. Contractor Defendants concealed this information.

620.     These contaminated materials exposed Plaintiff Direct Workers and Plaintiff Sister Facility Workers, including their family members, to mercury vapor .

621.     Plaintiff Direct Workers and Plaintiff Sister Facility Workers commenced this action within one (1) year of the date on which they became reasonably aware that they had a potential claim.

622.     During the times that Plaintiff Direct Workers and Plaintiff Sister Facility Workers were present at the FACILITY and SISTER FACILITY, and as a direct and proximate result of Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN and CUSTOM MECHANICAL], continuing and fraudulent misrepresentations to same, and continuing and fraudulent nondisclosure and concealment, of their true exposure to mercury and/or the harmful nature of their true mercury exposure at the FACILITY and SISTER FACILITY, the same were reasonably unaware of their peril until within one (1) years of this lawsuit.

623.     During the times that Plaintiff Direct Workers and Plaintiff Sister Facility Workers were present at the FACILITY and SISTER FACILITY, and as a direct and proximate result of Contractor Defendants continuing and fraudulent misrepresentations to same, and continuing and fraudulent nondisclosure and concealment, of their true exposure to other toxicants and/or the harmful nature of their true exposure to other toxicants at the FACILITY and SISTER FACILITY, the same were reasonably unaware of their peril until within one (1) years of this lawsuit.

624.     As a direct result of this concealment, Plaintiff Family Members were unaware of their exposure to mercury, or the injury derived from it. They have been unaware of these facts within one (1) year of this lawsuit.

625.     Plaintiff Family Members were exposed to mercury by cross-contamination through their sharing of the household with Plaintiff Workers, with said exposure being a direct and proximate result of the actions of the Defendants. Therefore, all of OLIN's actions that affected the Plaintiff Workers directly affected and injured the Plaintiff Family Members, as aforementioned.

626.     These fraudulent representations and fraudulent suppression by OLIN have proximately caused the injuries suffered by these Plaintiff Contractor Workers and the Plaintiff Family Members.

627.     OLIN was in a position of superior knowledge and had a duty to the Plaintiff Contractor Workers and Plaintiff Family Members to accurately represent the true potential of mercury toxicity and not to suppress their knowledge regarding the exposures and dangers of exposures.

**628.** In failing to accurately represent and/or to conceal the true facts, OLIN proximately caused the physical injuries of the Plaintiffs.

**629.** Plaintiff Family Members were exposed to other toxicants by cross-contamination through their sharing of the household with Plaintiff Contractor Workers, with said exposure being a direct and proximate result of the actions of OLIN. Therefore, OLIN's actions that affected the Plaintiff Contractor Workers directly affected and injured the Plaintiff Family Members, as aforementioned.

### CHAPTER X: TOLLING

**630.** Based on the facts and circumstances alleged herein, Plaintiffs have timely filed their causes of action within the applicable statute of limitations period. The Plaintiff Workers and Plaintiff Family Members were injured due to their exposure to the toxic chemical mercury and other toxicants. This exposure was caused by the Defendants.

**631.** After being diagnosed with, treated for, or aware of one or more (eventual mercury-related) health conditions, Plaintiff Workers and Plaintiff Family Members remained unaware until recently of the existence of the causal relationship to mercury and that they suffered an injury as a result of Defendants' wrongful conduct.

**632.** The nature of the Plaintiffs' injuries involves a latency period where the harmful effects of the toxic exposure were not discoverable for several years. As explained herein, the epidemiology of mercury toxicity is such that symptoms take many years to arise. When the Plaintiff Workers and Plaintiff Family Members experienced symptoms, the symptoms were reasonably attributable to another cause.

**633.** Neither the Plaintiffs nor the medical healthcare community were aware of the significant mercury exposures that were ongoing. The Defendants actively concealed these facts from the community. Plaintiffs contend that the "medical healthcare

community" did not include OLIN's company-paid doctor and medical staff that was clearly aware of these exposures and concealed said knowledge.

634.     Mercury toxicity creates a constellation of symptoms and injuries. Connecting these symptoms and injuries to a mercury exposure requires a subjective understanding over time. For the Plaintiffs, this understanding has only been derived within the applicable time period for the filing of this complaint.

635.     This information was provided to the Plaintiffs within the applicable statute of limitations period. Therefore, action on behalf of the Plaintiffs was tolled until such times that the Plaintiffs were reasonably aware.

## CHAPTER XI: COUNTS

636.     For the discussion of the Counts, Plaintiffs refer to Exhibit 1. This Matrix of Plaintiff Claims was introduced at the beginning of this Third Amended Complaint and is hereby incorporated as fully and completed, as if specifically stated herein. The Matrix of Plaintiff Claims includes a chart detailing the names, employers, relevant timelines, and counts for each identified Plaintiff Direct Worker, Plaintiff Contractor Worker, and Plaintiff Family Member. The rows for Plaintiff Family Members specify the family member who exposed them to contaminants, along with their timeline of exposure. Additionally, the chart enables quick identification of Plaintiffs who have submitted affidavits, as previously mentioned. A legend is provided at the beginning of the exhibit to facilitate the interpretation of the data presented

## Count I – Negligence

*Plaintiff Sister Facility Workers against OLIN.*

637.     Plaintiff Sister Facility Workers repeat and re-allege all prior allegations of this complaint.

638.    Plaintiff Sister Facility Workers are maintaining this claim against OLIN for the time periods in Exhibit 1 when said Plaintiff Workers were working at the FACILITY and/or SISTER FACILITY and OLIN was operating the FACILITY and/or SISTER FACILITY.

639.    OLIN owed a duty to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm.

640.    On a daily, regular, and frequent basis while working at the FACILITY and/or SISTER FACILITY, Plaintiff Sister Facility Workers were exposed to mercury and/or mercury-containing or contaminated materials, equipment, or premises.

641.    Plaintiff Sister Facility Workers had to pass through portions of the FACILITY even if their primary work was at the SISTER FACILITY, exposing them to mercury and/or mercury-containing or contaminated materials, equipment, or premises at the FACILITY. See the discussion at paragraphs 122 to 132.

642.    Depending upon the assigned task, sometimes Plaintiff Sister Facility Workers were personally handling or working with mercury and/or mercury-containing or contaminated materials, equipment, or premises, and sometimes their nearby co-workers were doing so.

643.    Despite knowing about the dangers of mercury, OLIN did not adequately warn Plaintiffs, or others similarly situated, and OLIN did not adequately eliminate, avoid, or mitigate the dangers to Plaintiffs, or others similarly situated, from the presence, use, and maintenance of mercury and/or mercury-containing or contaminated materials, equipment, at the FACILITY and/or SISTER FACILITY.

644.    OLIN negligently breached duties of care, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff Sister Facility Workers.

**645.** OLIN's negligence and breach of its said duties of care, included, but was not limited to:

a. In failing to adequately warn Plaintiff Sister Facility Workers, or others similarly situated, of the dangerous characteristics of mercury and mercury-containing or contaminated materials or equipment;

b. In failing to adequately warn Plaintiff Sister Facility Workers, or others similarly situated, of the dangers presented by OLIN's mercury-contaminated premises;

c. In failing to properly train Plaintiff Sister Facility Workers, and others similarly situated, to identify and avoid or at least minimize exposure to mercury and mercury-containing or contaminated materials or equipment;

d. In failing to provide Plaintiff Sister Facility Workers, and others similarly situated, with information as to what would be reasonably safe and sufficient apparel and proper protective equipment;

e. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce an appropriate safety plan;

f. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safe method of working with or around, handling, cleaning up, or disposing of mercury;

g. In continuing to supply, purchase, procure, own, or maintain mercury-containing or contaminated materials, equipment, and premises when OLIN knew or should have known that such materials, equipment, and premises caused injuries in those persons exposed to mercury;

h.  In inducing Plaintiff Sister Facility Workers, through material misrepresentations or concealment, to unknowingly expose themselves to the hazards of mercury;

i.  In failing to adequately test the mercury used for or on its materials, equipment, and premises;

j.  In failing to remove all the mercury or mercury-containing or contaminated materials or equipment from the FACILITY and/or SISTER FACILITY;

k.  In failing to meet OLIN's continuing duty to warn or advise Plaintiff Sister Facility Workers, and others similarly situated, of the dangers associated with mercury exposure and to cease all future exposure, and to keep the mercury-contaminated physical body, clothes, and tools of its workers, contractor workers and invitees away from the home environment;

l.  In failing to conduct adequate, if any, industrial hygiene, epidemiological, or medical studies related to mercury exposures resulting from the use of mercury and/or mercury-containing or contaminated materials or equipment at the FACILITY and/or SISTER FACILITY;

m.  In failing to provide instructions or a method for the safe use of mercury;

n.  In failing to provide adequate, if any, instructions in the use or removal of mercury-contaminated materials or equipment;

o.  In failing to adequately communicate information about the hazards of mercury in the FACILITY and/or SISTER FACILITY;

p.  In failing to provide Plaintiff Sister Facility Workers with a reasonably safe place at which to work.

q. In allowing or causing Plaintiff Sister Facility Workers to be improperly exposed to toxic mercury;

r. In engaging in misfeasance that set in motion a risk of harm to Plaintiff Sister Facility Workers.

s. In performing and/or failing to perform workplace safety and/or failing to adequately monitor mercury exposures and/or failing to provide adequate equipment, devices or goods, related to the monitoring, safety, protection from or containment of mercury releases within and/or around that FACILITY and/or SISTER FACILITY;

t. In designing, planning, repairing or constructing the buildings and/or equipment and/or systems therein, that adversely affected mercury monitoring, containment, safety, and/or releases at the FACILITY and/or SISTER FACILITY;

u. In failing to disclose to Plaintiff Sister Facility Workers their exposure to mercury in the workplace, and/or the true dangers and risk of mercury;

v. In operating and/or failing to operate and/or failing to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or devices and/or disabled mercury alarm systems at or around the FACILITY and/or SISTER FACILITY;

w. In failing to maintain safe working conditions at or around the FACILITY and/or SISTER FACILITY with respect to preventing mercury exposure;

x. In failing to adhere to legally required manufacturing practices, and/or failing to adhere to governmental standards, rules and/or regulations with regard to mercury safety, monitoring, releases and/or containment, such as constituted negligence per se;

y. In failing to adequately monitor, implement and/or perform mercury monitoring;

z. In breaching the standard of care and/or medical standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiff Sister Facility Workers the true dangers of and the true levels of the mercury exposures; and

aa. In breaching the standard of care and/or medical standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiff Sister Facility Workers the true dangers of and the true levels of the mercury exposures.

646. As a direct and proximate result of OLIN's negligence and/or negligence per se, Plaintiff Sister Facility Workers suffered personal injuries and damages as set out in this Complaint, in particular see Exhibit 44 - Plaintiffs' Summary of Symptoms.

647. Plaintiff Sister Facility Worker's demand against OLIN compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

## Count II – Negligence

*All Plaintiff Contractor Workers against OLIN.*

648. Plaintiff Contractor Workers repeat and re-allege all prior allegations of this complaint.

649. Plaintiff Contractor Workers are maintaining this claim against OLIN for the time periods in Exhibit 1 when said Plaintiff Workers were working at the FACILITY and/or SISTER FACILITY and OLIN was operating the FACILITY and/or SISTER FACILITY.

650. OLIN owed a duty to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm.

651. On a daily, regular, and frequent basis while working at the FACILITY and/or SISTER FACILITY, Plaintiff Contractor Workers were exposed to mercury and/or mercury-containing or contaminated materials, equipment, or premises.

652.     Depending upon the assigned task, sometimes Plaintiff Contractor Workers were personally handling or working with mercury and/or mercury-containing or contaminated materials, equipment, or premises, and sometimes their nearby co-workers were doing so.

653.     Despite knowing about the dangers of mercury, OLIN did not adequately warn Plaintiff Contractor Workers, or others similarly situated, and OLIN did not adequately eliminate, avoid, or mitigate the dangers to Plaintiff Contractor Workers, or others similarly situated, from the presence, use, and maintenance of mercury and/or mercury-containing or contaminated materials, equipment, on the jobsite.

654.     OLIN negligently breached duties of care to Plaintiff Contractor Workers, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff Contractor Workers.

655.      OLIN's negligence and breach of its said duties of care, included, but was not limited to:

   a.   In failing to adequately warn Plaintiff Contractor Workers, or others similarly situated, of the dangerous characteristics of mercury and mercury-containing or contaminated materials or equipment;

   b.   In failing to adequately warn Plaintiff Contractor Workers, or others similarly situated, of the dangers presented by OLIN's mercury-contaminated premises;

   c.   In failing to properly train Plaintiff Contractor Workers, and others similarly situated, to identify and avoid or at least minimize exposure to mercury and mercury-containing or contaminated materials or equipment;

d.  In failing to provide Plaintiff Contractor Workers, and others similarly situated, with information as to what would be reasonably safe and sufficient apparel and proper protective equipment;

e.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce an appropriate safety plan;

f.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safe method of working with or around, handling, cleaning up, or disposing of mercury;

g.  In continuing to supply, purchase, procure, own, or maintain mercury-containing or contaminated materials, equipment, and premises when OLIN knew or should have known that such materials, equipment, and premises caused injuries in those persons exposed to mercury;

h.  In inducing Plaintiff Contractor Workers, through material misrepresentations or concealment, to unknowingly expose themselves to the hazards of mercury;

i.  In failing to adequately test the mercury used for or on its materials, equipment, and premises;

j.  In failing to remove all the mercury or mercury-containing or contaminated materials or equipment from the FACILITY and/or SISTER FACILITY;

k.  In failing to meet OLIN's continuing duty to warn or advise Plaintiff Contractor Workers, and others similarly situated, of the dangers associated with mercury exposure and to cease all future exposure, and to keep the mercury-contaminated physical body, clothes, and tools of its workers, contractor workers and invitees away from the home environment;

l.  In failing to conduct adequate, if any, industrial hygiene, epidemiological, or medical studies related to mercury exposures resulting from the use of mercury and/or mercury-containing or contaminated materials or equipment at the FACILITY and/or SISTER FACILITY;

m.  In failing to provide instructions or a method for the safe use of mercury;

n.  In failing to provide adequate, if any, instructions in the use or removal of mercury-contaminated materials or equipment;

o.  In failing to adequately communicate information about the hazards of mercury in the FACILITY and/or SISTER FACILITY;

p.  In failing to provide Plaintiff Contractor Workers with a reasonably safe place at which to work.

q.  In allowing or causing Plaintiff Contractor Workers to be improperly exposed to toxic mercury;

r.  In engaging in misfeasance that set-in motion a risk of harm to Plaintiff Contractor Workers.

s.  In performing and/or failing to perform workplace safety and/or failing to adequately monitor mercury exposures and/or failing to provide adequate equipment, devices or goods, related to the monitoring, safety, protection from or containment of mercury releases within and/or around that FACILITY and/or SISTER FACILITY;

t.  In designing, planning, repairing or constructing the buildings and/or equipment and/or systems therein, that adversely affected mercury monitoring, containment, safety, and/or releases at the FACILITY and/or SISTER FACILITY;

u. In performing their duties as to contractors for the decommission-related and demolition-related work, by failing to protect those Plaintiff Contractor Workers from mercury exposure;

v. In failing to disclose to Plaintiff Contractor Workers their exposure to mercury in the workplace, and/or the true dangers and risk of mercury;

w. In operating and/or failing to operate and/or failing to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or devices and/or disabled mercury alarm systems at or around the FACILITY and/or SISTER FACILITY;

x. In failing to maintain safe working conditions at or around the FACILITY and/or SISTER FACILITY with respect to preventing mercury exposure;

y. In failing to adhere to legally required manufacturing practices, and/or failing to adhere to governmental standards, rules and/or regulations with regard to mercury safety, monitoring, releases and/or containment, such as constituted negligence per se;

z. In failing to adequately monitor, implement and/or perform mercury monitoring; and

aa. In breaching the standard of care and/or medical standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiff Contractor Workers the true dangers of and the true levels of the mercury exposures.

656. As a direct and proximate result of OLIN's negligence, Plaintiff Contractor Workers were caused personal injuries and damages as set out in this Complaint, in particular see Exhibit 44 - Plaintiffs' Summary of Symptoms.

657. Plaintiff Contractor Workers demand against OLIN compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

**Count III – Negligence**

*Plaintiff Family Members against OLIN*

658.     Plaintiff Family Members repeat and re-allege all prior allegations of this complaint.

659.     Plaintiff Family Members are maintaining this claim against OLIN for the time periods in Exhibit 1 when their said Plaintiff Workers were working at the FACILITY and/or SISTER FACILITY and OLIN was operating the FACILITY and/or SISTER FACILITY, resulting in the Plaintiff Family Members being exposed to mercury as a result of such work.

660.     OLIN negligently breached duties of care to Plaintiffs, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff Family Members.

661.     OLIN's negligence and breach of their said duties of care, included, but was not limited to:

a.  OLIN negligently allowed or caused Plaintiffs to be improperly exposed to toxic mercury;

b.  OLIN had scientific knowledge of the harmful level of exposure to the chemical mercury, plus knowledge that the Plaintiffs were/or would be exposed to such quantities;

c.  OLIN negligently performed and/or failed to perform workplace safety and/or failed to adequately monitor mercury exposures and/or failed to provide adequate equipment, devices or goods, related to the monitoring, safety, protection from or containment of mercury emissions within and/or around the FACILITY and/or SISTER FACILITY;

d. OLIN negligently designed, planned, repaired or constructed the buildings and/or equipment and/or systems therein, such as adversely affected mercury monitoring, containment safety or emissions at the FACILITY and/or SISTER FACILITY;

e. OLIN negligently performed its duties as general contractors and/or as subcontractors and/or as service providers for the decommission-related and demolition-related work, by failing to protect same from mercury exposure;

f. OLIN negligently failed to disclose to Plaintiffs their exposure to mercury in the workplace, and/or the true dangers and risk of same;

g. OLIN negligently operated and/or failed to operate and/or failed to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or emission-related structures, equipment and/or devices and/or disabled mercury alarm systems at or around the FACILITY and/or SISTER FACILITY;

h. OLIN negligently failed to maintain a safe workplace and/or safe working conditions at or around the FACILITY and/or SISTER FACILITY with respect to preventing mercury exposure;

i. OLIN negligently failed to adhere to legally required manufacturing practices, and/or failed to adhere to governmental standards, rules, and/or regulations with regard to mercury safety, monitoring, emissions and/or containment, such as constituted negligence per se;

j. OLIN negligently failed to adequately monitor and/or implement and/or perform mercury monitoring and that OLIN has breached the standard of care and/or impeded the medical standard of care by not adequately providing said services and/or by not

disclosing to party Plaintiffs the true dangers of and the true levels of the subject mercury exposures; and

k. OLIN negligently failed to adequately monitor and contain mercury-contaminated materials from leaving the FACILITY and SISTER FACILITY.

662. As a direct and proximate result of OLIN's negligence and/or negligence per se, Plaintiff Family Members were caused personal injuries and damages as set out in this Complaint, in particular see Exhibit 44 - Plaintiffs' Summary of Symptoms.

663. Plaintiff Family Members demand against OLIN compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

## Count IV – Negligence

*Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers against ARCH.*

664. Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers repeat and re-allege all prior allegations of this complaint.

665. Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers are maintaining this claim against ARCH for the time period when said Plaintiffs were working at the FACILITY and ARCH was operating the SISTER FACILITY, as stated by Plaintiff and time frame in Exhibit 1.

666. ARCH owed a duty to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm.

667. On a daily, regular, and frequent basis while working at the FACILITY and/or SISTER FACILITY, Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers were exposed to mercury and/or mercury-containing or contaminated materials, equipment, or premises.

668.    Depending upon the assigned task, sometimes Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers were personally handling or working with mercury and/or mercury-containing or contaminated materials, equipment, or premises, and sometimes their nearby co-workers were doing so.

669.    Despite knowing about the dangers of mercury, ARCH did not adequately warn Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers, or others similarly situated, and ARCH took minimal efforts to eliminate, avoid, or mitigate the dangers to Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers, or others similarly situated, from the presence, use, and maintenance of mercury and/or mercury-containing or contaminated materials, equipment, on the jobsite.

670.    ARCH negligently breached duties of care to Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers.

671.    ARCH's negligence and breach of its said duties of care, included, but was not limited to:

a.  In failing to adequately warn Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers, or others similarly situated, of the dangerous characteristics of mercury and mercury-containing or contaminated materials or equipment;

b.  In failing to adequately warn Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers, or others similarly situated, of the dangers presented by ARCH's mercury-contaminated premises;

c. In failing to properly train Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers, and others similarly situated, to identify and avoid or at least minimize exposure to mercury and mercury-containing or contaminated materials or equipment;

d. In failing to provide Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers, and others similarly situated, with information as to what would be reasonably safe and sufficient apparel and proper protective equipment;

e. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce an appropriate safety plan;

f. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safe method of working with or around, handling, cleaning up, or disposing of mercury;

g. In continuing to supply, purchase, procure, own, or maintain mercury-containing or contaminated materials, equipment, and premises when ARCH knew or should have known that such materials, equipment, and premises caused injuries in those persons exposed to mercury;

h. In inducing Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers, through material misrepresentations or concealment, to unknowingly expose themselves to the hazards of mercury;

i. In failing to adequately test the mercury used in or on its materials, equipment, and premises;

j. In failing to remove all the mercury or mercury-containing or contaminated materials or equipment from the FACILITY and/or SISTER FACILITY;

k.  In failing to meet ARCH's continuing duty to warn or advise Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers, and others similarly situated, of the dangers associated with mercury exposure and to cease all future exposure, and to keep the mercury-contaminated physical body, clothes, and tools of its workers, contractor workers and invitees away from the home environment;

l.  In failing to conduct adequate, if any, industrial hygiene, epidemiological, or medical studies related to mercury exposures resulting from the use of mercury and/or mercury-containing or contaminated materials or equipment at the FACILITY and/or SISTER FACILITY;

m.  In failing to provide instructions or a method for the safe use of mercury;

n.  In failing to provide adequate, if any, instructions in the use or removal of mercury-contaminated materials or equipment;

o.  In failing to adequately communicate information about the hazards of mercury in the FACILITY and/or SISTER FACILITY;

p.  In failing to provide Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers with a reasonably safe place at which to work;

q.  In allowing or causing Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers to be improperly exposed to toxic mercury;

r.  In engaging in misfeasance that set-in motion a risk of harm to Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers;

s.  In performing and/or failing to perform workplace safety and/or failing to adequately monitor mercury exposures and/or failing to provide adequate equipment, devices or

goods, related to the monitoring, safety, protection from or containment of mercury releases within and/or around that FACILITY and/or SISTER FACILITY;

t.   In designing, planning, repairing or constructing the buildings and/or equipment and/or systems therein, that adversely affected mercury monitoring, containment, safety, and/or releases at the FACILITY and/or SISTER FACILITY;

u.   In performing their duties as contractors for the decommission-related and demolition-related work, by failing to protect those Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers from mercury exposure;

v.   In failing to disclose to Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers their exposure to mercury in the workplace, and/or the true dangers and risk of mercury;

w.   In operating and/or failing to operate and/or failing to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or devices and/or disabled mercury alarm systems at or around the FACILITY and/or SISTER FACILITY;

x.   In failing to maintain safe working conditions at or around the FACILITY and/or SISTER FACILITY with respect to preventing mercury exposure;

y.   In failing to adhere to legally required manufacturing practices, and/or failing to adhere to governmental standards, rules and/or regulations with regard to mercury safety, monitoring, releases and/or containment, such as constituted negligence per se;

z.   In failing to adequately monitor, implement and/or perform mercury monitoring; and

aa.  In breaching the standard of care and/or impeding the medical standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiff Direct

Workers of OLIN and Plaintiff Contractor Workers the true dangers of and the true levels of the mercury exposures.

672.     As a direct and proximate result of ARCH's negligence and/or negligence per se, Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers were caused personal injuries and damages as set out in this Complaint, in particular see Exhibit 44 - Plaintiffs' Summary of Symptoms.

673.     Plaintiff Direct Workers of OLIN and Plaintiff Contractor Workers demand against ARCH compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

**Count V - Negligence**

*Plaintiff Family Members against ARCH.*

674.     Plaintiff Family Members repeat and re-allege all prior allegations of this complaint.

675.     Plaintiff Family Members are maintaining this claim against ARCH for the time periods in Exhibit 1 when their said Plaintiff Workers were working at the FACILITY and/or SISTER FACILITY and ARCH was operating the SISTER FACILITY, resulting in the Plaintiff Family Members being exposed to mercury as a result of such work.

676.     ARCH negligently breached duties of care to Plaintiff Workers, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff Family Members.

677.     ARCH's negligence and breach of its said duties of care, included, but was not limited to:

a.  ARCH negligently allowed or caused Plaintiff Family Members to be improperly exposed to toxic mercury;

b.  ARCH had scientific knowledge of the harmful level of exposure to the chemical mercury, plus knowledge that the Plaintiffs were/or would be exposed to such quantities.

c.  ARCH negligently performed and/or failed to perform workplace safety and/or failed to adequately monitor mercury exposures and/or failed to provide adequate equipment, devices or goods, related to the monitoring, safety, protection from or containment of mercury emissions within and/or around the FACILITY and/or SISTER FACILITY;

d.  ARCH negligently designed, planned, repaired or constructed the buildings and/or equipment and/or systems therein, such as adversely affected mercury monitoring, containment safety or emissions at the FACILITY and/or SISTER FACILITY;

e.  ARCH negligently performed their duties as general contractors and/or as subcontractors and/or as service providers for the decommission-related and demolition-related work, by failing to protect Plaintiffs from mercury exposure;

f.  ARCH negligently failed to disclose to Plaintiffs their exposure to mercury in the workplace, and/or the true dangers and risks to Plaintiffs;

g.  ARCH negligently operated and/or failed to operate and/or failed to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or emission-related structures, equipment and/or devices and/or disabled mercury alarm systems at or around the FACILITY and/or SISTER FACILITY;

h.  ARCH negligently failed to maintain a safe workplace and/or safe working conditions at or around the FACILITY and/or SISTER FACILITY with respect to preventing mercury exposure;

i.  ARCH negligently failed to adhere to legally required manufacturing practices, and/or failed to adhere to governmental standards, rules and/or regulations with regard to mercury safety, monitoring, emissions and/or containment, such as constituted negligence per se; and

j.  ARCH negligently failed to adequately monitor and/or implement and/or perform mercury monitoring and ARCH has breached the standard of care and/or impeding the medical standard of care by not adequately providing said services and/or by not disclosing to Plaintiffs the true dangers of and the true levels of the subject mercury exposures.

**678.**    As a direct and proximate result of ARCH's negligence and/or negligence per se, Plaintiff Family Members were caused personal injuries and damages as set out in this Complaint.

**679.**    The Plaintiffs in this case have symptoms consistent with the symptomology of mercury intoxication. These symptoms have been detailed by Plaintiffs in an attached exhibit. *See* Plaintiffs' Summary of Symptoms, Exhibit 44.

**680.**    Plaintiff Family Members demand against ARCH, individually and jointly, compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

**Count VI - Negligence**

*Plaintiff Direct Workers of OLIN against Contractor Defendants who performed work at the FACILITY.*

**681.**    Plaintiff Direct Workers of OLIN repeat and re-allege all prior allegations of this complaint.

**682.**    Plaintiff Direct Workers of OLIN are maintaining this claim against Contractor Defendants who are believed to have been performing work at the FACILITY while said

Plaintiffs were working at the FACILITY. For the details on the time frames that such Plaintiffs were exposed, see the approximate time frames listed by Plaintiff in Exhibit 1 – Matrix of Plaintiff Claims. Details on the exact scope of work and time frame performed are known to each Contractor Defendant and will be further identified in discovery in this matter.

683.    These Contractor Defendants  owed a duty to these Plaintiffs to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm.

684.    On a daily, regular, and frequent basis while working at the FACILITY, Plaintiffs were exposed to mercury and/or mercury-containing or contaminated materials, equipment, or premises.

685.    Depending upon the assigned task, sometimes Plaintiffs were personally handling or working with mercury and/or mercury-containing or contaminated materials, equipment, or premises, and sometimes their nearby co-workers were doing so.

686.    Despite knowing about the dangers of mercury, Contractor Defendants  did nothing to warn Plaintiffs, or others similarly situated, and Contractor Defendants did nothing to eliminate, avoid, or mitigate the dangers to Plaintiffs, or others similarly situated, from the presence, use, and maintenance of mercury and/or mercury-containing or contaminated materials, equipment, at the FACILITY.

687.    The Contractor Defendants negligently breached duties of care to Plaintiffs, which acts and/or omissions directly and proximately caused personal injuries to Plaintiffs.

688.    The said Contractor Defendants' negligence and breach of their said duties of care, included, but was not limited to:

a. In failing to adequately warn Plaintiffs, or others similarly situated, of the dangerous characteristics of mercury and mercury-containing or contaminated materials or equipment;

b. In failing to adequately warn Plaintiffs, or others similarly situated, of the dangers presented by Defendants' work on mercury-contaminated premises;

c. In failing to properly train Plaintiffs, and others similarly situated, to identify and avoid or at least minimize exposure to mercury and mercury-containing or contaminated materials or equipment;

d. In failing to provide Plaintiffs, and others similarly situated, with information as to what would be reasonably safe and sufficient apparel and proper protective equipment;

e. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce an appropriate safety plan;

f. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safe method of working with or around, handling, cleaning up, or disposing of mercury;

g. In continuing to supply, purchase, procure, own, or maintain mercury-containing or contaminated materials, equipment, and premises when Defendants knew or should have known that such materials, equipment, and premises caused injuries in those persons exposed to mercury;

h. In inducing Plaintiffs, through material misrepresentations or concealment, to unknowingly expose themselves to the hazards of mercury;

i. In failing to adequately test the mercury used in or on its materials, equipment, and premises;

j.   In failing to remove all the mercury or mercury-containing or contaminated materials or equipment from the FACILITY;

k.   In failing to meet Contractor Defendants' continuing duty to warn or advise Plaintiffs, and others similarly situated, of the dangers associated with mercury exposure and to cease all future exposure, and to keep the mercury-contaminated physical body, clothes, and tools of its workers, contractor workers and invitees away from the home environment;

l.   In failing to conduct adequate, if any, industrial hygiene, epidemiological, or medical studies related to mercury exposures resulting from the use of mercury and/or mercury-containing or contaminated materials or equipment at the FACILITY;

m.   In failing to provide instructions or a method for the safe use of mercury;

n.   In failing to provide adequate, if any, instructions in the use or removal of mercury-contaminated materials or equipment;

o.   In failing to adequately communicate information about the hazards of mercury in the FACILITY;

p.   In failing to provide Plaintiffs with a reasonably safe place at which to work;

q.   In allowing or causing Plaintiffs to be improperly exposed to toxic mercury;

r.   In engaging in misfeasance that set in motion a risk of harm to Plaintiffs;

s.   In performing and/or failing to perform workplace safety and/or failing to adequately monitor mercury exposures and/or failing to provide adequate equipment, devices or goods, related to the monitoring, safety, protection from or containment of mercury releases within and/or around that FACILITY;

t. In designing, planning, repairing or constructing the buildings and/or equipment and/or systems therein, that adversely affected mercury monitoring, containment, safety, and/or releases at the FACILITY;

u. In performing their duties as contractors for the decommission-related and demolition-related work, by failing to protect Plaintiffs from mercury exposure;

v. In failing to disclose to Plaintiffs their exposure to mercury in the workplace, and/or the true dangers and risk of mercury;

w. In operating and/or failing to operate and/or failing to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or devices and/or disabled mercury alarm systems at or around the FACILITY;

x. In failing to maintain safe working conditions at or around the FACILITY with respect to preventing mercury exposure;

y. In failing to adhere to legally required manufacturing practices, and/or failing to adhere to governmental standards, rules and/or regulations with regard to mercury safety, monitoring, releases and/or containment, such as constituted negligence per se;

z. In failing to adequately monitor, implement and/or perform mercury monitoring; and

aa. In breaching the standard of care and/or impeding the medical standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiffs the true dangers of and the true levels of the mercury exposures.

**689.** As a direct and proximate result of the said Contractor Defendants' negligence and/or negligence per se, Plaintiffs suffered personal injuries and damages as set out in this Complaint.

690. The Plaintiffs in this case have symptoms consistent with the symptomology of mercury intoxication. These symptoms have been detailed by Plaintiffs in an attached exhibit. Please see Plaintiffs' Summary of Symptoms, Exhibit 44.

691. Plaintiffs demand against all Contractor Defendants, individually and jointly, compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

## Count VII-Negligence

*Plaintiff Sister Facility Workers against Contractor Defendants who worked at the SISTER FACILITY.*

692. Plaintiff Sister Facility Workers repeat and re-allege all prior allegations of this complaint.

693. Plaintiff Sister Facility Workers are maintaining this claim against Contractor Defendants who are believed to have been performing work at the SISTER FACILITY while said Plaintiffs were working at the SISTER FACILITY. Plaintiff Sister Facility Workers are further maintaining this claim against Contractor Defendants and who are believed to have been performing work at the FACILITY while said Plaintiffs were working at the SISTER FACILITY, due the geographic proximity, interconnectedness and shared common areas of the FACILITY *SEE the discussion of the FACILITY and SISTER FACILITY at paragraphs 116 - 126.*. For the details on the time frames that such Plaintiffs were exposed, see the approximate time frames listed by Plaintiff in Exhibit 1 – Matrix of Plaintiff Claims. Details on the exact scope of work and time frame performed are known to each Contractor Defendant and will be further identified in discovery in this matter.

694. Contractor Defendants owed a duty to these Plaintiff Sister Facility Workers to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm.

695.    On a daily, regular, and frequent basis while working at the SISTER FACILITY, Plaintiff Sister Facility Workers were exposed to mercury and/or mercury-containing or contaminated materials, equipment, or premises.

696.    Depending upon the assigned task, sometimes Plaintiff Sister Facility Workers were personally handling or working with mercury and/or mercury containing or contaminated materials, equipment, or premises, and sometimes their nearby co-workers were doing so.

697.    Despite knowing about the dangers of mercury, Contractor Defendants ] did nothing to warn Plaintiff Sister Facility Workers, or others similarly situated, and Contractor Defendants did nothing to eliminate, avoid, or mitigate the dangers to Plaintiff Sister Facility Workers, or others similarly situated, from the presence, use, and maintenance of mercury and/or mercury-containing or contaminated materials, equipment, at the SISTER FACILITY.

698.    The said Contractor Defendants negligently breached duties of care to Plaintiff Sister Facility Workers, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff Sister Facility Workers.

699.    The said Contractor Defendants' negligence and breach of their said duties of care, included, but was not limited to:

a.  In failing to adequately warn Plaintiff Sister Facility Workers, or others similarly situated, of the dangerous characteristics of mercury and mercury-containing or contaminated materials or equipment;

b.  In failing to adequately warn Plaintiff Sister Facility Workers, or others similarly situated, of the dangers presented by Defendants' work on mercury-contaminated premises;

c. In failing to properly train Plaintiff Sister Facility Workers, and others similarly situated, to identify and avoid or at least minimize exposure to mercury and mercury-containing or contaminated materials or equipment;

d. In failing to provide Plaintiff Sister Facility Workers, and others similarly situated, with information as to what would be reasonably safe and sufficient apparel and proper protective equipment;

e. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce an appropriate safety plan;

f. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safe method of working with or around, handling, cleaning up, or disposing of mercury;

g. In continuing to supply, purchase, procure, own, or maintain mercury-containing or contaminated materials, equipment, and premises when Contractor Defendants knew or should have known that such materials, equipment, and premises caused injuries in those persons exposed to mercury;

h. In inducing Plaintiff Sister Facility Workers, through material misrepresentations or concealment, to unknowingly expose themselves to the hazards of mercury;

i. In failing to adequately test the mercury used in or on its materials, equipment, and premises;

j. In failing to remove all the mercury or mercury-containing or contaminated materials or equipment from the SISTER FACILITY;

k. In failing to meet Contractor Defendants' continuing duty to warn or advise Plaintiff Sister Facility Workers, and others similarly situated, of the dangers associated with

mercury exposure and to cease all future exposure, and to keep the mercury-contaminated physical body, clothes, and tools of its workers, contractor workers and invitees away from the home environment;

l. In failing to conduct adequate, if any, industrial hygiene, epidemiological, or medical studies related to mercury exposures resulting from the use of mercury and/or mercury-containing or contaminated materials or equipment at the SISTER FACILITY;

m. In failing to provide instructions or a method for the safe use of mercury;

n. In failing to provide adequate, if any, instructions in the use or removal of mercury-contaminated materials or equipment;

o. In failing to adequately communicate information about the hazards of mercury in the SISTER FACILITY;

p. In failing to provide Plaintiff Sister Facility Workers with a reasonably safe place at which to work;

q. In allowing or causing Plaintiff Sister Facility Workers to be improperly exposed to toxic mercury;

r. In engaging in misfeasance that set in motion a risk of harm to Plaintiff Sister Facility Workers;

s. In performing and/or failing to perform workplace safety and/or failing to adequately monitor mercury exposures and/or failing to provide adequate equipment, devices or goods, related to the monitoring, safety, protection from or containment of mercury releases within and/or around the SISTER FACILITY;

t. In designing, planning, repairing or constructing the buildings and/or equipment and/or systems therein, that adversely affected mercury monitoring, containment, safety, and/or releases at the SISTER FACILITY;

u. In performing their duties as contractors for the decommission-related and demolition-related work, by failing to protect Plaintiff Sister Facility Workers from mercury exposure;

v. In failing to disclose to Plaintiff Sister Facility Workers their exposure to mercury in the workplace, and/or the true dangers and risks of mercury;

w. In operating and/or failing to operate and/or failing to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or devices and/or disabled mercury alarm systems at or around the SISTER FACILITY;

x. In failing to maintain safe working conditions at or around the SISTER FACILITY with respect to preventing mercury exposure;

y. In failing to adhere to legally required manufacturing practices, and/or failing to adhere to governmental standards, rules and/or regulations with regard to mercury safety, monitoring, releases and/or containment, such as constituted negligence per se;

z. In failing to adequately monitor, implement and/or perform mercury monitoring; and

aa. In breaching the standard of care and/or medical standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiff Sister Facility Workers the true dangers of and the true levels of the mercury exposures.

**700.** As a direct and proximate result of the said Contractor Defendants' negligence and/or negligence per se, Plaintiff Sister Facility Workers suffered personal injuries and damages as set out in this Complaint.

**701.** The Plaintiffs in this case have symptoms consistent with the symptomology of mercury intoxication. These symptoms have been detailed by Plaintiffs in an attached exhibit. Please see Plaintiffs' Summary of Symptoms, Exhibit 44.

**702.** Plaintiffs demand against all Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN and CUSTOM MECHANICAL], individually and jointly, compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

## Count VIII - Negligence

*Plaintiff Contractor Workers against Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN and CUSTOM MECHANICAL] who performed work at the FACILITY, except that Plaintiff Contractor Workers are not suing their former employer for any time while an employee of said Contractor Defendant.*

**703.** Plaintiff Contractor Workers repeat and re-allege all prior allegations of this complaint.

**704.** Plaintiff Contractor Workers are maintaining this claim against Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN and CUSTOM MECHANICAL] who are believed to have been performing work at the FACILITY and/or SISTER FACILITY while said Plaintiffs were working at the FACILITY and/or SISTER FACILITY, other than their employer.

**705.** No Plaintiff Contractor Worker is suing their former employer for any time while the Plaintiff Contractor Worker was an employee of that named Contractor Defendant. For avoidance of doubt by way of an example, if a Plaintiff Contractor Worker was an employee of a Contractor Defendant BILFINGER, formerly known

as FRUCON, from 1995 - 2000, then that Plaintiff Contractor Worker is only making a claim under this against all other Contractor Defendants other than BILFINGER, formerly known as FRUCON, for this time period when that Plaintiff Contractor Worker was employed by BILFINGER, formerly known as FRUCON,. Further, in this example, the Plaintiff Contractor Worker would only be making a claim against those Contractor Defendants who were performing work at the FACILITY.

706. For the details on the time frames that such Plaintiffs were exposed, see the approximate time frames listed by Plaintiff in Exhibit 1 – Matrix of Plaintiff Claims. Details on the exact scope of work and time frame performed are known to each Contractor Defendant and will be further identified in discovery in this matter.

707. These Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN and CUSTOM MECHANICAL] owed a duty to these Plaintiffs to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm.

708. On a daily, regular, and frequent basis while working at the FACILITY and/or SISTER FACILITY, Plaintiffs were exposed to mercury and/or mercury-containing or contaminated materials, equipment, or premises.

709. Depending upon the assigned task, sometimes Plaintiffs were personally handling or working with mercury and/or mercury-containing or contaminated materials, equipment, or premises, and sometimes their nearby co-workers were doing so.

710. Despite knowing about the dangers of mercury, Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN and CUSTOM MECHANICAL]

did nothing to warn Plaintiffs, or others similarly situated, and Contractor Defendants did nothing to eliminate, avoid, or mitigate the dangers to Plaintiffs, or others similarly situated, from the presence, use, and maintenance of mercury and/or mercury-containing or contaminated materials, equipment, at the FACILITY and/or SISTER FACILITY.

711.     The Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL] negligently breached duties of care to Plaintiffs, which acts and/or omissions directly and proximately caused personal injuries to Plaintiffs.

712.     The said Contractor Defendants' [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL] negligence and breach of their said duties of care, included, but was not limited to:

a.   In failing to adequately warn Plaintiffs, or others similarly situated, of the dangerous characteristics of mercury and mercury-containing or contaminated materials or equipment;

b.   In failing to adequately warn Plaintiffs, or others similarly situated, of the dangers presented by Defendants' work on mercury-contaminated premises;

c.   In failing to properly train Plaintiffs, and others similarly situated, to identify and avoid or at least minimize exposure to mercury and mercury-containing or contaminated materials or equipment;

d.   In failing to provide Plaintiffs, and others similarly situated, with information as to what would be reasonably safe and sufficient apparel and proper protective equipment;

e.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce an appropriate safety plan;

f.  In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safe method of working with or around, handling, cleaning up, or disposing of mercury;

g.  In continuing to supply, purchase, procure, own, or maintain mercury-containing or contaminated materials, equipment, and premises when Defendants knew or should have known that such materials, equipment, and premises caused injuries in those persons exposed to mercury;

h.  In inducing Plaintiffs, through material misrepresentations or concealment, to unknowingly expose themselves to the hazards of mercury;

i.  In failing to adequately test the mercury used in or on its materials, equipment, and premises;

j.  In failing to remove all the mercury or mercury-containing or contaminated materials or equipment from the FACILITY and/or SISTER FACILITY;

k.  In failing to meet Contractor Defendants' continuing duty to warn or advise Plaintiffs, and others similarly situated, of the dangers associated with mercury exposure and to cease all future exposure, and to keep the mercury-contaminated physical body, clothes, and tools of its workers, contractor workers and invitees away from the home environment;

l.  In failing to conduct adequate, if any, industrial hygiene, epidemiological, or medical studies related to mercury exposures resulting from the use of mercury and/or mercury-

containing or contaminated materials or equipment at the FACILITY and/or SISTER FACILITY;

m. In failing to provide instructions or a method for the safe use of mercury;

n. In failing to provide adequate, if any, instructions in the use or removal of mercury-contaminated materials or equipment;

o. In failing to adequately communicate information about the hazards of mercury in the FACILITY and/or SISTER FACILITY;

p. In failing to provide Plaintiffs with a reasonably safe place at which to work;

q. In allowing or causing Plaintiffs to be improperly exposed to toxic mercury;

r. In engaging in misfeasance that set in motion a risk of harm to Plaintiffs;

s. In performing and/or failing to perform workplace safety and/or failing to adequately monitor mercury exposures and/or failing to provide adequate equipment, devices or goods, related to the monitoring, safety, protection from or containment of mercury releases within and/or around that FACILITY and/or SISTER FACILITY;

t. In designing, planning, repairing or constructing the buildings and/or equipment and/or systems therein, that adversely affected mercury monitoring, containment, safety, and/or releases at the FACILITY and/or SISTER FACILITY;

u. In performing their duties as contractors for the decommission-related and demolition-related work, by failing to protect Plaintiffs from mercury exposure;

v. In failing to disclose to Plaintiffs their exposure to mercury in the workplace, and/or the true dangers and risk of mercury;

w. In operating and/or failing to operate and/or failing to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or devices

and/or disabled mercury alarm systems at or around the FACILITY and/or SISTER FACILITY;

x.  In failing to maintain safe working conditions at or around the FACILITY and/or SISTER FACILITY with respect to preventing mercury exposure;

y.  In failing to adhere to legally required manufacturing practices, and/or failing to adhere to governmental standards, rules and/or regulations with regard to mercury safety, monitoring, releases and/or containment, such as constituted negligence per se;

z.  In negligently performing its duties as general contractors and/or as subcontractors and/or as service providers for the decommission-related and demolition-related work, by failing to protect same from mercury exposure;

aa. In failing to adequately monitor, implement and/or perform mercury monitoring; and

bb. In breaching the standard of care and/or impeding the medical standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiffs the true dangers of and the true levels of the mercury exposures.

**713.**    As a direct and proximate result of the said Contractor Defendants' [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL] negligence and/or negligence per se, Plaintiffs suffered personal injuries and damages as set out in this Complaint.

**714.**    The Plaintiffs in this case have symptoms consistent with the symptomology of mercury intoxication. These symptoms have been detailed by Plaintiffs in an attached exhibit. Please see Plaintiffs' Summary of Symptoms, Exhibit 44.

715.    Plaintiffs demand against all Contractor Defendants, individually and jointly, compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

## Count IX – Negligence

*Plaintiff Family Members against Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL] who performed work at the FACILITY and/or SISTER FACILITY.*

716.    Plaintiff Family Members repeat and re-allege all prior allegations of this complaint.

717.    Plaintiff Family Members are maintaining this claim against Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL] for the time periods in Exhibit 1 when their said Plaintiff Workers were working at the FACILITY and/or SISTER FACILITY and Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL] are believed to have been performing work at the FACILITY and/or SISTER FACILITY, resulting in the Plaintiff Family Members being exposed to mercury as a result of such work.

718.    These Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL] owed a duty to these Plaintiff Workers to refrain from engaging in conduct that creates an unreasonable and foreseeable risk of harm.

719.    On a daily, regular, and frequent basis while working at the FACILITY and/or SISTER FACILITY, Plaintiff Workers were exposed to mercury and/or mercury-containing or contaminated materials, equipment, or premises.

720.    Depending upon the assigned task, sometimes Plaintiff Workers were personally handling or working with mercury and/or mercury-containing or contaminated materials, equipment, or premises, and sometimes their nearby co-workers were doing so.

721.    Despite knowing about the dangers of mercury, Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL] did nothing to warn Plaintiff Workers, or others similarly situated, and Contractor Defendants did nothing to eliminate, avoid, or mitigate the dangers to Plaintiff Workers, or others similarly situated, from the presence, use, and maintenance of mercury and/or mercury-containing or contaminated materials, equipment, at the FACILITY and/or SISTER FACILITY.

722.    Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL] negligently breached duties of care to Plaintiff Workers, which acts and/or omissions directly and proximately caused personal injuries to Plaintiff Family Members.

723.    The negligence and breach of said duties of care by Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL], included, but was not limited to:

a. In failing to adequately warn Plaintiffs, or others similarly situated, of the dangerous characteristics of mercury and mercury-containing or contaminated materials or equipment;

b. In failing to adequately warn Plaintiffs, or others similarly situated, of the dangers presented by Defendants' work on mercury-contaminated premises;

c. In failing to properly train Plaintiffs, and others similarly situated, to identify and avoid or at least minimize exposure to mercury and mercury-containing or contaminated materials or equipment;

d. In failing to provide Plaintiffs, and others similarly situated, with information as to what would be reasonably safe and sufficient apparel and proper protective equipment;

e. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce an appropriate safety plan;

f. In failing to take reasonable precautions or exercise reasonable care to publish, adopt, and enforce a safe method of working with or around, handling, cleaning up, or disposing of mercury;

g. In continuing to supply, purchase, procure, own, or maintain mercury-containing or contaminated materials, equipment, and premises when Defendants knew or should have known that such materials, equipment, and premises caused injuries in those persons exposed to mercury;

h. In inducing Plaintiffs, through material misrepresentations or concealment, to unknowingly expose themselves to the hazards of mercury;

i. In failing to adequately test the mercury used in or on its materials, equipment, and premises;

j. In failing to remove all the mercury or mercury-containing or contaminated materials or equipment from the FACILITY and/or SISTER FACILITY;

k. In failing to meet Contractor Defendants' continuing duty to warn or advise Plaintiffs, and others similarly situated, of the dangers associated with mercury exposure and to cease all future exposure, and to keep the mercury-contaminated physical body, clothes, and tools of its workers, contractor workers and invitees away from the home environment;

l. In failing to conduct adequate, if any, industrial hygiene, epidemiological, or medical studies related to mercury exposures resulting from the use of mercury and/or mercury-containing or contaminated materials or equipment at the FACILITY and/or SISTER FACILITY;

m. In failing to provide instructions or a method for the safe use of mercury;

n. In failing to provide adequate, if any, instructions in the use or removal of mercury-contaminated materials or equipment;

o. In failing to adequately communicate information about the hazards of mercury in the FACILITY and/or SISTER FACILITY;

p. In failing to provide Plaintiffs with a reasonably safe place at which to work;

q. In allowing or causing Plaintiffs to be improperly exposed to toxic mercury;

r. In engaging in misfeasance that set in motion a risk of harm to Plaintiffs;

s. In performing and/or failing to perform workplace safety and/or failing to adequately monitor mercury exposures and/or failing to provide adequate equipment, devices or

goods, related to the monitoring, safety, protection from or containment of mercury releases within and/or around that FACILITY and/or SISTER FACILITY;

t.  In designing, planning, repairing or constructing the buildings and/or equipment and/or systems therein, that adversely affected mercury monitoring, containment, safety, and/or releases at the FACILITY and/or SISTER FACILITY;

u.  In performing their duties as contractors for the decommission-related and demolition-related work, by failing to protect Plaintiffs from mercury exposure;

v.  In failing to disclose to Plaintiffs their exposure to mercury in the workplace, and/or the true dangers and risk of mercury;

w.  In operating and/or failing to operate and/or failing to properly maintain mercury-related safety equipment and/or mercury monitoring, containment, and/or devices and/or disabled mercury alarm systems at or around the FACILITY and/or SISTER FACILITY;

x.  In failing to maintain safe working conditions at or around the FACILITY and/or SISTER FACILITY with respect to preventing mercury exposure;

y.  In failing to adhere to legally required manufacturing practices, and/or failing to adhere to governmental standards, rules and/or regulations with regard to mercury safety, monitoring, releases and/or containment, such as constituted negligence per se;

z.  In negligently performing its duties as general contractors and/or as subcontractors and/or as service providers for the decommission-related and demolition-related work, by failing to protect same from mercury exposure;

aa. In failing to adequately monitor, implement and/or perform mercury monitoring; and

bb. In breaching the standard of care and/or impeding the medical standard of care by not adequately providing mercury monitoring and/or by not disclosing to Plaintiffs the true dangers of and the true levels of the mercury exposures.

724.     As a direct and proximate result of said negligence and/or negligence per se, Plaintiff Family Members were caused personal injuries and damages as set out in this Complaint, in particular see Exhibit 44 - Plaintiffs' Summary of Symptoms.

725.     Plaintiff Family Members demand against Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL] compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

## Count X –Misrepresentation by Concealment

*Plaintiff Contractor Workers, Plaintiff Sister Facility Workers, and Plaintiff Family Members against OLIN.*

726.     Plaintiff Contractor Workers, Plaintiff Sister Facility Workers, and Plaintiff Family Members repeat and re-allege all prior allegations of this complaint.

727.     Plaintiff Contractor Workers, Plaintiff Sister Facility Workers, and Plaintiff Family Members are maintaining this claim against OLIN for the time periods in Exhibit 1 when their said Plaintiff Contractor Workers or Plaintiff Sister Facility Workers were working at the FACILITY or SISTER FACILITY, resulting in the Plaintiff Contractor Workers, Plaintiff Sister Facility Workers, and Plaintiff Family members being exposed to mercury as a result of such work.

728.     Prior to exposure of Plaintiff Contractor Workers and Plaintiff Sister Facility Workers to OLIN's equipment and processes utilizing toxic mercury and other toxicants,

OLIN possessed substantial medical and scientific data by which OLIN knew their mercury processes were, or were likely to become, hazardous to the life, health and safety of persons in the position of all Plaintiff Contractor Workers and Plaintiff Sister Facility Workers who were exposed to their processes. The aforementioned medical and scientific data includes a vast list of publications, pamphlets, EPA documentation and other resources, as described above, which established that mercury was widely recognized as harmful to persons who had regularly worked with and around mercury, as set forth above.

729.    Nevertheless, prompted by pecuniary motives and despite a duty to diclose, OLIN failed and refused to act upon such medical and scientific data, to warn Plaintiff Contractor Workers, and Plaintiff Sister Facility Workers of the life and health-threatening dangers of exposure to toxic mercury and the breathing of mercury vapor, and to take such other reasonable precautions necessary to lessen the dangers and potentially lethal and dangerous characteristics of these hazardous substances to Plaintiff Contractor Workers and Plaintiff Sister Facility Workers

730.    Further, OLIN falsely and repeatedly assured Plaintiff Contractor Workers and Plaintiff Sister Facility Workers that the FACILITY and SISTER FACILITY were safe. OLIN, in wanton and reckless disregard for human life and health, deliberately, intentionally and purposely withheld and concealed such safety information from those exposed to their processes and materials including Plaintiff Contractor Workers and Plaintiff Sister Facility Workers. See the detailed discussion, quotations and affidavit citations located at paragraphs 427 to 462.

731.    With the intent to deceive Plaintiff Contractor Workers and Plaintiff Sister Facility Workers, OLIN concealed or suppressed material facts from all Plaintiffs, to whom they

had a duty to disclose, regarding the dangers of mercury and other toxicants. These omissions were material and were made intentionally, falsely, with knowledge of their falsity, or with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred, and with the intent of misleading Plaintiff Contractor Workers and Plaintiff Sister Facility Workers into relying upon them. See the detailed discussion located at paragraphs 427 to 462.

732.     Upon information and belief, the individuals who made these fraudulent misrepresentations and the dates on which they were made are known to OLIN and will be further identified in discovery in this matter.

733.     Plaintiff Contractor Workers and Plaintiff Sister Facility Workers reasonably relied upon OLIN's representations, concealments, and suppressions because of OLIN's superior knowledge and duty of care toward the health and safety of Plaintiff Contractor Workers and Plaintiff Sister Facility Workers, and Plaintiff Contractor Workers and Plaintiff Sister Facility Workers suffered resulting injuries proximately caused by their reliance.

734.     Plaintiff Contractor Worker and Plaintiff Sister Facility Workers were not aware of the material facts concealed or suppressed by OLIN (regarding the dangers of mercury and other toxicants), and they would have acted differently if they had known.

735.     As a direct and proximate result of OLIN's ongoing misrepresentations, concealments, and suppressions, Plaintiff Contractor Workers and Plaintiff Sister Facility Workers were reasonably unaware of their exposure to dangerous levels of mercury, which resulted in their continued employment at the FACILITY and/or SISTER FACILITY and continued exposure to mercury, ultimately leading to personal injuries to Plaintiff Contractor Workers, Plaintiff Sister Facility Workers and Plaintiff Family Members.

736.     OLIN's fraudulent statements were made continuously throughout the time stated above, and is detailed in Exhibit 1, to the Plaintiff Contractor Workers and Plaintiff Sister Facility Workers while at the FACILITY and/or SISTER FACILITY, and more specifically were made as follows:

a.  That adequate mercury monitoring was being conducted when in fact monitoring was inaccurate, sporadic, and at times non-existent;

b.  That levels of mercury exposure were reasonably safe and that work exposures and processes posed no threat of danger for toxic mercury contamination;

c.  That the FACILITY and/or SISTER FACILITY were safe workplaces when in fact, the FACILITY and SISTER FACILITY were contaminated with excessive levels of mercury and the work processes used dangerously exposed Plaintiff Contractor Workers and Plaintiff Sister Facility Workers to excessive levels of mercury;

d.  That the FACILITY and/or SISTER FACILITY operated in compliance with safe industry practices and/or governmental rules and/or regulations regarding mercury emissions, when in fact it did not, which led to Plaintiff Contractor Workers and Plaintiff Sister Facility Workers being exposed to dangerous levels of mercury;

e.  That mercury containment, devices and warning systems, and/or equipment at the FACILITY and/or SISTER FACILITY were adequate to prevent harmful mercury exposures when the same were ineffective to prevent Plaintiff Contractor Workers and Plaintiff Sister Facility Workers from being exposed to dangerous levels of mercury exposure;

f.  That mercury emissions at the FACILITY and/or SISTER FACILITY were within safe and/or acceptable levels, when in fact, Plaintiff Contractor Workers and

Plaintiff Sister Facility Workers were exposed to unsafe and unacceptably dangerous levels of mercury exposure; and

g.  That periodic, employer-sponsored, urine testing of workers adequately or accurately revealed the mercury exposure of Plaintiff Contractor Workers and Plaintiff Sister Facility Workers, when in fact, that testing was ineffective to show actual levels, which led to Plaintiff Contractor Workers and Plaintiff Sister Facility Workers being exposed to dangerous levels of mercury.

737.  Plaintiff Family Members were harmed as a direct and proximate result of OLIN's fraudulent statements to the Plaintiff Contractor Workers and Plaintiff Sister Facility Workers while at the FACILITY and/or SISTER FACILITY. Exhibit 1 contains details on the specific Plaintiff Family Members, their connection to Plaintiff Contractor Workers and Plaintiff Sister Facility Workers, as well as the time frames for these workers.

738.  Plaintiff Contractor Workers, Plaintiff Sister Facility Workers and Plaintiff Family Members were unaware of the dangers to life and health resulting from exposure to OLIN's toxic mercury and not possessing the degree of technical knowledge and expertise of OLIN concerning toxic mercury and its use, continued to work with and around OLIN's mercury and were deprived by the above described acts and omissions of OLIN of the free and informed opportunity to remove themselves from exposure to OLIN's mercury and otherwise to protect themselves from exposure thereto.

739.  OLIN's fraudulent conduct of concealment or suppression was a direct and proximate cause of mercury related disease and related damages to Plaintiff Contractor Workers, Plaintiff Sister Facility Workers and Plaintiff Family Members.

740. The fraudulent scheme and fraudulent intent as described above was committed and carried out at the FACILITY and/or SISTER FACILITY with the intent of pecuniary gain, to maximize production and profits at the expense of the health of Plaintiff Contractor Workers, Plaintiff Sister Facility Workers, and Plaintiff Family Members knowing that in order to keep workers and to keep production up, Plaintiff Contractor Workers, Plaintiff Sister Facility Workers, and Plaintiff Family Members needed to believe they were safe and that their health was not at risk.

741. The Plaintiff Contractor Workers, Plaintiff Sister Facility Workers, and Plaintiff Family Members have symptoms consistent with the symptomology of mercury intoxication. These symptoms have been detailed by Plaintiffs in an attached exhibit. Please see Plaintiffs' Summary of Symptoms, Exhibit 44.

742. Plaintiff Contractor Workers, Plaintiff Sister Facility Workers, and Plaintiff Family Members demand against OLIN compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

**Count XI –Misrepresentation by Concealment**

*Plaintiff Direct Workers of OLIN, Plaintiff Sister Facility Workers, and Plaintiff Family Members against Contractor Defendants [BILFINGER, formerly known as FRUCON, ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL] who performed work at the FACILITY or SISTER FACILITY.*

743. Plaintiff Direct Workers of OLIN, Plaintiff Sister Facility Workers and Plaintiff Family Members repeat and re-allege all prior allegations of this complaint.

744. Plaintiff Direct Workers of OLIN, Plaintiff Sister Facility Workers and Plaintiff Family Members are maintaining this claim against Contractor Defendants [*[BILFINGER,* formerly known as FRUCON, *ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL*]

who are believed to have been performing work at the FACILITY or SISTER FACILITY while said Plaintiff Direct Workers of OLIN or Plaintiff Sister Facility Workers were working at the FACILITY or SISTER FACILITY, as stated by Plaintiff and time frame in Exhibit 1, including the Plaintiff Family Members who were exposed to mercury as a result of such work.

745.    Plaintiff Direct Workers of OLIN, Plaintiff Sister Facility Workers and Plaintiff Family Members reposed their trust and confidence in the Contractor Defendants to disclose material information regarding the potential harms associated with exposure to toxic mercury in the workplace.

746.    Contractor Defendants possessed substantial medical and scientific data regarding the work that was being done by them at the FACILITY and/or SISTER FACILITY, including the likelihood that such work would increase exposure of Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers to toxic mercury and other toxicants. This data indicated that their respective types of work involving mercury were known or likely to become hazardous to the life, health, and safety of individuals in the positions of all Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers who were exposed to such work.  This medical and scientific data comprises numerous publications, pamphlets, EPA documentation, and other resources, which established that mercury was widely recognized as harmful to persons who had regularly worked with and around mercury, as set forth above.

747.    Nevertheless, prompted by pecuniary motives and despite a duty to disclose, Contractor Defendants failed and refused to act upon such medical and scientific data, to warn Plaintiff Direct Workers of OLIN, and  Plaintiff Sister Facility Workers of the life

and health-threatening dangers of exposure to toxic mercury and the breathing of mercury vapor, and to take such other reasonable precautions necessary to lessen the dangers and potentially lethal and dangerous characteristics of these hazardous substances to Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers. For the details on the time frames that such Plaintiffs were exposed, see the approximate time frames listed by Plaintiff in Exhibit 1 – Matrix of Plaintiff Claims. Details on the exact scope of work and time frame performed are known to each Contractor Defendant and will be further identified in discovery in this matter. *See Affidavits (Exhibit 3, Powers Affidavit, ¶9, 11A); (Exhibit 7, Kelley Affidavit ¶7), (Exhibit 15, Webb Affidavit, ¶ 8), (Exhibit 22, Donaldson Affidavit, ¶20E).*

748.     Further, Contractor Defendants, in wanton and reckless disregard for human life and health, deliberately, intentionally and purposely withheld and concealed such safety information from those exposed to their processes and materials including Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers. See the detailed discussion, quotations and affidavit citations located at paragraphs 312- 325.

749.     With the intent to deceive Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers, Contractor Defendants concealed or suppressed material facts from all Plaintiffs, to whom they had a duty to disclose, regarding the dangers of mercury and other toxicants. These omissions were material and were made intentionally, falsely, with knowledge of their falsity, or with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred, and with the intent of misleading Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers into relying upon

them. See the detailed discussion located at paragraphs 312-325 and the affidavits incorporated herein as to the knowledge of each Contractor Defendant.

750.     Upon information and belief, the individuals who made these fraudulent misrepresentations and the dates on which they were made are known to Contractor Defendants and will be further identified in discovery in this matter.

751.     Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers reasonably relied upon Contractor Defendants' representations, concealments, and suppressions because of Contractor Defendants' superior knowledge and duty of care toward the health and safety of Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers, and Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers suffered resulting injuries proximately caused by their reliance.

752.     Plaintiff Family Members were harmed as a direct and proximate result of Contractor Defendants' fraudulent statements to the Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers while at the FACILITY and/or SISTER FACILITY. Exhibit 1 contains details on the specific Plaintiff Family Members, their connection to Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers, as well as the time frames for these workers.

753.     Plaintiff Direct Workers of OLIN, Plaintiff Sister Facility Workers and Plaintiff Family Members were not aware of the material facts concealed or suppressed by Contractor Defendants (regarding the dangers of mercury and other toxicants), and they would have acted differently if they had known.

754.     As a direct and proximate result of Contractor Defendants' ongoing misrepresentations, concealments, and suppressions, Plaintiff Direct Workers of OLIN

and Plaintiff Sister Facility Workers were reasonably unaware of their exposure to dangerous levels of mercury, which resulted in their continued employment at the FACILITY and/or SISTER FACILITY and continued exposure to mercury, ultimately leading to personal injuries to Plaintiff Direct Workers of OLIN, Plaintiff Sister Facility Workers and Plaintiff Family Members, as stated by Plaintiff and time frame in Exhibit 1.

755. Contractor Defendants' fraudulent statements were made continuously throughout the time stated above, and in Exhibit 1 to the Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers while at the FACILITY and/or SISTER FACILITY, and more specifically were made as follows:

    a. That adequate mercury monitoring was being conducted when in fact monitoring was inaccurate, sporadic, and at times non-existent;

    b. That levels of mercury exposure were reasonably safe and that work exposures and processes posed no threat of danger for toxic mercury contamination;

    c. That the FACILITY and/or SISTER FACILITY were a safe workplace when in fact, the FACILITY and/or SISTER FACILITY were contaminated with excessive levels of mercury and the work processes used dangerously exposed Plaintiff Workers to excessive levels of mercury;

    d. That the Contractor Defendants' work at the FACILITY and/or SISTER FACILITY was done in compliance with safe industry practices and/or governmental rules and/or regulations regarding mercury emissions, when in fact it was not, which led to Plaintiff Direct Workers of OLIN and Plaintiff Sister Facility Workers being exposed to dangerous levels of mercury; and

e.  That mercury containment, devices and warning systems, and/or equipment used at the FACILITY and/or SISTER FACILITY were adequate to prevent harmful mercury exposures when the same were ineffective to prevent dangerous levels of mercury exposure.

756.  Plaintiff Direct Workers of OLIN, Plaintiff Sister Facility Workers, and Plaintiff Family Members were unaware of the dangers to life and health resulting from exposure to Contractor Defendants' specialized work, which significantly increased their exposure to toxic mercury.

757.  Plaintiff Direct Workers of OLIN, Plaintiff Sister Facility Workers, and Plaintiff Family Members did not have the degree of technical knowledge and expertise of Contractor Defendants concerning toxic mercury exposure, but Plaintiffs continued to work around the Contractor Defendants' specialized work. In engaging in this type of potentially dangerous work, these Plaintiffs trusted that the Contractor Defendants would disclose necessary information required for Plaintiffs to protect themselves and their families, and to determine whether to continue their employment at the FACILITY or SISTER FACILITY. As a result of the Contractor Defendants' actions and omissions, Plaintiffs were deprived of the free and informed opportunity to remove themselves from exposure to mercury and otherwise to protect themselves and their family members from exposure thereto.

758.  Contractor Defendants' fraudulent conduct of concealment or suppression was a direct and proximate cause of mercury related disease and related damages to Plaintiff Direct Workers of OLIN, Plaintiff Sister Facility Workers and Plaintiff Family Members.

759.     The Plaintiffs in this case have symptoms consistent with the symptomology of mercury intoxication. These symptoms have been detailed by Plaintiff in an attached exhibit. Please see Plaintiffs' Summary of Symptoms, Exhibit 44.

760.     Plaintiff Direct Workers of OLIN, Plaintiff Sister Facility Workers and Plaintiff Family Members demand against Contractor Defendants *[BILFINGER,* formerly known as FRUCON, *ROBINS & MORTON, PEN, TURNER, WHITE ELECTRICAL, formerly known as DUNCAN, and CUSTOM MECHANICAL]* compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

## Count XII- Intentional (Fraudulent) Misrepresentation/Reckless Misrepresentation

*Plaintiff Contractor Workers against OLIN.*

761.     Plaintiff Contractor Workers repeat and re-allege all prior allegations of this complaint.

762.     Prior to exposure of Plaintiff Contractor Workers to OLIN equipment and processes utilizing toxic mercury and other toxicants, OLIN possessed substantial medical and scientific data by which OLIN knew its mercury processes were, or were likely to become, hazardous to the life, health and safety of persons in the positions of Plaintiff Contractor Workers, who were exposed to its processes. The aforementioned medical and scientific data includes a vast list of publications, pamphlets, EPA documentation and other resources, as described above, which established that mercury was widely recognized as harmful to persons who had regularly worked with and around mercury, as set forth above. See the detailed discussion, quotations and affidavit citations located at paragraphs 89-94; 133-185; 199-266; 273-286; 423-442, 463-471.

763.     Nevertheless, prompted by pecuniary motives and despite a duty to disclose, OLIN made representations of existing or past material facts that were false when made, and

failed and refused to act upon such medical and scientific data, to warn Plaintiff Contractor Workers of the life and health-threatening dangers of exposure to toxic mercury and the breathing of mercury vapor, and to take such other reasonable precautions necessary to lessen the dangers and potentially lethal and dangerous characteristics of these hazardous substances to Plaintiff Contractor Workers. See the detailed discussion, quotations and affidavit citations located at paragraphs 554-594 - OLIN Failed to Protect Plaintiff Contractor Workers.

764.　　Further, OLIN falsely and repeatedly assured Plaintiff Contractor Workers that the FACILITY and/or SISTER FACILITY were safe. OLIN, in wanton and reckless disregard for human life and health, knowingly, without belief in its truth, and/or recklessly (without regards to its truth or falsity) made material misrepresentations of such safety information to those exposed to OLIN's processes and materials including Plaintiff Contractor Workers. See the detailed discussion, quotations and affidavit citations located at paragraphs 554-594 - OLIN Failed to Protect Plaintiff Contractor Workers.

765.　　OLIN knowingly, without belief in its truth, and/or recklessly made intentional misrepresentations of material facts to the Plaintiff Contractor Workers, to whom they had a duty to disclose the dangers of mercury and other toxicants. These misrepresentations were about existing or past material facts regarding the dangers of mercury and/or safety measures at the FACILITY and/or SISTER FACILITY and were false when made, and Plaintiff Contactor Workers reasonably relied upon these misrepresented material facts. See the detailed discussion, quotations and affidavit citations located at paragraphs 554-594 - OLIN Failed to Protect Plaintiff Contractor Workers.

766. Upon information and belief, the individuals who made these fraudulent misrepresentations and the dates on which they were made are known to OLIN and will be further identified in discovery in this matter.

767. Plaintiff Contractor Workers reasonably relied upon OLIN's representations because of OLIN's superior knowledge and duty of care owed to Plaintiff Contractor Workers' health and safety, and Plaintiff Contractor Workers suffered resulting injuries proximately caused by their reliance on the misrepresentations and the fraud perpetrated by OLIN. See the detailed discussion, quotations and affidavit citations located at paragraphs 554-594 - OLIN Failed to Protect Plaintiff Contractor Workers  or See the attached affidavits specifically: *(Exhibit 3, Powers Affidavit, ¶19); (Exhibit 7, Kelley Affidavit, ¶22); (Exhibit 8, Albury, Sr. Affidavit, ¶22); (Exhibit 9, Brokish Affidavit, ¶21); (Exhibit 10, Fife Affidavit, ¶20); (Exhibit 11, Goins Affidavit, ¶18); (Exhibit 12, Anderson Affidavit, ¶18); (Exhibit 14, Pendergrass Affidavit, ¶24); (Exhibit 15, Webb Affidavit, ¶23); (Exhibit 22, Donaldson Affidavit, ¶24); (Exhibit 24, Cline Affidavit, ¶22); (Exhibit 26, Hylton Affidavit, ¶20); (Exhibit 27, Brooks Affidavit, ¶19); (Exhibit 28, Ownby Affidavit, ¶17); (Exhibit 37, Shaw Affidavit, ¶20).*

768. Plaintiff Contractor Workers were not aware of the material facts being misrepresented by OLIN (regarding the dangers of mercury and other toxicants), Plaintiff Contractor Workers would have acted differently if they had known the dangers and risks.

769. As a direct and proximate result of OLIN's ongoing misrepresentations of material facts, Plaintiff Contractor Workers reasonably relied upon the misrepresentations of material facts and were reasonably unaware of their exposure to dangerous levels of mercury, which resulted in their continued employment at the FACILITY and/or SISTER

FACILITY, and continued exposure to mercury, ultimately leading to Plaintiff Contractor Workers' personal injuries.

770.     OLIN's intentional or reckless misrepresentations of material facts were made continuously throughout the time stated above and as stated in the time frames set out in Exhibit 1, to the Plaintiff Contractor Workers while at the FACILITY and/or SISTER FACILITY, and more specifically were made as follows:

a.  That adequate mercury monitoring was being conducted when in fact monitoring was inaccurate, sporadic, and at times non-existent;

b.  That levels of mercury exposure were reasonably safe, and that work exposures and processes posed no threat of danger for toxic mercury contamination;

c.  That the FACILITY and/or SISTER FACILITY and premises were a safe workplace when in fact, the FACILITY and/or SISTER FACILITY and premises were contaminated with excessive levels of mercury and the work processes used dangerously exposed Plaintiff Contractor Workers to excessive levels of mercury;

d.  That the FACILITY and/or SISTER FACILITY operated in compliance with safe industry practices and/or governmental rules and/or regulations regarding mercury emissions, when in fact it did not, which led Plaintiff Contractor Workers to being exposed to dangerous levels of mercury;

e.  That mercury containment, devices and warning systems, and/or equipment at the FACILITY and/or SISTER FACILITY were adequate to prevent harmful mercury exposures when the same were ineffective to prevent dangerous levels of mercury exposure;

f.  That mercury emissions at the FACILITY and/or SISTER FACILITY were within safe and/or acceptable levels, when in fact, Plaintiff Contractor Workers were exposed at the FACILITY and/or SISTER FACILITY to unsafe and unacceptably dangerous levels of mercury exposure;

g.  That periodic, OLIN-sponsored, urine testing of workers adequately or accurately revealed the Plaintiff Contractor Workers' mercury exposure, when in fact, that testing was ineffective to show actual levels;

h.  That safety briefings and safety meetings were held at the FACILITY and/or SISTER FACILITY with the intention of keeping individuals at the FACILITY and/or SISTER FACILITY safe, when in fact, the safety briefings and safety meetings rarely, if ever, even mentioned mercury and utterly failed in warning individuals of the dangers of working at the FACILITY and/or SISTER FACILITY;

i.  That PPE provided at the FACILITY and/or SISTER FACILITY to Plaintiff Contractor Workers would protect them from any dangers or risks related to their exposure to mercury, mercury vapors, or other dangerous toxicants, when in fact, the PPE provided to and worn by Plaintiff Contractor Workers was insufficient to provide adequate protection; and

j.  That adequate medical monitoring, medical care, and medical advice were being provided at the FACILITY and/or SISTER FACILITY by doctors and nurses to Plaintiff Contractor Workers, when in fact, that monitoring, care, and advice was sporadic, inaccurate, non-existent, misleading, and inadequate to protect Plaintiff Contractor Workers and Plaintiff Sister Facility Workers from mercury exposure. For examples of material misrepresentations made by OLIN to Plaintiff Contractor Workers and Plaintiff Sister Facility Workers, see the attached affidavits, specifically: (*Exhibit 3, Powers Affidavit, ¶ 7,*

*13, 19, 21A, 21E, 21F); (Exhibit 4, Johnkins Affidavit, ¶3, 25); (Exhibit 6, Price Affidavit, ¶ 14, 23A, 23B); (Exhibit 9, Brokish Affidavit, ¶7A, 12, 14, 23A); (Exhibit 10, Fife Affidavit, ¶22A, 22B, 22E); (Exhibit 11, Goins Affidavit, ¶20); (Exhibit 12, Anderson Affidavit, ¶19A, 19D); (Exhibit 13, Hobbs Affidavit, ¶19D); (Exhibit 14, Pendergrass Affidavit, ¶11, 14, 26A); (Exhibit 15, Webb Affidavit, ¶25A); (Exhibit 16, McMahan Affidavit, ¶23A, 23C); (Exhibit 22, Donaldson Affidavit, ¶26A, 26B); (Exhibit 26, Hylton Affidavit, ¶14, 22B); (Exhibit 27, Brooks Affidavit, ¶10, 14); (Exhibit 29, Henegar Affidavit, ¶7A, 10, 14); (Exhibit 30, Vanhook Affidavit, ¶7); (Exhibit 32, Collins Affidavit, ¶5); (Exhibit 36, Lawson Affidavit, ¶9, 18); (Exhibit 37, Shaw Affidavit, ¶7D, 7F, 13); (Exhibit 40, McMahan Affidavit, ¶4A, 8).*

771.     OLIN's intentional (fraudulent) misrepresentations and/or reckless misrepresentations of material facts were a direct and proximate cause of Plaintiff Contractor Workers mercury-related diseases and related damages.

772.     The fraudulent scheme and fraudulent intent as described above was committed and carried out at the FACILITY and/or SISTER FACILITY with the intent of pecuniary gain, to maximize production and profits at the expense of the health of Plaintiff Contractor Workers, knowing that in order to keep workers and to keep production up, Plaintiff Contractor Workers needed to believe they were safe and that their health was not at risk.

773.     The Plaintiffs in this case have symptoms consistent with the symptomology of mercury intoxication. These symptoms have been detailed by Plaintiff in an attached exhibit. *See* Plaintiffs' Summary of Symptoms, Exhibit 44.

774.     Plaintiff Contractor Workers demand against OLIN compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

**Count XIII - Premises Liability**

*Plaintiff Contractor Workers and Plaintiff Sister Facility Workers against OLIN.*

775. Plaintiff Contractor Workers and Plaintiff Sister Facility Workers repeat and re-allege all prior allegations of this complaint.

776. This count is brought by Plaintiff Contractor Workers and Plaintiff Sister Facility Workers against OLIN.

777. On numerous occasions and for substantial periods of time, Plaintiff Contractor Workers and Plaintiff Sister Facility Workers worked at the FACILITY and were therefore invited onto and lawfully entered upon property owned and controlled by OLIN.

778. OLIN owed a duty to Plaintiff Contractor Workers and Plaintiff Sister Facility Workers to provide a reasonably safe workplace. OLIN breached this duty.

779. OLIN owed a duty to Plaintiff Contractor Workers and Plaintiff Sister Facility Workers to use due care to maintain their property free of unreasonably dangerous or defective conditions and to adequately warn Plaintiff Contractor Workers and Plaintiff Sister Facility Workers of existing dangerous or defective conditions on the premises, including the presence of toxic mercury. OLIN breached this duty.

780. While upon property owned and controlled by OLIN, Plaintiff Contractor Workers and Plaintiff Sister Facility Workers were exposed to large quantities of toxic mercury and mercury vapor.

781. At all times complained of herein, OLIN knew or should have known large quantities of mercury were present upon their premises including in and upon equipment and materials with which Plaintiff Contractor Workers and Plaintiff Sister Facility Workers were working.

782. At all times complained of herein, OLIN knew or should have known that Plaintiff Contractor Workers and Plaintiff Sister Facility Workers were exposed to dangerous levels of toxic mercury and mercury vapor at the FACILITY.

783. At all times complained of herein, OLIN knew or should have known that the PPE provided to Plaintiff Contractor Workers and Plaintiff Sister Facility Workers would not adequately protect Plaintiff Contractor Worker and Plaintiff Sister Facility Workers from the dangerous levels of toxic mercury and mercury vapor at the FACILITY.

784. OLIN knew or should have known that Plaintiff Contractor Workers and Plaintiff Sister Facility Workers would necessarily work with, around, or in close proximity to toxic mercury and mercury vapor.

785. At all times complained of herein, OLIN knew or should have known the exposure to, and inhalation of toxic mercury and that mercury vapor could cause severe illnesses, conditions, and diseases, as set forth herein. Those include, but are not limited to, neuropathy, memory loss, renal and hepatic failure, emotional dysregulation, cardiovascular diseases, loss of sensory abilities, seizures, attention and cognitive issues, reproductive injuries, depression, anxiety, and suicidality.

786. At all times complained of herein, OLIN knew or should have known Plaintiff Contractor Workers and Plaintiff Sister Facility Workers were unaware of the dangers associated with toxic mercury exposure, or the full magnitude of that danger, and therefore were not capable of taking adequate measures to protect themselves, their co-workers and Plaintiff Family Members.

787. At all times complained of herein, OLIN failed to otherwise exercise control as owners of the FACILITY in a manner calculated to maintain their premises free of

exposure to toxic mercury and mercury vapor, an unnecessarily dangerous or defective condition, and thereby protect the health of the workers and their families.

788.    At all times complained of herein, OLIN failed to contain the toxic mercury and mercury vapor or to provide Plaintiff Contractor Workers and Plaintiff Sister Facility Workers with safe and adequate PPE so as to render the FACILITY safe.

789.    OLIN knew or should have known of the conditions set forth in the paragraphs above and at all times complained of herein were in a superior position to that of Plaintiff Contractor Workers and Plaintiff Sister Facility Workers to know the dangers of toxic mercury.

790.    OLIN was negligent in its failure to warn Plaintiff Contractor Workers and Plaintiff Sister Facility Workers, and other persons similarly situated, of the dangerous or defective condition of the materials, equipment, or premises brought about by the presence of toxic mercury.

791.    OLIN was negligent in its failure to warn Plaintiff Contractor Workers and Plaintiff Sister FACILITY, and other persons similarly situated, that the Plaintiff Family Members could also be harmed by the dangerous or defective condition of the premises brought about by the presence of toxic mercury and the cross-contamination of their homes and community.

792.    The actions or omissions of OLIN set forth in the paragraphs above of this Complaint were the cause of or were a significant contributing factor in bringing about the physical injuries set forth in this Complaint and all damages suffered by Plaintiff Contractor Workers and Plaintiff Sister Facility Workers resulting from these physical injuries.

793. The Plaintiffs in this case have symptoms consistent with the symptomology of mercury intoxication. These symptoms have been detailed by Plaintiff in an attached exhibit. Please see Plaintiffs' Summary of Symptoms, Exhibit 44.

794. Plaintiff Contractor Workers and Plaintiff Sister Facility Workers demand against OLIN, individually and jointly, compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

## Count XIV - Premises Liability

*Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN against ARCH.*

795. Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN repeat and re-allege all prior allegations of this complaint.

796. This count is brought by Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN against ARCH for the time period that it operated the SISTER FACILITY.

797. During the time that ARCH operated the SISTER FACILITY, ARCH was responsible for the portions of the FACILITY that were shared with OLIN and used by workers from both the FACILITY and SISTER FACILITY.

798. ARCH knew or should have known about the levels of mercury contamination at the SISTER FACILITY and the portions of the FACILITY that were shared with OLIN.

799. ARCH knew or should have known there was mercury contamination in the product that was being supplied from the FACILITY to the SISTER FACILITY for use by ARCH.

800. On numerous occasions and for substantial periods of time, Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN worked at the SISTER FACILITY and/or FACILITY and were therefore invited onto and lawfully entered upon property owned and/or controlled by ARCH.

801.     ARCH owed a duty to Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN to provide a reasonably safe workplace. ARCH breached this duty.

802.     ARCH owed a duty to Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN to use due care to maintain their property free of unreasonably dangerous or defective conditions and to adequately warn Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN of existing dangerous or defective conditions on the premises, including the presence of toxic mercury. ARCH breached this duty.

803.     While upon property owned and/or controlled by ARCH, Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN were exposed to large quantities of toxic mercury and mercury vapor.

804.     At all times complained of herein, ARCH knew or should have known large quantities of mercury were present upon their premises including in and upon equipment and materials with which Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN were working.

805.     At all times complained of herein, ARCH knew or should have known that Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN were exposed to dangerous levels of toxic mercury and mercury vapor at the SISTER FACILITY and/or FACILITY.

806.     At all times complained of herein, ARCH knew or should have known that the PPE provided to Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN would not adequately protect Plaintiff Contractor Worker and Plaintiff Direct Workers of OLIN from the dangerous levels of toxic mercury and mercury vapor at the SISTER FACILITY and/or FACILITY.

807.     ARCH knew or should have known that Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN would necessarily work with, around, or be in close proximity to toxic mercury and mercury vapor.

808.     At all times complained of herein, ARCH knew or should have known the exposure to, and inhalation of toxic mercury and that mercury vapor could cause severe illnesses, conditions, and diseases, as set forth herein. Those include, but are not limited to, neuropathy, memory loss, renal and hepatic failure, emotional dysregulation, cardiovascular diseases, loss of sensory abilities, seizures, attention and cognitive issues, reproductive injuries, depression, anxiety, and suicidality.

809.     At all times complained of herein, ARCH knew or should have known Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN were unaware of the dangers associated with toxic mercury exposure, or the full magnitude of that danger, and therefore were not capable of taking adequate measures to protect themselves and their co-workers.

810.     At all times complained of herein, ARCH failed to otherwise exercise control as owners or operators of the SISTER FACILITY and/or FACILITY in a manner calculated to maintain their premises free of exposure to toxic mercury and mercury vapor, an unnecessarily dangerous or defective condition, and thereby protect the health of the workers and their families.

811.     At all times complained of herein, ARCH failed to contain the toxic mercury and mercury vapor or to provide Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN with safe and adequate PPE so as to render the SISTER FACILITY and/or FACILITY safe.

812.    ARCH knew or should have known of the conditions set forth in the paragraphs above and at all times complained of herein were in a superior position to that of Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN to know the dangers of toxic mercury.

813.    ARCH was negligent in its failure to warn Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN, and other persons similarly situated, of the dangerous or defective condition of the materials, equipment, or premises brought about by the presence of toxic mercury.

814.    The actions or omissions of ARCH set forth in the paragraphs above of this Complaint were the cause of or were a significant contributing factor in bringing about the physical injuries set forth in this Complaint and all damages suffered by Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN resulting from these physical injuries.

815.    The Plaintiffs in this case have symptoms consistent with the symptomology of mercury intoxication. These symptoms have been detailed by Plaintiff in an attached exhibit. Please see Plaintiffs' Summary of Symptoms, Exhibit 44.

816.    Plaintiff Contractor Workers and Plaintiff Direct Workers of OLIN demand against ARCH, individually and jointly, compensatory and punitive damages, in such amounts as are properly determined by the trier of fact.

**Count XV- Negligence Per Se**

*All Plaintiff Contractor Workers against OLIN.*

817.    Plaintiff Contractor Workers repeat and re-allege all prior allegations of this complaint.

818.    It is imperative to Tennessee public policy that the state does not allow employers to waive the requirements of the standards required by OSHA.

819.    The statutes setting forth the OSHA regulations were enacted for the safety of workers, particularly those, like the Plaintiff Contractor Workers, working in positions that might expose them to hazardous chemicals. See paragraph 290.

820.    Plaintiff Contractor Workers were members of the class of persons the OSHA standards were intended to benefit and protect, as Plaintiff Contractor Workers engaged in work in or around the vicinity of the FACILITY and/or SISTER FACILITY where hazardous chemicals, including mercury, were located and used. See paragraph 290 to 326.

821.    This standard of care required by OSHA was set forth as a standard of conduct which was designed to avoid the harm Plaintiff Contractor Workers suffered.

822.    OLIN violated OSHA standards and in so doing, fundamentally breached its duty to Plaintiff Contractor Workers, and failed to comply with the standard of conduct set forth in OSHA's required standard of care.

823.    OLIN negligently failed to adhere to legally required manufacturing practices, and/or failed to adhere to governmental standards, rules and/or regulations with regard to Mandatory Medical Evaluations required by OSHA Standards, specifically the Respiratory Protection Program mandatory requirement to have medical evaluations prior to using a respirator, such as to constitute negligence per se. See paragraph 290 to 326.

824.    OLIN negligently failed to adhere to legally required manufacturing practices, and/or failed to adhere to governmental standards, rules and/or regulations with regard to

implementing a written respiratory protection program required by OSHA. See paragraph 290 to 326.

825.    OLIN negligently failed to adequately monitor and/or implement and/or perform medical evaluations prior to mercury monitoring and that OLIN breached the standard of care and/or impeded the medical standard of care by not adequately providing said services and/or by not disclosing to Plaintiff Contractor Workers.

826.    OLIN's violation of the statute is a direct and proximate cause of Plaintiff Contractor Workers' injuries as set out in this Complaint, in particular see Exhibit 44- Plaintiffs' Summary of Symptoms.

827.    As a direct and proximate result of OLIN's ongoing misrepresentations of material facts, especially those related to occupational safety and health. Plaintiff Contractor Workers reasonably relied upon the misrepresentations of material facts and were reasonably unaware of the relevant OSHA medical standards. This lack of awareness led to their continued exposure to dangerous levels of mercury, resulting in their continued employment at the FACILITY and/or SISTER FACILITY, and continued exposure to mercury, ultimately leading to Plaintiff Contractor Workers' personal injuries.

**RELIEF SOUGHT**

828.    Based on the foregoing, Plaintiff Workers and Plaintiff Family Members request that process issue and be served on the Defendants and that the Defendants be required to answer within the time set forth by law.

829.    In addition, Plaintiff Workers and Plaintiff Family Members demand compensatory and punitive damages against all Defendants individually and jointly, in such amounts as are properly determined by the trier of fact.

**830.** Furthermore, Plaintiff Workers and Plaintiff Family Members ask for their discretionary costs of the cause, for interest on the judgment at the legal rate, for such other relief as the Court deems appropriate, that court costs be adjudged against the Defendants, and that this case be tried to a jury on all issues.

Respectfully submitted,

SUMMERS, RUFOLO & RODGERS, P.C.

By:  s/Jimmy F. Rodgers, Jr.
TN BPR # 16876
735 Broad Street, Suite 800
Chattanooga, TN   37402-2913
phone:  (423) 265-2385
fax: (423) 266-5211
e-mail:  jrodgers@summersfirm.com
*Co-Counsel for the plaintiffs*

JOEY JAMES ATTORNEY AT LAW, LLC

By:  s/Joey K. James
        ASB: 9672S76J – Lead Counsel
By:  s/David A. Tomlinson
        ASB: 3984N73D
By:  s/Heather L. Stephens
        ASB: 1429A04F
By:  s/Jevon Reinke
        ASB: 8912K14G
412 South Court Street, 5th Floor
Florence, AL 35630
phone: (256) 246-2500
Fax:    (256) 246-1086
e-mail:        joey@joeyjameslaw.com
               david@joeyjameslaw.com
               heather@joeyjameslaw.com
               jevon@joeyjameslaw.com

*Co-Counsel for the plaintiffs*

*BUCKINGHAM, DOOLITTLE & BURROUGHS, LLC*

/s/ Jude B. Streb
Jude B. Streb (Ohio #0071529)
Joshua E. O'Farrell (Ohio #0087061)
Justin S. Greenfelder (Ohio #0077924)
4277 Munson Street NW
Canton, Ohio 44735
Telephone:    (330) 492-8717
Facsimile:    (330) 492-9625

E-mail:     jstreb@bdblaw.com
jofarrell@bdblaw.com
jgreenfelder@bdblaw.com

*Co-Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 5, 2026, a copy of this document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

s/Jimmy F. Rodgers, Jr.